UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                            :

BEASTIE BOYS, et al.,                       :

                         :       12 Civ. 6065 (PAE)
                   Plaintiffs,     :

                         :       <u>OPINION & ORDER</u>

            -v-                  :

                         :

MONSTER ENERGY COMPANY,        :

                         :

                   Defendant.    :

                         :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

       This case involves claims by the Beastie Boys, the hip-hop group, against Monster

Energy Company ("Monster"), the energy-drink company.  Specifically, the Beastie Boys, along

with affiliated plaintiffs,[1] bring claims of copyright infringement and of violations of the Lanham

Act, 15 U.S.C. § 1051 *et seq.*, and the New York Civil Rights Law (NYCRL) § 51, arising out of

Monster's allegedly unauthorized publication of a promotional video that used as its soundtrack

a remix including songs originally composed and recorded by the Beastie Boys.

       At issue presently is a third-party Complaint which Monster, after it was sued by the

Beastie Boys, brought against Zach Sciacca, a/k/a "Z-Trip," the disk jockey ("DJ") who, with the

Beastie Boys' permission, originally made the remix.  Z-Trip furnished the remix to Monster.

Monster's Complaint alleges that Z-Trip authorized Monster to make unrestricted use of the

remix, including the Beastie Boys' original compositions and recordings contained in it, in its

promotional video.  Monster sues Z-Trip for breach of contract and also for fraud, the latter

---

[1] The Beastie Boys are a New York partnership.  The other plaintiffs are Michael Diamond, a
Beastie Boys member known as "Mike D"; Adam Horovitz, a Beastie Boys member known as
"Ad-Rock"; Dechen Yauch, Executor of the Estate of Adam Yauch, a late Beastie Boys member
known as "MCA"; and Brooklyn Dust Music, an entity through which the Beastie Boys did
business.  The Court refers to the plaintiffs collectively as the "Beastie Boys."

based on the claim that Z-Trip falsely represented to a Monster employee that he had authority to permit Monster to use the remix for its own purposes.

Discovery is now complete.  Z-Trip moves for summary judgment on Monster's claims against him.  For the reasons that follow, the Court grants his motion for summary judgment, and dismisses Monster's third-party complaint.

## I.    Background

### A.  The Beastie Boys' Claims against Monster[2]

The Beastie Boys are a famous hip-hop group "from the family tree of old school hip-hop."  Beastie Boys, InterGalactic (Capitol Records 1998); *see also* Z-Trip Aff. ¶ 7; Levy Aff.

---

[2] The Court's account of the facts is derived from the parties' submissions in support of and in opposition to the instant motions, including the parties' respective Local Rule 56.1 Statements (Dkt. 38 ("Z-Trip. 56.1") and Dkt. 47 ("Monster 56.1")); the Affidavit of Zach Sciacca, a/k/a Z-Trip (Dkt. 36) ("Z-Trip Aff."); the Affidavit of Stuart L. Levy (Dkt. 36) ("Levy Aff.") and the exhibits attached thereto, including Exhibit A ("the Agreement"), Exhibit C ("the Video"), Exhibit D ("Phillips Dep."), and Exhibit I ("Silva Dep."); the Affidavit of Nelson Phillips (Dkt. 46) ("Phillips Aff."); and the Affidavit of Tanya C. Pohl (Dkt. 45) ("Pohl Aff.") and the exhibits attached thereto, including Exhibit D ("Z-Trip Dep.").  Citations to a party's 56.1 Statement incorporate by reference the documents cited therein.  Where facts stated in a party's 56.1 Statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

The following abbreviations are used herein for the parties' memoranda of law: (1) Third-Party Defendant's Motion for Summary Judgment (Dkt. 36) ("Z-Trip Br."); (2) Memorandum of Law of Plaintiffs in Support of the Third-Party Defendant's Motion for Summary Judgment (Dkt. 39) ("Beastie Br."); (3) Opposition to Third Party Defendant Zach Sciacca's Motion for Summary Judgment Dismissing the Third-Party Complaint (Dkt. 44) ("Monster Br."); and (4) Reply in Further Support of Third-Party Defendant's Motion for Summary Judgment (Dkt. 50) ("Z-Trip Reply Br.").

Ex. J.  Monster is the maker of the eponymous "Monster" energy drinks.  Monster 56.1 ¶ 44; Philips Aff. ¶ 2.

The Beastie Boys' claims against Monster arise out of events in 2012.  As part of its marketing efforts, Monster organizes and sponsors an annual snowboarding competition in Canada called "Ruckus in the Rockies."  Phillips Aff. ¶¶ 3, 5.  The competition "promote[s] the Monster lifestyle and brand."  *Id.* ¶ 5.  The 2012 event included an after-party, at which various DJs, including Z-Trip, performed.  Z-Trip Aff. ¶ 15.

