```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/7/2014
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

BEASTIE BOYS, et al.,

                      Plaintiffs,

                -v-

MONSTER ENERGY COMPANY,

                      Defendant.

------------------------------------------------------------X

12 Civ. 6065 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

Trial in the above-captioned case is scheduled to begin on Tuesday, May 27, 2014. Plaintiffs (the "Beastie Boys") seek to offer expert testimony from Lisa Thomas concerning (1) the fair market value of a license to use the musical composition and sound recordings included in the allegedly infringing video at issue in this case (the "Video") and (2) the fair market value of the implied endorsement allegedly created by the use of the Beastie Boys' names and trademarks in the Video by defendant Monster Energy Company ("Monster"). Thomas's testimony has been the subject of several motions *in limine*; in response to the Court's rulings, the Beastie Boys have presented a modified expert report from Thomas. For the third time, Monster moves *in limine* to preclude Thomas's testimony. For the reasons that follow, that motion is denied, except to the extent that Thomas proposes to offer testimony based on the settlement agreement in *GoldieBlox, Inc. v. Island Def Jam Music Group et al.*, Case No. 4:13-CV-05428-DMR (N.D. Cal. filed Nov. 21, 2013) ("*GoldieBlox*"). The Court will not permit such testimony. *See infra* Section III.A.2.

I.      **Procedural Background**

The Court assumes familiarity with the facts and prior history of this case, which has been the subject of a number of decisions, *see* Dkts. 51, 89, 90, 96, and briefly recounts here only the background relevant to the instant motion.  On February 13, 2014, Monster moved to preclude Thomas from testifying at trial.  Dkt. 63.  On March 6, 2014, after briefing, the Court denied Monster's motion, except that it directed that, for Thomas to testify, she would have to revise her report so as to no longer base its estimate of the value of the license and of the implied endorsement on a perpetual term of use, but instead on a term of use matching the approximately five weeks that Monster allegedly used the Beastie Boys' songs to promote its brand.  Dkt. 89 ("*Thomas I*") at 5–7.  The Court also allowed Monster to re-depose Thomas in light of her revised report.  *Id.* at 7.

On March 19, 2014, after Thomas had revised her report, *see* Dkt. 92 Ex. B ("Revised Thomas Report"), Monster again moved to preclude Thomas from testifying at trial, this time on the ground that the revised report did not comply with *Thomas I*.  Dkt. 92.  After briefing, the Court again denied Monster's motion:

> Thomas's revised report, as explained by the Beastie Boys and by Thomas's declaration, appears to reflect a good faith effort to comply with the Court's March 6, 2014 order, and to remove the flawed assumption of a perpetual term of use which deprived Thomas's original report of the requisite "good grounds for [its] conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). Although Monster is entitled to be skeptical of Thomas's conclusions, the Court no longer perceives methodological shortcomings that render Thomas's opinions inadmissible based on the principles articulated in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and its progeny. Monster is, of course, fully at liberty to develop—at Thomas's deposition and at trial—its argument that Thomas's conclusions are unpersuasive.

Dkt. 96 ("*Thomas II*").

On April 18, 2014, after Monster had re-deposed Thomas, *see* Dkt. 114 Ex. C. ("Thomas Supp. Dep."), Monster again moved to preclude Thomas's testimony, Dkt. 109, and filed an accompanying memorandum of law, Dkt. 110 ("Monster Br."). On April 25, 2014, the Beastie Boys filed a memorandum of law in opposition. Dkt. 113 ("Beastie Br."). On April 28, 2014, the Court directed the parties to provide it with further details regarding the *GoldieBlox* settlement, which Thomas had identified as among the bases she relied upon in reaching her opinion about valuation. Dkt. 115. On April 30, 2014, the parties did so. Dkt. 117 ("Beastie *GoldieBlox* Letter"); Dkt. 118 ("Monster *GoldieBlox* Letter").

