E641bea1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  BEASTIE BOYS, A NEW YORK
   PARTNERSHIP, MICHAEL DIAMOND,
4  ADAM HOROVITZ AND DECHEN YAUCH
   AS EXECUTOR OF THE ESTATE OF
5  ADAM YAUCH, DECEASED, EACH
   INDIVIDUALLY AND COLLECTIVELY
6  D/B/A BROOKLYN DUST MUSIC,

7           Plaintiffs,

8       v.                          12-CV-6065 (PAE)

9  MONSTER ENERGY COMPANY,

10          Defendant.              Jury Trial

11 ------------------------------x
                                    New York, N.Y.
12                                  June 4, 2014
                                    9:03 a.m.
13
   Before:
14
                    HON. PAUL A. ENGELMAYER,
15
                                    District Judge
16
                        APPEARANCES
17
   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
18      Attorneys for Plaintiffs
   BY:  KEVIN R. PUVALOWSKI, ESQ.
19      PAUL W. GARRITY, ESQ.
        KENNETH B. ANDERSON, ESQ.
20      THOMAS M. MONAHAN, ESQ.
        STEPHANIE L. LIMBAUGH, Trial Support Specialist
21
   KANE KESSLER, P.C.
22      Attorneys for Defendant
   BY:  S. REID KAHN, ESQ.
23      DANA M. SUSMAN, ESQ.
        TANYA C. POHL, ESQ.
24
   ALSO PRESENT:  SCOTT WATSON, Trial Support
25

E641bea1

```
 1                (Trial resumed)
 2                (In open court; jury not present)
 3                THE COURT:  Okay.  Good morning, everyone.
 4                ALL COUNSEL:  Good morning.
 5                THE COURT:  I have very little for you this morning.
 6      I just wanted to make sure that we are collectively a
 7      well-oiled machine as we move towards the prospect of jury
 8      deliberations.
 9                Counsel, I'd asked everyone to put together a list of
10      exhibits and a list of witnesses so that we can turn that in to
11      the jury first thing as they begin their deliberations.  Have
12      you taken care of that?
13                MR. GARRITY:  We have.
14                THE COURT:  Have you worked together on that?  I just
15      want to make sure.
16                MR. GARRITY:  Yes.  Last night we coordinated.  My
17      colleague's about to hand a copy to you.
18                THE COURT:  Perfect.  Great.  All right.  That's
19      great.
20                And likewise, I just want to make sure that in the
21      event we get a request off the list for exhibits, that you've
22      sorted and have in an easy-to-retrieve place all the copies of
23      each of the exhibits in question?
24                MR. GARRITY:  Speaking for plaintiff, yes.  Certainly
25      for plaintiffs.  We have multiple copies that are all here.  I
```

E641bea1

1    believe on the defendant's side too.

2              THE COURT:  Is that correct, Mr. Kahn?

3              MR. KAHN:  I'm sorry.  I didn't hear the --

4              THE COURT:  The question is, on defense side exhibits,

5    should we get a request from the jury for them, I just want to

6    make sure that we are prepared to react quickly.  Do you have a

7    set of all the exhibits?

8              MR. KAHN:  Yes.  Yes.

9              THE COURT:  All right.  Very good.

10             All right.  I'll take a look through this.  I'm sure

11   it's fine.

12             Anything else from counsel to raise?  We got a voice

13   mail from Juror No. 1.  And I didn't listen to it; my law clerk

14   did, my deputy did.  Before studying it, of course, the

15   reaction was, oh, my god, there was going to be an issue.  She

16   was instead graciously apologizing for the fact that she

17   wouldn't be here until the 9:15 time and regretting that she

18   wasn't going to be able to meet my request that she be here

19   earlier.  In any event, I took it as just a sign of her

20   thoughtfulness and diligence, nothing more.

21             Anything else for either side to raise?

22             MR. KAHN:  There is one issue with respect to the

23   charge which we thought about yesterday after we left court,

24   which was, there was a request by the defendants for a charge

25   on nominative fair use, and that's not included in the charge.

E641bea1

1    The basis for that is the fact that the use of the name Beastie

2    Boys in the title of All Access: A Beastie Boys Megamix we

3    believe is nominative fair use.  Use of a title with the name

4    in the title, that accurately reflects the title, we contend is

5    nominative fair use, and we made a request for that charge.

6            THE COURT:  Can you hand up the request again.  I

7    thought we were done with the charge.

8            MR. KAHN:  It's on page 37.

9            (Pause)

10           THE COURT:  What would be the factual basis for this

11   charge?  In other words, defendants would have to prove, to

12   establish nominative fair use, among other things, that

13   "defendants used the mark in connection with goods or services

14   that are not readily identifiable without use of the mark."

15   That's a requirement you would have to show as a baseline to be

16   entitled to this charge.  Even under your construction of it,

17   what's the factual basis on which that element could be met?

18           MR. KAHN:  You couldn't refer -- I mean, that is the

19   title of the Megamix.  That's what it is.  It's the title of

20   the Megamix.

21           THE COURT:  But I think the point would be that

22   there's no need to reference the Megamix in the video.  In

23   other words, I think the point here is that it was a

24   discretionary decision to reference the Megamix and there

25   wasn't a need to do so.  Explain to me.  I'm missing something

E641bea1

1 here.

2    MR. KAHN:  I mean, it's my understanding that if you

3 use the title of a work --

4    THE COURT:  Right.

5    MR. KAHN:  -- and that title contains a name, because

6 that's the Beastie Boys', I guess here, trademark, that the use

7 of that trademark is nominative fair use.

8    THE COURT:  Okay.  And I take it, by the way, this

9 instruction would go -- I mean, as I understand the false

10 endorsement claim, it is really based on three things.  First

11 and foremost, it's based on the fact of the music being used;

12 second, it's based on the MCA reference; and third -- and this

13 is the only part that your instruction goes to -- it would be

14 the fact that the Beastie Boys are referenced in the title of

15 the Megamix.  And so to the extent that you're seeking this

16 instruction, it goes only to defend as against that third part,

17 correct?

18    MR. KAHN:  That's correct.

19    THE COURT:  And your point is that to link to the

20 Megamix, it was necessary to identify the Megamix in a way that

21 included the Beastie Boys name.

22    MR. KAHN:  That's correct.

23    THE COURT:  And that there is no way to link to the

24 Megamix without mentioning the Beastie Boys name.  In other

25 words, you couldn't --

E641bea1

1          MR. KAHN:  It was Z-Trip's name for the Megamix.  We

2     didn't choose the name.

3          THE COURT:  Right.  Remind me.  Can somebody put up on

4     the screen the actual link that appeared.  Sorry.

5          Okay.  So I thought what you were saying to me,

6     Mr. Kahn, was that essentially embedded in the link was the

7     name "Beastie Boys," such that one could literally not

8     effectuate the linking process without using the name "Beastie

9     Boys."  However, as the screen before me reads, it's not the

10    case at all.  It reads:  "Music.  All Access Beastie Boys

11    Megamix courtesy of Z-Trip.  Download the link for free at

12    ztrip.bandcamp.com."  Those last words beginning with

13    "Download" are the only operational words here.  That's the

14    name of the link.  It does not embed the name "Beastie Boys."

15    Instead, the name "Beastie Boys" comes in a discretionary

16    descriptor that applies above.  In other words, one could have

17    said, "Music, Z-Trip's Megamix," without referencing the

18    Beastie Boys, and the functionality of the link would have been

19    equally the same.

20         So my question to you again is:  In what sense would

21    there be a factual basis on which the jury could find that the

22    goods or services are not readily identifiable without use of

23    the mark?

24         MR. KAHN:  Again, I mean, you are talking about

25    accessing this particular Megamix, so, yes, you could go to

1    ztrip.bandcamp.com, but for what purpose?  You go into that

2    link for the purpose of accessing the Megamix that Z-Trip has

3    there, and if you don't refer to the title of the Megamix, then

4    what are you doing?

5              THE COURT:  Well, I think you could say you don't need

6    to mention the name "Beastie Boys."  You could say, "Music from

7    this recap video courtesy of Z-Trip.  Here's how you access his

8    Megamix."  The point is, an element of this nominative fair

9    use, on your account of it, would be that the goods and

10   services aren't readily identifiable without them.

11             Let me hear from plaintiffs on this.

12             I have to say, Mr. Kahn, I thought we were done with

13   the jury charges yesterday afternoon.  Had you intended to

14   raise this, it really would have been more constructive for me

15   to have a heads up beforehand.  I've got the instructions in

16   final form.  It's a little late to be raising this.

17             Let me hear from plaintiffs on your view as to whether

18   or not there's a factual basis for this instruction.

19             MR. GARRITY:  Briefly, your Honor, we don't believe

20   that there is a factual basis for this at this time.

21   Separately, before even jumping into this, we would note that

22   this is an affirmative defense that has never been raised by

23   the defendants in this case and we believe is waived under

24   Rule 8 as we --

25             THE COURT:  It was never raised in the complaint?

E641bea1

1          MR. GARRITY:  In the answers to the complaint.

2          THE COURT:  Okay.  Let's focus just on the factual

3     part.  I hear you on that, and that may or may not be right.

4     But it was in the draft jury charges.  I had not understood it

5     to be triggered by the facts of the case, inasmuch as the

6     essence of the claim of endorsement here involves the use of

7     the music and, secondarily, MCA.  This issue arises at most in

8     connection with the reference to Beastie Boys in connection

9     with the description of the Megamix.  So focusing on that

10    point, tell me why, from your point of view, there isn't a

11    factual basis.

12         MR. GARRITY:  There's no factual basis because there

13    is no need to identify -- I mean, they're talking about

14    identifying Z-Trip's product, which is basically the

15    ztrip.bandcamp.com.  They don't need to make any use of the

16    Beastie Boys name and mark in connection with making a

17    reference there.  So therefore, as a factual predicate, I don't

18    believe there's any basis to even try to sweep nominative fair

19    use into this.

20         Separately, with respect to a false endorsement,

21    nominative fair use is a defense to a straight trademark

22    infringement type of a claim, not a false endorsement.

23         THE COURT:  What's the classic circumstance in which

24    it comes up?

25         MR. GARRITY:  The classic nominative fair use case is

E641bea1

1    actually where there's a -- there was a contest out in the

2    Ninth Circuit involving, who's your favorite New Kid on the

3    Block, and the defense was, well, listen, if a newspaper wants

4    to run a contest in which they're talking about which New Kid

5    on the Block is their favorite, then they're necessarily going

6    to have to identify.  It's just a matter of -- you cannot --

7              THE COURT:  -- have the conversation without

8    mentioning the name.

9              MR. GARRITY:  That's correct.  That is a classic --

10             THE COURT:  Your point here is, that's not the case

11   because one could come up with ten different ways of

12   referencing Z-Trip's Megamix without needing to import the name

13   "Beastie Boys."

14             MR. GARRITY:  Yes, your Honor.

15             THE COURT:  All right.  Mr. Kahn, I'm persuaded by

16   that, I think as you could tell.  It seems to me that there

17   simply isn't a factual basis on which a jury could find that

18   the Megamix was not readily identifiable without use of the

19   mark.  Indeed, right off the bat, sitting right here, I can

20   think of easy ways of doing it, including simply dropping the

21   name "Beastie Boys" as used here, and that would accomplish it.

22   In other words, it could easily have said, "Music.  All Access

23   Megamix, courtesy of Z-Trip."  There's no need to mention

24   Beastie Boys.  Given that, there simply isn't a factual basis

25   for this instruction.  So with respect, I will decline the

E641bea1

1    request for that instruction.

2            Anything else counsel have?  But you have your

3    exception.

4            MR. KAHN:  Yes.  And just for the record, the

5    affirmative defense was included in the answer to the amended

6    complaint.

7            THE COURT:  Okay.  The record as to that point will

8    speak for itself.  My ruling here is really based on my

9    judgment that the first element of the nominative fair use

10   defense is not met here.  There isn't a factual basis on which

11   a jury could find that Z-Trip's Megamix was not readily

12   identifiable without use of the name "Beastie Boys."

13           Anyone else have anything else to raise while we wait

14   for our jury?

15           MR. PUVALOWSKI:  No, your Honor.

16           MR. KAHN:  No.

17           THE COURT:  Let me just suggest, as a practical point,

18   given my intention that the jury be fed lunch in the jury room

19   over what I expect will be a period of about a half hour, all

20   here are advised to make plans so that you can eat quickly on

21   your own, whether it means picking up lunch or whatnot.  I'm

22   happy for to you eat in the courtroom if you need to.  I'm not

23   a stickler for form.  But I don't want you to be left high and

24   dry.  All right?

25           I'll be out as soon as I'm advised that the jury is

E641bea1                         Levy - direct

1   here.

2                (Recess)

3                (In open court; jury present)

4                THE COURT:  Okay.  Good morning, ladies and gentlemen.

5   We're going to resume now with the completion of the direct

6   examination of Mr. Albert.

7                Mr. Albert, I'll remind you that you're still under

8   oath.

9                Mr. Kahn, you may inquire.

10               MR. KAHN:  Thank you, Judge.

11               Could we put up Defendant's Exhibit 128 on the screen.

12               THE COURT:  Yes.

13    JON ALBERT LEVY, resumed.

14   DIRECT EXAMINATION CONTINUED

15   BY MR. KAHN:

16   Q.  Mr. Albert, I believe we left off yesterday where you

17   discussed the amount of union scale.  Under what circumstances,

18   if any, are there musical artists who receive more than that

19   amount?

20   A.  On occasion I think that some might ask for double scale.

21   I don't recall it happening in any of our deals, but I think it

22   can happen.  And there's -- occasionally it can happen -- I

23   mean, I can -- there's certain artists that could request more

24   or maybe get it out of a courtesy.  Someone like -- I've had

25   Frank Sinatra or someone like that may ask for a higher amount

E641bea1                      Levy - direct

1    as a guarantee against scale, and he gets it because he's

2    Frank, just -- or the estate gets it because they ask for it,

3    or he would have years ago, and in deference to Frank, that's

4    what Frank gets.

5    Q.  But in the ordinary course of engaging in the negotiation

6    for a music license, would it be just union scale?

7    A.  Yes.  Yes, mm-hmm, even on major groups, yes.

8    Q.  In your opinion are the Beastie Boys, based upon the facts

9    and circumstances in this case that you've testified about,

10   entitled to receive more than union scale?

11   A.  No.

12   Q.  In reviewing the Ruckus in the Rockies video, did you

13   observe that in the video there was a reference to "RIP MCA"?

14   A.  Yes.

15   Q.  And did you obtain an understanding of what that reference

16   was to?

17   A.  Yes.

18   Q.  And what was that reference to?

19   A.  The passing -- I think within a day or so of the video

20   being released was Adam Yauch's passing then.

21   Q.  And did you also see in the video that at the end there was

22   a reference to Z-Trip's All Access Beastie Boys Megamix?

23          MR. KAHN:  Can we put that up on the screen.

24   Q.  Did you see that at the end of the video?

25   A.  Yes.

E641bea1                          Levy - direct

1   Q.  And as a result of your review of the materials in this

2   case, did you learn that there was a link to Z-Trip's Megamix

3   which was posted on Monster's Facebook site and on its YouTube

4   site?

5   A.  Yes.

6              MR. KAHN:  Can we put up the Facebook link.

7              THE COURT:  Go ahead.

8              MR. KAHN:  Thank you.

9   Q.  And was this the Facebook link that you saw and reviewed?

10  A.  Yes, I believe it is.

11  Q.  Do you have an opinion as to what the fair market value of

12  what a willing buyer and a willing seller -- I'm sorry -- what

13  a willing buyer would pay and what a willing seller would

14  receive for the use of the five songs on the video which

15  included a reference to "RIP MCA" and a reference to the

16  Z-Trip's All Access Megamix link that you just saw on the

17  screen?

18  A.  Yes.

19  Q.  And also included a reference in Facebook to that same All

20  Access Beastie Boys Megamix?

21  A.  Yes.

22  Q.  And that the Facebook page, Monster's Facebook page had

23  this link on its page for approximately two years, and it was

24  amongst all of the other information that was on Monster's

25  Facebook page.

E641bea1                          Levy - direct

1    A.  Yes.

2    Q.  Did you determine whether that would change the fair market

3    value that you told the jury that the use of the Beastie Boys'

4    music was worth?

5    A.  Yes, I have an opinion on that.

6    Q.  Okay.  What's your opinion?

7    A.  And I, of course, found out about this later.  I didn't

8    know this like a year ago or so when I did my report.  What we

9    would term that in the industry -- 'cause this sort of thing

10   happens.  We call it an inadvertent use.  And we'll go back to

11   a publisher, a record company, and say, there was an

12   inadvertent use, or it might be pointed out -- we might get a

13   call from a publisher that says, "Hey, you know that commercial

14   that was supposed to be gone six months ago?  Well, somebody

15   saw it in Detroit.  What's going on?"  To me, and in the

16   industry, it would matter what was inadvertent use exactly.  In

17   other words, in this one in particular, I have a range, I feel,

18   of what it's worth, and that's based upon primarily how visible

19   it is.

20           As an example, if this were on their first Facebook

21   page -- and I haven't been there in a long time.  I don't know

22   if I ever personally went to their Facebook page but just saw

23   on, you know -- in evidence.  But if it were, let's say, on the

24   front page, first page or so, the last couple of years, then

25   frankly, I think that would be --

E641bea1                          Levy - direct

1    Q.  So assume it was not on the front page.

2    A.  Okay.  If, let's say, you had to scroll down dozens and

3    dozens and dozens of pages, I think it's probably worth close

4    to nothing.  It's the sort of thing a publisher would

5    ordinarily say, okay, whatever, as a courtesy we'll just

6    overlook it, nobody probably saw it anyway because it was on

7    page 92 or something like that.  It would have very little

8    value, if any, the extra use, if it was inadvertent.

9    Q.  Okay.  So just to be clear, eliminating that Facebook page

10   link you just talked about, would the addition of the words

11   "RIP MCA" and the link in the video affect the value in this

12   case at all?

13   A.  You mean for the five-week period?

14   Q.  Yes.

15   A.  No, that's something that would just be included in a deal.

16   When we list how things are used, that would just be like

17   adding a Bose stereo onto a car when you buy it.  You might get

18   the dealer to probably just throw it in to get you to buy the

19   car.  It's just -- there's typically little things added:  "Oh,

20   we want to mention in the press that Beastie Boys are doing our

21   commercials now," or something like that.  We'll throw in

22   something like -- just little things.  And it really doesn't

23   add anything.  It would if it was done later on.  A couple

24   months into a deal, we want to add something, then there might

25   be some additional payment.

E641bea1                        Levy – direct

1    Q.  But assume it was done on the same day.

2    A.  Basically no.

3    Q.  Okay.  Have you ever heard of a vocal styling fee?

4    A.  A what?

5    Q.  Have you ever heard of a vocal styling fee?

6    A.  No.  I think I read the term in Lisa Thomas' expert report

7    last year.  Other than that, I've never heard the term.

8    Q.  Okay.  I'd like you to assume that the use in this case for

9    the five songs in the video was a perpetual use and assume that

10   the use was valued at $1,250,000 --

11   A.  Okay.

12   Q.  -- and all other facts in the case are the same.

13   A.  Okay.

14   Q.  Do you have an opinion as to how much the use of the five

15   songs would be for one year?

16   A.  As opposed to perpetuity?

17   Q.  Yes.

18   A.  Probably 10 percent of what perpetuity -- maybe 10 or

19   12 percent, something like that.  Like an eighth or a tenth of

20   the amount.

21   Q.  An eighth or a tenth.

22   A.  Of the amount, yes.

23   Q.  Okay.  So if it was 1,250,000, can you give us an

24   approximate range of what it would be for one year.

25   A.  125 to 150.

E641bea1                              Levy – direct

1    Q.  Now do you have an opinion, as a music licensing expert,

2    what the fair market value of the identical use in my

3    hypothetical situation would be if it were for five weeks?

4    A.  Probably half of what that one year would be, half of the

5    125 to 150.

6    Q.  So if we do the math, that would be 62,5, to 75,000,

7    correct?

8    A.  Yes.

9    Q.  Now if you assume that the use of the five songs and

10   including the name MCA, the name Beastie Boys, which was used

11   in the identical manner as it was used here, which means in the

12   video and on Facebook link, and that that use was valued at

13   $1 million for 50 years, do you have an opinion as to what that

14   value would be for 25 years?

15   A.  Half of perpetuity.  Let me think.  Maybe half?  I'm not

16   sure.  Maybe -- well, 25 is still -- I mean, it's -- half,

17   three quarters, something like that.

18   Q.  Are you saying that the difference between 50 years and 25

19   years would be between half and three quarters?

20   A.  I would think, something like that.

21   Q.  And what about if it were 10 years?

22   A.  Maybe between a quarter and a half.

23   Q.  Well, just so we're clear, the difference between 50

24   years -- if 50 years is a million dollars --

25   A.  Right.

E641bea1                    Levy - direct

1    Q.   -- how much would 10-year use be?

2    A.   Maybe quarter of a million.  I mean, there's no industry

3    guidelines here because I've never had a difference between 50

4    years and 10 years, so there's no guidelines to go by there,

5    so --

6    Q.   What's your opinion?

7    A.   A best estimate, that's my opinion, yes.

8    Q.   Do you have an opinion as to whether or not the length of

9    time of a use in connection with an endorsement matters?

10   A.   Oh, absolutely it matters.

11   Q.   In what way does it matter?

12   A.   It's one of the primary factors of cost.

13   Q.   So now go back to my hypothetical.  If 50 years is a

14   million dollars, how much would one year be?

15   A.   I would say about a tenth of that, which would be a hundred

16   thousand.

17   Q.   And instead of one year, if it was a million dollars for 50

18   years, how much would it be for five weeks?

19   A.   Half of the hundred thousand.  50,000.

20   Q.   Now why do you say half?  Five weeks obviously isn't half

21   of a year.

22   A.   No, but as I mentioned yesterday, in music licensing or in

23   celebrity contracts, they don't work pro rata.  In other words,

24   you cannot buy five weeks for a tenth of the price of the year.

25   Let's say a year was 50 weeks, which we know it's not, but just

E641bea1                         Levy - direct

1    to keep the numbers easy.  Five weeks is not a tenth of a year.

2    If something's used for five weeks, or three weeks or two weeks

3    or two months or three months, all that area is about half of

4    what a year would be.

5    Q.  Half of a year.

6    A.  Yes.

7    Q.  Okay.  In reviewing the materials for this case, were you

8    provided with the Beastie Boys' licensing history?

9    A.  Yes.

10   Q.  And is the Beastie Boys' licensing history for film and

11   television relevant to your determination of the fair market

12   value of the use of the songs in this case?

13   A.  No.

14   Q.  Why not?

15   A.  Virtually without exception, in my 38 years of doing this,

16   I have never discussed with any publisher, any record company,

17   nor have -- has it ever been brought up to me in any -- in any

18   placement situation, in any regard, what somebody got for

19   something outside of commercial use.  In other words, a

20   publisher never says, well, you know, they got a hundred

21   thousand dollars for a movie trailer; therefore, I want X

22   dollars for a commercial.  That's not even -- and the major

23   publishing companies, usually that's -- it's not even the same

24   person.  It's a specialty person, they call it.  The person who

25   does the synchronization licenses or the record company for the

E641bea1                         Levy - direct

1  master licenses typically is not the same person that does the

2  licensing for theatrical uses, which is television shows,

3  entertainment videos, trailers, etc., and the numbers just

4  aren't relevant at all.  It's just something that never ever

5  comes up.

6  Q.  Okay.

7  A.  Not to say that somebody in a band might think, well, gee,

8  I got this for that, maybe I should get this for that.  I don't

9  know.

10  Q.  Well, we're talking about, in the --

11  A.  It doesn't exist, no.

12  Q.  When you say it doesn't exist, what do you mean by that?

13  A.  It's never been mentioned to me.  Like I say, in thousands

14  of deals and tens of thousands of quotes, it's never come up.

15  Q.  So you anticipated I think my next question, which related

16  to the same question with respect to movie trailers.

17  A.  Yes.  Same thing.

18  Q.  Is it relevant?

19  A.  I'm sorry.

20  Q.  Is it relevant?

21  A.  No.

22  Q.  And is it not relevant for the same reason you just

23  discussed?

24  A.  Yes, correct.

25  Q.  Is the use of music in connection with video games a

E641bea1                          Levy - direct

1    commercial use, a commercial, in your opinion?

2    A.  No.  It is -- well, no, it's not a commercial, no, not that

3    anybody I deal with ever gets involved with, that I'm aware of.

4             MR. KAHN:  No further questions.

5             THE COURT:  All right.  Cross-examination?

6             MR. PUVALOWSKI:  Thank you, your Honor.

7    CROSS-EXAMINATION

8    BY MR. PUVALOWSKI:

9    Q.  Mr. Albert, in connection with your work at the Albert

10   Company, is it fair to say that your experience has been on the

11   buyer's side of the negotiation?

12   A.  I would say the vast majority of it, yes.  Not all of it,

13   but way in the 90s of percent, yes.

14   Q.  You make your living on the buyer's side, correct?

15   A.  Correct.

16   Q.  In the last 20 years, have you represented artists or

17   songwriters?

18   A.  Yes.

19   Q.  How many times?

20   A.  Just one or two.  Paul Anka being one.  He called.  I'm

21   sorry.  You didn't ask me who it was.

22             (Continued on next page)

23

24

25

E64gbea2                          Levy - cross

1   BY MR. PUVALOWSKI:

2   Q.   That's okay.  Now, as an expert witness, however, you work

3   for -- on behalf of both the artists and songwriters on the one

4   hand and the advertisers on the other hand, right?

5   A.   Correct.

6   Q.   In fact, you said yesterday that you spend more time

7   testifying on behalf of the artists and songwriters than you do

8   on the other side, right?

9   A.   Correct.

10  Q.   Now, let me ask you this:  When you analyze the fair market

11  value of a song for copyright purposes, do you use the same

12  analysis, the same factors, irrespective of whether you're

13  giving an opinion on behalf of the artists and songwriters on

14  the one side or the advertiser on the other?

15  A.   When you say "copyright" I'm not sure what you mean.  Do

16  you mean for fair market value?

17  Q.   Fair market value of the song.  Do you use the same factors

18  irrespective of whether you're working on the other side or the

19  advertiser's side?

20  A.   Absolutely.

21  Q.   Okay.

22  A.   Presuming the facts of the case are relevant, yes.

23  Q.   Now, you testified that you yesterday that you actually

24  testified in court ten or 12 times over your career, correct?

25  A.   Yes, I could be off a few either way.  I haven't counted in

E64gbea2                        Levy - cross

1    a long time.

2    Q.  In your experience, Mr. Albert, is it unusual for the

3    attorney for the party that you're giving an opinion for to

4    help prepare you for your testimony?

5    A.  No, they tip -- I typically would help prepare or maybe I

6    should ask you to please define "prepare."  It might be a

7    different definition than me.

8    Q.  Do you discuss your testimony with the attorney that you're

9    working with before you testify?

10   A.  Well, I don't know if I'd call it discuss.  What typically

11   will take place, probably the day before is, is the attorney

12   will let me know what questions I'm being asked and I'll give

13   an idea of what my answers will be.  But I'm not -- I'm not,

14   like, prompted what I'm supposed to say or whatever because I'm

15   sort of, how should I say, independent in that regard.

16          First off, I can't memorize things.  It's weird.  And

17   secondly --

18   Q.  You answered the question.

19          THE COURT:  You answered the question.

20          Next question.

21          THE WITNESS:  Okay.

22   Q.  Very briefly.  You spoke a little bit about your

23   compensation on this case with Mr. Kahn yesterday?

24   A.  Yes.

25   Q.  If I understand correctly, you're being paid a $9,500

E64gbea2                       Levy - cross

1    retainer to do the research and report, correct?

2    A.  Correct.

3    Q.  And then $9,500 per day west of the Mississippi, correct?

4    A.  Correct.

5    Q.  In this case, how many days west of the Mississippi did you

6    spend?

7    A.  I believe it was just one deposition day -- no, no, excuse

8    me.  It was two.  I also sat in on Lisa Thomas' deposition.

9    Q.  Okay.  And then how many -- and then $11,500 per day for

10   anything east of the Mississippi, correct?

11   A.  Correct.

12   Q.  And how many days east of the Mississippi have you spent on

13   this case?

14   A.  Right now, three.  We're spending the third.

15   Q.  Just for ease of let's call it ten thousand.  Well, let me

16   ask you this:  How much do you anticipate being paid in this

17   case in total?

18   A.  I guess now it's, if you're doing a ten-a-day average or

19   something, it would be 50, which it was going to be 30.  I was

20   supposed to be testifying Monday and then go on.  It held over.

21   Q.  Ten for the report.  Let's say it's ten, right?  Two days

22   in the west coast, right?  That's 30 total?

23   A.  Correct.

24   Q.  And three days here?

25   A.  Sixty.

E64gbea2                         Levy - cross

1    Q.   Sixty total?

2    A.   Yes.

3    Q.   Mr. Albert, do you have your expert report in front of you?

4    It was marked yesterday as Defendant's 95.

5    A.   Yes.   Uh-huh.

6    Q.   I'd like to take you through some questions about that

7    report.   The report's broken down into various sections,

8    correct?

9    A.   Yes.

10   Q.   Is it fair to say the first page and-a-half is about your

11   about your qualifications, is that right, generally?

12   A.   Yes.

13   Q.   And then on page two, there's a section that's entitled

14   "Foundation for this Report," do you see that?

15   A.   Yes.

16   Q.   In that section, you set forth some basic facts of this

17   case as you understand them, correct?

18   A.   Yes.

19   Q.   You say there that the Ruckus in the Rockies video was one

20   of approximately 900 videos which were available to visitors of

21   Monster Energy's website and YouTube channel and was not,

22   quote, featured in the website; in other words, it did not

23   appear featured on any homepage or otherwise heavily promoted.

24        Do you see that?

25   A.   Yes.

E64gbea2                        Levy – cross

1    Q.  When you wrote that, were you aware that the Ruckus in the

2    Rockies video was specifically promoted on Monster's Facebook

3    page?

4    A.  You mean like a homepage.

5    Q.  No.  Were you aware when you wrote that that this video, a

6    link of this video, was sent out to Monster's Facebook fans or

7    at least some part thereof?

8    A.  I don't recall if I was or not.

9    Q.  Okay.  At the time that you wrote that, were you aware that

10   the Ruckus in the Rockies video was promoted by press releases

11   that were sent out to various snowboarding magazines?

12   A.  I'm aware that at least --

13        THE COURT:  The question is, at the time of your

14   report, yes or no, were you aware of that, not what you are

15   currently aware.

16        THE WITNESS:  Well, at that time I believe I was aware

17   that it was in a couple of snowboarding online magazines if

18   that's what you're referring to.

19   Q.  My question is a little more precise, which is, are you

20   aware that Monster promoted the video by doing press releases

21   sent out to various snowboarding magazines?

22        MR. KAHN:  Objection.

23        THE COURT:  Is he now aware or at the time?

24   Q.  At the time were you aware?

25   A.  I believe I was aware at the time that it was sent to at

E64gbea2                        Levy – cross

1    least a couple of snowboarding magazines.  I don't know how

2    many.

3    Q.  Okay.

4    A.  I think it was a couple.

5    Q.  Were you aware at that time -- strike that.

6           Were you aware at the time that the video was both on

7    Monster's main web page, as well as its YouTube channel?

8    A.  I was not aware of it being on a homepage, no.

9    Q.  Now, you say that -- by the way, your understanding as to

10   the video was not featured and it was not otherwise heavily

11   promoted, that was an assumption that you were told, correct?

12   A.  Well, I was told that as a fact, which I assumed to be

13   correct, yes.

14   Q.  If that fact is incorrect, that is, that the video was

15   actually promoted by Monster, what effect would it have on your

16   overall view of this case?

17          MR. KAHN:  Objection to the question.

18          THE COURT:  Sustained as to form.

19          MR. PUVALOWSKI:  I apologize.

20          THE COURT:  Sustained.

21          You can rephrase.

22   Q.  Well, let me start with a foundational question.  What

23   impact on your opinion in this case did it have that you

24   believe that the video did not appear featured on any homepage

25   or was otherwise heavily promoted?

E64gbea2                        Levy - cross

1    A.  Well, it cut my estimate in half that it wasn't heavily

2    promoted.

3    Q.  We'll talk about the calculation in a moment.

4    A.  Okay.

5    Q.  Let's move on to Section B of the report, general

6    considerations.  That's the title of it, right?

7    A.  Yes.

8    Q.  You list four factors.  You said valuations and it says

9    "such valuations," let me make sure I find it here.  The fair

10   market value of the songs at issue and the additional fair

11   market value of the Beastie Boys' implied endorsement, such

12   valuations are based on several factors.