On May 9, 2012, Monster posted a promotional video (the "Video") recapping that year's Ruckus in the Rockies, featuring the competition and the after-party, on its YouTube channel.  Phillips Aff. ¶ 20.  The Video used as its soundtrack excerpts from a remix of Beastie Boys songs (the "Megamix") which had been created by Z-Trip.  Z-Trip 56.1 ¶ 28; Monster 56.1 ¶ 28.  Z-Trip had previously created the Megamix, and posted it on his (Z-Trip's) website, with the Beastie Boys' permission.  The excerpt of the Megamix which Monster included in its Video included portions of four Beastie Boys songs:  "So Watcha Want," "Sabotage," "Looking Down the Barrel of a Gun," and "Make Some Noise."  Z-Trip 56.1 ¶ 28; Monster 56.1 ¶ 28.[3]  The credits on Monster's Video read, in pertinent part:

> MUSIC
> ALL-ACCESS BEASTIE BOYS MEGA MIX
> COURTESY OF Z-TRIP
>
> DOWNLOAD THE LINK FOR FREE AT
> ZTRIP.BANDCAMP.COM

---

[3] The promotional video may have also included a fifth Beastie Boys song, "Pass the Mic."  The Beastie Boys state that, after filing the Complaint, they realized that the Video also included excerpts of "Pass the Mic."  Beastie Br. 1 n.1.  For clarity's sake, this opinion refers to only the four songs, without prejudice to the Beastie Boys' right to pursue claims that its rights relating to "Pass the Mic" were also infringed.

Video at 3:52. The next screen of the credits read, "RIP MCA." *Id.* at 3:54. MCA was the stage name of Beastie Boys member Adam Yauch, who died on May 4, 2012, after a three-year battle with cancer.

It is undisputed that Monster never contacted the Beastie Boys, their management, or any agent or representative to obtain permission to use the Beastie Boys' music compositions, sound recordings, or marks in the Video. Z-Trip 56.1 ¶ 40; Monster 56.1 ¶ 40; Phillips Dep. 185.

On June 13, 2012, Monster received a letter from counsel for the Beastie Boys, stating that Monster did not have permission to use Z-Trip's Megamix in the Video, presumably because Monster lacked permission to use the underlying Beastie Boys music. Monster Br. 5, Phillips Aff. ¶ 21. Monster thereupon removed the Video from its YouTube channel, and edited the Video, replacing the Megamix excerpts with music from the band Swollen Members. Phillips Aff. ¶¶ 22–23.

## B. Procedural Background

On August 8, 2012, the Beastie Boys sued Monster. Dkt. 1. The Complaint alleges that the Beastie Boys partnership co-owns the copyrights to the sound recordings of the four Beastie Boys songs used in the Video and that plaintiff Brooklyn Dust Music co-owns the copyrights to the musical compositions of those four songs; Compl. ¶¶ 12–19.; and that Brooklyn Dust Music and the Beastie Boys partnership co-own the copyrights to other Beastie Boys songs used in the Megamix. *Id.* ¶¶ 22–56.

The Complaint alleges that Monster, all without the Beastie Boys' consent, "synchronized and recorded" certain Beastie Boys songs and included them in the Video; that Monster thereby sought to and did associate its products with the Beastie Boys' original work; that the Video text for the same purpose referenced the names "Beastie Boys" and "Adam

Yauch"; and that Monster posted links to the Megamix and the Video on various websites, so as to advertise and promote Monster's products, events, and corporate goodwill. *Id.* ¶¶ 58–68.

The Complaint asserts nine claims for copyright infringement, one claim for violation of the Lanham Act, and one claim for violation of New York Civil Rights Law § 51. The copyright claims consist of two for each of the four Beastie Boys songs used in the Video: one for infringement of the Beastie Boys partnership's sound recording copyright and one for infringement of Brooklyn Dust's musical work copyright. Compl. ¶¶ 70–100. Each of these eight claims alleges an "unauthorized reproduction, preparation of a derivative work . . . distribution to the public . . . and public performance" that was "intentional and willful." Compl. ¶¶ 70–100. The ninth copyright claim asserts multiple copyright infringements arising from Monster's posting of the Megamix on multiple websites. *Id.* ¶¶ 101–108. The Lanham Act claim alleges that Monster made unauthorized use of the mark "Beastie Boys" and "the marks comprised of the legal and professional names" of the individual Beastie Boys. *Id.* ¶¶ 109–117. The New York Civil Rights Law claim alleges that Monster made unauthorized use of the voices of Mike D. and Ad-Rock in connection with its advertising. *Id.* ¶¶ 118–122.

On October 4, 2012, Monster answered. Dkt. 5. Overwhelmingly, Monster's Answer denied the Complaint's factual allegations or denied knowledge sufficient to enable it to form a belief as to the truth of those allegations. Answer ¶¶ 1–122. Monster raised 12 affirmative defenses. Relevant here, several sought to deflect responsibility for any copyright infringement to Z-Trip, the disk jockey who had made the Megamix. In this vein, the Answer stated that any injury to the plaintiffs was due to Z-Trip's negligence, fraud or breach of contract; that Monster reasonably relied on Z-Trip's apparent authority as an agent for the Beastie Boys; and that Monster had received a license or permission, presumably from Z-Trip, to use the Beastie Boys'

music.  *Id.* at 13.  Monster also raised the defense of a failure to join a necessary party, again presumably Z-Trip.  *Id.* at 12.[4]

On October 5, 2012, Monster brought a third-party Complaint against Z-Trip.  It alleged that Z-Trip had caused any damage to plaintiffs for which Monster might be found liable, by contracting with Monster to allow it to make unrestricted use of the Megamix, and/or by fraudulently leading Monster to believe that he had authority to license Monster to use for its own purposes the Beastie Boys' recordings on the Megamix.  Dkt. 9.  Monster based these claims on a brief set of interactions, during Ruckus in the Rockies, between Nelson Phillips, a Monster employee, and Z-Trip.  As relief, Monster sought, from Z-Trip, indemnification, compensatory and punitive damages, costs, and fees.