## II.   Applicable Legal Standards

"[T]he Rules of Evidence . . . assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. The Court's task "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). "[A] trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence 'an apples and oranges comparison.'" *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213–14 (2d Cir. 2009) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)). Additionally, "[a]n expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006), *aff'd on other grounds,* 552 U.S. 312 (2008). Pursuant to Federal Rule of Evidence 403, the Court may also exclude evidence if its probative

value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

### III. Discussion

#### A. The Fair Market Value of the Copyright License

Monster argues that Thomas's testimony concerning the fair market value of the copyright license should be precluded for two reasons: because Thomas's evaluation is so vague as to be illusory, and because she improperly relied on the *GoldieBlox* settlement.

##### 1. Whether Thomas's Evaluation is Illusory

Monster first argues that Thomas's evaluation of the copyright license is so vague as to be illusory, because (1) her report states that the license is worth "at least" $1 million, and (2) at her supplemental deposition, after persistent questioning, she stated that the license could be worth up to $10 million. Monster Br. 3–5 (referring to Revised Thomas Report 18 and citing Thomas Supp. Dep. 385–388). However, a full reading of Thomas's report and her deposition reveals that Thomas's opinion is not as vague as Monster suggests. Thomas clearly states that her best estimate of the fair market value of the license is $1 million. She is not fairly faulted for acknowledging the inherent uncertainty in estimating the value of a unique, intangible good. In acknowledging that uncertainty, Thomas, in fact, keeps company with the Second Circuit, which, when it first approved the method of measuring a copyright holder's actual damages through the fair market value of a hypothetical license fee, recognized the difficulty of that exercise. *See Davis v. The Gap, Inc.*, 246 F.3d 152, 166–67 (2d Cir. 2001) ("We recognize also that finding the fair market value of a reasonable license fee may involve some uncertainty. But that is not sufficient reason to refuse to consider this as an eligible measure of actual damages. Many of the

accepted methods of calculating copyright damages require the court to make uncertain estimates in the realm of contrary to fact."). The Court is unpersuaded that Thomas's testimony will confuse the jury: Ordinary people understand what it means when a seller says her product is worth "at least" a certain amount.

Monster is at liberty, of course, to challenge Thomas's conclusions as unpersuasive, and in the service of such an argument may, if it finds it productive to do so, elicit before the jury that Thomas's view is that the implied license at issue might be worth more than her best estimate of $1 million. But the fact that Thomas holds that view does not make her testimony excludable as unreliable.

### 2. The *GoldieBlox* Settlement

Monster next argues that Thomas has impermissibly relied on the *GoldieBlox* settlement agreement. Monster Br. 5–6. Although Monster is wrong to argue that Thomas's reliance on this settlement is cause to preclude her testimony in its entirety, the Court strongly agrees that it would be improper, under Federal Rules of Evidence 403 and 702, for Thomas to testify concerning the *GoldieBlox* settlement.

By way of background, GoldieBlox, Inc. ("GoldieBlox") identifies itself as "a toy company founded upon the principle of breaking down gender stereotypes, by offering engineering and construction toys specifically targeted to girls." Monster *GoldieBlox* Letter Ex. A ("*GoldieBlox* Compl.") ¶ 1. On November 18, 2013, GoldieBlox published, on its website and on YouTube, a video which "depicts three diverse girls rejecting stereotypical play as princesses with tiaras, and instead creating a highly creative and complex Rube Goldberg mechanism throughout multiple rooms and the yard of one of their homes." *Id.*; Beastie *GoldieBlox* Letter at 1. The GoldieBlox video is set to the tune of the Beastie Boys' song, "Girls," the original of

which includes lyrics such as: "Girls, all I really want is girls . . . Girls – to do the dishes / Girls – to clean up my room / Girls – to do the laundry / Girls – and in the bathroom." *GoldieBlox* Compl. ¶¶ 1, 19.  In the GoldieBlox version of "Girls," those lyrics are replaced with the following: "Girls.  You think you know what we want, girls . . .  Girls to build the spaceship / Girls to code the new app / Girls to grow up knowing / That they can engineer that." *Id.* ¶ 19.