13         Do you see that?

14   A.  Yes.

15   Q.  You list four factors, right?

16   A.  That's what's -- yes, four listed, yes.

17   Q.  The popularity of the music for which the license is

18   sought, number one?

19   A.  Correct.

20   Q.  An evaluation of the artist's celebrity/stature within

21   entertainment and recording industries in the general public,

22   correct?

23   A.  Correct.

24   Q.  The details and the usage, that is, where the materials

25   appear for what medium and for how long.  That's C, correct?

E64gbea2                        Levy - cross

1    A.  Correct.

2    Q.  And D the amounts that comparable music by a comparable

3    and/or contrasting artist.  That's D, correct?

4    A.  Correct.

5    Q.  Is it your testimony that these are the four factors that

6    you apply irrespective of whether you're working on behalf of

7    the artist or the advertiser?

8           MR. KAHN:  Objection, those are not the factors that

9    in total that he testified to are in this case.

10          THE COURT:  We'll let the witness answer.

11   A.  Well, I have a two-part answer to your question.  First

12   off, I added yesterday the desirability or what a willing buyer

13   would really be willing to pay, which I added that as, let's

14   say, a fifth.

15          And also many of these, yes, would be the same if I

16   was working, let's say, on the other side, if you will, on

17   plaintiffs' side -- on plaintiffs' side, but that would also

18   depend upon the case, which can have other factors in it.

19   Q.  I'm sorry.  I don't mean to cut you off.

20   A.  I say that would also be dependent on the particular case,

21   which would have other factors in it, possibly other factors.

22   I don't know.

23   Q.  Let me ask you, you just said that you added a factor about

24   what a willing buyer would be willing to pay, right?  That's

25   what you just said?

E64gbea2                        Levy - cross

1    A.  Yes.

2    Q.  Wasn't that always a consideration in your opinion?

3    A.  Yes, but I didn't list it.  I said a couple days ago it

4    literally came to me as a revelation that I should also be

5    thinking what is somebody willing to pay.  I mean, I've done

6    that for decades but never really put that down.  I just sort

7    of presumed that that was presumed by myself and everyone else

8    as opposed to specifically saying it, and I felt it should be

9    said.

10   Q.  Moving on briefly, we'll come back to the factors.  Section

11   C is other considerations, right?

12   A.  Yes.

13   Q.  It's fair to say that these are other things that you

14   considered, isn't that what this means?

15   A.  Yes.

16   Q.  And you write in your report "In this case the usage of the

17   plaintiffs' songs was as background music in a snowboard video

18   whose primary intent in my opinion was to entertain viewers;

19   semicolon, and at the same time, serve the commercial purpose

20   of promoting defendant Monster Energy brand."

21        That's what you wrote, right?

22   A.  Yes.

23   Q.  So you drew a conclusion about what was the intent behind

24   the video.  Isn't that fair to say?

25   A.  Yes.

E64gbea2                         Levy – cross

1    Q.   How did you draw that conclusion?

2    A.   Well, as I mentioned yesterday, of the literally thousands

3    of clients we've had, virtually every one has wanted to sell or

4    promote something, and I wouldn't see this to be any different.

5    In my world, people do videos and commercials and all these

6    things to promote something.

7    Q.   Monster's trying to sell its brand and its products through

8    this video, wouldn't you agree?

9    A.   Again, as I said yesterday, I don't know what's in their

10   heart and head, but I infer that.  That would be my inference,

11   yes.

12   Q.   Based on your experience in the industry, that's the

13   logical inference, correct?

14   A.   Yes, that's my inference.  Yes.

15   Q.   Fair enough.  I want to ask you specifically about the

16   first part of what you wrote there, which is, "the video whose

17   primary intent in my opinion was to entertain viewers."  And

18   then there's a semicolon after that?

19           MR. KAHN:  Your Honor, I object to --

20           THE COURT:  One moment.

21           Overruled.

22           Why don't you start the question again.

23           MR. PUVALOWSKI:  Sure.

24   Q.   I'll back up a little bit in the sentence.  "The usage of

25   plaintiffs' songs was as background music in a snowboarding

E64gbea2                        Levy - cross

1   video whose primary intent in my opinion was to entertain

2   viewers, semicolon."

3              Do you see that?

4   A.  Yes.

5   Q.  What made you conclude that the primary intent was to

6   entertain viewers?

7   A.  Because it's entertaining and I think that Monster would

8   like to keep people on their website, develop a good, warm and

9   fuzzy feeling.  It is entertaining.  I found it entertaining,

10  but it's also a commercial value.

11  Q.  Mr. Albert, you said that the primary intent was to

12  entertain viewers, right, that's what your report said?

13  A.  Yes.

14             THE COURT:  Just to be clear for context,

15  Mr. Puvalowski, so the jury understands the context in which it

16  was said, would you remind the jury, elicit what the second

17  half of that sentence says so it's read in context.

18             MR. PUVALOWSKI:  Absolutely.

19  Q.  There's a semicolon after -- "primary intent in my opinion

20  was to entertain viewers; and at the same time, serve the

21  commercial purpose of promoting the defendant Monster Energy's

22  brand."

23             THE COURT:  Now, you can go back and focus on the part

24  you want to focus on.

25             Go ahead.

E64gbea2                        Levy - cross

1    Q.  Tell me, you saw the Ruckus in the Rockies video several

2    times, correct?

3    A.  Yes.

4    Q.  Did you conclude that the neon green that's throughout the

5    video and the text was intended to entertain viewers?

6    A.  No, I felt the neon green -- you mean the logo?

7    Q.  Well, the logo and all of the various texts that appears in

8    the video?

9    A.  I don't remember the various texts.  I mostly remember the

10   logo.  I can't remember if it had the name Monster whatever,

11   but it was very prevalent in the whole video.

12   Q.  Okay.  The Monster logo was very prevalent, right?

13   A.  Yes.

14   Q.  The Monster colors were very prevalent?

15   A.  The Monster what?  I'm sorry?

16   Q.  Colors, color scheme, the neon green?

17   A.  I didn't really notice the color scheme, I guess.

18   Q.  Did you notice Monster banners and flags and logos all over

19   the video, right?

20   A.  Absolutely.

21   Q.  Okay.  Did your view that the primary intent was to

22   entertain viewers affect your conclusions of value?

23            MR. KAHN:  Objection to the form of the question.

24   It's only half of the sentence.

25            THE COURT:  Overruled.

E64gbea2                      Levy - cross

1          The witness has now had counsel read the sentence

2     twice during examination.  Counsel is entitled Mr. Kahn to

3     focus on the portion of the sentence that talks about the

4     primary intent.  That's what he's doing.

5          Go ahead.

6          THE WITNESS:  I'm sorry.  I don't remember the

7     question.

8     Q.  Did your conclusion that the primary intent was to

9     entertain viewers affect your opinion of the value in this

10    case?

11    A.  Okay.  Let me say I think you're misstating what I've said

12    here, so I can't really answer that.

13         I feel like you're saying here that I'm saying that

14    the primary intent was to entertain and also it just kind of

15    sort of sold something.  I'm not saying that.

16         I'm saying that the primary intent is entertainment

17    and to sell something.  I'm saying it's like 50/50.  I'm not

18    saying that selling something is no big deal.  It is a big

19    deal.  I think it's like 50/50.

20         I feel like you're trying to say I'm saying that it

21    was mostly for entertainment and that's not what I meant when I

22    wrote that.  I'm saying that's even why I put a semicolon.  To

23    me, that was emphasizing both:  It's this and it's that.

24    That's the primary intent, entertain and sell.  That's --

25    Q.  Okay.  So, this is another --

E64gbea2                    Levy - cross

1    A.  It's not disagreeing.  I'm saying they're equal.  I'm not

2    trying to say, well, it's mostly to entertain.  I'm not trying

3    to say that.  I'm saying to me, the primary intent is entertain

4    and sell.

5    Q.  So, we've discussed the language of the sentence enough,

6    but let me ask you this.  So this is another occasion where

7    50/50 is a direct split?

8    A.  I don't know if it's 45/55.  I don't know what's in the

9    hearts of the people who did it.  Maybe they just love

10   snowboarding and really want to entertain their pals and fellow

11   snowboarders.  I really don't know.

12              To me, looking at it, it's a promotional video, which

13   is -- promotional videos are to entertain, not bore people,

14   they are for entertainment, and they serve a promotional

15   purpose.  It's very common.

16   Q.  Let's talk about that.  Later in this same section, you

17   write "the use was not" -- in fact, it's the very next sentence

18   "The use was not a, quote, 'commercial,' unquote, such as a

19   30-second direct-sell television commercial, although the use

20   itself did have commercial benefits."

21              That's what you wrote, right?

22   A.  Correct.

23   Q.  Let's talk business what makes something a commercial in

24   your view.

25              You say this is not a commercial, but it is a

1  commercial use, right?  That's the distinction you're drawing?

2  A.  Yes.

3  Q.  Okay.  But that distinction has a tremendous difference in

4  the value of your opinion, isn't that right?

5  A.  Yes.  About a 50-percent difference.

6  Q.  Another 50 percent, right?

7  A.  Yes.

8  Q.  So is it fair to say that if the jury disagrees with you as

9  to whether this is a commercial, they shouldn't discount by

10  that 50-percent factor, correct?

11         THE COURT:  Let's take the jury out of the question

12  and rephrase it.

13  Q.  If this is a commercial, it shouldn't be discounted by that

14  50 percent, isn't that right?

15  A.  I'd say that's correct; yes.

16  Q.  So let's talk then about why you conclude that it is a

17  commercial use but not a commercial.

18         Now, isn't it true, Mr. Albert, that you've never been

19  aware of a definition of what a commercial is, but you just

20  know it when you see it?

21  A.  Yes.  I've been in advertising since I was 21.

22  Q.  So, there's no objective definition, but you know it when

23  you see it.  That's your testimony?

24  A.  There's no definition I'm aware of, but I've been dealing

25  with commercials for, wow, the better part of 50 years; that's

E64gbea2                         Levy - cross

1    been my business and generally accepted.

2              When I discuss with people what a commercial is or a

3    video and people in the music and entertainment industry, we

4    all feel we know the difference.  I don't know if anybody

5    actually -- if there's a pure definition.  I'm not aware of

6    one.

7    Q.  So, you're making a determination based on no objective

8    criteria as to that this video is not a commercial and that

9    drives a substantial difference in your opinion, isn't that

10   right?

11             MR. KAHN:  Objection.

12             THE COURT:  Sustained.  Argumentative.

13   BY MR. PUVALOWSKI:

14   Q.  Well, break it apart.  The commercial issue is a 50-percent

15   swing, correct?

16   A.  Correct.

17   Q.  You're not aware of any objective criteria by which someone

18   could make a determination as to whether this is a commercial

19   or not?  You just know whether it is or not.  You have an

20   opinion, right?

21   A.  No, I wouldn't say that.  I think there is objective -- I

22   have a lot of objective criteria, a lot of it in my experience,

23   but I don't know definitively how a commercial is defined.  But

24   I know that commercials, it's a paid use, it's usually of a

25   certain length, it's usually of a certain sell, it appears

E64gbea2                    Levy - cross

1    certain places and certain manners.

2            Like I say, I've been doing commercials for -- and

3    even producing them.  Prior to getting into this business, I

4    owned an ad agency in my early 20's.  I've been director of

5    advertising in a corporation.  I've been in all phases of the

6    business.  I feel I know what a commercial is.  But do I know a

7    specific academic definition?  No, I don't.

8    Q.  In this case, you concluded that the Ruckus in the Rockies

9    video is not a commercial because it doesn't look like one and

10   because it's not on paid media, isn't that a fair summary?

11   A.  No.

12   Q.  It's not?

13   A.  It's because it's a video and it's a promotional video and

14   I don't know of anybody in the industry would ever call this a

15   commercial.  We deal in these every day.  When we call a

16   publisher we say something's a video or a commercial, they know

17   instantly what we mean.

18           In almost 40 years of licensing, no publisher's ever

19   come back and said, hey, I thought you said this would be a

20   video and, hey, that's a commercial.  It's never happened

21   because we all work within a perceived definition of what it

22   is.

23           I didn't make the rules.  I just play within them.

24   And this is a video.  It's sort of like if you cut the top off

25   a pick-up truck and it has two seats in it, it's not a sports.

E64gbea2                        Levy - cross

1    I don't know -- I'm into sports cars since a kid and I don't

2    know how to define one, but I know one when I see it.

3            THE COURT:  Let's move on, Mr. Puvalowski.  I think

4    the issue has been fully ventilated now.

5            MR. PUVALOWSKI:  May I approach.

6            THE COURT:  Yes, you may.

7            May I have a copy.

8            MR. PUVALOWSKI:  The portion of the deposition that

9    I'd like to refer the witness to is on page 101 starting at

10   line four and going on to just line eight.

11           THE COURT:  I think it's consistent with his

12   testimony.  Overruled.  Sustained.

13   Q.  Now, you mentioned a moment ago that you at one time in

14   your career, you actually produced video -- commercials,

15   correct?

16   A.  Yes.

17   Q.  And isn't it fair to say that you could edit this video,

18   the Ruckus in the Rockies video for time, that is, move it from

19   four minutes to 30 seconds or so to make it into a commercial?

20   A.  Absolutely.

21   Q.  So, is it your testimony that if Monster had shot this

22   video and edited this video down to 30 seconds instead of four

23   minutes, you would consider it a commercial, correct?

24   A.  No.

25   Q.  No?

E64gbea2                              Levy - cross

1    A.   It would be a 30-second video.

2    Q.   Okay.  So then it's still a video because it's not on paid

3    media, that's your testimony, right?

4    A.   That's to me a big part of whether something's a

5    commercial, yes.

6    Q.   So if an infringer shoots a 30-second video that looks just

7    like a commercial, sounds just like a commercial, has

8    endorsements just like a commercial, has logos just like a

9    commercial, uses a underlying soundtrack just like a

10   commercial, but decides you know what, I'm going to put it up

11   only on my website, it's not paid media, is it your testimony

12   that that could never be a commercial for purposes of your

13   valuation?

14   A.   No.

15              MR. KAHN:  Object to the form of the question.

16              THE COURT:  Overruled.

17              Next question.  He said the answer.  The witness said

18   "no."

19              THE WITNESS:  I'm sorry, your Honor, I can answer.

20              THE COURT:  It was a yes or no question and you

21   answered it "no."  Your counsel can follow up on redirect.

22              THE WITNESS:  Okay.

23   Q.   I may regret this, but why not?

24   A.   Well, because the way you described it, you said if they

25   put things in it they're talking about or saying which isn't in

E64gbea2                         Levy - cross

1   the video, I don't hear any direct sell of the product, so you

2   put things in that -- you included in that things which really

3   aren't in this video; that's why I said no.

4          If you took --

5   Q.  You testified a moment ago --

6          THE COURT:  You asked him why.  Let him finish his

7   answer.

8          MR. PUVALOWSKI:  I apologize.  I thought he was

9   finished.

10  A.  If this video were edited to 30 seconds and nothing else

11  was added, no voiceover or anything, and it was put on the

12  website, just as it is, I would say it's a 30-second video.

13         If, however, you did as you said, which isn't -- which

14  would be to add things, you could turn this into a commercial,

15  yes, and, in which event, I would say it's a commercial that

16  somebody's using at their website and it would have to be

17  looked at as a commercial, yes, and it would definitely change

18  my opinion as to valuation.

19         MR. PUVALOWSKI:  I'd like to refer the witness to his

20  deposition at page 105, line 16 through 106, line seven.

21         THE COURT:  I'm sorry.  105 line 16 through where?

22         MR. PUVALOWSKI:  Through 106, line seven.

23         THE COURT:  No, that's consistent with his testimony.

24  Just to be clear, his testimony is that it that one is capable

25  of using the material here and turning it into a commercial.

E64gbea2                          Levy - cross

1   That is the essence of the testimony you're seeking to present

2   him with, so I regard these as consistent, not inconsistent.

3            Go ahead.

4   Q.  Is it your testimony that to turn the four-minute Ruckus in

5   the Rockies into a commercial -- let me ask you this way.  The

6   difference between the four-minute Ruckus in the Rockies

7   commercial -- video and a commercial is primarily its length,

8   isn't that right?

9   A.  Primarily, but that doesn't mean 99-percent primarily.

10  There's other factors --

11  Q.  Okay.

12  A.  -- including the words "paid," as I mentioned here --

13           THE COURT:  Please don't read aloud from your

14  deposition testimony.  You've answered the question.

15           Next question.

16           THE WITNESS:  Okay.

17  Q.  Let me move on.  There's another line in the other

18  considerations portion of your report.  You write "An implied

19  endorsement of Monster Energy -- "

20  A.  Wait.  I'm not there yet.  What page are we on?  Bottom?

21  Q.  Bottom of three on page four.

22  A.  Okay.

23  Q.  "An implied endorsement of Monster Energy by the Beastie

24  Boys can also be assumed due to their indirect association with

25  the brand within the video."

E64gbea2                         Levy - cross

1          That's what you wrote, correct?

2     A.   Yes.

3     Q.   The basis for that is that there are -- there's music of

4     the Beastie Boys in the video, correct?

5     A.   Correct, and the name appears at the end and it has "rest

6     in peace, MCA," yes.

7     Q.   So, all of those things suggest to you that

8     there's -- there is an implied endorsement of Monster by

9     Beastie Boys, correct?

10    A.   Yes.

11    Q.   Let's move onto the section the next section of your

12    report.  "The fair market value of the use."  That's what it's

13    entitled, correct?

14    A.   Yes.

15    Q.   Here is where you do your calculations that Mr. Kahn took

16    you through?

17    A.   Yes.

18    Q.   Let's do in this generally.  The starting place is a view

19    that one Beastie Boys song would command 150,000 to 200- per

20    side, correct?

21    A.   Correct for one-year's use in a commercial, yes.

22    Q.   And that's one-year use in the U.S., TV, radio and

23    internet, correct?

24    A.   Correct.

25    Q.   Then the way you structured your report, you proceed to

E64gbea2                         Levy - cross

1    take a series of discounts, is that fair to say?

2    A.  Correct.

3    Q.  Just briefly, the first discount is 50 percent because you

4    deem this to be only -- light internet use, correct?

5    A.  Yes.

6    Q.  So your opinion is that you divide by 50 percent, not 40?

7    A.  Correct.

8    Q.  Not 60?

9    A.  What I did was 50.

10        THE COURT:  Mr. Puvalowski, your call here, but if

11   your examination is largely tracking the chart, your call, but

12   might it be useful to have it up to anchor it up for the jury

13   in the calculative process.

14        MR. PUVALOWSKI:  I appreciate that.  In fact, I

15   intended to do that and I failed to.

16        Can we ask that the demonstrative exhibit, it's

17   Defendant Exhibit 129, be put up?

18   Q.  Mr. Albert, is it fair to say that the first discount that

19   you have here is 50 percent because it's light internet use,

20   correct?

21   A.  Here meaning the report?

22   Q.  Yes.

23   A.  Yes.

24   Q.  And then you take another discount, correct?

25   A.  Yes.

E64gbea2                    Levy - cross

1    Q.  You divide by 50 percent again because the use is only five

2    weeks, correct?

3    A.  Yes.

4    Q.  Again, not a 40-percent difference?

5    A.  Could it have been, yes, but no, I say 50 because that's an

6    industry standard.

7    Q.  Okay.  Could 40 percent have been a reasonable discount to

8    have in this case?

9    A.  Sure.

10   Q.  How about 30 percent?

11   A.  No, I don't think 30 percent.  I think it would be 50 which

12   is to your benefit.  I think it would be 50.

13           Well, there's 30 -- could it be 30?  I mean, really,

14   no.  I mean, could it happen, yes, but the industry standard

15   would be half.  Could something else happen?  Yes.

16   Q.  First, let me be clear:  You have a 50-percent discount,

17   correct?

18   A.  Correct.

19   Q.  If I think your testimony was that it could be a reasonable

20   discount could be 40 percent, correct?

21   A.  Well, it could be, but it wouldn't really be the industry

22   standard, but could it happen?  Yes.

23   Q.  Okay.  Well, why did you -- if 40 percent is reasonable,

24   and a 50-percent discount is reasonable, why did you pick 50

25   percent?

E64gbea2                    Levy – cross

1    A.  You're saying that reasonable and industry standard are the

2    same.  That's what I'm hearing.  Is 40 percent reasonable, yes,

3    but it is not the industry standard.

4    Q.  Would it be fair to use a 40-percent discount here,

5    Mr. Albert?

6    A.  Not for me to do it, no, because I'm supposed to be in as

7    an expert and testify also as, I believe, to industry standard

8    and it wouldn't be truthful if I said 40 or 60.  I could have

9    said 60 for my client and I won't do that because the industry

10   standard is 50.

11   Q.  It's exactly 50 percent all the time?

12   A.  No, I'm saying it can happen otherwise, but the standard,

13   like I say -- can anomalies happen?  Of course.  Of course,

14   they can, but the standard is 50 percent.

15   Q.  Let's move on.  The next step in your calculation is

16   another discount, correct?

17   A.  Correct.  Are we on B or C?

18   Q.  We're now to D.

19   A.  D.  Okay.

20   Q.  It's another discount of 50 percent, correct?

21   A.  Correct.

22   Q.  In this case because the video is not a commercial, that's

23   the use you just discussed?

24   A.  Correct.  Correct.

25   Q.  And again, the discount here exactly 50 percent, right?

E64gbea2                    Levy - cross

1    A.  Well, I say 50 because it's a standard, it doesn't have to

2    be 50.  I'm sure there's occasions it happened in life that's

3    not 50, but the standard is 50.  That's my experience, is that

4    it's 50.

5    Q.  Are there videos that look -- that in your view are just

6    videos, not commercials, but they approach what a commercial

7    looks like to you?

8    A.  Could it happen?  Yes.  I'm not familiar with any

9    because -- and the reason I'm not, I don't say that lightly --

10   I'm very careful in protecting my clients and if I got a

11   storyboard for a video that was going to be produced and I

12   thought it looked like a commercial, and I don't know if that's

13   happened but if it did as many other things have happened, I

14   would immediately call it to their attention and say, hey, you

15   do this and you post that, you're going to get sued by a

16   publisher because that's not a video.  So, it isn't something

17   that it would just be -- I'm sorry.

18           Now, I'm forgetting what the question is, tie it back.

19           THE COURT:  Next question.

20   Q.  Let me ask you this:  Is there a spectrum between what

21   might be on one hand a commercial promotion video on one hand

22   and a commercial on the other?  Is there a spectrum?

23   A.  In my experience, no.  It's black or it's white.  It's

24   either a video or it's a commercial.

25   Q.  And it's a bright line test?

E64gbea2                        Levy - cross

1    A.  It's a what?

2    Q.  It's a bright line test?

3    A.  I'm not familiar with that term.  I'm sorry.

4    Q.  So it either is a commercial or it's not.  There's no

5    gradations?

6    A.  In my world, it either is or it isn't.

7    Q.  And the discount is exactly 50 percent?

8    A.  No.  That's a standard and could it vary?  Yes.

9    Q.  Could a different percentage drive the fair market value of

10   a video in your terminology?

11              MR. KAHN:  Objection.

12              THE COURT:  Sustained.

13   Q.  Let's move on to E.

14   A.  Pardon?

15   Q.  To E on page five.

16              THE COURT:  Mr. Puvalowski, because you are using

17   numbers that don't appear on the chart, be sure to anchor what

18   you are referring to to something that's in the chart that's

19   before the jury so they can follow where you're going.

20              MR. PUVALOWSKI:  I will do that.

21   Q.  What we're looking at, Mr. Albert, if you look at your

22   screen, to correspond what with what the jury is looking at,

23   it's the portion multiplied by 2.5.

24              Do you see that?

25   A.  Yes.

E64gbea2                     Levy - cross

1    Q.  That corresponds to E in your report?

2    A.  Yes.

3    Q.  Okay.  Now, this is the Chuck E. Cheese discount, right?

4    A.  No.

5    Q.  This is the discount for frequency, correct?

6    A.  Yes.

7    Q.  The example you used during your direct examination was the

8    Chuck E. Cheese example, correct?

9    A.  Yes.

10   Q.  By the way, there's five songs, five Beastie Boys songs in

11   the Ruckus in the Rockies video, correct?

12   A.  Yes.

13   Q.  You say that we should multiply that number not by five,

14   but by 2.5, so half of that, right?

15   A.  Yes.

16   Q.  So, in effect would you agree with me that this is yet

17   another 50-percent discount on a per song basis?

18   A.  Yes.

19   Q.  So, we have four discounts, light internet at the top for

20   the jury, 50 percent; five weeks, 50 percent; the next, it's

21   not a commercial, 50 percent; and a frequency or a volume

22   discount, 50 percent.

23           Would you agree with me that that's what happening in

24   your report?

25   A.  Yes, in essence, yes.

E64gbea2                         Levy - cross

1    Q.  Let's talk about one or two of these issues in a little

2    more detail.  First, let's talk about the starting point.

3    A.  The what?

4    Q.  The starting point, why you determined that 150- to 200,000

5    per side for the Beastie Boys.

6    A.  Okay.

7    Q.  You testified yesterday that in your experience 80- to 90

8    percent of the bands out there fall into one category and there

9    are some below and there are some mega superstars above.  Is

10   that a fair summary of your testimony?

11   A.  I also said there might be a fourth in there between where

12   most of them fall and those mega superstars.  There's a small

13   category in there, too.

14   Q.  Okay.

15   A.  In other words, one doesn't have to be in one of three.

16   There can be in-between areas.

17   Q.  Is it your testimony that the Beastie Boys fall into the

18   80- to 90 percent category?

19   A.  Yes.

20   Q.  So your testimony is that your starting point is by

21   reaching a conclusion that the Beastie Boys were in the same

22   category as 80- to 90 percent of the other bands and acts out

23   there?  Is that what you're trying to say?

24   A.  No, I'm saying the other popular bands and groups out

25   there, meaning those which have achieved success.  Obviously,

E64gbea2                          Levy - cross

1    most bands out there are probably lounge acts and don't get

2    anything for commercials.  No, I'm talking about famous,

3    popular musical groups.

4    Q.  Okay.  How many are there, in your view?

5    A.  I really don't know if it's hundreds or a few thousand.

6    I've never counted -- I have no idea.

7    Q.  And what acts, what bands do you view as comparable to the

8    Beastie Boys?

9    A.  Well, pricewise and again, as I said, this is not music

10   because that would start to insult people and I don't

11   mean -- obviously, there are very different kinds of music, but

12   I think Beach Boys' music, Temptations music, Four Seasons'

13   music and Kiss' music, which I mentioned yesterday, that's the

14   kind of band that falls in there.  They're not on that low

15   part.  They're not on that high part.  They're in that where

16   most bands fall that have a good deal of success, and that's

17   where I think they are.

18   Q.  What drives that conclusion?  What is basis of that

19   conclusion from a price point that the Beastie Boys are

20   comparable to those acts?

21   A.  Because it's my opinion that they are.  I mean, that's my

22   opinion.  That's who they are.  They're not the Eagles, they're

23   not the Beatles, they're not the Stones, they're not Taylor

24   Swift.  They're probably happy that they're not.  They're not.

25   They're just not super megastar guys.  They're wonderful, but

E64gbea2                         Levy - cross

1    they're not in that category.  I believe they're in with the

2    majority of successful famous groups, popular group, respected

3    groups, but they're not superstars.  I'm sure to their fans

4    they are, but in general population, my opinion is they're not.

5    Q.  It's your testimony that all of those other groups

6    that -- of the popular groups fall into essentially the same

7    price point, is that your testimony?

8    A.  In the industry, yes, in the industry, yes.

9    Q.  One of the factors that drives your view as to whether a

10   band is a just a run-of-the-mill 80- to 90 percent popular

11   group versus a megastar is album sales, right?

12            MR. KAHN:  Objection to the form of the question.

13            THE COURT:  Overruled.  Is album sales one of the

14   factors you consider in where you sort a band?

15            THE WITNESS:  It is a factor, and I would never refer

16   to those groups that I deal with, including the Beastie Boys,

17   as run-of-the-mill.  I don't want my "yes" to imply that I

18   consider any of these people run-of-the-mill.

19   Q.  Fair answer.  I'm not attempting to put that

20   characterization into your mouth, but to the question, does

21   album sales affect your sorting for this purpose?

22   A.  Yes.

23   Q.  Now, one of the acts that you mentioned yesterday as a

24   megastar is 50 Cent, correct?

25   A.  Yes.

E64gbea2                          Levy - cross

1    Q.  But 50 Cent hasn't had the album sales that the Beastie

2    Boys had, has he?

3    A.  I don't know what his sales are.

4    Q.  Okay.  So that factor --

5    A.  Actually -- let me clarify, I think I do because I actually

6    represent him in another case, so I can't discuss and I'm sure

7    I probably was told once the album sales, and off the top of my

8    head, I have no idea what they are.  I don't remember.

9    Q.  Do you know that they're lower than the Beastie Boys?

10   A.  No.  I don't know that they're lower or higher.

11   Q.  If they are lower, would that affect your sorting of 50

12   Cent versus the Beastie Boys?

13   A.  No.

14   Q.  Are you aware that the most successful album of 50 Cent

15   sold fewer copies than the Beastie Boys' most successful album?

16   A.  That's very possible, but he has a higher stature in the

17   industry.  That's why that's another factor.  In other words,

18   album sales is a factor.  It's not the only one.  It's not the

19   prime one.  That's why there's also stature in the industry

20   where 50 Cent is up there in the stratosphere somewhere.

21   Q.  That's your conclusion, right?  That's your opinion?

22   A.  You bet; yes, it is.

23   Q.  Is there anything objective that we can point to, to test

24   the accuracy of that opinion?

25   A.  Yes.

E64gbea2                         Levy - cross

1   Q.  What?

2   A.  Public knowledge of 50's income, which I believe is up into

3   the nine figures, unbelievable, which I would imagine is way,

4   way past the income of the Beastie Boys.

5          As I mentioned yesterday, income from bankruptcies to

6   deals closed, is a factor when I evaluate fair market value.

7   And it's a factor when I negotiate.  If I know that somebody's

8   earning $100,000,000 a year, I'm not going to be able to entice

9   them with a $200,000 offer, and those are the anomalies.

10  Q.  Mr. Albert, you know that the vast majority of 50 Cent's

11  income has nothing to do with his music licensing, correct?

12  A.  I don't know that, but I know that there's other -- of

13  course there's other promotional and product situations, yes.

14  But that income will affect the price of his music for

15  commercials.  I doubt if he'll take $200,000 for a song.

16  Q.  Well, Mr. Albert, you know that the Beastie Boys won't take

17  $200,000 for a song either for a commercial, correct?

18  A.  No.  I know that because they simply won't do commercials.

19  If they did commercials, I think they would be in that 3- to

20  $400,000 all-in range and that their publisher and their record

21  company would talk them into that.

22  Q.  Let's talk about.  Your factor D on the jury's chart, the

23  first reduction, light internet, that deals with, A, what media

24  we're talking about internet, correct?

25  A.  Correct.

E64gbea2                         Levy - cross

1   Q.  And your view as to how heavy the use was on the internet,

2   correct?

3   A.  Correct.

4   Q.  Would you agree with me that the geography, that is, the

5   territory in this case with regard to Ruckus in the Rockies was

6   worldwide?

7   A.  Yes, I would.

8   Q.  And isn't it the case that the difference between a

9   worldwide commercial and a U.S.-only commercial is that you

10  would multiply the U.S.-only commercial by two or two

11  and-a-half times?

12  A.  On TV and radio.  Not internet.

13  Q.  Let's talk about the frequency discount for a moment.

14  Isn't it true that you don't -- you're not aware of a single

15  example of a frequency discount given in a commercial setting?

16  A.  Could you be a little more specific?  Are we talking about

17  number of -- what are you saying?  Songs, number of songs in a

18  commercial?  Number of celebrities in a something?  I'm not

19  sure.  If you can clarify it, I'd appreciate it.

20  Q.  I'm talking about songs, okay.  So, music in a commercial

21  as you define commercial, okay.

22  A.  Okay.

23  Q.  Isn't it true that you're not aware of a single example

24  where more than one song was used in a commercial?

25  A.  That is correct.

E64gbea2                         Levy - cross

1    Q.  So, when you made your conclusion that the amount of

2    copyright recovery for the Beastie Boys should be reduced by

3    half because of some frequency discount, that wasn't based on

4    anything having to do with commercials, correct?

5    A.  Correct.  Well, well, no.  When you said not anything, I've

6    done commercials and, in fact, for some time as an example, I

7    was responsible for getting talent for the milk ads, "Got

8    Milk?"

9         Those people only, at the time I was in it, we're

10   getting $25,000 apiece.  These are people who normally want

11   hundreds of thousands or millions.  But because so many people

12   were doing it, people would do it for less.  It was, again, a

13   frequency discount-type of situation.