### C.  Z-Trip's Motion for Summary Judgment

On August 1, 2013, following discovery, Z-Trip moved for summary judgment against Monster's Complaint.  Dkt. 36–38.  (Neither the Beastie Boys nor Monster moved for summary judgment on the Beastie Boys' claims against Monster; Monster did not move for summary judgment on its third-party claims against Z-Trip.)

In his motion, Z-Trip argues that, as a matter of law, he cannot have entered into a contract with Monster authorizing Monster to make the use it did of the Beastie Boys recordings on his Megamix, because (1) he lacked apparent authority to issue a license for the Beastie Boys' music and (2) his perfunctory exchanges with Phillips cannot be read to reflect agreement on material terms of such a license.  As to Monster's fraud claim, Z-Trip argues that summary

---

[4] Monster's other affirmative defenses were: lack of standing; lack of subject matter jurisdiction; failure to state a claim; preemption of the Lanham Act and state law claims; good faith; that the Beastie Boys could not recover for Monster's distribution of the Megamix "because there cannot be contributory infringement where there is no underlying direct infringement"; that statutory damages, if any, are limited to once for each work; and that damages, if any, are limited to once for each compilation in which the works are included.  *Id.* at 12–14.

judgment must be granted in his favor, because, *inter alia*, a reasonable person could not have believed that he had the authority to license the Beastie Boys' music for use by Monster.

On August 1, 2013, the Beastie Boys filed a memorandum in support of Z-Trip's motion. Dkt. 39. On August 22, 2013, Monster filed its opposition, Dkt. 40–43, with an exhibit redacted pursuant to a confidentiality order. On August 27, 2013, after obtaining the Beastie Boys' consent, Dkt. 48, Monster filed unredacted opposition papers. Dkt. 43–47. On September 9, 2013, Z-Trip filed a reply. Dkt. 49–50.

### D. Facts Relevant to the Motion for Summary Judgment

The following facts relevant to Z-Trip's motion for summary judgment have been adduced in discovery.

Zach Sciacca, who performs under the name Z-Trip, is "well-known and one of the best remix DJs." Phillips Aff. ¶ 7. In 2009, the Beastie Boys asked Z-Trip to create a remix of Beastie Boys' songs that fans could download for free to promote the Beastie Boys' then-upcoming album, "Hot Sauce Committee Part II." Z-Trip 56.1 ¶ 9; Z-Trip Aff. ¶ 10; Beastie Br. 2. In April 2011, Z-Trip released the 23-minute long "Megamix" on his website. Z-Trip 56.1 ¶ 10; Z-Trip Aff. ¶ 11. The Megamix consists of more than a dozen Beastie Boys' songs. Monster Br. 4.

Nelson Phillips is director of marketing for Monster's Canadian business unit. Phillips Aff. ¶ 1. He is responsible for planning Ruckus in the Rockies. *Id.* ¶ 3. Phillips completed one semester of college and worked in the forestry and ski industries before joining Monster. Phillips Dep. 7–9.

In February 2012, Phillips decided to book Z-Trip for that year's after-party. Phillips Aff. ¶ 7. On February 28, 2012, Z-Trip contracted with Monster to DJ the after-party for

$15,000 plus accommodations and transportation.  Z-Trip 56.1 ¶ 15; Z-Trip Aff. ¶¶ 13–14; Agreement at 1.

On May 5, 2012, Ruckus in the Rockies was held.  Phillips Aff. ¶ 9.  Snowboarders competed.  *Id.*  Z-Trip and other DJs performed.  Z-Trip Aff. ¶ 15.  Monster videotaped the event, including Z-Trip's performance.  Z-Trip 56.1 ¶ 17; Z-Trip Aff. ¶ 19.

That night, before Z-Trip's performance, Z-Trip and Phillips had a brief conversation in the green room of the Lake Louise Lodge.  Z-Trip Aff. ¶ 18; Phillips Aff. ¶ 11.  Phillips testified that the conversation lasted between four and five minutes, mostly devoted to the possibility of collaboration on future projects, but also with a 30-second segment related to the Megamix.  Phillips Aff. ¶ 11.  Phillips testified that he "asked Mr. Sciacca [Z-Trip] if he had any music that Monster could use for a web edit of the Ruckus in the Rockies event.  Mr. Sciacca told me yes.  He indicated that he had made a Megamix that was available on his website and it could be downloaded for free."  *Id.*; *see also* Phillips Dep. 206 ("Q.  How brief was the – how long is 'brief'?  A.  As simple as what I told you.  I asked him if he had any music that we could use.  He said there it is on my website, download it.  Q.  So we're talking about 30 seconds?  A.  Ish, yes.").[5]

On either May 6 or May 7, 2012, Z-Trip and Phillips had breakfast together.  Z-Trip Aff. ¶ 22; Phillips Aff. ¶ 12.  They spent most of the time discussing future collaborations.  Phillips Aff. ¶ 12; Z-Trip Aff. ¶ 23.  They also briefly discussed the Video.  Phillips testified that the conversation related to the Megamix: "I had a follow up conversation with Mr. Sciacca regarding