After GoldieBlox posted the video, counsel for the Beastie Boys—the same counsel who represents the Beastie Boys in this action—contacted counsel for GoldieBlox about the video's use of "Girls." *Id.* ¶ 3; Beastie *GoldieBlox* Letter at 1; Monster *GoldieBlox* Letter Ex. B. GoldieBlox then sought a declaratory judgment that its video was, *inter alia*, protected under the doctrine of fair use, as a parody. *GoldieBlox* Compl. ¶ 4.  The case "garnered widespread media attention," prompting the Beastie Boys to write an open letter, published in the New York Times, to which GoldieBlox responded with its own open letter.  *See* Beastie *GoldieBlox* Letter at 2.  On November 27, 2013, GoldieBlox removed the video from its website and from YouTube.  *Id.*  In the 10 days it was posted online, the GoldieBlox video was viewed by millions of people.  *Id.* at 4 n.2.

After the exchange of open letters, the parties began to discuss settlement.  *Id.* at 2.  On March 16, 2014, the parties settled.  *Id.* Ex. A ("*GoldieBlox* Settlement").  The *GoldieBlox* Settlement granted GoldieBlox a retroactive license to use the musical composition of "Girls" between November 18, 2013 and November 28, 2013.  *Id.* § 1.  In exchange, GoldieBlox agreed to make annual payments of 1% of its gross revenue, until the total payments reached $1 million, to a charitable organization chosen by the Beastie Boys and approved by GoldieBlox which supports "science, technology, engineering and/or mathematics education for girls." *Id.* § 2.  The parties also agreed to make certain, specifically worded public statements, *id.* §§ 4–5, and to

keep the settlement agreement confidential, with certain exceptions, including its use in litigation, *id.* § 6.

On March 17, 2014, the day after the *GoldieBlox* Settlement was fully executed, Thomas issued her revised report, in which she stated that "the fact that a 10-day use of one musical composition in an Internet-only YouTube channel video [the GoldieBlox video] can generate a $1 million negotiated license fee demonstrates that a five-week use of five musical compositions and five associated sound recordings in an Internet-only YouTube channel video [the Monster video] can warrant a substantial license fee as well." Revised Thomas Report 17. On March 26, 2014, at her supplemental deposition, Thomas stated that the *GoldieBlox* settlement provides the most comparable situation to Monster's alleged use of the Beastie Boys' copyrights in this case and that, based on the *GoldieBlox* Settlement, the fair market value of the instant license might be $1 million per copyright allegedly infringed, for a total of $10 million. Thomas Supp. Dep. 383–388. Monster now seeks to preclude Thomas from testifying about, and on the basis of, the *GoldieBlox* Settlement.

For two independent reasons, the Court grants the motion to exclude testimony by Thomas as to the *GoldieBlox* settlement.

First, any such testimony would be unreliable. Thomas herself acknowledged at her supplemental deposition that she is ignorant of the facts on which the settlement was based. *See* Thomas Supp. Dep. 342 ("Q. Do you know any of the factors that the attorneys took into consideration in settling the GoldieBlox case? A. No. I was not privy to the settlement negotiations. I wouldn't know. Q. And so it's fair to say that you don't know the basis upon which the $1 million settlement was arrived at; correct? A. Correct."). Without knowing "any of the factors" on which the *GoldieBlox* settlement was based, Thomas cannot possibly reliably

testify to the relevance, if any, of the *GoldieBlox* settlement to the measure of damages in this action. *See Daubert*, 509 U.S. at 597 (the trial judge must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand"). Bereft of knowledge about the facts on which the *GoldieBlox* settlement was based, Thomas can do no more than conjecture whether the terms (including the monetary component) of that settlement are a fair or unfair proxy for the value of the implied license at issue here. Under Rule 702 and *Daubert*, Thomas therefore cannot offer reliable expert testimony to the extent that testimony is based upon her speculative assumptions regarding the *GoldieBlox* settlement. *See, e.g.*, *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 357–58 (2d Cir. 2004) (upholding district court's exclusion of expert; district court found that the expert's "opinions were speculative because they were based on [his] unsupported conjecture of how the accident occurred" and that the expert "was on 'even shakier ground' in opining what injuries plaintiffs would have sustained had [his] hypothetical alternative design been used"); *Boucher*, 73 F.3d at 22 (district court should have excluded expert testimony regarding plaintiff's lost earnings because the expert's projection "was based on assumptions about [plaintiff's] employment prospects that represent a complete break with his work history of seasonal and intermittent employment").