14        So I've been involved with some many of those

15   situations that to me, this is the standard in the industry,

16   but is -- specifically putting more than one song in a

17   commercial?  No, never done that, have never been aware of it.

18   Q.  So the example of the milk commercial?

19   A.  Well, the ads, they were print.

20   Q.  Print ads, Okay.

21   A.  I'm sorry.  It wasn't --

22   Q.  So we're talking celebrity photos there, correct?

23   A.  Correct.

24   Q.  So, it has nothing to do with whether there would be a

25   frequency discount provided by a rock and roll band in

E64gbea2                    Levy - cross

1   connection with a promotional video?

2   A.   Incorrect.  I do not agree with that.  Can I expound on

3   that?

4   Q.   No, your counsel can if he wants to.

5   A.   Okay.

6   Q.   Now, your example as to the frequency discount was Chucky

7   E. cheese, right?

8   A.   Yes.

9   Q.   Chuck E. Cheese has got hundreds of stores and restaurants

10  all over the country?

11  A.   I believe around 600 over the world; yes.

12  Q.   So they use a lot of songs through their animatronic

13  characters, correct?

14  A.   And the kids singalong, yes.

15  Q.   So they use multiple songs as performance, correct?

16  A.   Correct.

17  Q.   Would you agree that's a completely different context than

18  a synch license used in connection with a commercial?

19  A.   No, because it's also synchronized often to video and we

20  provide both a synch and a performance license.

21  Q.   It's fair to say the only people watching that performance

22  are the little kids and the parents, the unlucky parents, who

23  are sitting in Chuck E. Cheese, right?

24  A.   Except for the ones who video their kids singing and put it

25  up on Facebook, so there's a lot of video out there.

E64gbea2                         Levy - cross

1   Q.  Mr. Albert, are you really suggesting that the discount has

2   anything to do with the fact that a parent might videotape

3   their child at Chuck E. Cheese?

4   A.  I was just trying to be specific in answering your

5   question.  That's all.

6           And, in our agreements there, everybody is aware that

7   this can happen; somebody can put a video up and then it

8   depends on the context whether it has to be taken down, so

9   these are very specific things.

10  Q.  I'll move on.  Let's move on to the next section.  This has

11  to do with the comparables, what are the comps.

12  A.  Uh-huh.

13  Q.  First of all, each of these comps is only one song?

14  A.  Can I ask you --

15  Q.  Starting at page five of your report.

16  A.  Thank you.

17  Q.  Each of the comparables here relate to just one song,

18  correct?

19  A.  Correct.

20  Q.  Let me refer your attention to -- in particular, there's a

21  comparable that you used, comparable number four.

22  A.  Yes.

23  Q.  Involving an internet-only video that involves a Johnny

24  Cash song called I've Been Everywhere, correct?

25  A.  Correct.

E64gbea2                          Levy - cross

1   Q.  Your comparable is that Mr. Cash's -- well, Mr. Cash's

2   estate I take it -- well, let me just ask the question.

3            Was Mr. Cash still alive at the time this deal was

4   done?

5   A.  No.

6   Q.  So, this was -- ended up being a one-year use, correct?

7   A.  No, eight months.  It says eight months.  I'm sorry, eight

8   months.

9   Q.  I'm not trying to trip you up.  Do you recall in

10  your -- doesn't matter.  That's fine.

11           Isn't it the case that after you created this report

12  you corrected that and indicated that it was a one-year

13  license?

14  A.  Gee, I don't remember that.  Did I?  I don't remember.  I

15  don't recall doing that.  No.

16  Q.  Not worth the time.  I'm not suggesting that your report's

17  wrong.

18  A.  It's not wrong.

19           THE COURT:  Next question.  Move on.

20  Q.  And the fee for that use -- and this is a Home Depot

21  commercial, Home Depot video, correct?

22  A.  Correct.

23  Q.  In your view, this was not a commercial, correct?

24  A.  Well, no, because it was contracted as a video, everybody

25  agreed it was a video, so it was a video.  I don't even know

E64gbea2                    Levy - cross

1    that I've seen it.

2    Q.  Well, you used it as a comparable to this case, right?

3            MR. KAHN:  Objection, your Honor.

4            THE COURT:  Overruled.  Sustained.  You need to

5    clarify what you mean by comparable.

6    Q.  You deemed this to be a comparable example supporting your

7    opinion in this case, correct?

8    A.  But I think we need to define comparable.  As I defined it

9    earlier in my report, comparable to me doesn't mean the same.

10   This was used to show people who get more than the Beastie

11   Boys, not the same.  Comparable to me also means contrasting.

12   So I put it in as an example as I explained earlier in like the

13   page before that these are examples of people who would get

14   more money than the Beastie Boys.  So, the point -- so people

15   were able, whether it was yourself -- I'm sorry -- at the time

16   in a deposition or later on for a jury, so the concept of what

17   video, what kind of money videos get, so that's why I put it

18   there.  But I did state in here that this is somebody who would

19   get more than the Beastie Boys.

20   Q.  So is it your opinion, is it your testimony that in your

21   view a Johnny Cash song, I've Been Everywhere, is more valuable

22   than Beastie Boys' Sabotage?

23   A.  Than Beastie Boys anything, yes.  Johnny Cash is Johnny

24   Cash; yes.

25   Q.  So any Johnny Cash song is going to be more valuable than

E64gbea2                          Levy – cross

1    Beastie Boys' Sabotage or Beastie Boys' Intergalactic or

2    Beastie Boys' Make Some Noise?

3    A.  I never said any Johnny Cash song.  I'm sure there are some

4    so obscure on a B side from 40 years ago, so no, I'm not going

5    to say any Johnny Cash song, but I've Been Everywhere is hardly

6    any Johnny Cash song.

7    Q.  Well, it's kind of a joke song, isn't it?

8    A.  Joke?

9              THE COURT:  Sustained.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E641bea3                    Levy - cross

1              THE COURT:  Mr. Puvalowski, how much more do you have?

2              MR. PUVALOWSKI:  A bit, your Honor.

3              THE COURT:  Let's be efficient.

4              MR. PUVALOWSKI:  Let's move on.

5     Q.  Now move on to Section F of your report, Mr. Albert.

6     A.  After the report?

7     Q.  F as in Frank, on page 7.  The fair market value of the

8     Beastie Boys' implied endorsement.  Do you see that?

9     A.  Sure.

10    Q.  Now you say there that you see no reason why singers and

11    musicians and the Beastie Boys would receive any more than

12    union scale residuals for their performance and implied

13    endorsement, right?

14    A.  That's correct.

15    Q.  Now isn't it true, Mr. Albert, that the implied endorsement

16    has nothing to do with union scale?

17    A.  That is completely incorrect in my experience.

18    Q.  Isn't it true that artists occasionally, when there is some

19    connection beyond just the use of the music, are able to

20    negotiate and receive a separate implied endorsement fee?

21    A.  Yes.  In fact, the union rules say that they can negotiate,

22    of course, yes.

23    Q.  And that's got nothing to do with any union contract.

24    That's a separate negotiation, correct?

25    A.  That has everything to do with the union contract because

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E641bea3                    Levy - cross

1    it says they may negotiate.  They do not have to accept scale.

2    They are not forced to.  They may negotiate a higher fee.

3    Q.  All right.  So it's fair to say that that happens when

4    there is some endorsement beyond just the playing of the music,

5    isn't that right?

6    A.  No.  No, because typically, like I was saying, 90 -- way in

7    the 90s percent of the time, what's accepted is scale, by major

8    groups.  They don't have to accept that, no.

9    Q.  Okay.  But --

10   A.  And it does cover the implied endorsement.  Because it does

11   come under the SAG-AFTRA commercials contract.  Now it doesn't

12   just mean commercials.  It's anything commercial.  And that is

13   what the -- an implied endorsement's about.  That's also why

14   Screen Actors Guild automatically gives an advertiser

15   exclusivity in their category.  So the singers in this can't --

16   they get a certain -- the buyer gets a certain exclusivity, and

17   which is part of the union agreement.  That's because it is

18   recognized there is an implied endorsement.

19   Q.  Mr. Albert, you just said that in 90 percent of the cases.

20   Doesn't that suggest that there are at least some cases where

21   there is an endorsement beyond the music itself for which there

22   is a separate fee that is negotiated?  Yes or no.

23   A.  There's always an endorsement beyond the music itself.

24   That's what I was trying to say.  And that's why they're paid

25   union scale is for that endorsement.  There's always an

E641bea3                         Levy - cross

1    endorsement there, yes.

2    Q.  Please answer my question.

3    A.  I did.

4    Q.  Are there occasions when an artist, because there is more

5    of a connection between them and the product or them and the

6    brand than just the use of their voice, just the use of their

7    music, in which they're able to negotiate a fee that's higher,

8    sometimes a lot higher, than just union scale?

9    A.  Well, my experience --

10             THE COURT:  It's a yes or no answer.  It's a yes or no

11   question.

12   A.  I can't answer yes or no because again, you stated

13   something in there that I'm not going to say yes to because

14   it's not -- it's a mischaracterization.  I don't understand

15   what you mean where -- when you said their name is used beyond

16   the music.  And if you defined it for me, how is their name

17   used, I'd be happy to answer the question.

18   Q.  Fine.  Mr. Albert, in your experience, in a commercial that

19   uses a piece of music, is the artist's name typically included

20   in text in that commercial?

21   A.  No, it is not.  Usually.

22   Q.  Okay.  In your experience, when a piece of music is used in

23   a commercial, is the stage name of one of the band members used

24   in the text of that commercial, typically?

25   A.  Usually no.

E641bea3                    Levy - cross

1  Q.  In your experience is there a message in the commercial

2  itself that links to a music download by the artist?  Is that

3  typical?

4  A.  No.

5  Q.  Would you agree with me that these factors establish a

6  connection that's beyond what is typically in a commercial?

7  A.  Well, first, it's not -- yes, but it's not in a commercial,

8  it's in a video.

9        THE COURT:  You've answered the question yes.  Next

10 question.

11       THE WITNESS:  Okay.

12       THE COURT:  Sir, when it's a yes or no question and

13 you're capable of answering yes or no, answer yes or no.

14       THE WITNESS:  Okay, yes, sir.

15 Q.  And that increased connection is what sometimes results in

16 a negotiated fee that is higher, sometimes far higher, than

17 just union scale, wouldn't you agree?

18 A.  I don't know if it's far higher, but it could result in

19 a -- an additional negotiation, yes.

20 Q.  And you've actually been an expert witness in some of those

21 cases, haven't you?

22 A.  I don't remember specifically what ones, but I'll say

23 probably yes.

24 Q.  All right.  Let's move forward.

25       Mr. Albert, would you agree that the first commercial

E641bea3                          Levy - cross

1  use of an artist's song will command a higher fee than a

2  subsequent use, everything else being equal?

3  A.  I'll give you a qualified yes.

4  Q.  Okay.  I'll take that.  That's because the advertisers do

5  not like songs that are already associated with other products

6  or causes, especially if the earlier ones were controversial,

7  isn't that right?

8  A.  That could be one of the reasons.

9  Q.  Okay.  So prior uses for a product or a cause decreases the

10  future value of an artist's music, wouldn't you agree?

11  A.  Well, usually, if we're talking fair -- rather a willing

12  buyer and seller, music isn't used that the artist wanted to --

13  Q.  Mr. Albert, just answer the question.

14  A.  Could you repeat it for me, please.

15  Q.  So prior uses for a product or cause decreases the future

16  value of an artist's music, wouldn't you agree?

17  A.  I think in a small percentage, that's -- I give a yes, a

18  small percentage.

19  Q.  Okay.  In fact, the association with someone else's product

20  tends to lessen the attractiveness of the song for other uses

21  altogether, isn't that right?

22  A.  I can't really say yes or no on that 'cause so many songs

23  are licensed so many times and are so desirable, I can't really

24  give a yes or no to that.

25  Q.  All right.  Do you agree that one use could alienate fans

E641bea3                         Levy - cross

1   who disagreed with that product or that cause?

2              MR. KAHN:  Objection.

3              THE COURT:  Sustained.

4   Q.  Could a prior use negatively impact the future sales

5   potential of the recordings themselves?

6              MR. KAHN:  Objection.

7              THE COURT:  Overruled.

8   A.  Could it what?  Could you just repeat the question for me.

9   Q.  Sure.  Could a prior use negatively impact the future sales

10  potential of the recordings themselves?

11  A.  Could it?  Yes.

12  Q.  In fact, the association of a band with a controversial

13  product might limit the band's future endorsement

14  opportunities, wouldn't you agree?

15  A.  Well, if the potential future advertiser had a problem with

16  it, potentially, yes.

17  Q.  Would you agree that within the advertising industry, when

18  a popular song is used, the general public believes that the

19  artist gave permission for use of the song?

20  A.  Yes.

21  Q.  Do you agree that the general public believes that the

22  artist or writer is associated with or approves of the product?

23              MR. KAHN:  Objection.

24              THE COURT:  One moment.

25              Sustained.

E641bea3                        Levy - cross

1   Q.  Would you agree that in at least some cases, a

2   consideration that needs to be taken into account, when coming

3   up with an opinion on fair market value, is the loss of

4   goodwill with the artist's fans?

5   A.  Yes.

6   Q.  In fact, that consideration needs to be taken into account

7   when those fans might feel that the artist has sold out,

8   correct?

9            MR. KAHN:  Objection.

10           THE COURT:  Overruled.

11  A.  I think so, yes.

12  Q.  And would you agree, generally, that promotional uses

13  typically command significantly higher fees than nonpromotional

14  uses of music as part of other artist's works?

15  A.  Non -- I don't do any nonpromotional things, so I'm not

16  sure how to answer that.

17  Q.  You only do commercials.

18  A.  No, I do anything commercial --

19  Q.  Fair enough.  Fair to say you --

20  A.  -- involving advertising.

21  Q.  -- you don't have a great deal of experience involving

22  licensing for film, correct?

23  A.  That's an understatement.  I have almost none.

24  Q.  Okay.  Same with TV?

25  A.  Yes, correct.

E641bea3                         Levy - cross

1   Q.  I'd like to talk to you about a couple of other matters

2   that you worked on.

3           Do you recall working on the Bette Midler case?

4   A.  Vaguely.  I know I was in it.  I think the appeal, I think,

5   I was on, I think.  Long time ago.

6   Q.  The facts of that case generally were that someone did a

7   soundalike of a Bette Midler song, correct?

8   A.  Of Bette Midler.  Sounded like Bette Midler, yes.

9   Q.  And was it your opinion in that case that the use of a

10  Bette Midler soundalike should result in Bette Midler receiving

11  a substantial payment?

12  A.  I don't remember any opinion in that case, but the way you

13  state it now, I'm sure I would have had that opinion.  I don't

14  remember my opinion, but it sounds good to me.

15  Q.  Do you recall a case, *Chuck Yeager v. Virgin America*?

16  A.  Yes.

17  Q.  And that was a celebrity endorsement case, correct?

18  A.  Yes.

19  Q.  Okay.  And the basic facts of that case were that Virgin

20  America had installed WiFi in all their planes, correct?

21  A.  Correct.

22  Q.  And in order to promote that fact, they sent out a press

23  release, right?

24  A.  I think over a half million people.  Oh, that was an

25  e-mail.  I don't remember a press release.

E641bea3                        Levy - cross

1    Q.  Some sort of release, let's just put it that way, correct?

2    A.  I think it was an e-mail.  I think the press release was

3    the AT&T case.

4    Q.  Okay.  So a release to half a million people, roughly,

5    right?

6    A.  I believe so.

7    Q.  In that release, they made reference to and made a

8    comparison -- ridiculous comparison made, perhaps, but a

9    comparison to the Virgin America's accomplishment in installing

10   WiFi and the breaking of the sound barrier by Mr. Yeager,

11   correct?

12            MR. KAHN:  Your Honor, I object.

13            THE COURT:  Sustained.  Let's move on.  This is not

14   about Chuck Yeager.  Please move on.

15            MR. PUVALOWSKI:  Your Honor, just one further question

16   on it, then I'll move on from Mr. Yeager?

17            THE COURT:  Okay.

18   Q.  In that case, they used Mr. Yeager's name and you

19   determined that that was worthy of an endorsement fee, correct?

20   A.  Yes.

21   Q.  And I'll move on.

22            Mr. Albert, do you recall acting as an expert witness

23   in a case entitled *Henley v. DeVore*?

24   A.  Yes.

25   Q.  And did you submit a declaration to --

E641bea3                    Levy - cross

1                MR. PUVALOWSKI:  Well, your Honor, may I approach?

2                THE COURT:  Yes.

3    Q.  Mr. Albert, I'm showing you what's been marked for

4    identification as Plaintiff's 272.  Do you recognize that?

5    A.  No, but it certainly looks like one of mine, but I don't

6    remember it, no.

7    Q.  Okay.  And it's a declaration that you submitted in a court

8    proceeding, correct?

9    A.  Yes.

10   Q.  And attached to that is a copy of an expert report you

11   prepared in that case, correct?

12   A.  Don't know.

13                I presume so if you say it's there, yes.

14   Q.  Okay.

15   A.  Yeah, looks like it.

16   Q.  Directing your attention to the expert report portion of

17   this, it starts on -- there's a legend at the top of the

18   exhibit?

19   A.  Is there a page number?

20   Q.  Yeah, page 8 of 19, per the top legend.

21   A.  Okay.

22   Q.  By the way, Mr. Albert, in that case, you were acting as an

23   expert for the artist, Mr. Henley, and his co-songwriter,

24   correct?

25   A.  Correct, yes.

E641bea3                        Levy - cross

1  Q.  Now taking a look at the expert report, just on page 1 onto

2  the first half of page 2 --

3          MR. KAHN:  Your Honor, I'm going to object if he's

4  about to read from the report.

5          THE COURT:  The report is not in evidence.

6  Mr. Puvalowski, just direct me, by page and paragraph number,

7  to what you're going to be asking about.

8          MR. PUVALOWSKI:  Your Honor, frankly, there are

9  multiple places, and I will -- starting on page 3, Factor A,

10  and specifically -- well, I don't want to go further than that

11  in terms of --

12          THE COURT:  One moment.

13          All right.  Let's be very targeted about the use of

14  this prior engagement.  Go ahead.

15  Q.  So Mr. Albert --

16          MR. KAHN:  Your Honor, I object.  I don't believe it's

17  inconsistent.

18          THE COURT:  I don't think there's been a question put,

19  Mr. Kahn.

20  Q.  Mr. Albert --

21          THE COURT:  I think the question was, "Mr. Albert."

22  Let's go on.  Let's let the question be asked.

23  Q.  Mr. Albert, could you take a look at page 3 of your expert

24  report.  It's page 10 of 19 at the top legend.  Do you see

25  that?

E641bea3                        Levy - cross

1    A.  Yes.

2    Q.  It's entitled General Considerations, right?

3    A.  Yes.

4    Q.  It's the same title that you used on your expert report in

5    this case.

6            MR. KAHN:  Objection, your Honor.

7            THE COURT:  Sustained.  Mr. Puvalowski, if there's a

8    targeted question you wish to ask, do so, but we're not going

9    to do the architecture of the report.  This is a different

10   case.

11   Q.  Mr. Albert, if you look at the bottom of that page, there

12   are four factors there, right?

13   A.  Yes.

14   Q.  You'd agree with me that the final three are exactly the

15   same factors that you listed in this case?

16           MR. KAHN:  Objection.  They're consistent with this

17   case.

18           THE COURT:  One moment.

19           Mr. Puvalowski, if you're using this to impeach, go

20   ahead, but I'll sustain the objection to that question.

21   Q.  With respect to the first factor --

22   A.  Yes.

23   Q.  -- there's --

24           THE COURT:  The first factor where?

25           MR. PUVALOWSKI:  It's Factor A on that page.

E641bea3                    Levy - cross

 1            THE COURT:  I'm sorry.  The foundation for relevance

 2   of that case to this has not been established.  We can't be

 3   getting into factors in another case that may not be alike.

 4            MR. PUVALOWSKI:  Let me take a step back then, your

 5   Honor.

 6   Q.  Mr. Albert, the basic facts of that case were that a

 7   political candidate used two of Mr. Henley's songs in YouTube

 8   videos in order to basically do campaign ads, is that fair to

 9   say?

10   A.  No, it's not fair to say.  That's -- it's way more than

11   that.  They imitated Mr. Henley's voice, they put it on a

12   website, they made it sound like Mr. Henley was endorsing a

13   candidate and a direct endorsement, express endorsement.  It

14   was very different.

15   Q.  Well, so you agree that it was posted on YouTube?

16   A.  I don't recall.  I mean -- whoops.  I'm sorry.  I'll say

17   maybe it was.  I don't recall.

18   Q.  And those two videos were posted for a period of just a

19   couple of days in one case and just a few weeks in another,

20   correct?

21            MR. KAHN:  Objection.

22   A.  I don't recall.

23            MR. KAHN:  This case is completely different.

24            THE COURT:  One moment.  One moment.  I'll permit a

25   limited inquiry, but Mr. Puvalowski, I'm close to excluding the

E641bea3                    Levy - cross

```
 1   line of inquiry on Henley.  You have to show some relevance and

 2   soon.

 3           MR. PUVALOWSKI:  Well, I'll try to short-circuit this,

 4   your Honor.

 5   Q.  Take a look at the next page, Mr. Albert.

 6   A.  What page number?

 7   Q.  Page 4, or 11 of 19 at the top legend.

 8   A.  Okay.

 9   Q.  There are four additional factors that you do not list in

10   this case, correct?

11           MR. KAHN:  Objection.

12           THE COURT:  Sustained.  Mr. Puvalowski, put aside

13   Henley and you can ask him whether or not a certain

14   consideration is relevant to the valuation in this case, and

15   let's take it where it goes.

16           MR. PUVALOWSKI:  Okay.

17   Q.  Well, would you agree that the effects of a use on future

18   licensing opportunities and earning potential of the music is a

19   factor in the valuation of copyright and endorsement

20   valuations?

21   A.  I agree that it can be.

22   Q.  Okay.

23   A.  And this was specific --

24           THE COURT:  Sir, we're not asking about Henley.  The

25   answer is yes?
```

E641bea3                        Levy - cross

1     A.  Yes.  Yes.

2              THE COURT:  Go ahead.

3     Q.  Would you agree that the effects that such usage would have

4     upon the artist's professional stature, his or her career and

5     fan relations can be a factor in coming up with a value for

6     music licensing fees and endorsement fees?

7     A.  Yes.

8     Q.  Would you agree that the diminished value of the artist's

9     future endorsement potential due to the usage could potentially

10    be a factor in the valuation of a copyright fee and implied

11    endorsement fee?

12    A.  Yes.

13    Q.  But you didn't list any of those factors as a factor in

14    this case, did you?

15    A.  No.

16    Q.  Isn't it the case that you have a different list of factors

17    depending on whether you're working for the artist on one hand

18    or the advertiser on the other?

19    A.  No.

20    Q.  Well --

21    A.  It's a completely different case.

22              THE COURT:  Mr. Puvalowski, you may now ask, yes or

23    no, whether he considered those factors in the Henley

24    representation.  I take it that's your point.

25    Q.  Did you consider these factors with respect to the Ruckus

E641bea3                      Levy - cross

1    in the Rockies, this case, the Ruckus in the Rockies video?

2    A.  I didn't think that it was --

3             THE COURT:  Yes or no.

4    A.  No.

5    Q.  And is it fair to say that you considered those in a case

6    where you were working for the artist and you did not consider

7    those in this case?

8    A.  No, that's not the reason.

9             THE COURT:  It's a yes or no question, sir.

10   A.  No.  Can you repeat the question then, because I want to

11   make sure I'm answering correctly.

12   Q.  Sure.  It's fair to say that you did consider those factors

13   when you were working for Mr. Henley?

14   A.  Yes.

15   Q.  And you didn't consider those factors now that you're

16   working for an advertiser, isn't that right?

17            MR. KAHN:  Objection to the form of the question.

18            THE COURT:  Yes or no.

19   A.  I can't say.  No, that's a complete misrep -- no, I can't

20   answer that because it's a misrepresentation of what took

21   place.

22   Q.  Well, we just established that you --

23   A.  If I answer yes or no, I'm in effect affirming your

24   question, and I'm not going to go there because these were so

25   different.

E641bea3                    Levy - cross

1    Q.  Well, in fact, Mr. Albert, in that case, Mr. Henley's name

2    wasn't used, correct?

3              MR. KAHN:  Objection.

4              THE COURT:  Sustained.  The question, Mr. Puvalowski,

5    which you may continue to pursue is, yes or no, did he consider

6    those factors or list them in his report here.

7              We've already established that he says he considered

8    them in Henley.  The open issue is that he didn't give you a

9    yes or no answer to your last question which related to this

10   matter.  Why don't you sharpen that question.

11   Q.  Yes or no, Mr. Albert -- we'll take them one at a time.

12   Did you consider the factor of what effects a use would have

13   upon future licensing opportunities in earning potential of the

14   music in this case, yes or no?

15   A.  No.

16   Q.  Did you consider the effects the use would have on the

17   artist's professional stature, his or her career, and fan

18   relations, yes or no?

19   A.  No.

20   Q.  Did you consider the diminished value of the artist's

21   future endorsement potential due to the use in this case, yes

22   or no?

23   A.  Not specifically, no.

24   Q.  So once again, would you agree that when you were working

25   for the artist, you considered these factors, and when you're

E641bea3                         Levy - cross

1    working for Monster, you didn't?  It's a simple question,

2    Mr. Albert.

3    A.  I'm going to say no, because it had nothing to do with the

4    fact that I was working for the artist.

5              THE COURT:  Look, the question is asked and answered.

6    It's argumentative to put it together in one question.  Let's

7    move on, Mr. Puvalowski.

8              MR. PUVALOWSKI:  Sure.

9    Q.  By the way, Mr. Albert, yesterday you talked about that you

10   didn't consider Grammy Awards to be significant.  Do you recall

11   that in your direct testimony?

12   A.  That's not what I said.  I said they're not significant in

13   the determination of fair market value.

14   Q.  Okay.  Fair enough.

15   A.  Of course they're significant.

16   Q.  Fair enough.  I meant it in the way that you just said it.

17   So you testified yesterday that a Grammy Award was not

18   significant in the fair market value determination, correct?

19   A.  Correct.

20   Q.  Okay.  Isn't it true that in the Henley case you valued the

21   two songs at issue $300,000 different because one was a Grammy

22   winner and one wasn't?

23             MR. KAHN:  Objection.

24             THE COURT:  Overruled.  Yes or no.

25   A.  First off, I don't recall, but I can say that Don Henley,

E641bea3                    Levy - cross

1    okay, Don Henley, i.e., The Eagles -- because I don't believe

2    they're separable any more than Paul McCartney is separated --

3    separable in minds from The Beatles -- I don't put Don Henley

4    and The Eagles even in a remote category as being the same as

5    the Beastie Boys.  No offense meant to them.  This is a

6    different case.  This was The Eagles.

7    Q.  Well, Mr. Albert, this wasn't The Eagles, was it?

8    A.  Well, to me Don Henley is The Eagles, and that's what it

9    is, in my opinion, in people's minds.

10   Q.  Is it fair to say that in that case you determined that

11   Mr. Henley would be entitled to a substantial endorsement fee?

12   A.  I don't recall, but probably.  It's Don Henley.

13   Q.  Well, take a look at page 7 of what's been marked as 272

14   for identification.  It's page 14 of 19 at the top legend.

15   A.  Page 7, what?  I'm sorry.

16   Q.  Page 7 at the bottom, or page 14 of 19 at the top.

17   A.  Right.

18   Q.  Do you see there, if you read onto the next page, that you

19   determined it was your opinion that Mr. Henley --

20           THE COURT:  Sorry.  I don't want the dollar amount

21   coming out.

22           MR. PUVALOWSKI:  I wasn't going to.

23   Q.  -- was entitled to an implied endorsement fee?

24           MR. KAHN:  Your Honor, objection.

25           THE COURT:  Yes, sustained.  I mean, it's a

E641bea3                        Levy - cross

1   methodology question, not a calculation question,

2   Mr. Puvalowski.

3   Q.  Well, you would agree with me that your opinion in that

4   case had nothing whatsoever to do with union scale, right?

5   A.  Right, because this was about Don --

6          THE COURT:  Yes or no, Mr. Albert.

7   A.  Yes, that's correct, yes.

8   Q.  And in that case Mr. Henley's voice didn't even appear in

9   the commercials, correct?

10          MR. KAHN:  Objection.

11   A.  That's incorrect.

12          THE COURT:  Overruled.

13   A.  It's incorrect.  This was done as a soundalike so people

14   thought it was Don Henley endorsing this candidate.

15   Q.  Okay.

16   A.  Personal endorsement.

17   Q.  And --

18   A.  Very different.

19   Q.  Mr. Henley's name wasn't used, was it?

20   A.  It didn't need to be.  People knew his voice.  And it's his

21   song singing -- it's him singing his own song.

22   Q.  And in that case he was entitled to both a copyright fee

23   and an endorsement fee, correct?

24   A.  An express endorsement fee, yes.

25   Q.  Okay.  Would you agree that the Beastie Boys' voices are

E641bea3                    Levy - cross

1    distinctive and identifiable?

2    A.  To their fans, yes.

3    Q.  Is that a yes?

4    A.  That's a yes.

5    Q.  Okay.  Would you agree that MCA's name, that that's

6    identifiable as identifying Mr. Yauch?

7    A.  Yes.

8    Q.  Would you agree that the use of the name in the text of the

9    video is highly unusual?

10   A.  Highly unusual?  No.

11   Q.  All right.  Unusual?

12   A.  Well, within a video, put in the credits, not that unusual,

13   so I don't think it's unusual, but it's also not usual.

14   Q.  So it's your testimony this is just a credit?

15   A.  I think it's a bit more than that, but I don't think it was

16   a big deal.  But it is something, yes.

17            THE COURT:  How much more, Mr. Puvalowski?

18            MR. PUVALOWSKI:  Your Honor, I would ask that just the

19   section paragraph B, General Considerations -- so it's on

20   page 10 of 19 at the top, through 11 of 19 at the top.

21            THE COURT:  Of which document?

22            MR. PUVALOWSKI:  That's Plaintiff's 272, your Honor.

23            THE COURT:  In the report in the Henley case?

24            MR. PUVALOWSKI:  Yes, your Honor.  I would ask that

25   that section, Section B, be admitted.

1          MR. KAHN:  Objection.

2          THE COURT:  Sorry.  Just give me more concretely what

3     you would like admitted.  The entirety of Section B?

4          MR. PUVALOWSKI:  Yes, your Honor.

5          THE COURT:  No, I won't admit it, because through your

6     questioning of the witness, you have established the fact that

7     in that case the relevant material was considered.  The

8     physical manifestation of that in the report is unnecessary to

9     be received.

10         MR. PUVALOWSKI:  Okay.  Your Honor, just one moment.

11    BY MR. PUVALOWSKI:

12    Q.  Mr. Albert, you testified just at the end of your direct

13    examination that you'd never heard of a vocal stylings fee, is

14    that right?

15    A.  I don't recall hearing about it, other than in this case I

16    have, yes.

17    Q.  Is it fair to say that --

18         THE COURT:  Sorry.  I didn't get the answer to my

19    question.  Do you have much left?

20         MR. PUVALOWSKI:  Oh, I apologize, Judge.  Maybe five

21    minutes.

22         THE COURT:  Okay.

23    Q.  Now in the course of this case, in determining the stature

24    and prominence of the Beastie Boys, one of the things you did

25    was ask your staff whether you got inquiries about Beastie Boys

E641bea3                    Levy - cross

1   music, correct?

2   A.  Correct.

3   Q.  Isn't it the case that the industry is well aware that the

4   Beastie Boys don't do commercials?

5   A.  I don't know what they're aware of, but I believe perhaps

6   the music industry is but I don't believe the advertising

7   industry is and those are who -- my clients, so when they ask

8   about a song, I don't think they know whether the group does

9   commercials or not.  Perhaps in the recording industry maybe a

10  lot of people do know.  Probably do.

11  Q.  Mr. Albert, you're aware that Ms. Thomas, the plaintiffs'

12  expert, testified about a hierarchy of synch licensing values,

13  correct?

14          MR. KAHN:  Objection.

15          THE COURT:  Sustained.

16  Q.  Let me ask you this:  Do you believe that there's a

17  hierarchy of synch licensing values?

18  A.  I don't know what that means.

19  Q.  Would you agree with me that the use for nighttime

20  television is less valuable, generally, than daytime

21  television?

22  A.  For what, commercials or programs?

23          THE COURT:  Sustained.  This case is not about

24  television.