---

[5] Z-Trip's recollection is different.  He testified that the conversation occurred moments before Z-Trip went on stage, lasted only 30 seconds, and consisted entirely of his complaining to Phillips that certain drinks that were supposed to be in the green room were not there.  Z-Trip Aff. ¶ 28.  On Z-Trip's motion for summary judgment, the Court considers the facts in the light most favorable to Monster, *i.e.,* the facts to which Phillips attested.

the use of his Megamix for the Video.  I told Mr. Sciacca that I would send him the Video after the first edit was complete.  I also told him that we would not publish the Video until he was completely satisfied with it and approved it.  Mr. Sciacca indicated his agreement."  Phillips Aff. ¶ 12.[6]

After the breakfast, Phillips went to Z-Trip's website and listened to the Megamix. Phillips Aff. ¶ 13.  Phillips testified that, based on Z-Trip's having directed him to his website and Z-Trip's representation that the Megamix was available for free, Phillips "believed that Mr. Sciacca had given me permission to use his Megamix as part of the soundtrack for the Video." *Id.* ¶ 14.  On that understanding, Phillips and the videographer then selected the portions of the Megamix to use in the video.  *Id.* ¶ 15.  Phillips testified that he did not believe he needed anyone else's approval to license the music on the Megamix for Monster's promotional Video, "[b]ecause Mr. Sciacca, who held himself out to be the creator of the Megamix, represented that it was permissible for me to use his Megamix."  *Id.* ¶ 16.  Indeed, Phillips testified, his view was that, because Z-Trip's remix was "available for free download on his website . . . it's there for use.  For free."  Phillips Dep. at 181, 183.  *See also id.* at 183–184 ("Q.  For any use.  By anybody.  A.  Yes.  Q.  Whether it's your home video or a video promoting Monster products.  A.  Yes.").

On May 8, 2012, at 11:47 p.m., Phillips sent Z-Trip the following email:

---

[6] In his testimony, Z-Trip, who maintains that the act of recording his DJ performance on video violated his contract with Monster, Z-Trip Aff. ¶ 20, Agreement ¶ 8, portrayed that conversation as focused on this subject, not the use of the Megamix:  "[T]he issue of the unauthorized videotaping was briefly discussed.  [Phillips] stated that his cameraman had captured good footage of the concert and that I would like what was being prepared from the footage.  He promised to send me a tape for review.  At that time I had no clue as to what he was planning on sending me, but I told him to send whatever he wanted."  Z-Trip Aff. ¶¶ 22–23.

> Hey Zach,
> Please have a look at the video from this past weekend and let me know if you approve.
> (I think we'll remove the logo[]s at the end since they're redundant and the rest will get cleaned up just a little bit more.)
> Thanks again for an amazing weekend!!
> Once you approve, we'll post on youtube and notify our 16M fans on fb [Facebook].
> the password is: ruckus
> http://vimeo.com/41825355

Levy Aff. Ex. B.  On May 9, 2012, at 3:50 a.m., Z-Trip replied:

> Dope!
> Maybe at the end when you put up the info about my Beasties mix, you could post below it "Download the mix for free at http://ztrip.bandcamp.com"
> That way people can pause it and go get it if they want… Also maybe a proper link on the description they can click thru once it's posted proper?
> Dope though… Love the can at the end.
> No 45 footage?
> And, btw [by the way]… Thanks again for everything… still high off the weekend!
> Z

*Id.* (ellipses in original).

Phillips and Z-Trip testified to different understandings of the meaning of Phillips's email and Z-Trip's response.  Phillips testified that, "[b]ecause both [Z-Trip's] Megamix and his image were used in the Video, I believed that Monster needed [Z-Trip's] approval to use his Megamix in the Video in addition to using his image."  Phillips Aff. ¶ 18.  Therefore, Phillips testified, his purpose in sending the email was to get Z-Trip's "approval that [he] appeared in the way that [he is] comfortable with."  Phillips Dep. at 128; *see also id.* at 129 ("Q.  And is that the e-mail that you were just referring [to] where you wanted to get his approval as to his appearance in the video?  A.  Yup.").  As to Z-Trip's response, Phillips testified, he understood the word "Dope" to "indicate[] [Z-Trip's] approval of the entire Video and all elements, including the use of his Megamix and his image."  Phillips Aff. ¶ 19.  Further, Phillips testified, he viewed Z-Trip's suggestion that the Video include a link to his website as being "in exchange for the use of his Megamix."  *Id.*

Z-Trip, by contrast, testified that, upon receiving the Video, he "was surprised that excerpts of the Megamix were used as the soundtrack," both because the Megamix had not played at the Ruckus in the Rockies and because "no one from Monster Energy had ever asked whether portions of the Megamix could be downloaded for use in a video." Z-Trip Aff. ¶ 26. He testified that he assumed that Phillips' purpose in sending him the Video for review was merely "to rectify his error in not having obtained my approval to videotape my performance prior to my having begun my concert." *Id.* ¶ 28. As for his email response, Z-Trip testified, he used the word "Dope!" to "convey that I liked how I appeared in the Video." *Id.* ¶ 29.