Second, even if Thomas was personally knowledgeable about the factors that gave rise to the *GoldieBlox* Settlement as negotiated, testimony as to that event would be properly excluded under Rule 403, because its probative value would be substantially outweighed by the danger of confusion and undue delay. Even as depicted by the Beastie Boys, the *GoldieBlox* Settlement has limited, if any, probative value here. It is not at all clear what value the jury in this case could derive from the *GoldieBlox* settlement. It arose in the context of a factually anomalous dispute; it was agreed upon not in a traditionally arms-length commercial negotiation, but in the

context and under the pressure of a pending litigation; the litigation in turn was complicated by GoldieBlox's defense of fair use, a defense which has no application here; and the payments agreed upon were to be made to charity, over time, based on GoldieBlox's future gross revenues. This last point bears emphasis: although Thomas, in her deposition, glibly equates the *GoldieBlox* Settlement to a license acquired for $1 million cash, in fact, valuing the *GoldieBlox* Settlement would present a complicated undertaking. It would require the jury to make assumptions about GoldieBlox's future gross revenues; to estimate GoldieBlox's tax savings, in each year, from the charitable contribution; and to apply a discounting function to those post-tax costs to achieve a measure of net present value. And even this calculation would only measure the cost of the settlement to GoldieBlox. Measuring the benefit to the Beastie Boys would require an inherently subjective assessment of the value that the Beastie Boys assigned to the charitable contributions required by the settlement.

And the factors on the opposite side of the Rule 403 equation are formidable. Thomas's attempt to liken the implied license in this case to the value of the *GoldieBlox* settlement would necessarily open the door to a searching examination of the specific factors that gave rise to that settlement. There has, however, not been any discovery into that settlement, and, as noted, Thomas, by her own admission, is ignorant as to how that settlement came about. To enable Monster to test Thomas's premise that the *GoldieBlox* Settlement is a fair analogue here, Monster would be entitled to take discovery as to the circumstances of that settlement, including by deposing the most percipient witnesses.[1] These, of course, are likely to be the counsel who

---

[1] *See* Monster *GoldieBlox* Letter at 1 ("Defendant is at a distinct disadvantage in providing the requested information since it was not a party to the GoldieBlox Action and the GoldieBlox Settlement Agreement did not occur until March 16, 2014, long after discovery in this action was completed.").

negotiated that settlement on the Beastie Boys' behalf—who also serve as the Beastie Boys' counsel in this case. Monster would be entitled to test to what degree the *GoldieBlox* settlement was driven by factors particular to that dispute and not present here. Monster would also be entitled to test whether the settlement reflected considerations particular to the litigation context from which that settlement arose, including the strengths and weaknesses of the parties' claims and defenses in that lawsuit, the cost and inconvenience of continued litigation, the prospect of unwelcome publicity, and the possibility that an adverse litigation outcome might create unhelpful precedent.

Under these circumstances, were Thomas to be permitted to testify that the *GoldieBlox* settlement was a fair measure of the value which Monster and the Beastie Boys would have assigned in arms-length negotiations to a time-limited license for Monster to use the Beastie Boys' songs at issue here, the paradigmatic concern under Rule 403 of an orderly proceeding's being derailed by a "trial within a trial" would ensue. The jury would unavoidably be treated to a detailed exploration of the facts and context of the *GoldieBlox* settlement, with the Beastie Boys highlighting features common to the two controversies and Monster highlighting features that make the settlement inapt, and with the jury compelled to assess the strength of the parties' litigation positions at the time of that settlement. Such a trial within a trial would run a great risk of confusing the jury, and would give rise to a substantial and needless delay. *See, e.g.*, *United States v. Aboumoussallem*, 726 F.2d 906, 912–13 (2d Cir. 1984) (upholding exclusion of testimony to avoid "trial within a trial"); *United States v. Al Kassar*, 582 F. Supp. 2d 498, 500 (S.D.N.Y. 2008), *aff'd*, 660 F.3d 108, 123–124 (2d Cir. 2011) ("[T]he situations are not, on their face, analogous, and it would require a trial within a trial before the jury could determine whether there was any meaningful analogy at all."); *ESPN, Inc. v. Office of Comm'r of Baseball*,

76 F. Supp. 2d 383, 407 (S.D.N.Y. 1999) ("The probative value of such an exercise is vastly outweighed by the confusion and delay that would inevitably result from conducting a trial within a trial."). Further, as noted, testimony about the *GoldieBlox* Settlement could give rise to a need for testimony from the Beastie Boys' counsel in that case, a problematic scenario given that these persons are the Beastie Boys' trial counsel here.