25  Q.  You examined the Beastie Boys' licensing history, correct?

E641bea3                          Levy - cross

1    A.  Yes.  Well, I reviewed it quickly.

2    Q.  Did you come to a conclusion as to, within a particular

3    category of use, whether the Beastie Boys were at the top of

4    the scale or at the bottom of the scale or the middle of the

5    scale?

6    A.  No, I did not.

7    Q.  You didn't look, did you?

8    A.  Well, I looked.  I probably spent a few minutes because I

9    saw that none of them were commercial licenses, they were for

10   what we call theatrical use, which I testified to before is

11   completely irrelevant, and when I go through the box of

12   information of a case, I just -- I quickly discard the things

13   that are irrelevant to my opinion, so what they got for a song

14   used on some TV show, which I think sometimes was tens of

15   thousands of dollars and sometimes was a few hundred dollars,

16   is inconsequential to what a commercial video is worth.

17   Q.  Mr. Albert, is it your testimony that the fact that the

18   Beastie Boys have received as much as 800,000 all in for the

19   use of Sabotage in a movie trailer is irrelevant to your

20   valuation?

21   A.  Actually, I believe I answered that in my expert report

22   where I said --

23           THE COURT:  But the expert report is not in evidence.

24   Would you answer the lawyer's question, please.

25           THE WITNESS:  No, my expert report in this case.

E641bea3                         Levy - cross

1           THE COURT:  It's not in evidence, so just answer the

2    lawyer's question without regard to the way you wrote it in

3    your report.

4    A.  Could you repeat the question, please.

5    Q.  Is it your testimony that the fact the Beastie Boys have

6    received as much as $800,000 for a movie trailer for the song

7    Sabotage, that that didn't have an impact on your fair market

8    valuation in this case?

9    A.  Zero impact.  That's correct.

10          MR. PUVALOWSKI:  No further questions.

11          THE COURT:  All right.  Any brief redirect?

12          MR. KAHN:  Yes, your Honor.

13          THE COURT:  Briefly, please.

14   REDIRECT EXAMINATION

15   BY MR. KAHN:

16   Q.  Mr. Puvalowski asked you about a frequency discount and

17   your experience with that.  Are there times during the course

18   of your business that you are involved in purchasing multiple

19   songs from a music publisher for the advertisers you represent?

20   A.  Yes.

21   Q.  And can you describe the circumstances under which that

22   would occur.

23   A.  Typically it's going to be something like Chuck E. Cheese,

24   where typically a few dozen songs per year are purchased and

25   typically it is not within a particular commercial or video to

E641bea3                          Levy - redirect

1  have multiples.

2  Q.  Okay.  Other than Chuck E. Cheese, are there times that

3  that occurs where an advertiser wants multiple songs from the

4  same music publisher?

5  A.  It happens, if -- if we can go over a couple of months,

6  yes, because what we will do is, let's say with Nissan as an

7  example, because we provide all of their music for all their

8  dealers nationwide, and they buy many songs a year, and we do

9  try to concentrate on certain publishers, sometimes certain

10 musical groups, but definitely publishers, to try to save money

11 on their advertising budget by taking a lot of business to one

12 place, and it works.  I mean, we get treated very well on our

13 pricing, but -- by getting a frequency discount.  We don't call

14 it that, "Hey, give us a frequency discount," but they know

15 when we do one campaign and call another month later for some

16 other song and sometimes it is for the same group, they're very

17 willing to cut their prices 'cause there's some loyalty there.

18 Q.  But if you purchase multiple songs over a period of time

19 from a music publisher for a particular client, does that

20 reduce the amount that you have to pay per song?

21 A.  I believe so.

22 Q.  Mr. Puvalowski asked you if there were occasions when an

23 artist gets more because there are elements used beyond the

24 music for a particular advertising or commercial promotional

25 use.  In this particular case, other than the union scale that

1    you talked about, is there any more, based on the facts of this

2    case, that you believe the Beastie Boys are entitled to?

3    A.   Again, I don't believe so because I believe that the uses,

4    the specific uses, like of the name in regards to the video,

5    the "Rest in peace," I believe that if that were negotiated in

6    the beginning, which is where it would be, it would be simply

7    included.  I don't think they were a big deal.

8    Q.   Okay.  Moving on to Mr. Puvalowski's questions about the

9    first commercial use, if the first commercial use is a

10   commercial use for a friend, does that eliminate it as a first

11   commercial use?

12   A.   It might.  I can think of an instance where it wouldn't,

13   where it didn't, but -- with Frank Sinatra, oddly enough.  I

14   think that it actually -- typically it would, because the

15   public doesn't know that it was done, let's say, for free or

16   cheap because it was a friend.  I was thinking, when Sinatra,

17   which everybody knows, back in the '80s --

18            THE COURT:  Enough of Frank Sinatra.  Next question.

19   Q.   Okay.  And if someone did an endorsement, if an artist did

20   an endorsement and gave the money away that they got for that

21   endorsement to charity, would that eliminate that endorsement

22   as a first commercial use?

23   A.   Probably not.  Wait, wait.  I'm sorry.  If they

24   eliminated -- if it was done and they gave the money away,

25   would it eliminate --

E641bea3                          Levy - redirect

1              THE COURT:  The question is:  Does the fact that the

2    artist gave the money from an endorsement away to charity

3    affect your analysis that it's a first commercial use and what

4    effect it would have.

5              THE WITNESS:  No.

6              THE COURT:  Next question.

7    A.  I mean, it's a commercial.  Thank you.

8    Q.  If you can take a look at the report that you were

9    referring to in the case involving Mr. Henley.  You were asked,

10   when Mr. Puvalowski --

11   A.  Just wait a minute.

12   Q.  Do you have it?

13   A.  Not yet, I don't, no.

14        Okay.

15   Q.  You were asked by Mr. Puvalowski about factors which are

16   included in this particular report which are not included in

17   the report that you rendered in this case.  Do you recall that?

18   A.  Yes.

19   Q.  And if you can take a look at page 4 of your report, which

20   is 11 of 19 of the document, and it was those four factors that

21   were not included in the report in this case, is that correct?

22             THE COURT:  To be more precise, Mr. Kahn, because

23   neither report is before the jury, the point is that these are

24   factors that he testified he considered in the Henley matter

25   and not in this case, regardless of where they're written in

E641bea3                    Levy – redirect

 1    the report.

 2                    MR. KAHN:  Okay.

 3    Q.  Can you tell us why you considered the factors in the

 4    Henley case and didn't consider them in this case.

 5                    THE COURT:  Thank you.

 6    A.  Yes.  Because in the Henley case it appeared that there was

 7    a direct endorsement of a conservative political candidate,

 8    very conservative political candidate, being done by Don

 9    Henley, where it appears that he changed the lyrics of a song

10    to support this candidate and that he sang the song, and this

11    created real fallout for him.  I mean, this wasn't perceived

12    fallout.  He was getting fans that were outraged, other people

13    that were shocked, and because it's Don Henley and The Eagles,

14    this wasn't just in some little niche.  This was general,

15    because this was out there for the general public, and I

16    believe the general public is extremely aware and cares about

17    The Eagles.

18    Q.  Okay.  And --

19    A.  And it was germane.  It was a big deal in that case.  So I

20    considered that.  I considered it in that case because it was a

21    major issue, and again, because of who was involved and what

22    was done.  It was very different than this case.

23    Q.  Okay.  And Mr. Puvalowski indicated that in the Henley

24    case, your opinion didn't just indicate that he should receive

25    union scale for what occurred in that case.  Can you tell us

E641bea3                    Levy - redirect

1  why.

2  A.  Because it was a direct express endorsement by Don Henley

3  of a specific candidate.  You didn't have to infer it.  Like,

4  well, a song of his was used so therefore he was okay with it.

5  This appeared that he sang a song, his song, changed the lyric

6  of it to endorse a specific product, i.e., this political

7  candidate.  That's very different.

8            MR. KAHN:  I have no further questions.

9            THE COURT:  Is there any recross?

10           MR. PUVALOWSKI:  No, your Honor.

11           THE COURT:  Very good.  Mr. Albert, you may step down.

12  Your testimony is complete.

13           (Witness excused)

14           THE COURT:  Mr. Kahn, am I correct that the defense

15  now rests?

16           MR. KAHN:  Yes.

17           THE COURT:  All right.  Very good.

18           Ladies and gentlemen, we're going to take our

19  midmorning break now, and when you return, I will be reading to

20  you the substantive instructions in this case.  At that point

21  we will be taking our abbreviated lunch break, premised on your

22  lunch having arrived, which I expect by then it will have.

23           So enjoy your ten-minute break.  I'll see you very

24  shortly.

25           THE DEPUTY CLERK:  All rise.

 1          (Jury excused)

 2          THE COURT:  Be seated.

 3          Mr. Puvalowski, just for the record, the reason why I

 4   truncated your use of the Henley report was that I understood

 5   your point to be that as a matter of methodology, he considered

 6   extra factors in that case that he didn't consider here, and

 7   rather than getting into a lot more background than that, it

 8   seemed more efficient to me to focus you on asking him about

 9   the factors, which in fact you then did very efficiently.  So I

10   think the point got made without needing to fish around too

11   much in Henley background.

12          All right.  We'll take a break now, and then, unless

13   counsel have anything further, when we come back, I'm going to

14   instruct the jury.  In the event that we have lunch arrive by

15   then, and I expect we will, we will then take our lunch break.

16   But it will be brief.  In the event that we don't have the

17   lunch, I will expect then counsel to begin their closing

18   argument.  Ms. Hummel and I will find a way to communicate the

19   arrival of the lunch to you so at least you have a little more

20   of a realtime sense of whether or not closing arguments will be

21   beginning right at the end of the instructions.  But my guess

22   is it's going to take me 30 or 40 minutes to go through the

23   instructions, so I think the odds are high that we'll be taking

24   a lunch break before, plaintiff, you begin.

25          See you in ten minutes.

E641bea3

```
1              THE DEPUTY CLERK:  All rise.

2              (Recess)

3              (In open court; jury not present)

4              THE COURT:  Counsel, my law clerk is handing to each

5    table two copies of the jury charge in final, which embodies

6    the changes that were made during the charge conference and

7    ensuing colloquy, and we're also giving a copy, of course, to

8    the court reporter.

9              Ladies and gentlemen who are here, because I'm about

10   to charge the jury and I want to make sure that they are

11   focused solely on the charge, I'll ask that either you stay for

12   the whole thing or stay for none of it, but don't be walking in

13   and out in the middle of the charge, okay?  Very good.

14             Ms. Hummel, kindly get the jury.

15             THE DEPUTY CLERK:  Yes.

16             (Jury present)

17             THE COURT:  Welcome back, ladies and gentlemen.

18             Members of the jury, you have now heard all of the

19   evidence in this case.  You have paid careful attention to the

20   evidence, and I am confident that you'll act together with

21   fairness and impartiality to reach a just verdict in this case.

22   We are near the point where you will undertake your vital

23   function as jurors of deliberating.  Before the lawyers make

24   their closing arguments, I'm going to instruct you about the

25   law that governs this case.  And there are two parts to these
```

E641bea3                    Charge

1    instructions.

2            First, I'm going to provide you with some general

3    instructions about your role and about how you're to decide the

4    facts of this case.  Those instructions would apply to just

5    about any trial.

6            Second, I'm going to give you some specific

7    instructions about the legal rules that apply to this

8    particular case.  I'm going to describe the elements of each of

9    the plaintiff's causes of action.

10           After these instructions, you'll hear closing

11   arguments from the lawyers, and then I'll give you some final

12   very brief instructions before you begin your deliberations.

13           Listening to these instructions may not be easy.  It's

14   important, however, that you listen carefully and that you

15   concentrate.  I ask for your patient cooperation and attention.

16   You will no doubt notice that I am reading these instructions

17   from a prepared text.  It would assuredly be more lively if I

18   just improvised, but it's important that I not do that.  The

19   law is made up of words, and those words are very carefully

20   chosen, and so when I tell you the law, it's critical that I

21   use exactly the right words.

22           You're going to have copies of what I'm reading in the

23   jury room to consult, and it will be very important for you to

24   read these instructions, so don't worry if you miss a word or

25   two.  But for now, listen carefully and try to concentrate on

1    what I'm saying.  I'm also going to be distributing to you a

2    verdict form in which to record your verdict.  It's going to

3    list the questions that you should consider and in the order

4    that you should consider them.  So with that material being

5    sent to you, there should be somewhat less need for extensive

6    notetaking, for example, than there might be if I weren't going

7    to be giving you a copy of these charges for the jury room.

8            To begin with, what is the role of the court?  I'll

9    instruct you on the law, and the first topic that I'm

10   addressing is the role of the court.  It is my duty to instruct

11   you on the law.  Just as it's been my duty to preside over the

12   trial and decide what testimony and evidence is relevant under

13   the law for your consideration, it's your duty to accept my

14   instructions on the law and to apply them to the facts as you

15   determine them.  On these legal matters you must take the law

16   as I give it to you.  You must not substitute your own notions

17   or opinions of what the law is or ought to be.  You should not,

18   any of you, be concerned about the wisdom of any rule that I

19   state.  Regardless of any opinion that you may have as to what

20   the law may be or should be, it would violate your sworn duty

21   to base a verdict upon any other view of the law other than

22   that which I give you.  If any attorney states or has stated a

23   legal principle different from any that I state to you in my

24   instructions, it's my instructions that you should follow.  You

25   should not single out any particular instruction as alone

1   stating the law.  You should consider my instructions as a

2   whole when you retire to deliberate in the jury room.

3          You are not to infer, from any of my questions or any

4   of my rulings on objections or anything else that I've done in

5   this trial, that I have any view as to the credibility of the

6   witnesses or how you should decide this case.  Any questions

7   that I asked were designed to make sure that the testimony was

8   clear and to avoid confusion and, frankly, to move the case

9   along.  You are expressly to understand that I have no opinion

10  as to the verdict that you should render in this case.

11         Now as to you, as members of the jury, you are the

12  sole and exclusive judges of the facts.  You pass judgment upon

13  the evidence.  You determine the credibility of the witnesses.

14  You resolve any conflicts as there may be within the testimony.

15  You draw whatever reasonable inferences you decide to draw from

16  the facts as you have determined them, and you determine the

17  weight of the evidence.

18         Although you're encouraged to use all of your life

19  experiences in analyzing testimony and reaching a fair verdict,

20  you may not communicate any personal professional expertise you

21  might have or any facts not in evidence to the other jurors

22  during deliberations.  You must base your discussions and your

23  decisions solely on the evidence presented to you during the

24  trial and that evidence alone.   (Continued on next page)

25

1          THE COURT:  You may not consider or speculate on

2    matters not in evidence or matters outside this case.

3          Now, to discuss the role of counsel.  It's the duty of

4    the attorneys to object when the other side offers testimony or

5    other evidence that the attorney believes is not properly

6    admissible.  Therefore, you should draw no inference from the

7    fact that an attorney objected to any evidence nor should you

8    draw any inference from the fact that I might have sustained or

9    overruled an objection.

10         From time to time, the lawyers and I have conferences

11   at side bar out of your hearing.  Those conferences involve

12   procedural and other matters, including whether or not

13   particular evidence was or wasn't admissible.  None of the

14   events relating to those conferences should enter into your

15   deliberations at all.

16         Similarly, the personalities and the conduct of

17   counsel in the courtroom are not in any way at issue.  If you

18   formed reactions of any kind to any of the lawyers, favorable

19   or unfavorable, whether you approved or disapproved of their

20   behavior as advocates, those reactions should not enter into

21   your deliberations.

22         You are to evaluate the evidence calmly and

23   objectively without prejudice or sympathy.  You're to be

24   completely fair and impartial.  Your verdict must be based

25   solely on the evidence developed at this trial or the lack of

1    evidence.  The parties in this case are entitled to a trial

2    free from prejudice and bias.  Our judicial system cannot work

3    unless you reach a verdict through a fair and impartial

4    consideration of the evidence.

5         It would be improper for you to consider in deciding

6    the facts of the case any personal feelings you may have about

7    the race, national origin, sex or age of any party or any

8    witness or any other such irrelevant factor.  This case should

9    be decided by you as an action between parties of equal

10   standing in the community and of equal worth.  All parties are

11   entitled to the same fair trial at your hands.  All parties

12   stand equal before the Court, before the law, and are to be

13   dealt with as equals in this Court.

14        Now, turning to the subject of the burden of proof.

15   The plaintiffs have the burden of proving all the elements of

16   their claims by a preponderance of the evidence.  So, what does

17   "a preponderance of the evidence" means?  To establish a fact

18   by a preponderance of the evidence means to prove that the fact

19   is more likely than not true.  A preponderance of the evidence

20   means the greater weight of the evidence.  It refers to the

21   quality and persuasiveness of the evidence, not the number of

22   witnesses or documents.

23        In determining whether a claim has been proven by a

24   preponderance of the evidence, you may consider the relevant

25   testimony of all witnesses, regardless of who may have called

E64gbea4                    Charge

them, and all the relevant exhibits received in evidence,
regardless of who may have produced them.  If, after
considering all the testimony, all the evidence, you are
satisfied that the plaintiffs, the party with the burden of
proof, have carried their burden on each essential point of the
claim or defense, then you must find in the plaintiffs' favor.
If, after such consideration, you find that the evidence
produced by the plaintiffs is outweighed by the evidence
against the plaintiffs' position or that the credible evidence
on a given issue is evenly divided between the parties – that
is, that it's equally probable that one side is right as it is
that the other side is right – then you must decide that issue
against the plaintiffs.  That is because the plaintiffs,
because they bear the burden of proof, must prove more than a
simple equality of evidence – they must prove the element by a
preponderance of the evidence.  On the other hand, the
plaintiffs need prove no more than a preponderance.  So long as
you find that the scales tip, how ever slightly, in favor of
the plaintiffs – that what they claim is more likely true than
not – then that element will have been proven by a
preponderance of the evidence.

          Some of you may have heard of proof beyond a
reasonable doubt, which is the proper standard of proof only in
a criminal trial.  That requirement does not apply to a civil
case such as this, you should put it out of your mind.

1          Now, I want to take a moment to describe to you what

2     is and what is not evidence in this case.  As I have said, you

3     may rely only on the evidence in your deliberations.

4          The evidence in this case is the sworn testimony of

5     the witnesses and the exhibits received in evidence.  On the

6     other hand, certain things are not evidence.  I'm going to go

7     through that one by one and first, I'm going to describe a list

8     of examples of things that are not evidence.

9          First, a question by a lawyer is not to be considered

10     by you as evidence.  It's the witnesses' answers that are

11     evidence and not the questions.  At times, a lawyer may have

12     incorporated into a question a statement which assumed certain

13     facts to be true, and asked the witness if the statement was

14     true.  If the witness denied the truth of the statement, and if

15     there's no direct evidence in the record proving that assumed

16     fact to be true, then you may not consider it to be true simply

17     because it was contained in the lawyer's question.

18          Second, similarly, arguments by lawyers are not

19     evidence, because the lawyers are not witnesses.  What they

20     have said to you in their opening statements was intended, and

21     what they will say to you in their closing arguments will be

22     intended, to help you understand the evidence and to reach your

23     verdict.  However, if your recollection of the facts differs

24     from the lawyers' statements, it is your recollection that

25     controls.

1          Third, statements that I may have made concerning the

2   evidence or, for that matter, questions that I have asked to

3   clarify things, do not constitute evidence.

4          Fourth, testimony that has been stricken or excluded

5   or I've asked you to disregard something is not evidence.  It

6   may not be considered by you in rendering a verdict.

7          And fifth, again, anything you may have seen or heard

8   outside the courtroom is not evidence.

9          Now, I'll provide you with some things that you may

10   consider as evidence.  As I've said, evidence may come in

11   several forms.  First, the sworn testimony of witnesses,

12   regardless of who called them, is evidence.  This is true of

13   the witnesses on both direct and cross, redirect and

14   recross-examination.  Second, the exhibits that were admitted

15   during the trial are evidence.  And third, prior testimony is

16   evidence.

17          Such testimony, known as depositions, is produced

18   through a procedure where, prior to trial, the attorneys for

19   one side may question a witness or their adversary under oath.

20   This is part of what is called pretrial discovery, and each

21   side is entitled to take depositions.  To the extent I admitted

22   excerpts of prior testimony at trial, you may consider the

23   prior testimony of a witness according to the same standards

24   you would use to evaluate the testimony of a witness given here

25   live at trial.

1          Now, as I told you in my initial instructions, there

2     are two types of evidence that you may consider in reaching

3     your verdict.  One type of evidence is direct evidence.  Direct

4     evidence is testimony by a witness about something that he or

5     she knows by virtue of his or her own senses, something he or

6     she has seen, felt, heard or touched.  For example, if the

7     witness testified that when she left her house this morning, it

8     was raining, that would be direct evidence about the weather.

9     Circumstantial evidence is evidence from which you may infer

10    the existence of certain facts.

11         To briefly restate the example I gave you last

12    Tuesday, assume that when you came here this morning, the sun

13    was shining and it was a nice day.  Assume the courtroom blinds

14    were closed and you couldn't look outside.  As you were sitting

15    here, someone walked in with an umbrella that was dripping wet

16    and then a few minutes later, another person entered with a wet

17    raincoat.

18         Now, because you can't look outside the courtroom and

19    you can't see whether or not it's raining, you have no direct

20    evidence of the fact that it had begun to rain, but on the

21    combination of facts that I've asked you to assume, it would be

22    reasonable and logical for you to conclude that it was now

23    raining or that it had been raining.

24         That's all there is to circumstantial evidence.

25    You're inferring on the basis of reason, experience and common

1   sense from one established fact to the existence or the

2   nonexistence of another fact.  Many facts, such as a person's

3   state of mind, are rarely susceptible of proof by direct

4   evidence.  Usually, such facts are established by

5   circumstantial evidence.  Where circumstantial evidence is

6   presented, it is of no less value than direct evidence because

7   it is a general rule that the law makes no distinction between

8   direct and circumstantial evidence.

9          Let me say a few words about expert witnesses.  You'll

10  recall that Lisa Thomas, Anthony Ricigliano, Erich

11  Joachimsthaler and Jon Albert all testified as experts in

12  certain fields and gave their opinions concerning certain facts

13  in dispute between the parties.

14         When a case involves a matter of science or art, or

15  requires a special knowledge or skill not ordinarily possessed

16  by the average person, an expert is permitted to state his or

17  her opinion for the benefit, for the information of the Court

18  and jury.  The opinions stated by the expert opinions were

19  based on particular facts, as they acquired knowledge of them

20  and testified to them before you.  You may reject an expert's

21  opinion if you find the facts to be different from those which

22  formed the basis of the opinion.  You may also reject the

23  opinion if, after careful consideration of all the evidence in

24  the case, expert and other, you disagree with the opinion.  In

25  other words, you're not required to accept an expert's opinion

1    to the exclusion of the facts and circumstances disclosed by

2    other testimony.  Such an opinion is subject to the same rules

3    concerning reliability as the testimony of any other witness.

4    It's given to assist you in reaching a proper conclusion; it's

5    entitled to such weight as you find the expert's qualifications

6    in the field warrant and must be considered by you, but it's

7    not controlling on your judgment.

8           Now I'm going to turn to the subject of witness

9    credibility.  You had the opportunity to observe the witnesses.

10   It's now your job to decide how believable each witness was in

11   his or her testimony.  You are the sole judge of the

12   credibility of each witness and of the importance of his or her

13   testimony.

14          In making these judgments, you should carefully

15   scrutinize the testimony of each witness, the circumstances

16   under which each witness testified, the impression the witness

17   made when testifying, and any other matter in evidence which

18   may help you decide the truth and the importance of each

19   witness' testimony.

20          So, how do you determine where the truth lies?  You

21   watched each witness testify.  Everything a witness said or did

22   on the witness stand counts in your determination.  How did the

23   witness impress you?  Did he or she appear to be frank,

24   forthright and candid?  Or was the witness evasive and edgy, as

25   if hiding something?  How did the witness appear?  What was his

or her demeanor; that is, his or her carriage, behavior,
bearing, manner and appearance while testifying?  Often, it's
not what a person says but how he or she says it that moves us.

         You should use all the tests for truthfulness that you
would use in determining matters of importance to you in your
everyday life.  You should consider any bias or hostility the
witness may have shown for or against any party, as well as any
interest the witness has in the outcome of this case.  You
should consider the opportunity the witness had to see, hear
and know the things about which he or she testified, the
accuracy of his or her memory, his or her candor or lack of
candor, his or her intelligence, the reasonableness and
probability of his or her testimony and its consistency or lack
of consistency and its corroboration or lack of corroboration
with other credible testimony.

         In other words, what you must try to do in deciding
credibility is to size a witness up in light of his or her
demeanor, the explanations given, and all the other evidence in
the case.  Always remember that you should use your common
sense, your good judgment and your everyday experiences in life
to make your credibility determinations.

         If you find that any witness has willfully testified
falsely as to any material fact – that is, as to an important
matter – the law permits you to disregard the entire testimony
of that witness upon the principle that one who testifies

1  falsely about one material fact is likely to testify falsely

2  about everything.  However, you are not required to consider

3  such a witness as totally unbelievable.  You may accept so much

4  of the witness' testimony as you deem true and disregard what

5  you feel is false.  By the processes which I've described, you,

6  as the sole judges of the facts, decide which of the witnesses

7  you will believe, what portion of each witness' testimony you

8  accept and what weight you will give it.

9          On some occasions during this trial, witnesses were

10  asked to explain an apparent inconsistency between testimony

11  offered at this trial and previous statements made by the

12  witness.  It is for you to determine whether a prior statement

13  was inconsistent and, if so, how much (if any) weight to give

14  to an inconsistent statement in assessing the witness'

15  credibility at trial.

16          Now, in deciding whether to believe a witness, you

17  should take into account any evidence that shows that a witness

18  may benefit in some way from the outcome of the case, such as a

19  financial interest.  Likewise, you should specifically note any

20  evidence of hostility or affection that the witness may have

21  towards one of the parties.  You should also consider any other

22  interest or motive that the witness may have in cooperating

23  with a particular party.

24          In this case, two of the plaintiffs, Adam Horovitz and

25  Michael Diamond, testified before you.  As parties to this

1    action, they are interested witnesses.

2            It is your duty to consider whether the witness has

3    permitted any such bias or interest to color his or her

4    testimony.  In short, if you find that a witness is biased, you

5    should view his or her testimony with caution, view it with

6    care and subject it to close and searching scrutiny.

7            An interested witness is not necessarily less

8    believable than a disinterested witness.  The mere fact that a

9    witness is interested in the outcome of the case does not mean

10   he or she has not told the truth.  It's for you to decide from

11   your observations, applying your common sense and experience

12   and all the other considerations mentioned, whether the

13   possible interest of any witness, or of any party, has

14   intentionally or otherwise colored or distorted his or her

15   testimony.  You're not required to believe an interested

16   witness; you may accept as much of his or her testimony as you

17   deem reliable and reject as much as you deem unworthy of

18   acceptance.

19           Similarly, a number of nonparty witnesses in this case

20   are employees or business associates of one of the parties.

21   John Silva is the Beastie Boys' manager.  Neil Calvesbert, Sam

22   Pontrelli, Nelson Phillips, LeRoy Nichols, and Brent Hamilton

23   are present or former employees of Monster Energy company.  You

24   may consider whether their testimony is in any way influenced

25   by the employment or business relationship with the party.

E64gbea4                        Charge

 1              Turning to the subject of preparation of witnesses.

 2     You've heard testimony during the trial that witnesses had

 3     discussed the facts of the case and their testimony with the

 4     lawyers before the witnesses appeared in court.  You may

 5     consider the nature and extent of a witness' preparation when

 6     you're evaluating a witness' credibility, but I should tell you

 7     that there is nothing either unusual or improper about a

 8     witness meeting with lawyers before testifying, so that the

 9     witness can be made aware of the subjects that he or she will

10     be questioned about, focus on those subjects and have the

11     opportunity to review relevant exhibits before being questioned

12     about them.  Such consultation makes the trial process more

13     efficient.  In fact, it would be unusual for a lawyer to call a

14     witness without such consultation.

15              What weight, if any, you give to the fact or nature of

16     a witness' preparation for his or her testimony, and what

17     inferences you draw from such preparation, are matters

18     completely within your discretion.

19              The law does not require any party to call as

20     witnesses all parties who may have been present at any time or

21     place involved in the case, or who may appear to have some

22     knowledge of matters at issue in this trial.  Nor does the law

23     require any party to produce as exhibits all papers and things

24     mentioned in the evidence in this case.

25              Each party has had an equal opportunity or lack of

E64gbea4                    Charge

1   opportunity to call any witnesses.  Therefore, you should not

2   draw any inferences or reach any conclusions as to what any

3   uncalled witnesses would have testified to had they been

4   called.  The absence of any witnesses should not affect your

5   judgment in any way.

6          In this case, the defendant is a corporation.

7   Corporations are not living, breathing people, beings, but

8   creations of law.  Obviously, the corporation itself cannot

9   act.  However, a corporation does act through its agents, that

10  is, its employees, officers or authorized representatives.  An

11  action by an agent of a corporation is attributed to the

12  corporation if the agent had the authority to make the decision

13  or take the action complained of.

14         That's the first part of my instructions, the ones

15  that would apply just about any case.  With those instructions

16  in mind, let me turn now to the substantive law to be applied

17  in this case.

18         There are really two distinct claims or sets of claims

19  here.  The first set consists of claims of copyright

20  infringement.  The second set consists of a single claim of

21  false endorsement.  I'm going to address these in turn.

22         As to the copyright claims, because Monster has

23  conceded that it infringed on the Beastie Boys' copyrights, you

24  will not need to decide whether the copyrights were infringed;

25  you will only need to decide what damages should result.

1    Nevertheless, some background on the law of copyright may

2    provide you with useful context for your decision as to

3    damages.

4           "Copyright" is the name for the protection that the

5    law extends to the author of an original work against the

6    unauthorized use or appropriation of that work by others.  In

7    ordinary circumstances, the author of a copyrighted work is the

8    owner of the copyright in that work and the copyright owner has

9    the right to exclude any other person from reproducing,

10   preparing derivative works, distributing, performing,

11   displaying or using the work covered by copyright for a

12   specific period of time.

13          There are two kinds of copyrights at issue in this

14   case:  Copyrights in musical compositions and copyrights in

15   sound recordings.  The difference is simple:  A musical

16   composition is composed by a composer, while a song recording

17   is recorded by a musician.  A person who owns a copyright in

18   either a musical composition or a sound recording has the right

19   to prevent anyone else from using that work in a soundtrack

20   without his or her permission.

21          As you have heard, the copyright claims in this case

22   pertain to five songs that were written and recorded by the

23   Beastie Boys:  So Whatcha Want, Sabotage, Looking Down the

24   Barrel of a Gun, Make Some Noise, and Pass the Mic.  For

25   simplicity's sake, I'm going to sometimes refer to these as the

1    five songs.  It is undisputed, and you must treat as

2    established, that the Beastie Boys partnership owns the

3    copyrights to the sound recordings of the five songs and that

4    Brooklyn Dust Music owns the copyrights to the musical

5    compositions of the five songs.

6         Now, you have heard some testimony concerning

7    co-ownership of the copyrights at issue.  Put that out of your

8    mind.  For the purpose of your work, you should assume that the

9    Beastie Boys partnership owns 100 percent of the copyrights to

10   the sound recordings and that Brooklyn Dust owns 100 percent of

11   the copyrights to the musical compositions.  And for

12   simplicity' sake, I'm going to refer to the plaintiffs

13   collectively in these instructions as the Beastie Boys, except

14   when it's necessary for me to note the distinction between the

15   Beastie Boys and Brooklyn Dust Music.

16        Monster has acknowledged that in the "recap" video

17   that it posted on YouTube, it used the Beastie Boys' five

18   musical compositions and the five sound recordings of those

19   songs without plaintiffs' permission and thereby infringed the

20   copyrights.

21        Turning now to damages:  The Beastie Boys are entitled

22   to recover either, one, actual damages, or, two, statutory

23   damages.  The Beastie Boys are entitled to choose between these

24   two categories of damages at any time, including after you

25   render your verdict.  Therefore, you must decide on a damages

1    amount for both of those categories.

2           I'm now going to describe to you both of those

3    categories of damages beginning with actual damages.

4           "Actual damages" means the amount of money adequate to

5    compensate the copyright owner for the fair market value of a

6    defendant's infringing use.  In this case, the Beastie Boys'

7    actual damages are to be measured by the market value of the

8    license fee that Monster would have paid them for the use of

9    their work.