On May 9, 2012, Phillips emailed Z-Trip to tell him that the Video had been posted on Monster's YouTube channel. Pohl Aff. Ex. B. Z-Trip again replied, "Dope!!!" *Id.*

On June 5, 2012, Z-Trip emailed his manager, Lorrie Boula:

> Lorrie,
> I feel really, really bad about this whole thing. I would never do anything intentionally to harm the Beasties, ever.
> The dude asked me when we were boarding and hanging. I thought a promo video about me was cool. I told him to reach out to you like always.
> I don't know what went down on the Monster side, but I figured they'd also reach out to the Beasties to clear their tunes too. . . Didn't know they didn't.
> I feel incredibly bad for having even the slightest bit of involvement in any of this.
> Please apologize to the Beasties entire camp for me, I feel like shit.
> Sorry,
> Zach

Pohl Aff. Ex. C. (ellipses in original).

## II.     Applicable Legal Standards

### A.   As to Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a

question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008). To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003)).

### B. As to Copyright

The copyright statute represents "a federal grant of a property interest in the production, replication, publication, and distribution of certain classes of 'original works of authorship fixed in any tangible medium of expression,' including musical compositions." *Davis v. Blig*e, 505 F.3d 90, 98 (2d Cir. 2007) (quoting 17 U.S.C. § 102(a)). "Copyright in a work protected under [the Copyright Act] thus initially vests in the author or authors of the work." *Id.* (quoting 17 U.S.C. § 201(a)). "Like other forms of property ownership, copyright ownership is a bundle of discrete rights regarding the owner's ability to use his property . . . each of which may be transferred and owned separately." *Id.* (citations omitted). "These rights include 'reproduc[ing,]' 'prepar[ing] derivative works,' 'distribut[ing,]' 'perform[ing,]' or 'display[ing]' a creative work." *Id.* (quoting 17 U.S.C. § 106). "[A]n owner may sue for infringement those who exploit the creative work without permission or assignment." *Id.*

Copyright owners "may license others to exercise these rights or assign the rights to others." *Id.* "There are two general categories of licenses: non-exclusive licenses, which permit licensees to use the copyrighted material and may be granted to multiple licensees; and exclusive licenses, which grant to the licensee the exclusive right—superior even to copyright owners' rights—to use the copyrighted material in a manner as specified by the license agreement." *Id.* at 99. Important here, when a copyright owner grants a non-exclusive license, the owner retains the ownership over his copyright, and may still sue unauthorized users for infringement. *See id.* at 101 ("A non-exclusive license conveys no ownership interest."). A copyright owner's exclusive right to reproduce his work includes the exclusive right to authorize synchronization of a copyrighted sound recording with an audiovisual work, *e.g.*, to authorize the use of a song in a movie or commercial soundtrack. *ABKCO Music, Inc. v. Stellar Records, Inc.*, 96 F.3d 60, 62 n.4 (2d Cir. 1996). "Incorporation of [a] sound recording without permission violate[s] [the copyright owners'] reproduction right." *Agee v. Paramount Commc'ns, Inc.*, 59 F.3d 317, 324 (2d Cir. 1995).

## III. Discussion

As noted, Monster brings claims against Z-Trip of both contract breach and fraud. Z-Trip moves for summary judgment on both.

### A. Contract

"To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound."[7] *Peterson v. Regina*, 935 F. Supp. 2d 628 (S.D.N.Y. 2013) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004)).

---

[7] Both parties apply New York law in their submissions. Such law applies to all claims here: Where "[t]he parties' briefs assume that New York law controls . . . such 'implied consent . . . is

Monster argues that "the oral conversations and emails between Phillips and [Z-Trip] formed a contract." Monster Br. 8. The terms of the contract, according to Monster, were that "[i]n exchange for promotion on the Video and Monster's placement of a link, to his website containing the Megamix, on its website, [Z-Trip] provided that Monster could use his Megamix for free." *Id.* at 16. And, because Monster's use of the Megamix (containing as it did original recordings and songs of the Beastie Boys) implicated the copyright rights of the Beastie Boys, Monster argues that Z-Trip represented to Monster that he had the authority to license third parties such as Monster to themselves use the Beastie Boys' original recordings that were contained on the Megamix. Monster argues that Z-Trip breached this agreement because Z-Trip did not, in fact, convey to it a valid license.

In moving for summary judgment, Z-Trip argues that the admissible evidence would not permit a trier of fact to find a binding contract on these terms between him and Monster. The Court agrees with Z-Trip. The only relevant evidence is (1) the testimony by Phillips and Z-Trip about their fleeting oral communications during "Ruckus in the Rockies" and (2) their ensuing email exchange. Even viewing this evidence in the light most favorable to Monster, a reasonable juror could not find an offer, sufficiently clear acceptance, or consideration, *e.g.*, a legal duty which Monster incurred to Z-Trip, let alone all three. *See Restatement (Second) of Contracts* § 1 (1981) ("A contract is a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty.").

### 1. Offer

An offer is "[a] promise to do or refrain from doing some specified thing in the future, conditioned on an act, forbearance, or return promise being given in exchange for the promise or

---

sufficient to establish choice of law.'" *Wolfson v. Bruno*, 844 F. Supp. 2d 348, 354 (S.D.N.Y. 2011) (quoting *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000)).

its performance; a display of willingness to enter into a contract on specified terms, made in a way that would lead a reasonable person to understand that an acceptance, having been sought, will result in a binding contract." Black's Law Dictionary (9th ed. 2009).