In sum, the Court holds that the confusion and delay occasioned by introduction of evidence as to the *GoldieBlox* Settlement would substantially outweigh—indeed, it would overwhelm—the limited probative value of the *GoldieBlox* testimony. Rule 403 therefore requires exclusion of Thomas's testimony relating to the *GoldieBlox* settlement.

It does not follow, however, from the preclusion of testimony about the *GoldieBlox* Settlement that Thomas may not testify at all. The Court has previously held that her testimony about the fair market value of the copyright license is sufficiently reliable to be presented to the jury. *See Thomas I*; *Thomas II*. Accordingly, Thomas may testify concerning the fair market value of the copyright license, but neither she, nor any other witness, may testify about the *GoldieBlox* Settlement, nor may counsel advert to that settlement before the jury. Thomas is directed to delete from her revised report the paragraph on page 17 concerning the *GoldieBlox* Settlement, and any other changes necessary to conform that report to reflect the Court's preclusion of evidence of that settlement, but she may not make any further changes to her report. The revised report is to be submitted to defense counsel and the Court by Monday, May 12, 2014.

### B. The Fair Market Value of the Implied Endorsement

Monster next argues that the Court should preclude Thomas from testifying at trial concerning the fee that Monster would have paid for the Beastie Boys' implied endorsement, which goes to the measurement of actual damages under the Lanham Act claim.

By way of background, in her original report, Thomas's discussed the implied endorsement fee in a single paragraph. *See* Dkt. 102 Ex. B ("Thomas Report") 18–19. Noting the brevity of Thomas's treatment of that issue, Monster argued that "Thomas's report does not indicate *any* methodology for determining an implied endorsement fee." Dkt. 103 at 19 (emphasis in original). The Beastie Boys responded that Thomas's analysis concerning the implied endorsement fee "follows from the discussion concerning synchronization rights for which Thomas explained the methodology, bases and rationale for her conclusions." Dkt. 107 at 10. The Court agreed. *See Thomas I* at 4 ("Thomas's valuation of the implied endorsement plainly draws upon the methodology that she earlier used to value the copyright claims."). The Court therefore held that Thomas could testify as to the value of the implied endorsement.

As noted, however, in *Thomas I* the Court also directed Thomas to revise her report so that the report no longer based its estimate of the value of the license and implied endorsement on the assumption of a perpetual term of use. *Id.* at 5–7. When Thomas revised her report, she did not change the implied endorsement paragraph or her estimate of the implied endorsement fee. *See* Dkt. 95 Ex. A at 21–22 (comparing the original and revised reports). Monster then sought to have Thomas's testimony precluded for failure to comply with the Court's order. Dkt. 92. In response, Thomas declared that "the updated assumptions described in the Order would not affect the reasonable value of an implied endorsement for several reasons," including that "it is generally the fact of an endorsement, and its corresponding announcement, that is the most

important element in determining an endorsement's value," especially in this case, in which Monster allegedly sent a "Facebook posting accompanying the Video (which also makes explicit reference to the Beastie Boys by name) . . . to Monster's *16 million* Facebook fans." Dkt. 95 Ex. B ("Thomas Decl.") ¶¶ 5–6 (emphasis in original); *see also* Dkt. 95 (letter from the Beastie Boys explaining Thomas's revisions). In *Thomas II*, the Court accepted this explanation and denied Monster's second motion to preclude Thomas's testimony.

Monster now attacks Thomas's estimate of the implied endorsement fee on the ground that (1) contrary to the Beastie Boys' earlier representation, Thomas's estimate is not based on the same methodology as her estimate of the license fee, *see* Monster Br. 6–9; and (2) her implied endorsement methodology is "a mystery," and her conclusion is based on no more than her own *ipse dixit*, *see id.* 9–11.