10           In determining the value of a license, you should not

11    consider the subjective views of the Beastie Boys or Monster

12    about how much a license fee would have cost.  Rather, the

13    inquiry is an objective one into the fair market value of such

14    a license.  The plaintiffs have the burden of proving damages

15    by a preponderance of the evidence.  The amount of a reasonable

16    licensing fee may not be based upon mere speculation, but it

17    also does not need to be established with absolute certainty.

18    Rather, it's based on the evidence indicating the amount that a

19    willing buyer and a willing seller would have agreed upon for

20    the use in question.  In determining what a reasonable

21    licensing fee would be, you can consider testimony from fact

22    witnesses, expert testimony, past licensing fees for similar

23    uses, and other licensing fees for the Beastie Boys' music.

24           Now, the second category of damages that you must

25    decide upon is statutory damages.  Because copyright owners

1   often face great difficulties in ascertaining and proving what

2   the law calls "actual damages," the law provides that a

3   copyright owner is entitled in certain circumstances to recover

4   a monetary award from an infringer even if the owner cannot

5   prove actual damages.  Within certain broad ranges, which I'm

6   going to describe to you in a moment, the statute gives you

7   discretion to determine the amount of statutory damages that

8   you find to be just in light of the evidence presented.

9           Now, you must make one award of statutory damages per

10  "work" infringed.  This is true no matter how many copies were

11  made or how widely they were distributed.  In this case, you

12  should consider each of the five musical compositions and each

13  of the five sound recordings as a separate work for the purpose

14  of awarding statutory damages.  Thus, doing the math, you must

15  make a total of ten statutory damages awards in connection with

16  Monster's copyright infringements.

17          For each of the ten works, you must award statutory

18  damages within a certain range.  The applicable range depends

19  on whether you find that Monster's infringements were

20  "innocent," "willful" or neither innocent nor willful.  And for

21  simplicity's sake, I'm going to refer to infringement that is

22  neither innocent nor willful as "regular."  In a moment, I'm

23  going to tell you what those three ranges are, but first I'm

24  going to describe to you what innocent, willful and regular

25  mean.

1          Infringement is "innocent" if the infringer was not
2    aware, and had no reason to believe, that its action were
3    infringing.  Factors you should consider in determining
4    innocence include:  Monster's level of sophistication, the
5    customs in Monster's industry, and the overall circumstances at
6    the time the video was disseminated.  It is Monster's burden to
7    prove, by a preponderance of the evidence, that its
8    infringements were innocent.  If the Beastie Boys provided
9    proper notice of copyright prior to the infringement, such as
10   by affixing a copyright notice on the work, then Monster's
11   infringement cannot have been innocent.
12         Infringement is "willful" if the infringer either knew
13   that its conduct was infringing or acted with reckless
14   disregard or willful blindness to the prospect that its conduct
15   was infringing; that is, that it harbored actual doubts about
16   its right to distribute a video containing the copyrighted
17   music and yet willfully proceeded to do so without
18   investigating further.  You may infer Monster's state of mind
19   from its conduct.  Factors you should consider in determining
20   willfulness include:  Whether Monster knew or should have known
21   that the Beastie Boys music was protected by copyright; whether
22   Monster received warnings about its infringements; whether
23   Monster had experience with previous copyright ownership or
24   prior lawsuits regarding similar practices; and whether Monster
25   was in an industry where knowledge of copyright is prevalent.

1   The Beastie Boys have the burden of proving, by a preponderance

2   of the evidence, that Monster's infringement was willful.

3            Finally, if you find neither innocent nor willful

4   infringement, you should find regular infringement, again,

5   which is the word we use to refer to infringement which is

6   neither innocent nor willful.

7            The parties agree, and I instruct you, that you need

8   make only one determination as to whether Monster's

9   infringement was innocent, willful or regular.  That

10  determination will apply to each of the ten works infringed.

11           Now, turning to the award ranges that are set by

12  statute:  If you find that Monster's infringements were

13  innocent, the Beastie Boys are entitled to an award of between

14  $200 and $30,000 for each of the ten works infringed; that is,

15  at least $2,000 and at most $300,000 in total.

16           If you find that Monster's infringements were willful,

17  the Beastie Boys are entitled to an award of between $750 and

18  $150,000 for each of the ten works infringed; that is, at least

19  $7,500 and at most $1,500,000 in total.

20           Finally, if you find that Monster's infringements were

21  regular, the Beastie Boys are entitled to an award of between

22  $750 and $30,000 for each of the ten works infringed; that is,

23  at least $7,500 and at most $300,000 in total.

24           Now, as I've already mentioned, in deciding on an

25  award within these ranges, in other words, you'll figure out

1    innocent, willful or regular and that, in turn, will identify

2    the floor or the ceiling that you can set for each award, here

3    are now the factors to be considered within those ranges.

4           As I've already mentioned, in deciding on an award

5    within those ranges, you have the discretion to choose an

6    amount that you believe is just in light of the evidence

7    presented.  The following are some of the factors that may help

8    guide your assessment of an appropriate award and you may

9    consider any or all of them.

10          First, Monster's state of mind and, in particular,

11   whether Monster's conduct was willful, merely negligent or

12   innocent; second, the expenses saved and profits earned, if

13   any, by Monster in connection with the infringement; third, the

14   deterrent effect of such an award on Monster and third parties;

15   fourth, whether Monster cooperated in providing evidence

16   concerning the value of the infringing material; fifth, the

17   revenue lost by the plaintiffs, if any, as a result of the

18   infringement; and sixth, the conduct and attitude of the

19   parties.

20          As I said, you shall make one award of statutory

21   damages against Monster for each of plaintiffs' ten copyrighted

22   works.

23          In applying these factors to determine the appropriate

24   amount of statutory damages for each work, you may, but you're

25   not required to, take into account the fact that two awards of

1    statutory damages are being awarded for each song – one to the

2    Beastie Boys partnership, as the owner of the sound recording

3    copyrights at issue, and a second to Brooklyn Dust Music, as

4    owner of the music composition copyrights at issue.  In

5    applying these factors, you may also, but you're not required

6    to, consider the fact or the extent of the affiliation between

7    the Beastie Boys partnership and Brooklyn Dust Music.

8           That completes my discussion of the copyright claims.

9           The second portion of this case concerns the Beastie

10   Boys' allegation that Monster violated a statute called the

11   Lanham Act, it's a federal statute, by creating the false

12   impression that the Beastie Boys endorsed Monster's products.

13   I will refer to this as the false endorsement claim.  Monster

14   denies liability on the false endorsement claim.  Therefore,

15   you must decide whether there is liability.  Only if you find

16   liability are you to turn to the issue of damages.

17          False endorsement occurs when a defendant uses a

18   celebrity's persona without permission to suggest false

19   endorsement or association.

20          There are four elements of a false endorsement claim

21   under the Lanham Act; they are, that the defendant, one, made a

22   false or misleading representation of fact; two, in commerce;

23   three, in connection with goods or services; and four, that is

24   likely to cause consumer confusion as to the origin,

25   sponsorship or approval of the goods or services.

1          Now, here, the second and third elements are not

2     disputed, and you must treat them as established.  To establish

3     liability, the Beastie Boys must prove the remaining two

4     elements, the first and the fourth, each by a preponderance of

5     the evidence.

6          As to the first element – that the defendant made a

7     false or misleading representation of fact – the law recognizes

8     that false representations need not be based on spoken words

9     alone.  A misrepresentation may arise from the intentional

10    omission or concealment of facts that make what was written,

11    said or done deliberately misleading.  The misrepresentation

12    may be written, oral or arise from a course of conduct that

13    communicate a false fact or facts.

14         As to the fourth element, likelihood of confusion, the

15    Beastie Boys must demonstrate that as a result of Monster's

16    conduct, numerous consumers using ordinary care and prudence

17    were likely to have been misled or confused as to whether the

18    Beastie Boys have endorsed Monster's products.  Although the

19    Beastie Boys do not need to show that any specific person was

20    actually confused for you to find a likelihood of confusion,

21    the Beastie Boys must demonstrate not just a possibility of

22    confusion, but a probability of confusion.

23         In analyzing the likelihood of confusion, you should

24    consider the following factors, as well as any additional

25    factors that you find to be relevant.  Your evaluation of any

E64gbea4                      Charge

1      factors, however, should not be done in a mechanical way, such

2      that the party with the greatest number of factors weighing in

3      its favor wins.  Rather, you should focus on the ultimate

4      question of whether consumers are likely to be confused.

5              The factors you should consider include these:  First,

6      the level of recognition that the Beastie Boys have among

7      purchasers of Monster's products; second, the similarity

8      between the Beastie Boys' music and names and the music and

9      names used by Monster; third, any evidence of actual consumer

10     confusion regarding whether the Beastie Boys endorsed Monster's

11     products; fourth, Monster's intention in selecting the Beastie

12     Boys' music and names; and fifth, the sophistication of

13     Monster's potential customers.

14             If you find that Monster is liable on the false

15     endorsement claim, then you must determine whether damages are

16     appropriate.  To obtain damages, the Beastie Boys must prove by

17     a preponderance of the evidence that Monster intended to

18     deceive the public concerning whether the Beastie Boys endorsed

19     its products.  If the Beastie Boys so prove, then the law

20     presumes that consumers were confused or deceived, unless

21     Monster proves that consumers were not confused or deceived.

22     Put another way, if you find that Monster intended to deceive

23     consumers, the burden is then on Monster to show that the

24     Beastie Boys were not injured by its actions.

25             If you find that the Beastie Boys should be awarded

1    damages on their false endorsement claim, then you should

2    measure their damages by the market value of the license fee

3    that they were entitled to charge for their endorsement.  This

4    is similar in concept to the fair market value of the license

5    fee for the Beastie Boys' copyright claims, except that the two

6    licenses are for distinct purposes:  The license you must value

7    on the copyright claims pertain to the rights to synchronize

8    the Beastie Boys' composition and music; whereas, the license

9    you must value on the false endorsement claim, if you reach

10   this question, pertains to the endorsement by the Beastie Boys

11   of Monster's products.

12           As I instructed you concerning the copyright claim, in

13   determining the fair market value of such a license fee, you

14   should not consider the subjective views of the Beastie Boys or

15   Monster.  Rather, again, the inquiry is an objective one into

16   the fair market value of such a license.  The Beastie Boys have

17   the burden of proving damages by a preponderance of the

18   evidence.  The amount of a "reasonable licensing fee" for the

19   Beastie Boys' endorsement may not be based on mere speculation

20   but also does not need to be established with absolute

21   certainty.  Rather, it is based on the evidence indicating the

22   amount that a willing buyer and a willing seller would have

23   agreed upon for such an endorsement.

24           In determining what a reasonable licensing fee for

25   such an endorsement would be, you can consider testimony from

1    fact witnesses, expert testimony, past licensing fees for

2    similar uses, and other licensing fees for the Beastie Boys'

3    endorsement.

4            In considering the value of an endorsement license,

5    you may also consider the fact that the Beastie Boys would also

6    have received, contemporaneously, a fee for licensing the ten

7    copyrighted works to Monster.  It is for you to determine what,

8    if any, effect the existence of the copyright license would

9    have had on the amount of the fee paid for the contemporaneous

10   endorsement license.

11           If you find that Monster is liable on the false

12   endorsement claim, there is one additional determination you

13   must make.  You must determine whether or not the Beastie Boys

14   have shown by a preponderance of the evidence that Monster

15   acted in bad faith when it infringed on the Beastie Boys' right

16   to control their own endorsement.  You must make this

17   determination whether or not you've awarded the Beastie Boys

18   damages on the false endorsement claim.  As with all of the

19   other issues that I have identified, there is a place on the

20   verdict form on which to record that determination.

21           In determining whether Monster acted in bad faith, you

22   should consider multiple factors:  Whether Monster acted

23   deliberately or with a callous or reckless disregard for the

24   Beastie Boys' rights; whether Monster intended to create

25   confusion or deceive consumers; whether Monster continued to

communicate the allegedly false endorsement at issue after it

had received notice of a potential infringement; and whether

Monster had a credible innocent explanation for its conduct.

Ladies and gentlemen, this concludes my instructions

to you on the law that you'll be called upon to apply in this

case.

I am informed by Ms. Hummel that your lunch is here.

So what we're going to do now is take a lunch break.  When we

come back from lunch, we'll hear closing arguments from the

parties.  First we'll hear arguments from the plaintiffs and

then we'll hear arguments from the defendant.

After closing arguments, I'll have some very brief

final instructions for you before you begin your deliberations.

Again, I'm going to remind you for one of the last

times not to discuss the case.  That time is coming soon, but

we're not quite there yet.

Have a good lunch.  It's 12:40.  Do you think, let me

get a show of hands, will you be finished in a half hour?  Does

anyone need more time than that?  All right.  I'll see you

promptly here at 1:10 p.m. for closing arguments.

Thank you, ladies and gentlemen.

(Jury excused)

(Continued on next page)

E64gbea4                      Charge

1            (In open court; jury not present)

2            THE COURT:  Be seated.  Again, I'm authorizing counsel

3     to eat in the courtroom.  Time is very brief.  I want you to be

4     comfortable.  Put away the detritus after you're done.

5            Mr. Puvalowski, Mr. Kahn, Ms. Susman, if you need the

6     lectern here, by all means, move it over.  I would ask you,

7     though, because that lectern doesn't come equipped with a

8     microphone and because we have a large courtroom and a lot of

9     people here, if you're going to be closing from that lectern,

10    just be mindful of keeping your voice up so everyone can hear

11    you.

12           Anything from counsel before we break.

13           MR. PUVALOWSKI:  No.

14           MR. KAHN:  No.

15           THE COURT:  Have a good lunch.

16           (Luncheon recess)

17           (Continued on next page)

18

19

20

21

22

23

24

25

E641bea5

AFTERNOON SESSION

1:12 p.m.

1    (In open court; jury not present)

2    MR. KAHN:  Your Honor, just one quick question.  After

3    Mr. Puvalowski's summation, can we just take a quick break to

4    rearrange --

5    THE COURT:  I think my guess is that that will be when

6    we take the afternoon break for the jury.  Yes, we'll take at

7    least a short break for you to rearrange.

8    Counsel, I've given each side 90 minutes for

9    summation.  It's for your table to keep track of the time.  I'm

10    not going to be calling out what's left on the clock, I don't

11    have a red light, so it's for your colleagues to do that.

12    Ms. Hummel, let's bring in the jury.

13    THE DEPUTY CLERK:  Yes, your Honor.

14    (Jury present)

15    THE COURT:  All right.  Welcome back, everyone.

16    I hope you had a good, if truncated, lunch.

17    We're now ready for closing arguments, beginning with

18    plaintiff.

19    Mr. Puvalowski.

20    MR. PUVALOWSKI:  Thank you, your Honor.

21    "At Monster, all our guys walk the walk in action

22    sports, punk rock music, partying, hanging with the girls, and

23    living life on the edge."  Living life on the edge.  For a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E641bea5                    Summation - Mr. Puvalowski

1   multinational corporation like Monster to have a marketing

2   program that's based on living life on the edge, that's fine.

3   That's up to them.  What's not okay, ladies and gentlemen, is

4   to have policies and procedures and controls about copyright

5   licensing, about licensing for endorsements, that follows the

6   exact same casual attitude.  Life on the edge.

7        In this case, the evidence has shown that Monster did

8   indeed live life on the edge with respect to copyright

9   compliance issues.  They didn't really have a policy that

10  anyone consistently even knew.  They hired people who were

11  responsible for putting together these videos who had no

12  experience whatsoever.  They provided no training, they

13  provided no guidelines.  They certainly did live life on the

14  edge, ladies and gentlemen, and they did it to their benefit.

15       You heard all of that in this case, how their

16  marketing policy was based on these videos, a thousand of them

17  now up on the web.  Despite that, despite the fact that these

18  videos are a core part of their marketing strategy, no one was

19  responsible at Monster.  They truly were living life on the

20  edge.  And it resulted, ladies and gentlemen, in this case in

21  an absolutely egregious, willful infringement of the Beastie

22  Boys' copyrights -- copyrights in five different songs.  Ten

23  different copyrights.  It resulted in an egregious and willful

24  and bad faith infringement of the Beastie Boys' right to choose

25  who they're going to endorse, what products they're going to

E641bea5                      Summation - Mr. Puvalowski

1    support, how their name can be used, how the name of MCA can be

2    used.  Living life on the edge was a direct result in those

3    infringements, and it was intentional, they made money as a

4    result, and that's what this case is all about.

5            Over the course of the next little while -- I'll try

6    to make it as little as possible -- I'm going talk to you about

7    the subjects that the judge just instructed you on, and I'll

8    follow the same basic order that the judge followed.

9            So I'm going to start with the copyright claims.  And

10   as the judge indicated, the copyright claims, in terms of

11   liability, it's not disputed.  Monster has admitted that they

12   did indeed infringe on the Beastie Boys' copyrights.  So we'll

13   talk about actual damages first and then we'll move on to

14   statutory damages and willfulness and what all that means.

15   I'll then go on to talk about the implied endorsement claims

16   and what the evidence shows with regard to the fact that the

17   Ruckus in the Rockies video and the surrounding promotion of

18   that event and video did indeed imply an endorsement and

19   suggests to the public, suggests to Monster's consumers, that

20   the Beastie Boys were endorsing the Monster brand and the

21   Monster product, which was absolutely positively false.

22           So let's start right off the bat on the copyright

23   claims.  And again, copyright liability is admitted here.  No

24   question.

25           So let's move right into, first, actual damages.  You

1    heard the judge talk about the fact that there are two

2    different kinds of damages in a copyright case -- actual

3    damages and statutory damages.  For the moment I'm talking

4    about the first kind, actual damages.  And the source of the

5    evidence, primarily, or at least the person who provided the

6    opinion as to the actual damages in this case, was Lisa Thomas,

7    the Beastie Boys' expert.  And you heard Ms. Thomas go through

8    the factors that she considered -- the prominence of bands,

9    prominence of the song, the context of the use of the music,

10    the territory, the duration, the media.  And by the way, ladies

11    and gentlemen, all of those factors should sound pretty

12    familiar by this point because they're effectively the same

13    factors that Mr. Albert said do indeed go into the calculation

14    of the fair market value of a copyright license in this

15    context.

16          Ms. Thomas examined comparables.  Specifically, she

17    examined the Beastie Boys' licensing history.  This is

18    important, ladies and gentlemen, because we have in evidence

19    before you three exhibits -- Plaintiff's 219, Plaintiff's 220,

20    and Plaintiff's 265 -- that set forth what the Beastie Boys'

21    licensing history has been in terms of synch license,

22    synchronization licenses, since 1999.  Goes back 15 years.  You

23    can see for yourself what the Beastie Boys' licensing history

24    is.  You can see for yourselves when they provide a license for

25    a little amount of money, when they get a lot of money from

E641bea5                     Summation - Mr. Puvalowski

1  their music.  And I would submit to you, ladies and gentlemen,

2  that that licensing history -- and I'm not going to show it to

3  you.  It's one of these schedules.  You've seen it in evidence.

4  And again, I encourage you to take a look at it more carefully

5  during your deliberations, if you want to.  You have a 15-year

6  history of what they actually licensed their music for.  You

7  don't really have to guess here.  You can see it yourselves.

8  And it shows a couple of things.  That licensing history shows

9  a couple of things, we submit, absolutely clearly.

10         Number one, the Beastie Boys' music is very valuable.

11  It is licensed a lot.  And within the various categories of

12  uses that Lisa Thomas talked to you about, the Beastie Boys get

13  a lot of money within those categories.  So if you recall,

14  there was a discussion about hierarchy of licensing.  And

15  Ms. Thomas explained to you that at the bottom, the least

16  valuable, maybe a few hundred bucks, is Jimmy Kimmel or David

17  Letterman, when Paul Shaffer plays a song while a guest comes

18  in, etc.  That's the lowest.  Next up, daytime variety shows.

19  Above that, television.  Above that, television promos.  Above

20  that, movies.  And by now, ladies and gentlemen, we are really

21  into the area where there is negotiation between a willing

22  buyer and a willing seller, and as the judge instructed you a

23  few minutes ago, that's the test that you need to apply in

24  determining what the copyrights' fair market values are in this

25  case.  So that licensing history, ladies and gentlemen, shows

1   you what in reality a willing seller and a willing buyer have

2   been willing to negotiate for Beastie Boys music over a 15-year

3   period.  And it shows that with respect to movies and movie

4   trailers -- and you heard Ms. Thomas explain that movie

5   trailers is the second highest, commercials being the highest,

6   trailers being the second highest, but even within the trailers

7   category, the Beastie Boys have received anywhere from $75,000

8   on the low end, per side, to $400,000 on the high end, per

9   side.  In fact, you heard that that 400,000 per side for the

10  Hancock trailer was for the song Sabotage, one of the songs

11  that is at issue in this case.  So anywhere from 75,000 a side

12  to 400,000 per side.  And Ms. Thomas explained to you that

13  that's the category of use that she found to be most comparable

14  to the use here.  And if anything, the use here would be one

15  step higher.

16          We don't have that one step higher, and you know why.

17  It's because the Beastie Boys have pursued a policy, have

18  enforced a policy, from the beginning of the band, that they

19  didn't feel it was right to license their music for commercial

20  product ads.  They haven't done it.  They haven't done it from

21  the very beginning, and the testimony is they haven't done it,

22  first, because they don't think it's the right thing to do, and

23  second, they think that there's a view that their fans would

24  think ill of them if they sold out in this manner.  That's the

25  testimony.  So we don't have comparables in the commercial

1    space.  We don't.  That's true.  But we do have repeated

2    comparables in the space right below it.

3         So what did Ms. Thomas do?  She provided an opinion of

4    a fair market value of $125,000 per side, which is at the lower

5    end of the basic range for trailers, and even for movies.  We

6    submit to you that that is a very conservative estimate.  She

7    then reduced it to take into account the fact that there was

8    only a five-week use in this case, and she reduced it by

9    20 percent.  So her final opinion as to the fair market value

10   of the ten copyrights here was 20 percent less 125, or $100,000

11   per side.

12        Now a couple things to point out.  There is

13   substantial evidence in the record that supports Ms. Thomas'

14   opinion here.  Number one, again, the licensing history.  You

15   can take a look at the whole history, and that history

16   absolutely supports it 100 percent.  Number two, you've heard

17   the testimony from Mr. Silva, the band's manager, about the

18   high demand that the band is in now and consistently, even

19   today, as to commercials.  Even though the industry knows that

20   it's highly unlikely they're going to say yes to a commercial,

21   they still get inquiries.  Puma, Dell Computer, Samsung, just

22   in the recent history, inquiries for commercials.

23        The Beastie Boys' music is very distinctive.  The

24   Beastie Boys are a very popular band.  They are very cool.

25   They truly are iconic, to use a word that Lisa Thomas used.  So

E641bea5                    Summation - Mr. Puvalowski

1    any product or any cause, anything that is able to use the

2    Beastie Boys' music is going to benefit from that cool, is

3    going to benefit from the goodwill that this band has developed

4    over the course of a 30-year career.

5            So in fact, you heard from Mr. Silva that not too long

6    ago, the band turned down an offer for the use of the song

7    Sabotage for an Arnold Schwarzenegger movie that would have

8    been $500,000 per side.  A million dollars they turned down.

9    Now what does this show?  Number one, I submit it shows that

10   Sabotage is a very, very popular song.  The Beastie Boys remain

11   a very popular group, very much in demand.  It also absolutely

12   shows that their policy that they followed from the beginning

13   is a sincere one.  They leave a lot of money on table.  This is

14   for a use -- this is not even a product commercial.  They

15   scrutinize the offers.  They pay attention to what the use is.

16   They make a determination:  Is this consistent with our views?

17   Is it consistent with how we want to protect our catalog?  And

18   they make a decision.  And at times they leave a lot of money

19   on the table in order to protect that catalog, and in order to

20   protect their integrity, frankly.

21           I just want to point out -- and we'll talk a little

22   bit more in a moment about Mr. Albert.  But as you heard

23   yesterday afternoon and this morning, Mr. Albert's starting

24   point with regard to his own copyright calculation estimated

25   for a one-year US, TV and radio commercial, that any given song

E641bea5                    Summation - Mr. Puvalowski

1    for the Beastie Boys would be between 150 and $200,000 per

2    side.  300, $400,000 per song.  That's his starting point.  Now

3    we're going to talk in a little bit about all his various

4    50 percent reductions, but where he started absolutely supports

5    Lisa Thomas' proposition and the rest of the evidence in this

6    case that shows that the Beastie Boys are indeed a very

7    prominent band, indeed have a great deal of stature with

8    respect to their licensing, and indeed, their songs -- their

9    music is very, very valuable.

10           Now in response to this evidence, 15 years of

11   licensing history, the opinion of someone who's been in the

12   industry for 25 plus years, representing similar acts -- The

13   Eagles, Chicago, Steely Dan -- in opposition to that, what did

14   Monster put forward?  Well, first, they put forward a watch, a

15   watch that Michael Diamond and the rest of the band helped

16   design.  Ladies and gentlemen, you know why they designed this.

17   You know what it was for.  It was for a charity purpose.  It

18   was from the beginning for a charity purpose.  It's got a funny

19   picture of Mike on the face.  It's got a quote from the band on

20   the band.  Excuse the pun.  It wasn't an intended pun.  It was

21   always -- and the Beastie Boys didn't get a dime for this.  It

22   was a charity project.  And Mike Diamond himself delivered the

23   check to Columbia University's college radio station, a

24   charitable organization.  That's the first thing they attacked

25   the band with, this watch.  That's a joke, ladies and

1    gentlemen.  It is.  That the Beastie Boys should somehow be

2    penalized because they did a charity project with a friend, a

3    charity project that resulted in a significant charitable

4    contribution to a charity here in New York City?  It's a joke

5    that that is somehow proof that -- I don't know what -- that

6    the copyrights are worth less?  I don't know.

7            What's the next thing they put forward?  A series of

8    videos.  So there's really kind of three categories here.  One

9    is the JibFest video; two is the ESPN promos, the ESPN X Games

10   promos; and three is the Nike SB Chronicles movie.  Let me just

11   spend a little bit of time on each one of those.  You've seen

12   them all.  Well, you've seen at least portions of these three

13   categories.

14           Let's start with JibFest.  JibFest is a series of

15   what's called webisodes.  They vary in length, around ten

16   minutes, or some are more.  There is I think -- I believe five

17   of them.  Five of them.  They're all in evidence.  I think

18   you've only been shown one or perhaps two during the course of

19   this trial.  But if you're curious, you can absolutely ask to

20   watch every one, all of them.  And the defense has suggested

21   that because these -- now it's a snowboarding event.  Small

22   group of people.  It's not public there.  It's just the

23   snowboarders.  There's interviews of the snowboarders, there's

24   a discussion of the genesis of the event from years past,

25   there's a discussion of the tricks, etc.  And yes, there is a

E641bea5                    Summation - Mr. Puvalowski

1    Nixon logo painted on the side of the jump feature.  And Nixon

2    JibFest, with a red tree, which is not the Nixon logo, is on

3    headbands or something.  So the Nixon name is there, the Nixon

4    logo is there.  But ladies and gentlemen, the suggestion that

5    Nixon JibFest is like Ruckus in the Rockies is ridiculous.  It

6    insults your intelligence.  If you have any worries about this

7    at all, please watch them.  I submit to you that after watching

8    the JibFest videos, if you didn't know already that Nixon makes

9    watches, you wouldn't know after watching the video.  There's

10   just no product placement at all.  If you didn't know that that

11   red teardrop thing on the feature was Nixon's logo, you would

12   have no idea that it was a logo of any particular thing.

13   There's not product placement, unlike Ruckus in the Rockies.

14   There's no mascots or girls or anybody else dressed up in

15   costumes to support the Monster products.  There's a storyline,

16   there's discussions, etc.  And without doubt, ladies and

17   gentlemen, the focus of those webisodes is on the snowboarding.

18          Now, ESPN.  ESPN X Games, an ESPN event held twice a

19   year -- once in the summer, once in the winter.  And I think we

20   saw all of them, these little short promos.  Just a few seconds

21   of the Beastie Boys music within those promos.  And ladies and

22   gentlemen, again, the suggestion that these promos should

23   affect your view of the valuation of a four-minute commercial

24   that's chock-full of logos and product placements and costumes

25   and the whole 9 yards is really, really ridiculous.

E641bea5                    Summation - Mr. Puvalowski

1                Now at the end of the promos, it says X Games,

2    Sponsored by Jeep, and on one or two of them there's a

3    voiceover that says that.  What does that have to do with

4    anything?  Beastie Boys aren't sponsoring Jeep.  They've

5    licensed their music to do a promo for the X Games, and the X

6    Games happen to be sponsored by Jeep.  Talk about a tenuous,

7    tenuous link.  Frankly, ladies and gentlemen, if you watch

8    those things, you'll see, again, that they're very clever

9    little promos, talking owls and talking moose, with a small

10   clip of a snowboarder or snowmobiler, with a very short clip of

11   Beastie Boys music.  To suggest that that is the same as the

12   Ruckus in the Rockies doesn't bear any consideration.

13               So what we have here, I would submit to you, that if

14   the point is that these things, the watch and JibFest and ESPN,

15   Nixon Chronicles -- I mean Nike chronicles -- so the last

16   category, this movie, Nike SB Chronicles, Nike skateboarding

17   chronicles.  Actually, if you watch the whole thing -- and I

18   invite you to.  If you have any questions on this, there's a

19   very slickly made, very beautiful, if you like skateboarding,

20   movie featuring multiple skateboarders.  And one of those

21   skateboarders uses, as he's skating -- as one of those

22   skateboarders is skating, there's the Beastie Boys song in the

23   background.  So Beastie Boys licensed it.  Now at the beginning

24   there's a Nike logo with the swish and a pair of tennis shoes,

25   a cartoon pair of tennis shoes hanging over a wire, and at the

E641bea5                    Summation - Mr. Puvalowski

1    end there's a Nike logo as well, but beyond that, ladies and

2    gentlemen, for most of the time these skateboarders aren't even

3    wearing Nike shoes.  Some of them are but some of them aren't.

4    Again, the suggestion that Nike SB Chronicles is a Nike ad the

5    way that Ruckus in the Rockies is an ad is just plain false.

6    And if you have any questions, again, please watch it.

7          Now so our first point on this is that one of these

8    things is not like the other, and in this case one of these

9    things, Ruckus in the Rockies, is not like all the rest of

10   them.  But there's a more fundamental point here.  There are

11   other big distinctions here.  Number one, Nike Chronicles and

12   JibFest and the watch and ESPN asked permission.  That's the

13   biggest distinction, ladies and gentlemen.  They asked

14   permission and permission was granted.

15         Number two, while the defense might want to quibble

16   with the Beastie Boys as to where the Beastie Boys want to draw

17   the line on what is an appropriate use for their music and what

18   is not, you know who gets to make that decision?  The Beastie

19   Boys do.  The Beastie Boys get to make the decision as to

20   whether they license their music for a friend, Chad DiNenna,

21   who's involved with Nixon; they get to make a decision whether

22   they want to license their music for an ESPN sporting event

23   promotion; they get to make the decision as to whether the Nike

24   film is a good thing to associate with or not.  It's their

25   decision.  Unlike the Ruckus in the Rockies, where the decision

E641bea5                     Summation - Mr. Puvalowski

1    was taken away from them.

2            Now let's talk about Mr. Albert briefly.  Again, his

3    starting point is, frankly, a little higher than Lisa Thomas'

4    starting point.  He starts at 150 to $200,000 per side per

5    song.  He then takes a series of discounts, and so let's just

6    talk about those discounts briefly.

7            And you've seen this.  I'm not going to pull it up on

8    the screen.  It's Defendant's 128.  50 percent discount because

9    it's like internet use.  We'll get back to that in a moment as

10   to whether it was actually like internet use.  50 percent

11   discount because it's only five weeks.  50 percent discount

12   because it was only one of the -- well, it was only one of 900

13   videos, but he's also stated that this is because it wasn't a

14   commercial.  We'll talk about that a lot.  And finally,

15   multiplied by 2.5 rather than the five songs, and as he

16   admitted on the stand this morning, that's another 50 percent

17   discount.  So you have Mr. Albert, who's been in the industry a

18   long time, who's done a lot of licenses, and every single

19   discount he takes just happens to be 50 percent.  Doesn't

20   matter what the context is, it doesn't matter how he really

21   judged in terms of relative scale.  They're all 50 percent.

22   Ladies and gentlemen, I submit to you, with due respect to

23   Mr. Albert, that those 50 percent discounts have a lot more to

24   do with getting Monster's number lower than they have to do

25   with any industry standards or reasoned judgment.  So let's

E641bea5                    Summation - Mr. Puvalowski

1    talk about a couple of those things right now.