There are four communications between Phillips and Z-Trip during which, conceivably, an offer could have been made: the green room conversation, the breakfast conversation, and the emails of May 8 and 9, 2012. Monster is, tellingly, noncommittal as to at which one of these the supposed offer was made. But the events at none could be plausibly read to involve an offer.

In the green room, Phillips testified, he "asked [Z-Trip] if he had any music that Monster could use for a web edit of the Ruckus in the Rockies event." Phillips Aff. ¶ 11. That, however, was a question; it was not an offer. In response, Phillips testified, "[Z-Trip] told me yes. He indicated that he had made a Megamix that was available on his website and it could be downloaded for free." *Id.* Z-Trip's response, at most, could be taken as a factual representation as to Monster's ability to download the Megamix. In no sense was it an offer to engage in a contract, let alone the one posited by Monster. It did not specify any legal duty that Monster took on in consideration for permitting the download. And, even if it had, the right ostensibly offered to Monster, to download the Megamix, is a far cry from the rights that Monster claimed it obtained from Z-Trip: to reproduce, for its own commercial purposes, including on various websites, the original recordings and songs of the Beastie Boys contained on the Megamix. Quite the contrary, the exchange in the green room is devoid of any discussion or acknowledgment of such rights.

At breakfast, Phillips testified, he "had a follow up conversation with [Z-Trip] regarding the use of his Megamix for the Video. I told [Z-Trip] that I would send him the Video after the first edit was complete. I also told him that we would not publish the Video until he was

completely satisfied with it and approved it. [Z-Trip] indicated his agreement." *Id.* ¶ 12. This conversation, too, however, does not propose a bilateral exchange, let alone one in which Monster offered consideration in exchange for a license to use, in the manner it ultimately did, the Beastie Boys' recordings on the Megamix.

On May 8, 2012, Phillips emailed Z-Trip:

Hey Zach,
Please have a look at the video from this past weekend and let me know if you approve.
(I think we'll remove the logo[]s at the end since they're redundant and the rest will get cleaned up just a little bit more.)
Thanks again for an amazing weekend!!
Once you approve, we'll post on youtube and notify our 16M fans on fb [Facebook].
the password is: ruckus
http://vimeo.com/41825355

Levy Aff. Ex. B. This, too, was not an offer of contractual terms: It did not specify the legal duties that Monster was offering to undertake. Nor did it use language remotely sufficient to support a finding that Phillips was proposing to acquire, from Z-Trip, the right to use the underlying copyrighted material owned by the Beastie Boys. And, contrary to Monster's claim in opposition to summary judgment, no reasonable jury could find, in Phillips' statement that he would post the remix on YouTube, an offer of an exchange of promises. Read naturally, Phillips' email was instead merely describing his intended conduct.

Finally, there is Z-Trip's response to Phillips's email, sent on May 9, 2012, at 3:50 a.m.:

Dope!
Maybe at the end when you put up the info about my Beasties mix, you could post below it "Download the mix for free at http://ztrip.bandcamp.com"
That way people can pause it and go get it if they want… Also maybe a proper link on the description they can click thru once it's posted proper?
Dope though… Love the can at the end.
No 45 footage?
And, btw [by the way]… Thanks again for everything… still high off the weekend!
Z

*Id.* (ellipses in original). But Z-Trip's email response did not constitute the offer that was a necessary predicate for contract formation. A reasonable jury could not read it to propose mutual promises in consideration for each other. Rather, Z-Trip's suggestion that Phillips include a link to his website—prefaced and qualified with the word "maybe"—cannot fairly be read as any more than that, a suggestion. The exchange of emails would not have imposed on Monster, in return for posting the video, a legal duty to Z-Trip to post a link to his website.

## 2. Acceptance

There is, in any event, no evidence on which a reasonable juror could find acceptance of contractual terms. Monster appears to argue that Z-Trip's use of the exclamation "Dope!" at the beginning of the May 9, 2012 email reflected his acceptance. Monster Br. 13. But that argument fails for at least two reasons. First, as noted, there was no clear and reasonably specific offer that preceded it. There was, therefore, nothing for Z-Trip to accept. Second, viewed in context, the word "Dope!" as used by Z-Trip was not "'clear, unambiguous and unequivocal,'" as required under New York law. *Transition Investments, Inc. v. The Allen O. Dragge, Jr. Family Trust*, No. 11 Civ. 04775 (AJN), 2012 WL 1848875, at *6 (S.D.N.Y. May 21, 2012) (quoting *Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 83 (2d Cir. 1998)). In proper context, the word "Dope!" could certainly be taken as an expression, albeit unorthodox, of approval and acceptance of another's antecedent offer. But here, Z-Trip's exclamation, "Dope!" was in response to Phillips's query, "Please have a look at the video from this past weekend and let me know if you approve." Levy Aff. Ex. B. Viewed in this context, Z-Trip's response of "Dope!" plainly communicated that, in some sense, he "approve[d]" of "the video." But such approval is quite distinct from conveying assent to a mutual exchange of promises or other consideration. And it certainly did not convey that Z-Trip had authority to approve, on behalf of the Beastie Boys, a

free license to Monster to use the Beastie Boys' recordings and songs.  There is no fair reading of the facts under which Z-Trip, by exclaiming "Dope!," accepted such a contractual offer.  Z-Trip's locution, although memorable, was entirely too enigmatic and elliptical to constitute the "clear [and] unambiguous" acceptance necessary for contract formation.