After reviewing Thomas's supplemental deposition, the Court concludes that, although Thomas's estimate of the implied endorsement fee may draw less upon her estimate of the license fee than had previously been indicated, and although her articulation of her rationale in her report is less fulsome than ideal, Thomas has put forth articulable facts that, considered in the context of her career and experience, supply a reliable basis for her estimate. Those facts include the Beastie Boys' stature; Monster's alleged use of the Beastie Boys' name in the text of the video and related announcements; and Monster's alleged use of five popular Beastie Boys' songs in the Video. *See* Thomas Supp. Dep. 388–400. Thomas's deposition testimony elaborates upon, and is consistent with, her report. *Compare id. with* Revised Thomas Report 19. Her reasoning is not, as Monster asserts, "a mystery," or a pure *ipse dixit*. And Monster, for its part, overlooks part of her reasoning, by treating certain facts, such as Monster's alleged use of five popular Beastie Boys' songs, as bearing solely on the fact of the endorsement, and not its value,

*see* Monster Br. 9–10; Thomas Supp. Dep. 388–400, even though such facts may be probative as to both.

Monster also argues that three endorsement deals which Thomas personally participated in negotiating and which form a basis for her conclusion, involving her clients Glenn Frey, Janet Jackson, and Randy Newman, are not comparable to the implied endorsement at issue here. *See* Monster Br. 11–14. But those differences, which the parties concisely summarize in their briefs, are simple enough to present and understand that they can be readily addressed during cross-examination and considered by the jury in evaluating the credibility of Thomas's testimony. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

The Court is, however, concerned by the fact that, in her deposition, Thomas refused, out of deference to the confidentiality interests of those clients, to provide the precise value of the fees negotiated in those endorsement deals. Instead, she testified to approximate amounts. *See* Dkt. 102 Ex. C at 61, 102, 104–105, 112. At the time of this deposition, Monster did not raise this refusal with the Court as a discovery dispute. Had the issue been presented, the Court would have ordered Thomas to disclose the specific amounts of those deals, subject to a confidentiality provision limiting pretrial disclosure of that information.

The issue has now, however, been squarely presented by the prospect of Thomas's upcoming trial testimony. The Court will not permit Thomas to testify on the basis of the value of endorsement deals that she has negotiated for other clients if she is not prepared to disclose the precise value of those deals. Estimates and general ranges, and broad assertions of comparability, will not do. Absent such specification by Thomas, the jury would be left to take

Thomas's word that the value of these deals is fairly comparable, all factors considered, to the value she assigns to the implied endorsement here; and Monster would be unfairly disabled from fully testing Thomas's claim to this effect. Put differently, the Court will not permit Thomas to use her personal experience negotiating endorsement deals for her clients as both a sword and a shield in this litigation.

Accordingly, as it is the Beastie Boy's intention that Thomas use the endorsement deals of her clients as a basis for her testimony at trial as to the value of the implied endorsement deal at issue here, Thomas must be prepared to testify, and be cross-examined about, the specific values of these clients' deals. This ruling assures that Thomas's testimony, to the extent based on the values of endorsement deals of her clients, is precise and subject to adversarial testing. *Cf. Amorgianos*, 303 F.3d at 267 (noting "that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony"). The Beastie Boys are directed, by Monday, May 12, 2014, to confirm, in a letter to the Court and Monster, whether they intend to elicit testimony from Thomas based on the values of the endorsement deals of the other clients referenced in her report or deposition, and if so, specifically which clients. Assuming that the Beastie Boys so confirm their intention to do so, they are directed, by Tuesday, May 13, 2014, to set out, in a letter to Monster's counsel, the precise endorsement values that Thomas would testify to as to each of those deals, so as to permit Monster to take account of this information in its trial preparation. Until Thomas testifies in open court, this information is to be treated as confidential by Monster's counsel and to be maintained on an attorneys'-eyes-only basis, subject of course to Monster's right to make further application to the Court as to this point or to any agreement that counsel together may reach.

## CONCLUSION

For the foregoing reasons, Monster's motion to preclude Thomas's testimony is denied, except that Thomas may not testify regarding the *GoldieBlox* Settlement, *see* Section III.A.2, *supra*. The Clerk of Court is directed to terminate the motion pending at docket number 109.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: May 7, 2014
       New York, New York