2            First, like internet usage.  You heard about this,

3    that the reason he took a 50 percent discount was that this is

4    like internet usage.  And on this, he points to the fact that

5    it was up on Monster's website, Monster's YouTube channel, and

6    it wasn't heavily promoted elsewhere.  And he also points to

7    the fact that only 14,000 people saw this video on the YouTube

8    channel when it was up.  First, you know, ladies and gentlemen,

9    why only 14,000 people saw that video?  Because we caught them

10   and we made them take it down after five weeks.  That's why.

11   It's not because of any other reason.  I submit to you, ladies

12   and gentlemen, that you shouldn't get a discount for stealing,

13   and that's what happened here.

14           In any event, on the substance of it, was it like

15   internet use?  Wasn't promoted.  That's his words:  Wasn't

16   promoted.  He's wrong on the facts.  It was promoted.  First,

17   it was promoted on Monster's Facebook page.  And I know there's

18   been some testimony in this case as to whether it was pushed

19   out to 16 million or only 10 percent of that.  The fact is that

20   it was pushed out to a lot of people.  A lot of Monster's own

21   consumers got a Facebook posting that was a link to the video,

22   and there's a little thumbnail -- I'll show it to you a little

23   bit later in the presentation -- a little thumbnail with a

24   video and next to it was a link, a link to Z-Trip's Megamix, a

25   link that in two places has the Beastie Boys name.  So number

E641bea5                        Summation - Mr. Puvalowski

1     one, the video was promoted to a lot of people.

2              Number two, it was promoted through various

3     snowboarding websites.  There will be additional discussion

4     about that in a moment as well.  These websites picked it up,

5     carried the story, actually had a link to the video, and had a

6     link to the download as well.  So it was promoted.  It was

7     promoted far beyond Monster's own web page.  In fact, you'll

8     see a document in a little bit that the release ended up on at

9     least dozens of other pages.

10             Second, the five-week use.  Let's talk about that a

11    little bit.  Well, let me draw a fine point.  So his first

12    50 percent reduction, we submit to you, is not appropriate.

13    There should be no reduction because this was not intended to

14    be a like internet use.  The fact that 14,000 people were all

15    that saw it, number one, it's because we caught them, and

16    number two, it doesn't matter.  As you recall from what the

17    judge instructed you, the measure of damages here is what a

18    willing buyer and a willing seller would be willing to do, and

19    that's prospectively for this use.  The five-week use, you have

20    to take that into account, which we'll talk about in a moment.

21    But if Monster's ad was lousy and nobody wanted to watch it,

22    you heard testimony from Lisa Thomas and you heard testimony

23    from Mr. Albert, guess what, the advertiser doesn't get the

24    money back.  And that just makes a lot of sense.  If Monster

25    were to contract with the Beastie Boys before this were put

1    out, it doesn't really matter if 1,000 or 14,000 or 140,000

2    people see the video.  That's on them.  The five-week use is

3    different.  The five-week use would have to be taken into

4    account.

5          Let's talk about that.  So Mr. Albert says it's a

6    50 percent discount.  Ms. Thomas said it was a 20 percent

7    discount.  So frankly, we don't have a huge -- I know it's

8    30 percent, but there's not a huge swing here.  Ms. Thomas put

9    forward why she thought that a 20 percent discount was

10   appropriate.  Mr. Albert, you can predict what his discount

11   was.  50 percent, just like every other number he stated in

12   this case.

13         Let's move on to his 50 percent discount because this

14   was not a commercial.  And there was a lot of back and forth

15   this morning on this very point.  I submit to you, ladies and

16   gentlemen, that he has not in any way, shape, or form explained

17   why he came to that conclusion.  He says it's too long.  Then I

18   asked him, if you cut it down to 30 seconds, would it be

19   commercial then?  Nope, because it's not on paid media.  Well,

20   if that's the standard, ladies and gentlemen, of video of this

21   sort, that an infringer gets to put on its own website for

22   free, well, under his definition, it could never, ever, ever,

23   logically, be a commercial.  If it has to be on paid media, if

24   I'm a beverage company, I get to infringe as much as I want and

25   it will never be a commercial.  I can make them look exactly

E641bea5                    Summation - Mr. Puvalowski

1   like a commercial on TV and it will never be a commercial,

2   according to him, because it's not on paid media.  That's what

3   he said this morning.

4           In any event, this is an issue, ladies and gentlemen,

5   that is completely within your own logic, your own common

6   sense.  You all know what is a commercial in your own mind,

7   what is not a commercial.  I would submit to you that that

8   video, there is no doubt that that is a commercial.  It's got

9   the Monster logo all over it.  It's got the Monster colors all

10  over it.  It's got multiple featuring of the Monster product,

11  sometimes with girls holding them and sometimes on a trash can,

12  bouncing into the trash can, multiple times, banners, flags,

13  features in the snow.  They painted the snow green.  The only

14  dialogue in the entire video is Z-Trip thanking Monster, and

15  this is an entertainment?  It's a commercial.  It's a

16  four-minute commercial.  It's a four-minute commercial using

17  five Beastie Boys songs as its soundtrack, prominent, prominent

18  soundtrack.  Suggesting that this is not a commercial and

19  therefore you should cut it in half, yet again, again, exactly

20  50 percent, is just belied by the video itself.

21          Finally, with regard to what I call the Chuck E.

22  Cheese discount, Mr. Albert testified that he had never in his

23  experience done a commercial for more than one song.  He flatly

24  doesn't know whether it would be industry practice to give a

25  discount in the context of commercials.  He doesn't have any

E641bea5                    Summation - Mr. Puvalowski

1    basis for his view.  Chuck E. Cheese and having the little

2    robots sing songs is a whole lot different.  It's a performance

3    issue.  The only people that see that are the kids and the

4    parents that are there.  Completely different from a commercial

5    that uses prominent, lengthy, very distinctive pieces of five

6    Beastie Boys songs.

7           So we submit to you, ladies and gentlemen, that the

8    like internet discount should not be applied, at all.  We

9    submit to you that the five-week use, there should be a

10   discount, and you should make a determination which expert is

11   more persuasive -- Lisa Thomas, who suggested that it should be

12   20 percent, or Mr. Albert, who picked 50 percent out of the

13   air.  The 50 percent commercial reduction, we submit that that

14   should not be reduced in any way, shape, or form.  And then the

15   frequency discount.  There is no basis for it.  There's no

16   logic in it.  It should not be given.  Given all of those, his

17   number actually ends up higher than Lisa Thomas'.

18          Mr. Albert has another problem, ladies and gentlemen,

19   other than the logic of his analysis.  He has a credibility

20   problem.  During the cross-examination this morning it came out

21   that when Mr. Albert is working as an expert, he's an expert.

22   He works both sides, whoever will pay him the money that he

23   demands, $11,500 for today.  When he's working for the artist,

24   he's got more factors -- factors about the damage to the

25   goodwill of the artist.  He had three other, four other

1  factors, ladies and gentlemen, four other factors in the Henley

2  case.  Now Mr. Kahn's going to get up and say, oh, it's

3  different facts.  The facts were -- and this came out -- two

4  different Don Henley songs were used in political

5  advertisements.  It wasn't even Don Henley's real voice.  It

6  was an impostor.  No Don Henley name, no download, no link, no

7  reference to MCA or the equivalent, to another band member.

8  Facebook posting.  All of this other stuff.  But Mr. Albert, in

9  that case, construed multiple other factors and made a

10 determination that an endorsement fee far in excess of the

11 union scale was appropriate.

12         The whole union scale issue, ladies and gentlemen, is

13 nonsense.  Doesn't make any sense.  As he explained, the union

14 scale issue is, when a singer or a musician actually performs

15 on a recording, they get a small residual.  The implied

16 endorsement fee that Lisa Thomas is talking about has nothing

17 at all to do with that.  That endorsement fee has to do with

18 the use of the name, with the use, the suggestion that the

19 download, you know, links the band to the Monster brand, the

20 Monster product; has to do with the reference to MCA,

21 Mr. Yauch's stage name; has to do with the link on Facebook

22 that also linked to the download; had to do with the promotion

23 to snowboard magazines that pushed it out into the media; all

24 of these various steps that Monster took to link the Beastie

25 Boys to its products and to its brand.  And it's not just the

E641bea5                    Summation - Mr. Puvalowski

1    music.  It's far more than the music.  And that's what

2    Ms. Thomas is talking about.  That's why an endorsement fee is

3    appropriate in this case.

4            In fact, Mr. Albert admitted, from the lengthy

5    cross-examination, that 90 percent of the time such and such

6    union scale is enough.  Well, ladies and gentlemen, 10 percent,

7    10 percent of the licenses -- that's a lot of times -- when

8    this kind of implied endorsement fee is appropriate.  And Lisa

9    Thomas explained under what circumstances would a band like

10   Beastie Boys permit their name to be used, permit their band

11   mate's name to be used, permit a download that makes it look

12   very distinctly like Beastie Boys are endorsing this product,

13   they're on board, Beastie Boys are on board.  Five songs are

14   used in the video, Beastie Boys are on board; their name's on

15   the video, Beastie Boys are on board; there's a message, "RIP

16   MCA."  Beastie Boys are on board because the Facebook posting

17   uses the Beastie Boys name twice.  Beastie Boys are on board

18   because the snowboard magazines, media articles, use the video

19   and used the download link.  All of these things suggest very

20   directly the Beastie Boys are on board with our product and our

21   brand, and that was flatly false.

22           So let's move on to specifically -- we've already

23   started talking about this a little bit.  Well, so we've talked

24   about actual damages.  I'm going to move on now to statutory

25   damages, the second measure of damages on the copyright claim.

E641bea5                        Summation - Mr. Puvalowski

1    And as the judge instructed you, you need to find damages on

2    both ways.

3            So one of the decisions that you need to make relates

4    to -- the first issue you need to decide is whether the

5    infringement here was innocent, willful, or neither innocent

6    nor willful -- as the judge called it, regular.  Ladies and

7    gentlemen, let me start with innocent, and Monster will try to

8    persuade you that innocent is the right category.  I submit to

9    you that this can be rejected very, very quickly.

10           The judge instructed you, if the Beastie Boys provided

11   proper notice of copyright prior to the infringement, such as

12   by affixing a copyright notice on the work, then Monster's

13   infringement cannot have been innocent.  If there's a copyright

14   notice on the work, it can't be innocent infringement.  That's

15   what the judge just instructed you.  So let's take a quick

16   look.  There's four CDs or albums involved.

17           Paul's Boutique is the first one.  Copyright 1989,

18   Capitol Records.

19           Check Your Head is the next one.  Copyright 1992,

20   Capitol Records.

21           Ill Communication.  Copyright 1994, Capitol Records.

22           Hot Sauce Committee Part Two.  Copyright 2011, Capitol

23   Records.

24           This disposes completely of the innocent infringement

25   issue.  So let's move on to whether it's willful.

1    And ladies and gentlemen, I submit to you that the

2    evidence is absolutely overwhelming that this was willful

3    infringement.  The standard -- start there.  Infringement is

4    willful if the infringer either knew that its conduct was

5    infringing or acted with reckless disregard or willful

6    blindness to the prospect that its conduct was infringing.  Now

7    on this point I'm going to walk you through two basic areas

8    where the evidence comes through.

9    Number one, we're going to focus a little bit on

10    Nelson Phillips.  We talked about him and how he put together

11    the video and his interactions with Z-Trip, and then we'll turn

12    to the broader discussions and implications of other Monster

13    employees at headquarters and elsewhere.  So let's start -- and

14    in fact, if I can ask that 130 be brought up on the screens.

15    And ladies and gentlemen, I'll have some boards and some

16    screens.  Please bear with me.  But, 130.

17    130, ladies and gentlemen.  It's coming up now.  130

18    is Z-Trip's contract.  He testified about it.  And just to lay

19    the groundwork here as to what the context was about whatever

20    approvals Z-Trip gave to Mr. Phillips, if you'll look at the

21    third page in the exhibit and specifically paragraph 8,

22    Recordings of Performance.  "Absolutely no audio recording,

23    video recording, nor radio broadcasting shall be allowed during

24    the performance unless prior written permission has been

25    granted by the artist or their representative."  Z-Trip

1    testified that from his perspective, he could not be videotaped

2    that night unless he gave his approval.  He testified that this

3    was the context of the approval that was provided in the e-mail

4    exchange, which is the famous "Dope" e-mail that we're going to

5    talk about in a moment.  So let's get right to that.

6         If we can pull up -- let's start with 134, just on the

7    PDF, and I'll bring it up on the board in a moment.

8         All right.  So this is an excerpt from the famous

9    "Dope" e-mail, which is Plaintiff's 134 in evidence.  Just

10   first, by way of background, there's an e-mail below this that

11   is from Mr. Phillips to Zach, Mr. Sciacca.  It says, "Hey,

12   Zach – Please have a look at the video from this past weekend

13   and let me know if you approve."  It goes on to say, "I think

14   we'll remove the logos at the end since they're redundant, and

15   the rest will be cleaned up just a little bit more.  Thank you

16   again for an amazing weekend.  Once you approve, we'll post on

17   YouTube and notify our 16 million fans on Facebook."  Okay?  By

18   the way, that's not there.  This is an excerpt, and from that

19   e-mail we get to this e-mail.  And you know what Z-Trip's

20   response was.  "Dope."

21        So let's talk about this.  There is no reference

22   whatsoever that either the request or the one-word answer had

23   anything at all to do with the music.  Full stop.  Full stop.

24   There's no context in either the e-mail that precedes it or

25   certainly in Mr. Sciacca's one-word slang response.  And so

E641bea5                    Summation - Mr. Puvalowski

1    let's stay there for just a moment.

2            Monster would have you believe that by saying "Dope,"

3    Mr. Phillips believed -- by the way, there is no dispute.  No

4    rights were given here.  The copyright claim, as you know, has

5    been admitted.  But what Monster's saying is that Nelson

6    Phillips was just -- he's making an honest mistake.  That's

7    what you heard in opening, and that's been the basic gist of

8    all the testimony:  It's just an honest mistake.  This is not

9    an honest mistake here, in the sense that there's no way that

10   Nelson Phillips actually thought he was receiving any approval

11   for music.  It's not in any of the context here.  In fact,

12   despite what the position of Monster has been during this

13   trial, there's actually testimony on this in the record that

14   shows that the trial defense is simply false.

15           This is testimony from this trial, and it was a

16   readback of a deposition transcript from Mr. Phillips.  And for

17   the record, it's page 1154/9 through 16.

18           "Q.  Mr. Phillips, you recognize -- and in fact,

19   Mr. Kahn took you through a little bit of this e-mail.  Just

20   directing your attention to the bottom half for a moment.  You

21   write to Mr. Sciacca, 'Hey, Zach, please have a look at the

22   video from this past weekend and let me know if you approve.'

23   It goes on.  You would agree with me that there's nothing in

24   that e-mail that says anything about music in the video,

25   correct?"

1           "A.  I would agree with you, yes."

2           This is from 1153, line 7 to 22:

3           "Well, what was it relative to?"

4           And this is from the deposition.

5           "A.  We wouldn't put out a video with anybody, be it

6     athlete, be it DJ, be it musician, without their approval based

7     on the actual content."

8           "Q.  Because they appear in it?"

9           "A.  Because they appear in it, because they would

10    like to appear in a certain way."

11          "So you wanted their approval that they appeared in

12    the way that they're comfortable with."

13          "A.  Yes."

14          "And that was the purpose of your sending Mr. Sciacca

15    an e-mail?"

16          "A.  Yes."

17          That was Mr. Phillips' sworn testimony during his

18    deposition.  This e-mail, the "Dope" e-mail, was about

19    obtaining the approval of how Mr. Sciacca looked.  Somehow that

20    got turned, for purposes of this trial, into "Dope" means, "I

21    thought I had a license."  It's nonsense.  And Mr. Phillips

22    confirmed that it's nonsense.

23          In fact, it goes on:

24          "My question to you, Mr. Phillips, is:  When

25    Mr. Sciacca wrote 'Dope,' did you understand him to mean that

E641bea5                    Summation - Mr. Puvalowski

1    he was giving you the authority to use Beastie Boys music in

2    the Ruckus in the Rockies video?"

3            "A.  No."

4            This "Dope" e-mail simply does not mean, on its face

5    or through explanation, what Monster wants you to believe it

6    means.

7            In fact, ladies and gentlemen, I would submit to you

8    that there is serious, serious doubt as to whether there was

9    any discussion whatsoever on this topic.  If you take a look

10   at -- this is another piece of testimony, from Mr. Phillips:

11           "Q.  The full answer to your question was --" and this

12   is a deposition readback -- "At the time I don't know that we

13   talked about it, but like I mentioned before, the aesthetic of

14   it, the content, the music, the flow, his appearance."

15           No doubt Mr. Kahn will focus on the second half of

16   that, but I want you to think about what the implications of

17   that first half are.  He said, "At the time I don't know that

18   we talked about it."  This is an individual, ladies and

19   gentlemen, who testified to you, on that stand, that he never

20   thought about copyright licensing, during this whole process.

21   He said that on the stand.  And here we have him, albeit in a

22   deposition, saying, "At the time I don't know that we talked

23   about it."  He is not even sure if he had the conversation with

24   Mr. Sciacca that he's now testifying to, very clearly, by the

25   way.  He's got a real, real credibility problem, ladies and

E641bea5                    Summation - Mr. Puvalowski

1     gentlemen.

2            Now I would submit to you -- and I'm fairly confident

3     that Mr. Kahn will talk to you about this e-mail.  This is the

4     e-mail from Z-Trip to his manager, Lorrie Boula.  And Z-Trip

5     writes, "I feel really, really bad about this whole thing.  I

6     would never do anything intentionally to harm the Beasties,

7     ever.  The dude asked me when we were boarding and hanging.  I

8     thought a promo video about me was cool.  I told him to reach

9     out to you like always."

10           You know what that's in reference to.  So this is a

11    contemporaneous reference back in June of 2012.  Z-Trip, who

12    came here, came here and testified very straightforwardly, I

13    would submit to you, answered all the questions, got no bone to

14    pick here, he explained to you what this was, what this meant.

15    He said, whenever they would ask me any kind of legal stuff, I

16    would say:  Call Lorrie.  I don't deal with this.  Call Lorrie.

17    This e-mail is totally supportive of that view.  Certainly

18    supportive of the view that Z-Trip didn't provide permission on

19    anything.  This supports the view that at most he directed

20    Mr. Phillips to Ms. Boula.  We know that Mr. Phillips did not

21    contact Ms. Boula or anyone from Beastie Boys or anywhere else.

22           So let's -- by the way, last bit with regard to

23    Mr. Phillips for the moment.

24           So here we are in July of 2012, and I submit to you

25    this e-mail gives a real indication of how seriously

1   Mr. Phillips took this whole situation.  "Yo, Trevor, check the

2   video attached and tell me if it's okay to use your music.

3   I've found myself in a bit of trouble using unlicensed music

4   lately.  Ha."  Couple things going on here, ladies and

5   gentlemen.  First, let's just focus on the "Ha" for a moment,

6   in all caps, with an exclamation point.  Certainly suggests

7   that he's not taking this very seriously.  And that's very

8   consistent with the fact that you heard him testify here, he's

9   never been disciplined for this.  He admittedly infringed five

10  Beastie Boys copyrights -- ten copyrights, five songs.  He's

11  never been disciplined in any way for this.  I submit to you

12  that a company that took its responsibilities a little more

13  seriously would treat an employee a little differently;

14  particularly an employee who, on its face, is not taking this

15  seriously, even after his mistake was caught.  His "mistake"

16  was caught.

17          Second, ladies and gentlemen, this is very relevant

18  for another purpose.  You heard Mr. Phillips' testimony about

19  this, and when I asked him if he was in trouble, he came up

20  with a story that he wasn't talking about trouble.  He was

21  making an inside joke to Mr. Andrew because Mr. Andrew's stage

22  name is Trouble.  That was his story.  I don't claim to fully

23  understand the story at this point, but I would submit to you

24  that this is an English sentence.  It has a plain meaning.

25  "I've found myself in a bit of trouble using unlicensed music

E641bea5                        Summation – Mr. Puvalowski

1    lately."  Very clear.  It's very straightforward.  There's no

2    hidden message here.  He's saying on this e-mail exactly what

3    he's saying in this e-mail.  He used unlicensed music.  So his

4    explanation under oath on that stand puts his credibility even

5    more in doubt.

6           Let's move on from Mr. Phillips directly to Monster in

7    general.  So we know that the Ruckus in the Rockies video was

8    not only reviewed by Mr. Phillips, we know it went to Ryan

9    Hartsfield and LeRoy Nichols, and that it was reviewed by

10   Monster's headquarters, but not for music licensing but rather

11   to make sure that it looked cool enough, that the Monster logos

12   were done correctly, etc.  We know that it was only after this

13   lawsuit that they started taking some steps to ensure that

14   their YouTube channel videos had clearances.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

E64gbea6                     Summation - Mr. Puvalowski

1              MR. PUVALOWSKI:  There's an email from -- and if we

2      pull up 191:  "As a result of this, we are forced to implement

3      some changes to our YouTube posting process.  We are working on

4      these right now and these will be issued this week, but the big

5      change will be that all videos will have to be approved by

6      Corona before they get posted.  Any time music is used will

7      need authorization on the music."

8              This is a change in policy, ladies and gentlemen,

9      because they didn't have a policy before this.

10             More than that, you heard testimony from Brent

11     Hamilton, August 12, same day as the email I showed you.  "It

12     was Canada.  I warmed them."  He testified what he meant

13     "warned them."  "I already met with legal on it."

14             Now he on the stand tried to tell you, well, he told

15     you, he tried to convince you that when he said "it was

16     Canada," he wasn't talking about Nelson Phillips.  He was

17     talking about the sports marketing people.  That doesn't make

18     any sense.  The re on this email is lawsuit.  "It was Canada."

19     You know what that means.  It was Nelson Phillips in Canada who

20     posted a YouTube Ruckus in the Rockies video.  "I warned them."

21             I submit to you, ladies and gentlemen, the evidence

22     suggests that he's concocting a story so that he can try to

23     explain away the "I warned them" part of this.  We submit he

24     did warn them.  He knew full well that the music clearance

25     procedures were faulty, and Monster as a whole knew as well.

E64gbea6                          Summation - Mr. Puvalowski

1    Similar, "It was our guy in Canada, I warned them."  Again,

2    same frankly lame excuse about the explanation.  "I warned

3    them."  Monster as a whole was well aware that its music

4    licensing compliance was shoddy, if not nonexistent.

5             Now, given all of this, when you deliberate, you'll

6    need to determine whether this conduct was willful.  And the

7    judge has already instructed you that there are factors to

8    determine whether it was willful that you should consider.

9    None of these are dispositive; you can consider them all in the

10   grand scheme of things:  Whether Monster knew or should have

11   known that the Beastie Boys music was protected by copyright.

12   You know that factor is satisfied.  We talked about the

13   copyright.

14            Whether Monster received warnings about its

15   infringement:  Brent Hamilton's emails fit directly and

16   squarely and persuasively into this category.  Whether Monster

17   had experience with previous copyright ownership or prior

18   lawsuits regarding similar practices:  There are emails in the

19   record that, number one, there's emails about copyright

20   clearance procedures on YouTube; number two, there's testimony

21   that they would themselves take action when their own products,

22   when their own copyrights were infringed.  They would have

23   takedown notices to Facebook or YouTube when their own

24   intellectual property was infringed.  Finally, whether Monster

25   was in an industry where knowledge of copyright is prevalent:

E64gbea6                    Summation - Mr. Puvalowski

1   Ladies and gentlemen, this is a company that has built a

2   marketing campaign, a marketing strategy that's based on the

3   posting of a thousand videos.  They have both trademark and

4   copyright issues in terms of their own business that they

5   protect.  This is absolutely a factor that is satisfied here.

6           Ladies and gentlemen, there is no doubt, we submit,

7   that the evidence shows that at the very least, they put their

8   heads in the sand on this, and frankly, we submit it was far

9   more than that.

10          This was intentional.  They allowed people like Nelson

11  Phillips to be in control.  They provided no training

12  whatsoever, despite the fact that their marketing strategy was

13  based on videos.  This rises to the level of reckless

14  disregard, recklessness -- let me get the right language --

15  reckless disregard or willful blindness to the prospect that

16  the conduct was infringing.  Absolutely satisfied.

17          So, once you find that the infringement was willful,

18  you have to determine what the proper statutory damages are for

19  that willful infringement.  The Court has already instructed

20  you that there are factors that you should consider.  You can

21  consider any or all of these:  Monster's state of mind and in

22  particular whether Monster's conduct was willful, merely

23  negligent or innocent.  We talked about this.  We submit the

24  evidence is crystal clear that it was indeed willful.  They

25  were warned.  They had a guy in charge of this with no

E64gbea6                    Summation - Mr. Puvalowski

training, no experience, didn't -- never thought of it.  They

did have a review process and that review process had nothing

to do with music rights.  It had to do with whether Monster

looked good.

        The expenses saved, profits earned, if any, by Monster

in connection with the infringement, and this -- I want to pull

something up we should have looked at earlier.  You've seen

evidence on this, you heard testimony that most companies spend

their money on ad agencies, TV commercials, radio spots, and

billboards to tell how good their products are.  At Monster, we

choose none of the above.  They save money, ladies and

gentlemen, by pursuing a marketing strategy that's based on

these videos.

        This is a multinational corporation that has made a

choice as to what its strategy is going to be, has made a

choice to put up a thousand videos, many of which with music,

and they have made a choice not to have an adequate music

clearance procedure.

        The deterrent effect of such an award on Monster and

third parties:  We submit that Monster does indeed need to be

deterred here.  This is, again, a large company that pursued an

intentional policy and despite what their policy was, they had

no controls whatsoever.  The local people, people like Nelson

Phillips with no training, he was never told what to do by

Monster on this issue, had never thought of it before, he's put

E64gbea6                    Summation - Mr. Puvalowski

1    in charge while they save money by pursuing this strategy, by

2    not doing regular TV ads.

3           Revenue lost by plaintiffs:  We talked about from our

4    perspective what that is just in terms of the licensing issue,

5    and the conduct and attitude of the parties.  I submit to you

6    that what you saw on the stand from Brent Hamilton trying to

7    get around his warned -- "I warned them" emails, from Nelson

8    Phillips himself saying something completely different on this

9    stand than he said under oath on deposition about these very

10   issues gives you a good indication of the conduct and attitude

11   of the parties.

12          There's also an email in the record, we talked about

13   it a little, it's an email involving a gentleman named Chris

14   Nichols in which Chris Nichols, you heard this testimony

15   through Mr. LeRoy Nichols, Chris Nichols suggested that there

16   be an additional kind of component to the social media strategy

17   that would allow them to track who was reading -- this is

18   after-the-fact, this is later in 2012 -- who was actually

19   reading the materials that they were starting to put together;

20   and he suggested one of the reasons was to make sure that

21   copyright compliance was in order.  It was proposed to LeRoy

22   Nichols.  LeRoy Nichols considered it.  And that proposal never

23   got implemented because of the resources issue:  Money, people,

24   time.  Even then, after being sued by Beastie Boys, they didn't

25   take this seriously enough.  They need to be deterred and that

E64gbea6                    Summation - Mr. Puvalowski

1    attitude needs to be taken into account.

2         We submit that the evidence supports, fully supports,

3    a finding of willfulnesses on the copyright infringement and

4    that the maximum amount on the copyright damages, statutory

5    damages, should be indicated by you with respect to all ten

6    copyrights.  That amount is $150,000 per copyright.  And in

7    light of all the circumstances here, the truly egregious nature

8    of what occurred here, $150,000 per copyright is completely

9    appropriate.

10        Let me move on to the endorsement case.  Again, the

11   endorsement case is different from copyright.  We're not

12   talking about the use of the copyrights.  We're talking about

13   the connection that the Ruckus in the Rockies video and the

14   surrounding promotion made between the band and the Monster

15   product and brand.

16        You heard the judge instruct you, there are two

17   elements as to liability that are at issue:  Number one, did

18   the defendant make a false or misleading representation of

19   fact?  This gets down to, was there a suggestion that the

20   Beastie Boys endorsed Monster?  We submit to you, ladies and

21   gentlemen, the answer to that is easy.  You can watch the

22   video.  Five songs, not one song, five songs.  What does that

23   mean?  What does that mean in terms of the connection?  I

24   submit to you that it means there's more connection.  Use of

25   the Beastie Boys in the text of the video.  What does that

E64gbea6                    Summation - Mr. Puvalowski

1    mean?  More of a connection.  Use of MCA's name in the video.

2    More connection.  Suggestion that there's a download available.

3    More connection.  Promotion on Facebook, using the Beastie

4    Boys' name twice.  More connection.

5           Oh, by the way, very briefly, so we have the RIP MCA

6    graphic.  We've got the music All-Access Beastie Boys MCA.  You

7    remember Nelson Phillips' testimony about whether or not that

8    was Monster's green?  You know it's Monster's green.  The whole

9    thing was done in Monster's green.  The laser light show was in

10   green that they highlighted.  Everything was green.  The snow

11   was green.  All done in Monster colors, another example of, and

12   frankly, a bit of a silly point.  He did not tell you the

13   truth.  He told you flat out, that's not Monster's green color.

14   You can see it with your own eyes, ladies and gentlemen.  Of

15   course it is.  So that's the first element, was there a

16   misrepresentation made?

17          The second element -- actually, it's the fourth

18   element, so it's the second element that matters for our

19   purposes, is whether this is a likelihood of confusion.  And

20   for likelihood of confusion, the definition is the Beastie Boys

21   must demonstrate that as a result of Monster's conduct,

22   numerous consumers -- as to the fourth element, likelihood of

23   confusion:  The Beastie Boys must demonstrate that as a result

24   of Monster's conduct, numerous consumers using ordinary care

25   and prudence were likely to have been misled or confused as to

1    whether the Beastie Boys have endorsed Monster's products.  So,

2    let's talk about that.

3            So, the judge read to you a number of factors that you

4    can consider, that you should consider.  Number one, the level

5    of recognition that the Beastie Boys have among purchasers of

6    Monster's products.  What's the overlap between Monster's

7    consumer base and the Beastie Boys fan base?  There's a lot of

8    testimony on this, ladies and gentlemen.  There's a lot of

9    proof even from Monster's own witnesses, from Nelson Phillips:

10   Heros, heavy influence, was a major part of the night of the

11   Ruckus in the Rockies after-party.

12           You heard from Brent Hamilton:  We'd love to get the

13   Beastie Boys.  They'd be great.  We're not willing to pay what

14   it would take to get the Beastie Boys.  You heard that from

15   Brent Hamilton.

16           Second, the similarity between the Beastie Boys' music

17   and names and the music and names used by Monster.  They are

18   identical.  That is the Beastie Boys in the video.  That is

19   their music.  That is their name.  That is MCA's name.  Number

20   two, it's identical.  I'll come back to actual confusion in a

21   moment.

22           Monster's intention in selecting the Beastie Boys'

23   music and names.  Again, it was a big deal at the Ruckus in the

24   Rockies.  Mr. Phillips helped select the music.  He actually

25   helped -- he actually discussed with the person who edited the

1  video which selection should be used.  It turns out the guy

2  used different selections, but it was at least discussed.  The

3  use of the Beastie Boys was absolutely intentional.  And you

4  heard a lot of testimony about how snowboarders in general

5  relate to the Beastie Boys' music, etc.

6          Then the sophistication of Monster's potential

7  customers:  And this is really about -- there's testimony in

8  the record about the fact that Monster products are really

9  impulse purchases.  They're at gas stations and convenience

10 stores, etc.  And we submit that that kind of impulse purchase

11 where it's not like you're researching a car and trying to

12 figure out, okay, if I'm going to research a car and find out

13 which one is best for my four-person family and gas mileage,

14 etc., I might do a lot of research, then an ad like this may

15 not have much influence.  But if I'm a 22-year-old snowboarder

16 and I see an ad like this, and the next time I'm in a

17 convenience store, I might very well pick up the Monster

18 instead of the Red Bull.  That's what this comes down to, and

19 we submit that this factor squarely goes in the direction of a

20 finding of the likelihood of confusion.

21          So, actual confusion:  There does not need to be

22 actual confusion, ladies and gentlemen, in order to find this

23 element.  In fact, you should consider all of the following

24 factors and come to a conclusion as to whether there is a

25 likelihood of confusion.  It does not need to be actual

E64gbea6                    Summation - Mr. Puvalowski

1    confusion.

2            So, let's talk about a couple of documents here that

3    go to this issue.  You've seen this many times.  This is the

4    Facebook post.  The Facebook post has "Monster" on it and it

5    comes through on the newsfeed of the consumer, thumbnail of the

6    video, Ruckus in the Rockies, Beastie Boys Megamix by Z-Trip.

7    Download All-Access of Beastie Boys Megamix.  Beastie Boys'

8    name is mentioned twice and this is squib that would come

9    through.