### 3.  Consideration

The supposed contract also fails for lack of consideration.  Conceivably, as Monster argues, Z-Trip stood to benefit from Monster's linking its Video to his website.  Monster Br. 13–14.  But a fair reading of the email exchange between Phillips and Z-Trip is that any such benefit was incidental.  The sparse communications between the two cannot be read to imply a binding promise by Monster in exchange for Z-Trip's approval of its proposed use of the Megamix.  Had Monster decided not to post the Video, or to post it but not include a link to Z-Trip's website, Z-Trip would not have been able to claim a breach of an actionable agreement.  Indeed, although Monster emphasizes that "consideration can consist of an exchange of promises," *id.* at 14, tellingly, it never argues that Monster made an actual promise to Z-Trip.

### 4.  Terms

Finally, even if an offer and acceptance of an exchange of promises constituting consideration could be found in Phillips' sparse communications with Z-Trip, no reasonable person could understand Z-Trip to have granted Monster the rights necessary here—to wit, a license on behalf of the Beastie Boys to use the underlying copyrighted material owned by the Beastie Boys, or, as Monster alternatively appears to posit, indemnification against a future suit by the Beastie Boys for violating such copyrights.  The two men's communications could not remotely support such a conclusion.  It would take an heroic effort of explication to derive such a conclusion from their words and informal email exchanges.  And to read Phillips's or Z-Trip's

words to convey a contract to cede Monster such rights would flout common sense. Phillips, a former forestry and ski-industry worker with no evident legal expertise, never raised any such questions with Z-Trip, or reflected any awareness of the copyright interests that Monster would need to acquire or license to bring the promotional Video it contemplated into compliance with copyright law. It is implausible to imbue his statements with appreciation of the relevant copyright concepts and an intent to acquire, from the Beastie Boys, the necessary license.

Further, the Beastie Boys, as owners of the copyrights to the underlying songs, *see* Z-Trip 56.1 ¶ 3, Levy Aff. Ex. I (Silva Dep.) 34–56, held the exclusive right to authorize Monster to "reproduce," "prepare derivative works," "distribute," and publicly perform the music, 17 U.S.C. § 106, including by synchronizing it with an audiovisual work such as the Video. *ABKCO Music, Inc. v. Stellar Records, Inc.*, 96 F.3d 60, 62 n.4 (2d Cir. 1996). Z-Trip was never a member of the Beastie Boys, Z-Trip 56.1 ¶ 6, Z-Trip Aff. ¶ 9, Phillips Dep. 205, and did not hold any Beastie Boys copyrights, Z-Trip 56.1 ¶ 7, Z-Trip Aff. ¶ 9. And the summary judgment record does not supply any credible basis on which Phillips, even had he been savvy to his employer's necessary licensing needs, could reasonably conclude that Z-Trip had the right to license third parties such as Monster to use the underlying copyrighted material owned by the Beastie Boys.

The evidence thus, in multiple respects, precludes finding a contract between Monster and Z-Trip. On Monster's third-party claim of a breach of such a contract, summary judgment thus must be granted for Z-Trip.

**B. Fraud**

"Proof of fraud under New York law requires a showing that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the

19

plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Matana v. Merkin*, No. 13 Civ. 1534 (PAE), 2013 WL 3940825 at *12 (S.D.N.Y. July 30, 2013) (quoting *Wall v. CSX Transp., Inc.,* 471 F.3d 410, 415–16 (2d Cir. 2006)). Here, Monster asserts that Z-Trip defrauded it when, after Phillips asked Z-Trip "if he had any music that Monster could use as the soundtrack to the Video," Z-Trip "told Phillips that Monster could use his Megamix." Monster Br. 17. Monster faults Z-Trip for failing to disclose the fact, known to him during the relevant time "that he did not have permission to license his Megamix because it contains Beastie Boys music." *Id.*

Viewed in light of the factual record assembled in discovery, Monster's claim of fraud is risible. First, Monster has not adduced *any* evidence tending to show that Z-Trip acted with fraudulent intent. Monster argues that a fact-finder could infer fraudulent intent because (1) Z-Trip knew that he lacked permission to authorize the synchronization of his Megamix but did not volunteer this to Phillips; and (2) Z-Trip's general practice, when asked about music to accompany a video, is to refer people "to music that is … stuff I own," but he did not do so here. *Id.* at 17–18 (quoting Z-Trip Dep. 113).[8] But no reasonable fact-finder could possibly infer fraudulent intent on Z-Trip's part from his silence on these points.

Viewed charitably to Phillips, his assembled communications with Z-Trip are instead consistent at best with a miscommunication. Phillips did not make at all clear to Z-Trip, and Z-Trip plainly did not appreciate that Phillips might not be aware, that Monster needed certain licenses in connection with its creation and intended use of the promotional video. Nor did

---

[8] Z-Trip testified: "If anybody ever asks me about music to accompany with a video, I usually refer them to music that is either stuff I own or stuff that—well, basically that's it, only stuff I own. . . . if somebody comes asking for anything that I worked on that I don't own the copyright to, I'm distinctive in telling them that's great, but I don't own the copyright. You would have to get that cleared." Z-Trip Dep. 113.