10           We talked about the snowboard magazines.  This is Dano

11   Pendygrasse.  There's some testimony about him.  He's a PR

12   person.  He's communicating with Nelson Phillips.  "Ok, so you

13   want me to get it out of Snowboarder Mag, Snowboard Mag, any

14   others that are pressing?  It's hard to put the toothpaste back

15   in the tube with the internet, that release is still on dozens

16   of pages out there."

17           They widely -- they successfully widely got this out

18   to dozens of pages out there through third-party media sources.

19   So Monster did it on their YouTube channel, on their Facebook

20   page, on their own web page, plus they were able to push it out

21   through media sources to multiple others.

22           And just summing it up very nicely, Mr. Hartsfield:

23   Re:  YT.  I submit YT is YouTube.  "True, but I think it's the

24   fact we used the song and provided a link to download for free

25   makes it look more like we are sponsoring them."  Absolutely

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E64gbea6                    Summation - Mr. Puvalowski

1    true.  Absolutely right.  That's one of the core issues here.

2    Makes it look like there's a connection between the Beastie

3    Boys and Monster.

4         Let's talk next about implied endorsement damages,

5    ladies and gentlemen.  And the judge instructed you that if you

6    find Monster's liable, by finding a misrepresentation and a

7    likelihood of confusion, to obtain damages the Beastie Boys

8    must prove by a preponderance of the evidence that Monster

9    intended to deceive the public concerning whether the Beastie

10   Boys endorsed its products.

11        Did Monster intend to deceive consumers?  We submit

12   the logical answer here, the inescapable conclusion of all of

13   this evidence is yes.  Again, let's start at the general.  You

14   have a multinational corporation operating in multiple

15   countries all over the world selling, you heard it, 100 million

16   cans a year, huge marketing budget, $120 million, that's the

17   testimony, and incorporating, because they made a choice not to

18   use TV, incorporating a thousand videos on YouTube as part of

19   their marketing strategy to promote -- specifically to promote

20   the Monster brand.  That's where we start.  That's the choices

21   that Monster made in terms of its marketing.

22        And then what are the next choices they made?  They

23   made a choice not to have a compliance procedure with regard to

24   music licensing.  Let me make the point this way, ladies and

25   gentlemen.  As of May of 2012 when the Ruckus in the Rockies

1   video was made, how many people at Monster had the

2   responsibility whose job it was to handle music clearance

3   rights for these videos?  Zero.  That's the clear testimony.

4   Zero.

5          They relied on outside producers to make sure that the

6   outside producers cleared it.  In the outside countries, like

7   Nelson Phillips in Canada, they relied on the local teams to

8   make sure that the proper clearances were made.  But you know

9   what?  That doesn't get Monster anywhere because you heard what

10  kind of care they take.  You heard what kind of decisions they

11  made in terms of whether they put people in place that could

12  actually handle this job.

13         So Nelson Phillips who is responsible for the content

14  of these videos, no expertise.  Zero, none.  Never thought

15  about it before this.  They knew, well aware, that he had no

16  expertise and they put him in charge in Canada.  Never gave him

17  so much as a written guideline, never talked to him about this

18  topic, never gave him any training on this topic.

19         Ladies and gentlemen, these are intentional decisions

20  here.  They made an intentional decision not to go the TV route

21  and pay ad agencies.  Well, that comes with a consequence,

22  ladies and gentlemen.  If you're going to post videos yourself,

23  if you're going to pursue this strategy, it is incumbent on you

24  to have a clearance procedure to make sure that your employees

25  are not stealing from people, because that's what happened

1  here.  Nelson Phillips stole from the Beastie Boys.  That is

2  plain.  But he was able to steal from the Beastie Boys because

3  of the intentional decisions that Monster made down the line.

4  And it was a decision that was made despite warnings from Brent

5  Hamilton, despite even after this all blew up not taking the

6  resources and time and people to fix it.  They're still making

7  this decision.  This is intentional conduct, ladies and

8  gentlemen, and it resulted in the Ruckus in the Rockies video.

9  Again, two people from Corona reviewed this.  They had to

10  approve it.  They actually are the ones who posted it and they

11  didn't approve it for music rights.  They only approved it for

12  Monster branding issues.

13         Let me juxtapose a couple of facts for you here,

14  ladies and gentlemen.  Brent Hamilton, the director of music

15  licensing, and this has to do with bands that they are

16  sponsoring, not music rights, there's testimony in the record

17  that he would have loved to get the Beastie Boys.  He'd love to

18  get the Beastie Boys.  It's a great connection.  Snowboarders,

19  skateboarders, the consumer base and the fan base overlap very,

20  very well.  And the Beastie Boys are cool, their music is

21  distinctive, it would bring a lot to the brand, but what was

22  his conclusion?

23         He didn't even ask because he knew full well that

24  Monster would be unwilling to pay what it took to get the

25  Beastie Boys.  So you've got that knowledge.  Monster knows

E64gbea6                    Summation - Mr. Puvalowski

1    that, Monster knows that they can't -- that they don't want to

2    pay the Beastie Boys what the Beastie Boys would want.  Monster

3    as a company knows that.

4         But notwithstanding that, you've got Ryan Hartsfield

5    and LeRoy Nichols and Nelson Phillips all approving a video

6    with five Beastie Boys songs on it.  Those two things don't

7    match, ladies and gentlemen.  They don't match because Monster

8    took no -- they didn't care.  They were saving money by this

9    system and they were perfectly happy doing so, and it didn't

10   matter to them if their employees were stealing from the

11   Beastie Boys.  It just didn't matter.  This is intentional.

12        Just real briefly on damages on the endorsement side,

13   you heard Ms. Thomas talk about what it would take and again

14   this is willing buyer, willing seller scenario, what it would

15   take, what it would take between a willing buyer in Monster and

16   a willing seller in Beastie Boys to get the Beastie Boys to

17   allow the use of their name and a download and the use of MCA's

18   name and the use of five songs instead of one and the promotion

19   on Facebook, the promotion on snowboard magazines, etc., etc.,

20   etc.  She gave you a reasoned opinion as to how much that would

21   cost; as opposed to Mr. Albert who tried to convince you that

22   the implied endorsement fee is covered by union scale.

23        Ladies and gentlemen, you know that doesn't make any

24   sense.  Union scale covers the voice of voice performance, the

25   musical performance.  It doesn't cover the name.  It doesn't

E64gbea6                    Summation – Mr. Puvalowski

1    cover the name of MCA.  It doesn't cover all of this other

2    promotion.  It doesn't cover the use of the name in the

3    Facebook posting.  It doesn't cover any of this stuff because

4    it's just, frankly, not relevant.

5         There could have been background singers, they're

6    going to get union scale, but the Beastie Boys, the ones whose

7    name is being used, that needs to be an arm's-length fair

8    market value willing buyer, willing seller transaction and

9    that's the measure of damages in this case.

10        Lisa Thomas gave you an opinion of a million dollars

11   given the prominence of the Beastie Boys.  That is absolutely a

12   fair market value in this case as opposed to the few thousand

13   dollars that Mr. Albert would like you to believe.

14        Wrapping up, ladies and gentlemen.  In his opening,

15   Mr. Kahn told you that this is a place of justice.  And while

16   the defense has said many things that I disagreed with during

17   the course of the trial, on that he and I concur.  This is

18   indeed a place of justice.  This is a place where the law

19   applies.  And ladies and gentlemen, it is now your job.  And

20   Mike Diamond and Adam Horovitz and Dechen Yauch ask you to go

21   follow the law, apply the law to the facts of this case.  And

22   we are confident that when you do that, you will find, number

23   one, that the actual damages in this case are at least a

24   million dollars on the copyright side; number two, that the

25   infringement was absolutely positively willful; number three,

1    that the proper calculation of statutory damages should be

2    $150,000 per copyright; number four, that we have met our

3    burden to show that Monster tried to imply that the Beastie

4    Boys endorsed their brand and product; and number five, that we

5    have shown that the use of the improper endorsement was

6    actually deceptive and that we have suffered damages in a

7    license fee that would be a million dollars as well.

8            Thank you very much for your attention.  And I

9    appreciate all of your attention throughout the entire trial.

10           Thanks.

11           THE COURT:  Thank you, Mr. Puvalowski.

12           Ladies and gentlemen, this is a good time for our

13   afternoon break.  I'll see you at 2:55.  And again, I'll remind

14   you not to discuss the case.

15           (Jury excused)

16           THE COURT:  Does counsel have anything to add?

17           MR. KAHN:  No.

18           THE COURT:  Ladies and gentlemen in the public, I

19   understand that the monitor is again not working.  The reason

20   I've been emailing here is to try to get somebody to fix it and

21   we have somebody trying to work on it.  It's my hope the public

22   monitor will be working at least for the second summation.

23           (Recess)

24           (Continued on next page)

25

1            (In open court; jury present)

2            THE COURT:  Welcome back, ladies and gentlemen.  We'll

3    here now from the defense.

4            Mr. Kahn.

5            MR. KAHN:  Thank you, your Honor.

6            Good afternoon, everybody.  I want to take this

7    opportunity, it's the last opportunity I get to speak to you,

8    to thank you all for your jury service.  Everyone in this

9    courtroom knows how important it is.  Everyone in this

10   courtroom greatly appreciates it.

11           During the course of my summation, I'm going to be

12   discussing with you the evidence in this case.  Just like

13   Mr. Puvalowski did, I'm going to be presenting evidence that I

14   recall in the case.

15           If your recollection of the evidence differs from my

16   recollection of the evidence, use your recollection or have

17   anything that was said in the courtroom read back to you.

18           What Mr. Puvalowski just said to you is, as I told you

19   in the opening statement, his view of the evidence; it's the

20   way he wants you to interpret the evidence.  What he said to

21   you -- nothing he said is evidence to you and nothing I say to

22   you in the course of my summation is evidence in the case.

23           This case, I submit to you, should be decided by the

24   evidence presented.  And I think if you look at the evidence

25   presented from the testimony of the witnesses, you'll see that

E64gbea6                        Summation - Mr. Puvalowski

1    the conclusions, speculations and theories which you heard from

2    Mr. Puvalowski just don't make sense.  They don't hold

3    together.

4            They essentially created a smokescreen around the

5    evidence so that you really can't or he's trying to prevent

6    you, I submit, from seeing the facts in this case because,

7    frankly, this is a simple case.

8            The argument that you heard from Mr. Puvalowski that

9    Monster Energy willingly used Beastie Boys' music in a recap

10   video and intentionally placed links to that video on social

11   media and intentionally deceived consumers into believing that

12   Monster Energy was sponsored by the Beastie Boys is a fiction

13   that is created solely for the purpose of this lawsuit.  It's

14   contrary to the undisputed facts of this case, which I'm going

15   to talk to you about, and it's contrary to the evidence, and

16   it's also contrary to common sense.

17           The plaintiffs are trying to take the undisputed

18   evidence and essentially spin a tale of some insidious

19   corporate conspiracy by urging you to believe essentially that

20   Monster Energy purposely didn't have adequate policies

21   concerning music licensing because they were hoping that one

22   day, one of its employees would take unauthorized music and put

23   it on a recap video.

24           They are urging you to believe, as part of this

25   conspiracy, that Monster Energy intentionally hired Nelson

1    Phillips in May of 2007, five years before this Ruckus in the

2    Rockies recap video was ever made, because they knew he didn't

3    have any expertise in music licensing, because they knew he

4    didn't have any expertise in the copyright law.  They hired him

5    because they knew those facts hoping and with the desire that

6    five years later in 2012 he would willfully use unlicensed

7    music on a recap video, because that's what we're talking about

8    here, a recap video.

9          Mr. Puvalowski and the plaintiffs want you to believe

10   that as part of this corporate conspiracy, Monster Energy is a

11   marketing machine which intentionally tried to capitalize on

12   the persona of the Beastie Boys; they intentionally,

13   intentionally tried to deceive their customers into believing

14   that the Beastie Boys sponsored Monster Energy; and they

15   intended to accomplish this goal as part of this conspiracy by

16   posting a recap video, along with 900 other recap videos, on

17   their Monster Energy YouTube channel.  And plaintiffs want you

18   to believe that as part of this conspiracy that finally, after

19   five years, that plan worked because the Beastie Boys' music

20   was used in a recap video for the Ruckus in the Rockies event.

21         I'm not going to tell you any stories during the

22   course of my summation and my discussion may not be as exciting

23   as Mr. Puvalowski's allegation of corporate conspiracy to

24   violate the copyright laws and intentionally deceive consumers,

25   but what I'm going to talk to you about is going to be based

1    upon the undisputed evidence that you heard at the trial.

2            As I said before, although many documents have been

3    introduced in this case, and you saw Mr. Puvalowski put these

4    documents up in front of you, just a few of them, and although

5    you heard the testimony of many witnesses, I submit to you that

6    this is a simple case.  And as Jon Albert told you, let's not

7    be misled:  This is a case about a commercial video.  It's not

8    about a movie trailer containing Beastie Boys music.  This case

9    is not about an endorsement of a product by the Beastie Boys or

10   a billboard in Times Square.  This case is about one recap

11   video, which was put on a YouTube site so that it was with 900

12   other videos.  There was no attempt to make that video easier

13   to find on that YouTube site than any other video that was on

14   that site.

15           Now, at the very beginning of the case in my opening

16   statement, I told you that Monster Energy does not dispute that

17   the Beastie Boys are entitled to receive the fair market value

18   for the use of the songs on the Ruckus in the Rockies video.

19   And the reason I mentioned in my opening is the same reason

20   that I'm going to discuss with you now and it's obvious:  The

21   reason is, Nelson Phillips made a mistake.  He produced a video

22   with music from a megamix created by a DJ named Z-Trip, and the

23   plaintiffs want you to believe that Nelson Phillips

24   purposefully, willfully and with the intent to deceive Monster

25   Energy's customers into believing that the products were

1    endorsed by the Beastie Boys, that he intentionally put

2    Z-Trip's music on that video.  The evidence will show that that

3    position is illogical, it's unreasonable, it's just contrary to

4    common sense.

5         Now, the plaintiffs have the burden of proof here.

6    The defendants are not required to prove many of the elements.

7    There is absolutely no evidence, I submit to you, that Nelson

8    Phillips acted willfully or that he intended to deceive anyone.

9    There is no evidence that Monster Energy acted willfully or

10   intended to deceive anyone; rather, the evidence showed that

11   Nelson Phillips made a mistake.

12        What are the undisputed facts?  One of the ways that

13   Monster Energy markets its brand is through the sponsorship of

14   various athletes and events, and you heard the evidence of how

15   they do that.  They have athletes wear logos, they have Monster

16   branding at events.  They have Monster logos on vehicles and

17   the public becomes aware of Monster Energy through that type of

18   marketing where they market the brand.  They don't say to

19   anybody this is a product that tastes better than another

20   product; that's not how they do it.

21        There was never any strategy in Monster Energy to use

22   TV commercials or radio commercials to sell their products.

23   That's not how they ever strategized to become the company they

24   are today.  So Mr. Puvalowski's statement to you that they

25   saved money by not doing TV commercials I submit to you it's

E64gbea6                     Summation - Mr. Puvalowski

1    just disingenuous.

2              Mr. Puvalowski heard the evidence.  You heard the

3    evidence.  Their strategy has nothing to do with TV

4    commercials.  Their strategy has nothing to do with

5    advertising, traditional advertising of their product.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              MR. KAHN:  Another way that they market their product

2       is through recap videos.  They take videos of various events,

3       they put them on their YouTube channel, and people who are

4       interested in the events, who are interested in Monster Energy,

5       who didn't have a chance to go to the events, go to the YouTube

6       channel, Monster Energy hopes, and they view the recap videos.

7       That's another way of marketing.

8              The testimony was that these videos comprise a very

9       small part of the marketing strategy of Monster Energy.  The

10      major part is the sponsorship of these various events.

11             Nelson Phillips was hired in 2007, and you heard

12      testimony that he essentially organized the Ruckus in the

13      Rockies event.  He was responsible for the preparation of the

14      event, hiring the videographers, hiring the musical people who

15      were going to be playing at the event and at the after-parties,

16      the photographers, and essentially making sure that the event

17      ran smoothly.

18             Now you heard Nelson Phillips tell you about his

19      background.  He graduated high school, he went to work in the

20      forest industry, and then he had some jobs at various companies

21      before he went to work at Monster Energy.  And you saw him

22      testify from the witness stand, and it's for you to determine

23      his credibility.  But for Mr. Puvalowski to put up an e-mail

24      that occurred after this event with a friend of Nelson

25      Phillips, who Nelson Phillips told you his name was Trouble,

and for Nelson Phillips to mention that "I'm in trouble because
of the fact there was a lawsuit filed" and then say, "Ha," and
ask you to infer from that that Nelson Phillips acted
recklessly, intentionally, and wilfully, I submit to you is
absurd.  That "Ha," as you heard Nelson Phillips tell you, was
a reference to the double entendre, the joke, the inside joke,
that he was making to his friend.  It was not a reference, as
he said, to the lawsuit.

        So what happened at this particular event?  Before I
get there, I'm sure you recall the testimony about how Nelson
Phillips, in the past, had gotten music for the recap events
that he had produced.  He said he did about a dozen of them.
He said that he was friendly with some DJs and some local
bands.  Sometimes local bands offered their music and he put it
on a particular recap video.  Sometimes the DJs offered their
music.  Sometimes the music would come from other sources.  But
it was all local people.  He never was involved in music
clearance.  He trusted that when someone said, "Here, I'd like
you to use this music," that he could use the music.  Maybe
that wasn't smart.  Maybe that wasn't the best thing to do.
But the fact is that that doesn't make him an intentional
infringer, especially when you look at what happened here.  He
booked DJ Z-Trip, as he said, for the event, which took place
on May 5, 2012, and because he thought it was a successful
event, he wanted to make a recap video.  And at the beginning

E641bea7                    Summation - Mr. Kahn

1    of the trial, you saw the Ruckus in the Rockies video, and of

2    course you're welcome to look at it again, if you so choose.

3    And he testified that what happened before the after-party

4    event is that in the green room, which is where the people who

5    were going to play at the event wait, he had a meeting with

6    Nelson Phillips, and I'm just -- if I may put up that timeline

7    that we had up before.

8            So this timeline, as I said, May 5, 2012 was the

9    event, and before the after-party, he meets Z-Trip in the green

10   room, and they have a conversation.  And this is

11   uncontroverted, essentially.  Nelson Phillips asked Z-Trip if

12   he had any music that Monster Energy could use for the webedit

13   of the recap video.  And Z-Trip told him he had a Beastie Boys

14   Megamix and that anyone could download it for free and that

15   Nelson Phillips could go to his website and use that music.

16   Z-Trip suggested the use of that music.  Z-Trip created that

17   Beastie Boys Megamix.  That Beastie Boys Megamix was on

18   Z-Trip's website.  This is not a case where someone just takes

19   music and uses it.  This is a case where Z-Trip made a

20   suggestion that Nelson Phillips followed because he had no

21   reason not to trust him when Z-Trip said, "Go to my website, I

22   have the music, anyone can download it for free," that it was

23   okay.

24           On the evening of the event, there was an after-party.

25   And there were three DJs who played at that after-party.  And

1  as you all know, through the testimony, Adam Yauch had passed

2  away tragically the day before, and during the after-party, the

3  DJs played some Beastie Boys music to honor the memory of Adam

4  Yauch.  Z-Trip at one point talked to the crowd and said, "Rest

5  in peace, Adam Yauch."  Nelson Phillips testified to those

6  facts.  He testified that -- I'm sorry.  He said, "RIP, rest in

7  peace, MCA."  And Nelson Phillips testified that MCA was the

8  nickname for Adam Yauch.

9          On the morning of May 7, 2012, Z-Trip and Nelson

10  Phillips meet for breakfast, and at that point Z-Trip tells

11  Nelson -- Nelson Phillips tells Z-Trip that when the edit is

12  complete, meaning the music is on the video, that he would send

13  it to Z-Trip for his approval.

14          Now Mr. Puvalowski read a portion of Nelson Phillips'

15  deposition testimony where he was being asked questions at a

16  deposition, with lawyers in a room, and he was shown a contract

17  that he had never seen before, which talks about appearance

18  approval.  And at one point he was asked, "When you sent him

19  the video and you were asking him to approve, isn't it true you

20  were asking him to approve his appearance?"  Well, yes, he was.

21  He was asking him to approve his appearance.  But he was asking

22  him to approve more than just his appearance.  And he testified

23  at that very same deposition that:

24          "Q.  Were you more specific as to what had to be

25  approved?"

1           "A.  At that time I don't know that we talked about

2       it, but like I mentioned before, the aesthetic of it, the

3       content, the music, the flow, his appearance."

4           Now we're not talking about whether or not he had a

5       conversation with Z-Trip about what he was going to approve.

6       We're talking about the state of mind of Nelson Phillips.  This

7       is what he thought when he was going to send this video to

8       Z-Trip to approve.  He thought in his mind that he was sending

9       it to Z-Trip to approve the entire video.  And that's what's

10      important here.  It's not whether they had a conversation about

11      whether or not or what aspects of the video was going to be

12      approved, because Z-Trip didn't say that either.  What's

13      important here is the state of mind and whether or not Nelson

14      Phillips and Monster Energy acted wilfully.  That's what's

15      important.  And the evidence is clear that, based upon these

16      facts, he didn't act wilfully.

17          After the conversation, you know that Nelson Phillips

18      went to Z-Trip's website as suggested.  They downloaded the

19      music.  He and Clayton Larson did an edit and they sent that

20      edit to Z-Trip on May 8, 2012.  And Nelson Phillips sent the

21      edit on May 8, 2012, and he said -- now I believe you have the

22      entirety of that in front of you.  Is that -- okay.  If you

23      look at the bottom of that e-mail, it says, "Please have a look

24      at the video from this past weekend and let me know if you

25      approve."  And Nelson Phillips told you, and he testified in

his deposition a long time ago, that what he meant by that was
approve the aesthetic of it, the content of it, the music, the
flow, and Z-Trip's appearance.

He then says, "Once you approve," meaning once Z-Trip
approves, "we'll post on YouTube and notify our 16 million fans
on Facebook."  If Nelson Phillips was going to act wilfully, is
this all part of the conspiracy, that he would send this for
Z-Trip's approval so that later on he could say, "Listen, I
sent it to Z-Trip to approve"?  Was that Nelson Phillips'
mind-set?  Was that what he was thinking way back in May of
2012?

So he does, he sends it to Z-Trip to approve, and at
the top is the e-mail that he receives back on the very next
day, and it says, "Dope."  And I even know what that means now,
and certainly Nelson Phillips knew what it meant then.  It
meant great, awesome.  And then he says, Z-Trip says, "Maybe at
the end, when you put up the info about the Beastie Boys mix,
you could post below it," and then he asks him to post his
link.  Now that's Z-Trip's request.  Nelson Phillips told you
that Z-Trip had suggested to go to his website and use this
music, that he allowed that, and in consideration for that,
Nelson Phillips agreed to put this reference to Z-Trip's All
Access Beastie Boys Megamix on the video.  And that's exactly
what happened.

With respect to the video itself, Nelson Phillips also

1   told you that there was a reference -- and you've seen it --

2   "RIP MCA."  And he told you that he had been a Beastie Boys

3   fan, he told you that many people that night were aware of the

4   passing of Adam Yauch, and he told you that he thought it would

5   be a tribute to Adam Yauch to put "RIP MCA" in that video.  Is

6   there any other way that that can be interpreted when you see

7   Nelson Phillips testify on the stand?  Do you really think that

8   it really makes sense that that was part of some type of a

9   conspiracy and Nelson Phillips was thinking that, if I put MCA

10  in this video, then it's going to appear that the Beastie Boys

11  sponsor Monster Energy's products?  He also put the link to

12  Z-Trip's website, at the request of Z-Trip.  And that link

13  refers to the All Access Beastie Boys mix.  And the plaintiffs

14  want you to believe that Nelson Phillips did that wilfully to

15  deceive the consumers of Monster Energy into believing that the

16  Beastie Boys were sponsoring Monster Energy's products.

17          On May 9, 2012, Nelson Phillips put the video up on

18  YouTube and he wrote an e-mail to Z-Trip and he said,

19  essentially, "Check it."  And he testified that he meant, when

20  he said, "Check it," the video's up, take a look, see what you

21  think.  And Z-Trip wrote back, again, "Dope."  Z-Trip never, in

22  any of the e-mails you've seen here, and in any of the

23  testimony that you heard in this trial, said, "I like the way I

24  appear, but you need to contact the Beastie Boys to see if you

25  can get music use."  He testified he thought that Nelson

E641bea7                    Summation - Mr. Kahn

1    Phillips had gotten the clearance.  Somehow, from the date of

2    the event to May 8, when he first sent him the video, he got a

3    clearance of all the copyrights, of the copyright for the

4    publishing and the copyright for the sound recording.  That's

5    what Z-Trip's testimony was.

6           On June 13, 2012, Monster Energy received a letter

7    from attorneys representing the Beastie Boys, and on that same

8    day, on the same day, they took the video down.

9           Although Nelson Phillips believed he had obtained

10   permission from Z-Trip to use the video, he's not a lawyer, he

11   didn't know the technicalities of the copyright law, he didn't

12   know that he was legally required to obtain permission from the

13   Beastie Boys.  He used the Megamix which was on Z-Trip's

14   website.  He didn't know that Z-Trip didn't own the copyrights.

15   He didn't know any of that.  All he knew was that Z-Trip said

16   it was okay.  In hindsight, is that okay?  Would Nelson

17   Phillips do that today?  No.  But back then, when he did it,

18   was that willful?  Was that intentional?  Did he intentionally

19   violate the Beastie Boys' copyright?  Did he intentionally use

20   those songs knowing that he didn't have permission from the

21   Beastie Boys, that he needed permission from the Beastie Boys,

22   and that placing that video with the songs was a violation of

23   the Beastie Boys' copyright?  I submit to you that there's no

24   evidence at all that he knew that.

25          What the evidence shows, what's clear, once we get

E641bea7                        Summation - Mr. Kahn

past all of the assertions of a corporate conspiracy, is that

Z-Trip made a mistake based on a misunderstanding that it was

okay because he had spoken to Z-Trip to put the music on the

video.

          The story that the plaintiffs have weaved together for

you to convince you that this was a willful and intentional

effort to deceive consumers is just pure fantasy.  And Monster

did have a policy regarding the usage.  You heard Sam Pontrelli

testify what their policy was.  Their policy was that they used

third-party providers to produce content and that the contracts

with those third-party providers included a provision that the

third-party providers would obtain all rights to all of the

elements of the videos they produced.  And he told you that's

how it worked in the United States.  This was a growing

company.  And at that time, in Canada, Nelson Phillips was the

guy.  He was the guy in Canada making the videos.  And the

notion that Monster Energy somehow, because their policies with

respect to Canada weren't as good as maybe they should have

been, therefore also acted wilfully in an effort to facilitate

Nelson Phillips to infringe copyrights of the Beastie Boys,

that just doesn't make any sense.

          You also heard LeRoy Nichols testify, and you heard

him testify there was another service that was used by Monster

Energy called Audiosocket, and that was a service where music

could be obtained that had clearance.  So it's not as if

Monster Energy had no policies in place whatsoever.  They had

policies in place.  Those policies did not prevent Nelson

Phillips from essentially trusting Z-Trip and doing what he

did.  Today, it wouldn't happen.  It was a mistake.

The fact that there was testimony about Chris Nichols

and whatever suggestions he made, those suggestions related to

putting the social media guide on the website in a digital

format instead of a hard copy format.  That's what that was

about.  There was some suggestion that he made, that

Mr. Puvalowski is weaving into his theory, that there was a

corporate conspiracy here.  He was a web master.  What does the

web master do?  Puts content on the web.  He was a graphic

artist.  He did graphics for the social media guy.

You also heard testimony from Brent Hamilton.  Yes, he

said he liked the Beastie Boys.  And yes, he said he thought at

some point that it would be good to have the Beastie Boys.  But

he knew that there wasn't a budget to have a sponsorship deal

with the Beastie Boys.  He may have thought of many groups over

the course of time that he would like to have, that he would

like Monster Energy to sponsor, but the fact that he thought of

groups doesn't make him some kind of conspirator.

You did see an e-mail in which he said, "It's Canada.

I warned them."  And he told you what he meant by that.  And he

told you, before you saw that e-mail, an e-mail which he

testified to on direct examination, that he had spoken with the

sports marketing department, a man named Vipe Desai, who had

contacted him because he needed some music, and Brent Hamilton

essentially said, "Listen, if you need music, you have to have

clearance," and Brent Hamilton, who was in the music department

at Monster Energy, director of music events, had that

knowledge, and that knowledge and that statement indicates that

Brent Hamilton expressed a concern about getting clearance.  It

wasn't as if Brent Hamilton was ignoring the requirement that

there be clearance.

        And then he wrote an e-mail.  And after the event,

after the lawsuit happened, lots of people at Monster Energy,

as you can understand, were talking about the fact that there

was a lawsuit.  And he said, "I warned them."  And he told you,

when he said, "I warned them," he was referring to the sports

marketing department.  You know, essentially Brent Hamilton was

writing that e-mail to whomever he was writing it, to explain

that he had nothing to do with this problem, this lawsuit.

That was the purpose of that e-mail.  And he indicated that he

warned the sports marketing department, and when he said it was

Canada, it was because he knew the lawsuit came out of a video

that was made in Canada and he had warned the sports marketing

department, and there are athletes in Canada.  It's for you to

decide whether or not he was telling you the truth when he told

you about that e-mail.  But there is no contrary testimony.

There's his testimony about what that e-mail meant, who he

1    warned, and the circumstances surrounding that warning.

2              Was Monster Energy perfect?  Absolutely not.

3              You also heard the testimony of Sam Pontrelli and

4    LeRoy Nichols.  Did they appear to be to you some masterminds

5    of this corporate conspiracy?  Part of some insidious plan to

6    trade on the Beastie Boys' personae?  Didn't they appear to you

7    to be responsible people who were attempting to do their job in

8    a responsible way?  You heard Sam Pontrelli tell you that the

9    focus of Monster Energy's marketing efforts is distribution in

10   stores, sponsorship of events, and he described his overall

11   marketing efforts.

12             As you heard during his Honor's instructions to you,

13   the Beastie Boys are entitled to recover actual damages or

14   statutory damages.  Actual damages, as Mr. Puvalowski said, is

15   the fair market value of what a license fee would be between a

16   willing buyer and a willing seller for the use of the five

17   songs.  Now to determine that reasonable value, Monster Energy

18   retained a music licensing expert whose expertise is in music

19   licensing for commercial purposes, for advertising purposes.

20   And that expert was Jon Albert.  He is one of the top experts

21   in the music licensing field in advertising.  His company's

22   been around for 38 years.  He has negotiated thousands and

23   thousands of music licenses.  He's gotten quotes for thousands

24   and thousands of music licenses.  And essentially he got up

25   there and he told you what the real world is.  He told you that

E641bea7                    Summation - Mr. Kahn

1    when you sit down to make a deal, you talk about all the

2    elements of the deal.  And all the elements of this particular

3    deal included if you were going to have a willing buyer and a

4    willing seller.  All the elements of the deal included the five

5    songs, it would have included the reference to MCA, it would

6    have included the name Beastie Boys in the link, and also the

7    link on Facebook.  And he told you how much would be the fair

8    value for the license of the copyrights for the music, and then

9    he told you that with respect to the voices on the music and

10   the other elements that I just discussed with you, that that

11   would be an additional fee that would be received, that would

12   be discussed at the same time that that negotiation took place,

13   and he told you that in this industry that he's worked in for

14   38 years, that fee would be what he characterized as union

15   scale, and I believe he told you it would translate into

16   approximately $25,000.

17         Plaintiffs offered the testimony of Lisa Thomas to

18   prove what the fair market value of the license is.  I submit

19   to you that her testimony was incredible, it was illogical, it

20   was unbelievably inconsistent.  When you want to talk about

21   numbers, Mr. Puvalowski criticized Jon Albert for essentially

22   communicating to you yesterday and today that the industry

23   standard for the various calculations that he made is

24   50 percent for the various deductions that he made.  Well, Lisa

25   Thomas' number for damages -- a million dollars for the use of

E641bea7                    Summation - Mr. Kahn

1    the songs and the copyrights, and, what a coincidence, a

2    million dollars for MCA, for the use of the voices, and for the

3    reference to the name Beastie Boys.  Same number.  Where did

4    she get that number from?  From the air.  Because her testimony

5    shows that what she says made absolutely no sense.