Phillips make clear to Z-Trip that Monster believed that Z-Trip had authority to convey such licenses on the Beastie Boys' behalf, and that he had done so by his idiomatic shorthand "Dope!" Alternatively viewed, Monster's decision to delegate to Phillips alone the responsibility by which Monster was to acquire, for commercial exploitation, various intellectual rights presumptively belonging to an iconic band was reckless. On the record before the Court, Monster had no business entrusting such matters to Phillips. It is, in fact, quite unseemly for Monster, rather than taking responsibility for its own lack of care, to argue now that any liability it may have to the Beastie Boys in copyright was somehow a product of a fraud perpetrated by a disk jockey, Z-Trip.

Further undermining Monster's claim of fraud, Monster has not adduced any evidence of any motive for Z-Trip to defraud Monster. Quite the contrary, the evidence on the summary judgment record is that Z-Trip and Monster were developing a business relationship, Phillips Aff. ¶ 12; Z-Trip Aff. ¶ 23, which could only be undermined by an ostensible deliberate attempt by Z-Trip to defraud Monster. Z-Trip had every incentive to keep Monster and the Beastie Boys happy. And Z-Trip's later conduct, ruing his failure to prevent Monster's misuse of the Beastie Boys' original recordings from occurring, is not easily consistent with fraud. Pohl Aff. Ex. C ("Please apologize to the Beasties entire camp for me, I feel like shit."). To be sure, Z-Trip did stand to benefit from the exposure he would get from the Video. But any such exposure would have been much greater had Monster had obtained the lawful rights it, apparently, needed to the Beastie Boys songs, so as to prevent the circumstance in which Monster would have to hurriedly take down the Video upon detection by the Beastie Boys.

Separately, viewing the evidence in the light most favorable to Monster, a reasonable juror could not find that Monster reasonably relied on Z-Trip's allegedly fraudulent statements.[9] Phillips, being apparently uninformed about copyright and the need for appropriate licensure, conceivably may have believed, after his brief exchanges with Z-Trip, that all was well. But that is not the pertinent inquiry. The standard for reasonable reliance is not measured by the effect on an employee with no apparent qualifications to negotiate complex matters of licensing and copyright law. The two conversations and one email exchange between the two men—short, casual, and vague—did not supply a reasonable basis on which Monster, a major corporation, could conclude that it had obtained the necessary license to make use for its own purposes of the Beastie Boys' original recordings. *See Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997) ("[I]f the plaintiff has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations.") (citation omitted). Monster has not made any credible argument why it was reasonable to rely on Z-Trip's colloquialisms as a basis to conclude it had obtained from him the necessary licenses.

Further, the summary judgment record is devoid of evidence that Monster undertook any effort to investigate these matters. Phillips did not inquire of Z-Trip whether he had any authority from the Beastie Boys to license their original works, including to authorize use of their

---

[9] Monster attempts to argue that reasonable reliance is an issue of fact that cannot be determined on summary judgment, but there is no rule of law to this effect. The case Monster cites, *JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393 (S.D.N.Y. 2004), states only that, "[w]here the reasonableness of reliance depends upon factual determinations that . . . remain in dispute after discovery, the fraud claim should not be summarily dismissed on that ground." *Id.* at 413 (citation omitted). But whether the issue "remain[s] in dispute after discovery" is a case-specific question. Here, the issue does not so remain.

music in a video.  Phillips Dep. at 179.  Indeed, Phillips testified that he was not even thinking about licensing during his interactions with Z-Trip.  *Id.* at 181.  Rather, Phillips testified, he believed that, because Z-Trip's remix was "available for free download on his website . . . it's there for use.  For free."  Phillips Dep. at 181, 183.  *See also id.* at 183–184 ("Q.  For any use.  By anybody.  A.  Yes.  Q.  Whether it's your home video or a video promoting Monster products.  A.  Yes.").  That is not the law.  Monster's reliance on Phillips to protect its interests in these matters was perforce unreasonable.

In sum, if Monster is liable to the Beastie Boys, it may not shift legal responsibility for such lapses to Z-Trip.[10]  Any such liability on Monster's part would arise instead because Monster left these matters in the hands of an employee insensitive to the legal issues presented by making derivative use of, and commercially exploiting, the Beastie Boys' original work.  In musical terms, Z-Trip can now, therefore, rest at least "as cool as a cucumber in a bowl of hot sauce," because Monster's Third-Party Complaint against him has "got the rhyme and reason but no cause."  Beastie Boys, So Watcha Want (Capitol Records 1992).  It is therefore dismissed, with prejudice.

## CONCLUSION

Third-party defendant Sciacca's motion for summary judgment is granted.  The Clerk of Court is respectfully directed to dismiss him from this case and to terminate the motion pending at docket number 36.

---

[10] This does not necessarily mean, of course, that Phillips's interactions with Z-Trip are legally irrelevant to the dispute between the Beastie Boys and Monster.  The Beastie Boys have alleged, for example, that Monster's alleged infringements were "willful." Compl. ¶¶ 70–100.  If established, this would increase the available statutory penalties for infringement.  17 U.S.C. § 504(c)(2).  Monster disputes that any infringement was willful.  Answer at 13.  The interactions between Phillips and Z-Trip may well be relevant to proof of willfulness.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: November 4, 2013
       New York, New York