6            On credibility, one of the first things she told you

7    is that she came here with essentially a script in her

8    briefcase.  She told you that before this trial, on Memorial

9    Day, she received the questions in writing that were going to

10   be asked, and I asked her, were the answers on there.  And she

11   said for each question there were bullet points.  Well, I

12   submit to you, those bullet points essentially were the answers

13   to the questions.  So from the plaintiffs' attorneys, she

14   received a script, which she testified she read several times,

15   and then she came into court, with that script in her

16   briefcase, took the witness stand, and essentially told you

17   what was on that script.  Can you believe a witness that comes

18   to court with a script that's given to them by the attorneys

19   representing one of the parties in the case?  I submit to you

20   that her testimony is incredible for that reason alone.

21           But it's not only that reason alone that her testimony

22   makes no sense.  First of all, she relies on essentially, in

23   coming up with her value, on the factors that she told you

24   about, but then she talked about what she really relied on.

25   What she really relied on was something that she herself said

E641bea7                Summation - Mr. Kahn

1    is not comparable, similar to what Jon Albert said, because she

2    relied on three movie trailers that had Beastie Boys music.

3    And she said although that's not really comparable to a use in

4    the advertising industry, she chose to rely on those because

5    they were the most comparable use because there were no other

6    uses she could rely on.  Well, what about all of the other

7    licenses that she negotiated, that she testified that she

8    negotiated over the course of years for music licensing for

9    other people, for similar people?  You didn't hear one license

10   agreement that Lisa Thomas negotiated for anybody that she

11   relied on in this case.  What she chose to rely on are three

12   movie trailers, the highest-paying movie trailers that the

13   Beastie Boys had ever been involved in.  And she used those

14   movie trailers, even though those movie trailers and the music

15   on them are licensed for, as she told you, a perpetual term,

16   which she characterized as to the end of the universe, for all

17   media rights, TV, radio, billboards, she said anything and

18   everything, worldwide use, and they were for big Hollywood

19   movies.  That use is not comparable.  That use is not

20   comparable to one recap video amongst 900 for five weeks on

21   Monster's YouTube channel.  And Jon Albert told you that movie

22   trailers and movies have no relevance to what the value of a

23   piece of music is in the advertising industry.

24          Lisa Thomas failed to consider what the most

25   comparable uses actually were; uses that are commercial uses of

E641bea7                    Summation - Mr. Kahn

1    Beastie Boys music.  That includes the Nixon JibFest video,

2    which was a snowboarding competition, with Beastie Boys music,

3    and logos of the Nixon company.  She said that's not

4    comparable.  Well, that is and was a commercial use made by the

5    Beastie Boys of their music.

6         They also used their music for the promotion of the X

7    Games.  The X Games are produced by ESPN.  ESPN is in the

8    business of producing sports events.  The X Games, as Lisa

9    Thomas said, is the product of ESPN.  And the Beastie Boys'

10   music was on those commercials you saw, on those commercials

11   for the X Games, all of which, at the end, said, "Sponsored by

12   Jeep."  That was a commercial advertising use.

13        You also saw a portion of the Nike SB video.  The

14   issue is, were the Beastie Boys associated with Nike by that

15   video?  I submit to you that they were.  Because the Nike logo

16   was at the beginning of the video and at the end of the video

17   and the sneaker with the Nike logo was at the beginning of the

18   video, and yes, the video is not a commercial advertisement,

19   but it's a commercial use of the Beastie Boys in connection

20   with a huge company like Nike, just like the Nixon JibFest was

21   a commercial use of a huge company like Nixon and the X Games

22   was a commercial use of the huge company ESPN.

23        And Lisa Thomas essentially ignored those uses.  If

24   you eliminate the Nixon JibFest value because it was for a

25   friend, you still have the ESPN spots, commercials, which were

1    12,500 a side, and the Nike SB video, which included the Nike

2    logo, was $4500.  But she ignored those videos.

3          And let's look at what she said about the value.  She

4    came in and said, in court, that for five weeks the license fee

5    would be a million dollars.  And then she said that previously

6    she had written a report in this case in which she said that

7    the license fee for a perpetual use, in perpetuity, was

8    $1,250,000, and that to reduce it to five weeks, she gave a

9    20 percent discount.  Now Jon Albert, a person that is

10   experienced in advertising and licensing music in advertising,

11   said that if the perpetual use is 1,250,000, then if you reduce

12   it to one year, it would be between an eighth and a tenth of

13   that amount, or 125,000 to 150,000.  And if you reduced it to

14   five weeks, it would be half of that amount, 62,000 to 75,000.

15   Does it really make sense that Lisa Thomas would say, forever,

16   in perpetuity, and the difference between that and five weeks

17   merits only a reduction of 20 percent?  It makes absolutely no

18   sense.

19         Now with respect to statutory damages, Judge

20   Engelmayer told you that there are ten steps for damage awards.

21   Two sides for each song.  But in deciding how much to award for

22   statutory damages within the various ranges that you were

23   instructed about, you are entitled to take into consideration

24   the affiliation between the Beastie Boys as a band and Brooklyn

25   Dust, which was set up by the Beastie Boys as their publishing

1    company.  Brooklyn Dust was not a corporation.  Brooklyn Dust

2    was not a limited liability company or a limited partnership.

3    It was the Beastie Boys calling themselves Brooklyn Dust and

4    using that as their publishing company for the copyright, and

5    on the other side, prior to the death of Adam Yauch, it was the

6    same three people.  I submit to you that in considering the

7    amount for each of the ten statutory damage awards that you

8    take into consideration the fact that two awards for each song

9    are going to go to the same people, essentially.

10           Now in terms of the factors that you were told about

11   in the instructions, Monster's state of mind and particularly

12   whether Monster's conduct was willful or merely negligent or

13   innocent, we submit to you there is no evidence at all of

14   willful conduct.

15           The expenses saved and profits earned.  Now

16   Mr. Puvalowski tried to talk to you about expenses saved.  That

17   was a contortion.  That was disingenuous.  To say that they

18   saved expenses on television commercials just is incorrect.

19   They never intended to do television commercials.  I already

20   discussed that with you.

21           Profits earned.  There's no evidence of that at all.

22           The deterrent effect.  In this case we submit there is

23   no need for a deterrent effect.  Monster Energy took all

24   appropriate actions to remedy infringement.  They admitted that

25   there was an infringement.  They're willing to pay the fair

1    market value for that infringement.  And they have put

2    procedures in place to try to prevent any additional

3    infringement.

4           And LeRoy Nichols told you that he is not aware of any

5    other actions being filed against Monster Energy related to

6    copyright infringement in connection with any of the videos

7    that he posted.

8           Whether Monster Energy cooperated in providing

9    evidence concerning the value of the infringing material.

10   Monster Energy, as we previously said, admitted to you that

11   there was an infringement.

12          The revenue lost by the plaintiffs, if any, as a

13   result of the infringement.  No evidence of it.  No evidence.

14   Mr. Puvalowski made arguments, but there is no evidence from

15   the witness stand or in the documents of any loss.

16          The conduct and attitude of the parties.  Again,

17   Monster Energy immediately removed the video and made attempts

18   to remove it from third-party sites, by notifying other people

19   to remove it, by following up and seeing that it was removed.

20          Now the plaintiffs aren't content to receive the fair

21   market value for the use of the songs.  They've also made a

22   claim which is called a false endorsement claim.  In that claim

23   the plaintiffs have to prove by a preponderance of the evidence

24   that Monster Energy made a false or a misleading representation

25   of facts concerning the Beastie Boys' endorsement, concerning

1    the Beastie Boys' endorsement of Monster products, and that --

2    and this is very important -- that that material

3    misrepresentation was likely to cause consumer confusion as to

4    the Beastie Boys' sponsorship or approval of Monster Energy and

5    its products.  Where is the evidence of that?  Mr. Puvalowski

6    can get up and say, based on these facts, it's likely to cause

7    confusion, but where was the evidence?  No evidence whatsoever.

8    No surveys, no focus groups, no marketing research expert, no

9    evidence whatsoever of likelihood of confusion.

10          With regard to the first element, misrepresentation

11   element, there are two categories in this case, and one

12   category are the items that are contained in the video, and the

13   other category is the name of the Beastie Boys in the All

14   Access Megamix, which was posted on some websites.  And also

15   the use of MCA in the video.

16          I submit to you that the name of Z-Trip's Megamix and

17   "RIP MCA" are incidental items which are contained in the

18   video, which don't support a false endorsement claim.  The use

19   in that way doesn't make any claim about any product, let alone

20   Monster Energy's product.  There's no language in there that

21   the Beastie Boys support Monster Energy or anything else.

22          What's in that video and on the links is merely an

23   accurate representation of the name Z-Trip chose for the

24   Megamix that he created for the Beastie Boys.  It's no

25   different than if Nelson Phillips had written a book and

1    dedicated it to the memory of somebody who had passed away.  No

2    reasonable person would think that that video was trading on

3    the goodwill of the Beastie Boys.

4           With respect to, again, consumer confusion, they don't

5    just have to prove that there's some possibility of consumer

6    confusion.  There has to be proof of a probability of consumer

7    confusion.  There's nothing about that.

8           It's important in this case that with respect to the

9    instructions, if you find that there isn't any liability for a

10   false endorsement claim -- and we contend that there isn't --

11   that you then have to find that Monster Energy intentionally

12   deceived consumers, and again, I submit to you that there's

13   absolutely no evidence of that at all.

14          The only evidence in this case is that Nelson Phillips

15   did something, he got into a pickle, he made a mistake, and

16   then Monster Energy and Nelson Phillips did everything they

17   could to try to fix it.  If Nelson Phillips and Monster Energy

18   wanted to steal the personae of the Beastie Boys and

19   intentionally deceive anybody, they certainly wouldn't have

20   done that by putting songs on a recap video, putting a

21   reference to the title of Z-Trip's Megamix, and saying "RIP

22   MCA" as a tribute.  And they wouldn't post the video on YouTube

23   with 900 other videos.

24          If Nelson Phillips and Monster Energy wanted to

25   falsely present to the public and intentionally deceive the

E641bea7                    Summation - Mr. Kahn

public about the sponsorship of the Beastie Boys, I submit to

you they would have put Michael Diamond's picture on a Monster

Energy can, they would have put up a billboard in Times Square

saying, "The Beastie Boys like Monster Energy," they would have

essentially done what was done with this watch.  They didn't do

any of those things.  Even the press release that was sent out

and the language that was on the YouTube video made reference

to the event but it didn't make any reference to the Beastie

Boys.  It didn't even make any reference to music of the

Beastie Boys being played during the course of the event.

Ask yourselves, if Monster Energy was intentionally

attempting to deceive the public, why, when they put out a

press release about the event and why, when they put on YouTube

the video, why didn't they include any text about Beastie Boys'

music being played that night or any other reference to the

Beastie Boys other than the title of the Megamix?  The reason

is because they were not acting wilfully, they were not acting

intentionally, they weren't intentionally trying to do anything

wrong.

With respect to damages, you heard the testimony of

Erich Joachimsthaler, who is a marketing expert, a branding

expert.  He analyzed the facts in this case, and he told you

that there was absolutely no possibility of any association

between Monster Energy and the Beastie Boys based upon the use

in this case, and he told you why -- the length of time, the

E641bea7                      Summation - Mr. Kahn

various places it was used.  He gave you reasons why he

concluded that there was no possibility.  He didn't say no

probability; he said no possibility at all of an association

between Monster Energy and the Beastie Boys based upon the use.

You saw him testify.  I submit to you he was a credible

witness.  It's for you to decide whether or not, based on his

credentials, that conclusion is credible.

        Finally, if the Beastie Boys overcome all of the

hurdles that are necessary for you to even consider 1 dollar of

damages for this alleged claim of false endorsement, the only

evidence in the case about that, on behalf of the Beastie Boys,

is Lisa Thomas.  Lisa Thomas, the person who came here and,

Mr. Puvalowski said, gave you a reasoned opinion.  She gave you

a reasoned opinion with the script in her briefcase.  I submit

to you that her opinion was far from reasonable and it made

absolutely no sense.

        Let's just take a look at Lisa Thomas' testimony on

this issue.  She told you that there was more than a typical

association between the product and the artist, meaning the

Beastie Boys in this case.  She told you that because of that

association the Beastie Boys are entitled to $1 million.  Did

you hear anything about how she actually arrived at that

number?  As I told you in the opening, she arrived at that

number by picking it out of a hat.  And how do we know that?

We know that based on the rest of her testimony.  She has no

E641bea7                    Summation - Mr. Kahn

1    expertise in associations, she has no training in marketing,

2    and yet she came here and told you that she concludes that an

3    association was made, based on the use of the songs and the

4    name and the reference to MCA.

5           Let's look at what else she said, because that's

6    really important in determining whether or not to believe her

7    valuation on this issue.  She said that she believed 23 million

8    people were notified of the Facebook posting.  And she said

9    that was an extremely important factor in her evaluation.  She

10   told you that the Facebook link was worth ten times more than

11   everything that was in the video, based upon the fact that she

12   understood 23 million people to be notified of the posting.

13   She said that if 16 million people were notified of the

14   posting, it wouldn't change her million-dollar value.  And she

15   said if 1.6 million people were notified of the posting, it

16   wouldn't change her value.  And we know from the testimony that

17   no more than 1.6 million people could possibly have been

18   notified of that posting.  But I asked her, if 610,000 people

19   were notified of the posting, would that change your value?

20   And she said no.  And then I asked her if a lesser number would

21   change her value, and she said no.  And then finally, I said,

22   if no one saw the posting, would that change the value?  And

23   she said no.  She said it doesn't matter if no one sees the

24   posting.  So in her testimony, within ten minutes, she went

25   from saying that it was important, it was an important factor

E641bea7                    Summation - Mr. Kahn

in her evaluation that 23 million people saw the posting, to

telling you that it doesn't make any difference if no one saw

the posting.  In fact, I think she talked about whether or not

the tree falls in the forest.  If no one saw the posting, how

is it possible that any association between the Beastie Boys

and Monster Energy could possibly be created?  If there's no

association created, I submit to you that there is no value.

There can't be any value.

What else did Lisa Thomas say?  With respect to the

term of the implied endorsement, she says, it doesn't matter

whether it was used for five weeks or for a hundred years.

That doesn't make any difference.  You heard Jon Albert tell

you that with respect to an endorsement, the most important

thing is how long it's used.  Lisa Thomas told you five weeks,

a hundred years, makes no difference, because she said time

doesn't matter.  That opinion is clearly erroneous, and it's

illogical.  In fact, although she told you that time doesn't

matter, she also discussed her own licensing deals -- licensing

deals which she considered to be comparable in some way to the

use in this case.  And she told you about Glenn Frey, who was a

member of The Eagles, and she told you that for a use that was

three months for what she characterized as a vocal styling fee,

he got $450,000.  In that particular instance she also told you

that Glenn Frey did not get any payment for the use of the

musical composition copyright, he got no payment for the use of

the publishing rights.  He got what she characterized as the
vocal styling fee, and Jon Albert told you he had never even
heard of that word.

She said that was for the use of three months.  She
said for the use of one year, that number would be seven
figures.  She didn't give us where in the seven figures it
would be, but she said it would be seven figures.  She said for
in perpetuity, it would be -- at one point in her testimony she
said 40 million, and another point in her testimony she said
30 million, at another point in her testimony she said it would
be between 20 and 25 million, and in her sworn testimony in
August of 2013, for that same deal, for in perpetuity, she told
you it would be 10 million.  So within the space of the time
she was on the witness stand, she changed the number that she
told you Glenn Frey would get for the deal she did in
perpetuity at least three times, and in August, she had a
completely different number.  Is that someone that you can
believe her testimony, that this is worth a million dollars
should be believable?  I submit to you that her testimony is
worthless.

She also compared Janet Jackson.  That was a
comparable.  When she was asked about Janet Jackson, it turns
out that that was for Blackglama Furs.  It was a one-year
license agreement for her to wear the furs in print
advertising, and there were other elements of that.  And she

1    then also told you that there was a second year to that deal,

2    which was exercised, and she said in the second year, Janet

3    Jackson got more than she got in the first year.  So for Janet

4    Jackson, clearly time mattered, because she did an endorsement

5    for two years that was way more valuable than doing an

6    endorsement for one year.

7        And let's just look at the nature of the endorsement

8    that Janet Jackson did.  It was a print ad in magazines and it

9    was a billboard in Times Square.  It was a two-year deal.

10   Janet Jackson's picture is on the billboard.  Two of Janet

11   Jackson's pictures are on the billboard.  The name Blackglama

12   is on the billboard.  Is that what we have in this case?  Is

13   that a similar comparable use, as Lisa Thomas said?  It's just

14   part of the testimony of Lisa Thomas that is incredible, that

15   makes no sense, and I submit to you you cannot consider the

16   rest of her testimony to be credible in any way.

17       How can you possibly believe anyone that says, within

18   the space of ten minutes, five or six or seven different

19   statements on the same subject?  I submit to you you can't.  I

20   submit to you that her million-dollar number is a number she

21   just made up.

22       Jon Albert told you what the real world was.  He told

23   you about how much it would be for those additional elements

24   which would be negotiated in the real world on the same day and

25   not separate and apart from the use of the copyrights and the

E641bea7                    Summation - Mr. Kahn

1    use of the songs, and he told you that there would be some

2    additional value, which he characterized as approximately

3    $25,000.

4            Remember, we don't get to damages, though, on this

5    false endorsement claim unless there's proof of a false

6    representation, unless there's proof of a likelihood of

7    confusion.  There is none.

8            Mr. Puvalowski was absolutely correct that we do agree

9    that this is a place of justice.  It's a place of justice for

10   everybody.  And the fact that, as Jon Albert said, the Beastie

11   Boys are likeable people, the fact that they come from New

12   York, the fact that they love to play in Madison Square Garden,

13   the fact that they give money to charity, all of those facts

14   are facts that have nothing to do with your determination in

15   this case.  And I submit to you that when you look at all the

16   evidence in this case, you will reject the testimony of Lisa

17   Thomas, that you will base your decision on the testimony given

18   by Jon Albert, who clearly was a credible, believable,

19   experienced witness, and that if you do that, that justice in

20   this case will be done.

21           Thank you very much for, again, your service and for

22   paying attention to my somewhat long-winded summation.

23           Thank you.

24           THE COURT:  Thank you, Mr. Kahn.

25           All right.  Ladies and gentlemen, now that you've

E641bea7                    Charge

heard the closing arguments of the parties, you are about to go
into the jury room to begin your deliberations.  Before you do
that, I'm going to give you a few final instructions.

        If during your deliberations you want to see any of
the exhibits, you may request to see them.  We'll either send
them into the jury room or we'll bring you back out into the
courtroom to see them.  To assist you, the parties have
prepared a list of the exhibits that were received, listed in
order by exhibit number and a brief description.  If you want
any of the testimony sent or read back, you may also request
that.  Any communication with the court should be made in
writing, signed by your foreperson -- I'll get to that in a
moment -- and given to the Marshal, whom, as in all cases, I'm
going to swear to make sure that your deliberations take place
uninterrupted.  Please remember that it's not always easy to
locate what you might want so be as specific as you possibly
can in requesting exhibits or portions of testimony.  If you
want any further explanation of the law as I've explained it to
you, you may request that from the court.  If there's any doubt
or question about the instructions I've given you during the
trial, you should not hesitate to send me a note asking for
clarification or for further explanation.

        It's very important that you not communicate with
anyone outside the jury room about your deliberations or about
anything touching this case.  There's only one exception to

1    rule.  If it becomes necessary during your deliberations to

2    communicate with me -- to request exhibits or to request

3    testimony or to request any clarification of the law -- you

4    should send me a note, in writing, signed by your foreperson

5    and given to one of the Marshals or my deputy Ms. Hummel.  No

6    member of the jury should ever communicate with me except by a

7    signed writing, and I in turn will never communicate with a

8    member of the jury on any subject touching on the merits of the

9    case other than in writing or orally in open court.  If you

10   send any notes to the court, do not disclose anything about

11   your deliberations.  Specifically, don't disclose to anyone --

12   not even to me -- how the jury stands, numerically or

13   otherwise, until after you have reached a unanimous verdict or

14   have been discharged.

15           Now as to notes.  Many of you have taken notes

16   periodically throughout this trial.  I want to emphasize to

17   you, as you're about to begin your deliberations, that notes

18   are simply an aid to memory.  Notes that any of you may have

19   made may not be given any greater weight or influence in

20   determination of the case than the recollections or impressions

21   of other jurors, whether from notes or memory, with respect to

22   the evidence presented or what conclusions, if any, should be

23   drawn from such evidence.  Any difference between a juror's

24   recollection and another juror's notes should be settled by

25   asking to have the court reporter read back the transcript or

E641bea7                    Charge

1    for me to give you an excerpt of the transcript -- which can be

2    done, although it will take a little bit of time to do it --

3    because it's the court record rather than any juror's notes

4    upon which the jury must base its determination of the facts

5    and its verdict.

6            In a few moments you'll retire to decide the questions

7    that I have described to you.  For plaintiffs to prevail on the

8    questions you must answer, they must sustain their burden of

9    proof as I've explained it to you with respect to the questions

10   you're considering.  Your verdict on each question must be

11   unanimous.  Each juror is entitled to his or her opinion, but

12   you are required to exchange views with your fellow jurors.

13   This is the very essence of jury deliberations.  It is your

14   duty to discuss the evidence.  If you have a point of view and

15   after reasoning with other jurors it appears that your own

16   judgment is open to question, then of course you should not

17   hesitate in yielding your original point of view if you're

18   convinced that the opposite point of view is really one that

19   satisfies your judgment and good conscience.  You're not to

20   give up your point of view, however, that you conscientiously

21   believe in simply because you are outnumbered or outweighed.

22   You should vote with the others only if you are convinced on

23   the evidence, the facts, and the law that it is the correct way

24   to decide the case.  You are not to discuss the case until all

25   of you are present.  Five or six jurors together is only a

gathering of individuals.  Only when all of the jurors, all

eight of you, are present do you constitute a jury, and only

then may you deliberate.

        The first thing you should do when you retire to

deliberate is to take a vote to select one of you to sit as

your foreperson.  The foreperson will send out any notes, and

the jury has reached a verdict, he or she will notify the

Marshal that the jury has reached a verdict, and when you come

into open court, the foreperson will be asked by me to state

what the verdict is.

        Once you have made your verdict, you will record your

decision on the verdict form which I've prepared for you.  You

should answer every question.  And the form is clear.  It gives

you the sequence.  You should proceed through each question in

the order in which they're listed.  The foreperson should fill

in the verdict sheet and date it, and each of you should sign

it.  The foreperson should then give a note to the Marshal

outside your door stating that you have reached a verdict.  Do

not specify what the verdict is in your note.  I will stress

that each of you must be in agreement with the verdict that is

announced in court.  Once your verdict is announced by your

foreperson in open court and officially recorded, it cannot

ordinarily be revoked.

        I will remind you that you took an oath to render

judgment impartially and fairly, without prejudice or sympathy

E641bea7                    Charge

 1   and without fear, solely upon the evidence in the case and the

 2   applicable law.  Your oath sums up your duty.  I know that you

 3   will do your duty and reach a just and true verdict.

 4           I will ask you to remain seated for a moment while I

 5   confer with the attorneys one last time to see if there are any

 6   additional instructions they would like me to give to you or if

 7   there's anything I need to cover.  In this regard, I want to

 8   you sit here.  I'm going to again ask you one final time not to

 9   discuss the case while you're seated in the box, again, because

10   the case hasn't been formally submitted to you.

11           Counsel, may I see you at the sidebar.

12           (At the sidebar)

13           THE COURT:  First of all, let me just say, both

14   closing arguments were truly terrific.

15           MR. KAHN:  Thank you.

16           THE COURT:  It is a pleasure for me in this job to get

17   to watch lawyers practice their craft.  Two really terrific

18   summations.

19           MR. PUVALOWSKI:  Thank you, Judge.

20           MR. KAHN:  Thank you.

21           THE COURT:  Does anyone have anything to raise with

22   me?

23           MR. KAHN:  No.

24           MR. PUVALOWSKI:  No.

25           THE COURT:  One thing I'm going to say to them beyond

E641bea7                    Charge

just emphasizing about getting the instructions, the verdict

form, the list of materials, is something along these lines:

"We're near the end of the day.  Between now and 5 p.m. gives

you time to get started on your work, but realistically, given

the hour, you may well need to resume your work tomorrow.  So

once we hit 5 p.m. today you should cease deliberations for the

day and you may leave.  You're to return tomorrow and continue

deliberating.  Of course you should not discuss the case

overnight or at any other time except as a group of eight in

the jury room.  You should return tomorrow by 9:30 a.m.  Once

you're all here, I'll bring you into the courtroom and direct

you to resume deliberations and also have a word or two about

logistics.  We'll have breakfast for you tomorrow morning at

9 a.m., and, in the event that you're still here at lunchtime,

we'll have lunch for you.

          MR. PUVALOWSKI:  Your Honor, one question I have is,

would you be inclined to give the jury the option to deliberate

late tonight?

          THE COURT:  Counsel?  I mean, if they all want to, I

guess they can.  I mean, presumably that would be done in the

event that they are close enough that they can actually get

something finished today, but I'm happy to do that.

          MR. PUVALOWSKI:  I just think it makes sense, given

we're imposing on them a day extra.

          THE COURT:  Good point.  Mr. Kahn, any objection?

E641bea7

1            MR. KAHN:  No.

2            THE COURT:  Very good.  I'll do that.  Thank you.

3            (In open court)

4            THE COURT:  Members of the jury, that concludes my

5    instructions to you.  After Ms. Hummel administers the oath to

6    the Marshal here, you will retire to the jury room and begin

7    this phase of your deliberations.

8            A couple of things.  I'm going to send you to the jury

9    room with these three items:

10            — Multiple copies, one for each of you, of my jury

11    instructions.  We'll mark it for the record as Court Exhibit 6,

12    but each of you will have a copy of the instructions.

13            — Several copies of the verdict form.  That was

14    referred to a few times, and we're marking that as Court

15    Exhibit 7.

16            — And a combined list, which the parties graciously

17    prepared, a list of all the witnesses in the order they

18    testified and all the exhibits, which we will mark as Court

19    Exhibit 8.

20            One other thing.  I'm mindful that we are near the end

21    of the day.  It's 4:20.  Between now and 5 p.m. gives you time

22    to get started on your work.  If any of you are unable to work

23    past 5 p.m., realistically it may well be you'll need to resume

24    your work tomorrow.  Nobody should feel any pressure to work

25    after 5 p.m.  But once we hit 5 p.m. today, you should either

E641bea7

1    cease deliberating for the day or, if all of you wish to

2    continue, you may continue.  But to be quite clear, unless all

3    of you unanimously wish to continue on after 5 p.m., you must

4    stop then and leave for the day and you will then resume

5    tomorrow promptly at 9:30.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E64gbea8

1          THE COURT:  If that's the way this goes, you, of

2    course, should not be discussing the case overnight or at any

3    time other than as a group of eight in the jury room.

4          As I said tomorrow, assuming that there's no verdict

5    today, you should return by 9:30 a.m.  Once you're all here, I

6    will bring you into the courtroom to direct you to resume

7    deliberating.  And I'll also have a word or two about

8    logistics.

9          Again, assuming there's going be deliberations

10   tomorrow, we will have breakfast waiting for you as we have all

11   these other days.  And in the event you should be continuing

12   with your work through the day, our plan would be to supply you

13   with lunch.  Ms. Hummel will give you menus.

14         At this point, once Ms. Hummel swears the marshal, you

15   are to go into the jury room.  I'll remind you as a first

16   matter of business, please select a foreperson and send me a

17   note signed, dated and timed through the marshal or through

18   Ms. Hummel telling me whom you have selected as your

19   foreperson.

20         Ms. Hummel, will you kindly please swear in the

21   marshal.

22         (Marshal sworn)

23         (At 4:23, p.m. the jury retired to deliberate)

24         THE COURT:  Be seated.  Does counsel have anything to

25   raise at this point?

E64gbea8

1          MR. PUVALOWSKI:  Not from the plaintiff.

2          MR. KAHN:  No.

3          THE COURT:  Let me say one thing, which is a slightly

4     longer version of something I said to counsel at the side bar

5     but I can say it now that the jury is out of the room.

6          All of you who have been watching all or parts of this

7     trial have been witness to some very fine lawyering on both

8     sides.  One of real pleasures for me in this job is to see

9     really gifted lawyers practice their craft.  It's something I

10    used to do, so I'm an attentive former consumer.  And I've been

11    deeply impressed by the lawyering in the case, including what

12    we just saw, which were two very, very fine closing arguments.

13         So just from the point of view of the practice of the

14    legal craft I want to say to all of you that I'm mindful there

15    are clients on both sides in the room that you chose wisely and

16    that the lawyering here was really quite exceptional.

17         With that, I need to, in a few minutes, take a guilty

18    plea in a criminal case.  I think we can wait a few minutes to

19    get what I expect will be the first note from the jury, which

20    will be the one identifying whom their foreperson is, but in a

21    few minutes, I'll need to ask counsel to clear away enough

22    space at the tables so I can take that plea.

23         Counsel, I'll be awaiting in the robing room until

24    either we received a note or until the parties for the guilty

25    plea are here.

E64gbea8

1          Thank you.

2          (Recess pending verdict)

3          (At 4:37 p.m., a note was received from the jury)

4          THE COURT:  Counsel, in the civil case, Beastie Boys

5    v. Monster Energy, are you all here?

6          MR. PUVALOWSKI:  Yes.

7          MR. KAHN:  Yes.

8          THE COURT:  I just want to read into the record a

9    mundane note that we have, but I wanted to put it in the record

10   and we'll mark it as jury note number one.

11         It reads:  Tom Pinto will be foreperson, that's juror

12   number six.  And then it adds the first question:  Can we have

13   eight copies of the verdict form rather than two?

14         So we're running off extra copies, and Ms. Hummel will

15   bring them in.  Thank you.

16         (Recess pending verdict)

17         (At 4:48 p.m., a note was received from the jury)

18         THE COURT:  This is a nonevent.  I just wanted to be

19   sure you heard what the note is.  We're going to mark this as

20   jury note number two.  It simply says:  We're leaving at 5:00

21   and returning 9:30 a.m. tomorrow.

22         Again, I wanted you to give real time reporting from

23   me, but there it is.  Ms. Hummel will mark this as jury note

24   number two.

25         With that, I think we are done for the day.  I'll ask

E64gbea8

1    that counsel be here five minutes before the jury is here, just

2    in case something has unexpectedly come up. I don't need all

3    of you here. I imagine you may well want to be here. But

4    during the course of the day, particularly early on when I

5    expect we are more likely than not to get notes, I will need

6    one member of each team here.

7         One consideration. Back when I was doing trials very

8    often, we would do long read-backs to the jury when they

9    requested trial excerpts. We can do that. It takes a lot of

10   time.

11        Much more recently, the more modern trend in the

12   courthouse has been that when there's a request for the

13   read-back, that counsel agree with each other as to what the

14   responsive parts of the transcript are, and then basically a

15   transcript that is limited to the responsive portions is given

16   to the jury, which the jury can read.

17        It saves everybody a lot of time. It has a little bit

18   of a mechanical aspect to the process because it basically

19   requires counsel to go through the transcripts and then flag

20   lines and then somebody needs to do whatever redacting is

21   needed to be done.

22        I leave it to your collective good judgment how you

23   want to proceed, but with my insight from experience, that if

24   there's a way of mechanically creating a redacted transcript

25   like that, it actually saves everybody a lot of time and gets

E64gbea8

1      the jury the information more quickly than it otherwise might.

2               In any event, I assume you'll each have a full set of

3      the transcripts at your tables.  In the event we get such a

4      request I will ask you to consider whether that's the approach

5      you want to go with.

6               As soon as we get something along those lines, and we

7      do, asking for transcript excerpts, I would expect you to work

8      together in good faith to identify all portions of the

9      transcript and delete out any lawyer/judge colloquy,

10     objections, and whatnot, and just to get to the substance of

11     the testimony.  Does anyone have anything from me before we

12     adjourn for the evening?

13               MR. PUVALOWSKI:  No.

14               MR. KAHN:  No.

15               THE COURT:  I wish you a good evening and for the

16     first time, I'm sure in several weeks, a full night's sleep.

17               Again, just amplifying what I said before, it's really

18     been an exceptionally well-tried case.  And how ever the jury

19     comes out in the case, I'm confident that they have been

20     presented with all the relevant information they could possibly

21     hope to have and all the arguments and inferences fairly drawn

22     from that evidence.  It was really quite well tried.

23               We stand adjourned.  Can I see counsel off the record

24     in the robing room, please.

25               (Adjourned to June 5, 2014 at 9:25 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

JON ALBERT LEVY

Direct By Mr. Kahn . . . . . . . . . . . . . .1508

Cross By Mr. Puvalowski  . . . . . . . . . .1518

Redirect By Mr. Kahn . . . . . . . . . . . .1583