UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                       :

BEASTIE BOYS, A NEW YORK PARTNERSHIP,  :
MICHAEL DIAMOND, ADAM HOROVITZ AND  :
DECHEN YAUCH AS EXECUTOR OF THE     :    12 Civ. 6065 (PAE)
ESTATE OF ADAM YAUCH, DECEASED, EACH :
INDIVIDUALLY AND COLLECTIVELY D/B/A/  :
BROOKLYN DUST MUSIC,                :

                                         :

                    Plaintiffs,      :
       -v-                         :

MONSTER ENERGY COMPANY,        :

                    Defendant.    :

                                         :
------------------------------------------------------------X

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTIONS FOR JUDGMENT AS A MATTER OF LAW, OR, IN THE ALTERNATIVE, FOR A NEW TRIAL

SHEPPARD MULLIN RICHTER & HAMPTON LLP
Kevin R. Puvalowski
Paul W. Garrity
Kenneth B. Anderson
Thomas Monahan
30 Rockefeller Plaza
New York, New York  10112
(212) 653–8700

*Counsel for Plaintiffs*

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

RECORD EVIDENCE ............................................................................................... 4

ARGUMENT .............................................................................................................. 7

I.   MONSTER CANNOT SATISFY ITS HIGH BURDEN ON THE MOTIONS ............... 7

II.  THE JURY'S FINDING OF WILLFUL COPYRIGHT INFRINGEMENT IS
     SUPPORTED BY THE EVIDENCE AT TRIAL .............................................. 8

III. MONSTER'S USE OF PLAINTIFF'S PERSONA WITHOUT PERMISSION
     WAS A FALSE ENDORSEMENT IN VIOLATION OF THE LANHAM ACT ........... 11

     A.   Monster's References To Beastie Boys And MCA Are Actionable .................... 12

     B.   The Jury Properly Found That Monster's Use of the Beastie Boys' Names
          And Music Resulted In A Likelihood Of Confusion ............................................ 14

     C.   Evidence Of Monster's Intentional Deception Supports The Monetary
          Damages Awarded By The Jury ........................................................................ 18

     D.   Monster's Use Of Multiple Copyrighted Works Was Properly Introduced
          At Trial And The Jury's Consideration Of That On The False
          Endorsement Claim Was Proper ........................................................................ 20

IV.  THE DAMAGES AWARDED ARE REASONABLE .................................................. 23

CONCLUSION ......................................................................................................... 25

TABLE OF AUTHORITIES

Page(s)

Cases

*Agence France Presse v. Morel*
   2014 WL 3963124 (S.D.N.Y. Aug. 13, 2014) ........................................................ 8

*AIG Global Secs. Lending Corp. v. Banc of Am. Secs, LLC*
   386 Fed. Appx. 5 (2d Cir. 2010) ...................................................................... 23

*Bevevino v. Saydjari*
   574 F.2d 676 (2d Cir. 1978) .............................................................................. 9

*Borghese Trademarks Inc. v. Borghese*
   2013 WL 143807 (S.D.N.Y. Jan. 14, 2013) ...................................................... 20

*Brady v. Wal-Mart Stores, Inc.*
   455 F. Supp. 2d 157 (E.D.N.Y. 2006) ............................................................... 9

*Brown v. Twentieth Century Fox Film Corp.*
   799 F. Supp. 166 (D.D.C. 1992) ...................................................................... 16

*Bruce Lee Enterprises, LLC v. A.V.E.L.A., Inc.*
   2013 WL 822173 (S.D.N.Y. March 6, 2013) .................................................... 13

*Bryant v. Media Right Prods., Inc.*
   603 F.3d 135 (2d Cir. 2010) ............................................................................. 10

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*
   650 F. Supp. 2d 214 (S.D.N.Y. 2009) ............................................................... 25

*Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers*
   34 F.3d 1148 (2d Cir. 1994) ............................................................................... 8

*EMI Catalogue v. Hill, Holiday, et al.*
   228 F.3d 56 (2d Cir. 2000) ............................................................................... 22

*Geisel v. Poynter Products, Inc.*
   283 F. Supp. 261 (S.D.N.Y. 1968) ................................................................... 17

*George Basch Co. v. Blue Coral, Inc.*
   968 F.2d 1532 (2d Cir. 1992) ........................................................................... 21

*GMA Accessories, Inc. v. POP, LLC*
   765 F. Supp. 2d 457 (S.D.N.Y. 2011) ............................................................... 19

*Henley v. DeVore*
   733 F. Supp. 2d 1144 (C.D. Cal 2010) .............................................................. 22

*Home Shopping Club, Inc. v. Charles of the Ritz Grp., Inc.*
   820 F. Supp. 763 (S.D.N.Y. 1993) ........................................................ 18

*Int'l Star Class Yacht Racing Assoc. v. Tommy Hilfiger, U.S.A., Inc.*
   80 F.3d 749 (2d Cir. 1996) ................................................................ 20

*Jackson v. Odenat*
   2014 WL 1202745 (S.D.N.Y. Mar. 24, 2014) ........................... 12, 15, 18

*L.A. Printex Indus., Inc. v. Does 1-10*
   2013 WL 6170580 (2d Cir. Nov. 26, 2013) ...................................... 8, 10

*Lipton v. Nature Co.*
   71 F.3d 464 (2d Cir. 1995) ................................................................ 9

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*
   799 F.2d 867 (2d Cir. 1986) .............................................................. 17

*Metromedia Co. v. Fugazy*
   983 F.2d 350 (2d Cir. 1992) .............................................................. 9

*Nat'l Football League v. PrimeTime 24 Joint Venture*
   131 F. Supp. 2d 458 (S.D.N.Y. 2001) ............................................... 26

*New Kids on the Block v. News Am. Pub., Inc.*
   971 F.2d 302 (9th Cir. 1992) ............................................................. 13

*Oliveira v. Frito-Lay, Inc.*
   251 F.3d 56 (2d Cir. 2001) ................................................................ 22

*Polaroid Corp. v. Polarad Elecs. Corp.*
   287 F.2d 492 (2d Cir. 1961) .......................................................... 15, 19

*Psihoyos v. John Wiley & Sons, Inc.*
   2012 WL 5506121 (S.D.N.Y. Nov. 7, 2012) ..................................... 10

*Raedle v. Credit Agricole Indosuez*
   670 F.3d 411 (2d Cir. 2012) ............................................................ 8, 9

*Reeves v. Sanderson Plumbing Prods., Inc.*
   530 U.S. 133 (2000) ......................................................................... 8

*Seale v. Gramercy Pictures*
   968 F. Supp. 918 (E.D. Pa. 1997) ..................................................... 16

*Sequa Corp. v. GBJ Corp.*
   156 F.3d 136 (2d Cir. 1998) .............................................................. 9

*Tiffany (NJ) Inc. v. eBay Inc.*
   600 F.3d 93 (2d Cir. 2010)................................................................................ 13

*Twin Peaks Prods., Inc. v. Publn'ns Int'l, Ltd.*
   966 F.2d 1366 (2d Cir. 1993)............................................................................... 9

*In re WorldCom, Inc. Sec. Litig.*
   352 F. Supp. 2d 472 (S.D.N.Y. 2005)................................................................ 19

*Yurman Design, Inc. v. PAJ, Inc.*
   262 F.3d 101 (2d Cir. 2001)........................................................................... 8, 10

*Zervitz v. Hollywood Pictures*
   995 F. Supp. 596 (D. Md. 1996)......................................................................... 25

<u>Statutes</u>

15 U.S.C.
   § 1115(b)(4)....................................................................................................... 13

<u>Other Authorities</u>

FED. R. CIV. P.
   50........................................................................................................................ 10
   50(a)..................................................................................................................... 5
   50(a)(1)................................................................................................................. 8
   59......................................................................................................................... 9
   59 and 60............................................................................................................. 9

Plaintiffs Beastie Boys, a New York Partnership, and Michael Diamond, Adam Horovitz and Dechen Yauch as Executor of the estate of Adam Yauch, deceased, d/b/a Brooklyn Dust Music (collectively, "Plaintiffs" or "Beastie Boys"), by their attorneys, Sheppard Mullin Richter & Hampton LLP, respectfully submit this memorandum and accompanying declaration of Kevin R. Puvalowski in opposition to the motions filed by Monster Beverage Company ("Monster" or "Defendant") for judgment as a matter of law, or, in the alternative, for a new trial.

## PRELIMINARY STATEMENT

At trial, Plaintiffs presented ample competent and persuasive evidence demonstrating that Monster's use of Beastie Boys' music and its multiple references to Beastie Boys' names and marks, a Beastie Boys music download, and to the recent death of one of the members of the band constituted willful copyright infringement and an intentionally deceptive false endorsement of Monster's products.  More specifically, among many other things, Beastie Boys introduced evidence, by and large without objection, that convincingly showed that Monster had no permission to use five Beastie Boys musical compositions and sound recordings in the Ruckus in the Rockies advertising video and that its proffered excuse for the unauthorized use — that Monster believed it had permission to use the music based on a conversation with a disk jockey who performed at the event — was neither supported by the evidence nor objectively reasonable. Indeed, Beastie Boys proved that the context of Monster's copyright infringement and false endorsement constituted willful and intentionally deceptive conduct:  that, despite Monster's reliance on a web-based marketing strategy involving the posting of on-line videos, Monster chose to blithely ignore third-party intellectual property interests by having essentially no music clearance policy and by relying on employees with no training or expertise to create and approve such videos.  Based on this evidence, and following entirely correct jury instructions to which

there was (and is) no significant objection, the jury found for Beastie Boys on each and every

issue, making explicit findings of willful infringement, false endorsement liability, eligibility for

false endorsement damages, and Monster's bad faith, and it awarded substantial actual and

statutory copyright damages as well as damages for the false endorsement.

There is no basis in law or equity to upset this verdict, and the instant motion is based on

little more than its unhappiness that the jury wholly rejected Monster's facially unbelievable

excuses for its egregious conduct.  None of Monster's arguments on this motion withstand

scrutiny.  First, there was plainly ample evidence that Monster's copyright infringement was

willful.  Among other things, the evidence demonstrated that Monster did not obtain permission

to use Beastie Boys music from anyone, that it approved and posted the offending video with no

music clearance review, that warnings concerning infringement were given to the Canadian

employee that created the video, that Monster created and posted the video notwithstanding that

it knew that it could not afford to use Beastie Boys' music, and that its proffered excuse—to

blame it on a disk jockey who performed at the event—was just plain false, as well as being

facially unreasonable.

Second, there was plainly ample evidence demonstrating a likelihood of confusion and

thus supporting the jury's false endorsement liability verdict.  The evidence is clear that many

aspects of Monster's Ruckus in the Rockies advertising video and its marketing surrounding that

video could reasonably be construed to result in a likelihood of confusion.  The video itself, for

example, used Beastie Boys music over essentially the entirety of the four-plus minute

advertisement; it used five different Beastie Boys musical compositions and sound recordings;

within which defendant used iconic, identifiable song titles, lyrics, hooks, and the band

members' distinctive voices; it specifically used the Beastie Boys name and identifies a website

link where Beastie Boys music could be downloaded; and it makes reference to the recent death of Adam Yauch, a member of the band. In addition, Monster's promotion of the video on YouTube and Facebook similarly used the Beastie Boys name and a link to the download. Given the factors that must be considered on likelihood of confusion, which the Court correctly charged without objection, this evidence taken together plainly show a likelihood of confusion.

Monster's arguments on this point do not withstand scrutiny. Monster's complaint, for example, that the jury should not have been permitted to rely on the use of five Beastie Boys songs as part of the proof showing a false association should be rejected for several independently sufficient reasons: (a) it is wrong as a matter of law, as use of copyrighted material in the context of other evidence can properly be relied upon to show a false association; (b) contrary to Monster's assertions, the record is clear that it was *Monster's* counsel and not Plaintiffs that elicited the fact that the use of five songs was a factor showing a false association between Monster and Beastie Boys, and Monster cannot credibly be heard to complain now about the introduction of evidence that it elicited at trial; and (c) Monster failed to make this argument on its directed verdict motion, and therefore has waived it. Similarly, Monster's theory of nominative fair use should be rejected: as the Court expressly ruled during the trial, Monster failed to make out a factual basis that the nominative fair use doctrine was applicable because Monster failed to demonstrate that its use of the Beastie Boys name was required; indeed, its factual suggestion that the use of the Beastie Boys name was requested by the disk jockey is demonstrably false.

Finally, there was more than sufficient evidence to demonstrate intentionally deceptive conduct to support Lanham Act damages. The evidence shows that Monster chose to rely on a marketing strategy that eschews traditional advertising expenditures; instead, it chose to rely on

videos posted to the Internet.  Notwithstanding this video-based strategy, Monster chose to

ignore third-party intellectual party rights completely, despite evidence of warnings, and had

effectively no policy for music rights clearance.  Instead, it relied entirely on outside producers

or, for productions made in-house, on Monster employees with zero training, experience or

expertise in clearance.  With this intentionally lax corporate policy as context, Monster posted a

video and published accompanying promotional materials using Beastie Boys music and the

Beastie Boys name, without permission and without any credible excuse, all despite knowing

that Monster could not afford to actually pay for such use.  Taking all of this together, the jury,

following the Court's correct instructions, reasonably could have (and did) conclude that

Monster's conduct was intentionally deceptive and thus supported Lanham Act damages.

Indeed, the jury went further and made an explicit finding (again, based on a wholly correct jury

instruction) that Monster acted in bad faith.

     In sum, the record is absolutely clear that both Plaintiffs and Defendant received a

scrupulously fair trial in this case:  Plaintiffs and Defendant put in their evidence, made their

arguments, and received a legally correct and factually supported jury charge on every contested

issue.  The jury, hearing that properly admitted evidence, hearing counsel's arguments, and

hearing and following the Court's correct instructions on the law, utterly rejected Monster's lame

and factually incredible excuses for its egregious conduct.  That decision was supported by the

evidence and by common sense, and there is no reason under law or equity that that verdict

should be upset.

## RECORD EVIDENCE

     Monster maintains a marketing program that relies heavily on the production and online

distribution of promotional videos for the Monster brand. (Tr. 1050:7-1053:7; Pl. Exs. 221, 238.)

Indeed, as Monster proudly points out on its website and in its marketing materials, "Most

companies spend their money on ad agencies, TV commercials, radio spots, and billboards to tell you how good their products are. At Monster, we choose none of the above." (Pl. Exs. 221, 238.) Despite distributing hundreds of such marketing videos, as of May 2012, Monster did not have any real policy for clearance of third-party intellectual property rights in videos and had no policy whatsoever for videos that were internally produced. (Tr. 1055:20-1057:7, 1278:17-1279:4, 1134:17-1141:9; Nichols Tr. 18:17-20:11, 22:25-24:18.)[1]

In that context, Nelson Phillips, Monster's Director of Marketing in Canada, hired a disk jockey to perform at Monster's snowboard event at Lake Louise Ski Resort, in Canada, called "Ruckus in the Rockies 2012" held on May 5, 2012. (Tr. 356:6-19; Pl. Ex. 130.) The disk jockey, Zach Sciacca (a/k/a "DJ ZTrip"), had previously been engaged by Plaintiffs to create a compilation of Beastie Boys recordings that was used in connection with the promotion of Beastie Boys' album "Hot Sauce Committee Part Two." (Tr. 356:20-357:10.) After the event, Mr. Phillips supervised the creation of a four-minute advertising and promotional video featuring portions of the Ruckus in the Rockies event (the "Video Advertisement"), which included as its soundtrack prominent portions of five Beastie Boys musical compositions and sound recordings (collectively, the "Copyrights"). (Tr. 1113:21-1115:10; Pl. Ex. 211.)

The record is clear that Mr. Sciacca did not provide Monster with permission to use the Copyrights, and if Monster had asked to use excerpts from his compilation he would have referred that request to his management team. (Tr. 477:19-479:22, 495:11-496:19, 975:10-977:11.) Mr. Phillips sent an initial version of the Video Advertisement to Mr. Sciacca via email dated May 8, 2012. (Pl. Ex. 134.) Mr. Sciacca believed that the Video Advertisement was sent

---

[1] In addition to relying upon evidence presented throughout the trial, where appropriate, Plaintiffs cite to the deposition testimony submitted for consideration on Monster's Rule 50(a) motion at the close of Plaintiffs' case. Citations to trial testimony are preceded by "Tr." and citations to deposition testimony are preceded by the deponent's name and "Dep. Tr."

to him so that he could approve of the use of his likeness, as required by his performance contract with Monster, and nothing in the communications transmitting the Video Advertisement to Mr. Sciacca for approval mentioned the use of any music in connection with the Video. (Tr. 1110:7-1112:20, 454:15-456:3, 459:23-461:8, 477:19-479:22, 1153:4-1154:1, 1177:20-1181:11, 362:12-364:9, 369:24-370:6, 1151:18-1154:16.)  In the email, for example, Mr. Phillips asks Mr. Sciacca simply:  "Please have a look at the video from this past weekend and let me know if you approve." (Pl. Ex. 134.)  There is no explicit or implicit suggestion in the email that Mr. Sciacca was being asked to review the music.  In reviewing that initial version of the Video Advertisement, Mr. Sciacca noticed the Copyrights were being used as the soundtrack, and assumed that Monster had secured approval to use those Copyrights directly form Plaintiffs. (Tr. 369:24-370:6, 480:6-12.) After reviewing the video, Mr. Sciacca approved his likeness by responding "Dope" and asked Monster to include a link to his remix compilation. (Tr. 468:4-469:8; Pl. Ex. 134.)  Significantly, Mr. Sciacca did not ask that any reference to the Beastie Boys be embodied in the Video Advertisement, but explicitly only asked that Monster include the link "Download the mix for free at http://ztrip.bandcamp.com" so that a person viewing the Video could pause the video and go to that webpage. (*Id.*)  The decision to include the Beastie Boys name in the text was thus exclusively Monster's. (Tr. 11155:8-1156:3.)

Monster did far more, however, than simply include Mr. Sciacca's website link in the Video Advertisement.  Monster incorporated the "Beastie Boys" name and mark into the advertising and added a prominent credit at the end of the Video Advertisement that displayed "RIP MCA" — an explicit reference to the death of Adam Yauch, a member of the Beastie Boys.

(Pl. Exs. 133, 211.)[2] Monster posted the Video Advertisement on its website and YouTube channel and promoted the Video in a message to its followers on Facebook that referenced the Beastie Boys and in a press release issued to various online snowboarding magazines. (Pl. Exs. 134, 150, 165, 200, 270, 276; Tr. 1162:25-11-1166:22.) Indeed, Monster's post on Facebook referencing the Beastie Boys remained available until at least March 20, 2014. (Pl. Ex. 270.) Monster never sought Plaintiffs' permission to use the Beastie Boys' Copyrights and marks in the Video Advertisement and its accompanying promotion. (Tr. 1171:4-1174:20.)

## ARGUMENT

## I.  MONSTER CANNOT SATISFY ITS HIGH BURDEN ON THE MOTIONS

Monster cannot prevail on its motion to set aside the verdict and enter judgment in Monster's favor as a matter of law unless it can prove that "a reasonable jury would not have a legally sufficient evidentiary basis to find for" Plaintiffs. FED. R. CIV. P. 50(a)(1).  In evaluating a motion for a judgment as a matter of law, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  This standard will be met "only if there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against the moving party." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 108 (2d Cir. 2001); *see also L.A. Printex Indus., Inc. v. Does 1-10*, 2013 WL 6170580,

---

[2] The jury heard that Mr. Phillips clearly understood the drama and significance of including the term "RIP MCA" in the Video Advertisement, and sought to increase the effect of its use in the Video by telling his team producing the Video to include "at the very end 'RIP MCA' [p]ause on the RIP MCA and then slowly fade to black." (Tr. 1144:21-1145:17; Pl. Ex. 133.)  He admitted on cross examination that this was done to increase the drama of the Video Advertisement. (Tr. 1149:21-1150:2.)

at *3 (2d Cir. Nov. 26, 2013) (affirming denial of defendant's motion for judgment as a matter of law where a reasonable juror could conclude that defendant had willfully infringed plaintiff's work).  Moreover, Monster cannot raise any issues on this motion that it did not specifically raise in its motion for a directed verdict at the close of the evidence. *See Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1155 (2d Cir. 1994) ("judgment as a matter of law is limited to those issues specifically raised in a prior motion for a directed verdict" (quotation and citation omitted)).

Monster meanwhile cannot prevail on its motion for a new trial unless it can establish that "the verdict is 'seriously erroneous' or 'a miscarriage of justice.'" *Agence France Presse v. Morel*, 2014 WL 3963124, at *3 (S.D.N.Y. Aug. 13, 2014) (quoting *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417-18 (2d Cir. 2012)).  As a general matter, "jury verdicts should be disturbed with great infrequency," and only in the most "egregious cases." *Raedle*, 670 F.3d at 418 (2d Cir. 2012); *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir. 1978) (courts must "abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result").  In considering a motion for a new trial, "trial judges must exercise their ability to weigh credibility with caution and great restraint, as a judge should rarely disturb a jury's evaluation of a witness's credibility, and may not freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury." *Raedle*, 670 F.3d at 418; *see also*; *Lipton v. Nature Co.*, 71 F.3d 464, 472-73 (2d Cir. 1995).

## II.   THE JURY'S FINDING OF WILLFUL COPYRIGHT INFRINGEMENT IS SUPPORTED BY THE EVIDENCE AT TRIAL

As the Court correctly and without objection charged, factors the jury could consider in determining willfulness included:  "[w]hether Monster knew or should have known that the Beastie Boys music was protected by copyright; whether Monster received warnings about its

infringements; whether Monster had experience with previous copyright ownership or prior lawsuits regarding similar practices; and whether Monster was in an industry where knowledge of copyright is prevalent." (Tr. 1611:19-25.)  In considering willfulness, the "standard is simply whether the defendant had knowledge that its conduct represented infringement or perhaps recklessly disregarded that possibility." *Twin Peaks Prods., Inc. v. Publn'ns Int'l, Ltd.*, 966 F.2d 1366, 1372 (2d Cir. 1993); *see also L.A. Printex Indus.*, 2013 WL 6170580, at *1; *Yurman Design*, 262 F.3d at 112; *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 143 (2d Cir. 2010). "Willfulness need not be proven directly but may be inferred from the defendant's conduct." *Psihoyos v. John Wiley & Sons, Inc.*, 2012 WL 5506121, at *1 (S.D.N.Y. Nov. 7, 2012) (quoting *N.A.S. Import., Corp. v. Chenson Enterprises, Inc.*, 968 F.2d 250, 252 (2d Cir. 1992)). A plaintiff can prove that "an infringement was 'willful' under the Copyright Act by demonstrating that the defendant acted with 'reckless disregard' for, or willful blindness to, the plaintiff's rights." *Id.*  A jury's finding of willfulness is reviewed "under the same deferential Rule 50 standard that applies to factual determinations pertinent to liability." *Yurman Design*, 262 F.3d at 112.

Monster cannot meet its high burden of showing that the jury's finding of willful infringement was unreasonable, seriously erroneous or a miscarriage of justice.  In its attempt to meet this burden, Monster draws inferences and construes the evidence submitted at trial overwhelmingly in its favor — not in a light most favorable to Plaintiffs.  When the evidence is construed in a light most favorable to Plaintiffs, that evidence shows that Monster acted willfully with respect to Beastie Boys' rights in the Copyrights.  Monster was aware of licensing and copyright issues and implemented an advertising plan that eschewed traditional advertising and instead posted thousands of videos on its website and YouTube channel. (Tr. 1050:7-1053:7; Pl. Exs. 221, 238.)  Despite this advertising strategy, Monster lacked any formal policy to avoid

copyright infringement in its videos. (Tr. 1055:20-1057:7, 1278:17-1279:4, 1134:17-1141:9.)  In fact, although Monster employees reviewed all videos to confirm that they were "cool" and "fitting with the [Monster] brand," it had essentially no policy for reviewing videos for protected third-party content, relying instead on outside producers, and had no policy whatsoever with respect to videos, like the Video Advertisement relevant here, that were produced internally. (Tr. 1278:17-1279:4.)

Monster's infringement occurred despite its clear understanding of copyright law, as evidenced by its own internal memoranda and its annual marketing budget of approximately $120 million. (Tr. 1050:7-18; Pontrelli Dep. Tr. 19:5-21, 32:13-18; Pl. Ex. 196, 198.)  Plaintiffs also introduced emails sent by Monster's Director of Music Marketing, Brent Hamilton fairly indicating that he "warned" their "guy in Canada" before this action was instituted about copyright infringement. (Pl. Exs. 189, 195.)  Mr. Hamilton also indicated that Monster would have liked to have entered into a sponsorship agreement with the Beastie Boys, and even considered it as possibility, but ultimately decided not to pursue it because it knew it would be too expensive. (Tr. 1378:23-1379:12; Hamilton Dep. Tr. 85:25-86:11.)  Stated differently, despite knowing explicitly that it could not afford to use Beastie Boys' music, Monster nevertheless approved and posted a Video Advertisement using that music.

Monster seeks to avoid the evidence of its willful conduct by relying on the self-serving and uncorroborated testimony of Mr. Phillips to argue that Monster sought and obtained permission to use the Copyrights in the Video Advertisement. (Monster Br. at 3-5.)  However, Mr. Sciacca testified that he did not recall such a request ever being made by Mr. Phillips, and, if such a request had been made, Mr. Sciacca would have referred Mr. Phillips to his management team. (Tr. 477:19-479:22, 495:11-496:19, 975:10-977:11.)  Moreover, Mr. Phillips admitted he

never sought or attempted to seek permission to use the Copyrights and Beastie Boys marks from

Plaintiffs, Mr. Sciacca, Monster's legal department, or anyone else. (Tr. 1171:4-1174:20.)

Instead, Monster relies heavily on an email exchange with Mr. Sciacca that, on its face, has

nothing to do with approval of the music in the Video Advertisement but rather plainly

concerned Mr. Sciacca's approval of his own likeness, as Mr. Sciacca testified. (Tr. 369:24-

370:6; Pl. Ex. 134.)  When considering these facts in a light most favorable to Plaintiffs, a very

simple narrative emerges:  Mr. Phillips, despite being warned about copyright issues, created the

Video Advertisement featuring the Copyrights and Beastie Boys' marks without permission and

with utter disregard for whether Monster was authorized to make such a use; all in the context of

a woefully lax corporate attitude toward third-party intellectual property and despite the fact that

Monster heavily relied on video content in order to save money on traditional advertising

expenses.  On this record, the jury had more than sufficient evidence to make a finding of

willfulness.[3]

## III.    MONSTER'S USE OF PLAINTIFF'S PERSONA WITHOUT PERMISSION WAS A FALSE ENDORSEMENT IN VIOLATION OF THE LANHAM ACT

To prevail on their claim for false endorsement under the Lanham Act, Plaintiffs had the

burden at trial of establishing that Monster (1) in commerce, (2) made a false or misleading

representation of fact, (3) in connection with goods or services, (4) that is likely to cause

consumer confusion as to origin, sponsorship, or approval of the goods or services.  *See Jackson*

---

[3] As incredible as Mr. Phillips' testimony was regarding his alleged conversations with Mr. Sciacca, other portions of his testimony were downright laughable.  Mr. Phillips initially testified for example that the fonts in the Video Advertisement used in connection with the references to the Beastie Boys and the late Mr. Yauch did not bear Monster's trademark green even though they plainly did. (1157:10-25.)  Mr. Phillips further testified that his emailed statement that he had "found [himself] in a bit of trouble for using unlicensed music lately...HA!" was not in reference to his use of the Copyrights in the Video Advertisement, but was instead a reference to the stage name of the gentlemen he was emailing with. (*Compare* Pl. Ex. 170 *with* Tr. 1169:10-170:13, 176:1-12, 178:23-179:9.) The jury was entitled to consider these obvious falsehoods when assessing whether Mr. Phillips was being truthful about his alleged conversations with Mr. Sciacca.  We submit that the jury arrived at its own determination as to whether Mr. Phillips was a credible witness and found that he was not.

*v. Odenat*, 2014 WL 1202745, at *7 (S.D.N.Y. Mar. 24, 2014) (finding that use of rap artist's image and the name of his record label in connection with hip-hop music website could sustain a claim for false endorsement). After attempting to resurrect a nominative fair use argument expressly considered and rejected by the Court before charging the jury, Monster here challenges only element (4) above: the jury's finding that, as a result of Monster's conduct, consumers using ordinary care and prudence were likely to have been misled or confused as to whether the Beastie Boys have endorsed Monster's products. The jury here had an abundant evidentiary basis to find a likelihood of confusion arising from Monster's use of Plaintiffs' names, marks, music, identity and persona in the Video Advertisement. Moreover, the jury properly found that Monster acted in bad faith and intended to deceive the public concerning whether the Beastie Boys endorsed it's products, thereby supporting its damages finding.

## A.    Monster's References To Beastie Boys And MCA Are Actionable

Initially, Monster claims that it's use of Plaintiffs' names, marks, music, identity and persona in marketing and promoting it's goods is non-actionable nominative fair use. In order to determine whether use qualifies as "fair" under 15 U.S.C. § 1115(b)(4), courts assess whether the term is used (1) descriptively, (2) other than as a mark, and (3) in good faith. *See Bruce Lee Enterprises, LLC v. A.V.E.L.A., Inc.*, 2013 WL 822173 (S.D.N.Y. March 6, 2013). Any such use thus "cannot imply a false affiliation or endorsement by the plaintiff of the defendant." *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 103 (2d Cir. 2010). Ultimately, a nominative use of a mark is one "where the only word reasonably available to describe a particular thing is pressed into service." *New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d 302, 308 (9th Cir. 1992).

Although not acknowledged by Monster in its motions, the Court expressly considered and rejected Defendant's request for a proposed jury charge on this defense on the ground that it lacked a factual basis:

Okay.  So I thought what you were saying to me, Mr. Kahn, was that essentially embedded in the link was the name "Beastie Boys," such that one could literally not effectuate the linking process without using the name "Beastie Boys." However, as the screen before me reads, it's not the case at all.  It reads:  "Music.  All Access Beastie Boys Megamix courtesy of Z-Trip.  Download the link for free at ztrip.bandcamp.com."  Those last words beginning with "Download" are the only operational words here.  That's the name of the link.  It does not embed the name "Beastie Boys."  Instead, the name "Beastie Boys" comes in a discretionary descriptor that applies above.  In other words, one could have said, "Music, Z-Trip's Megamix," without referencing the Beastie Boys, and the functionality of the link would have been equally the same.

(Tr. 1503:5-19.)  Based upon such facts, which are plain from the Video Advertisement itself, the Court declined to give the instruction, and explained "[m]y ruling here is really based on my judgment that the first element of the nominative fair use defense is not met here.  There isn't a factual basis on which a jury could find that Z-Trip's Megamix was not readily identifiable without use of the name 'Beastie Boys.'"  (Tr. 1507:7-12.)

Indeed, Monster's repeated factual claim in its motion that it included the Beastie Boys' name in the Video Advertisement at the request of Mr. Sciacca is simply not supported by the evidence.  Mr. Sciacca did not ask that any reference to the Beastie Boys be embodied in the Video Advertisement, rather, he explicitly only asked Monster to include the text "Download the mix for free at http://ztrip.bandcamp.com." (Pl. Ex. 134; Tr. 468:4-469:8.)  The decision to include the "Beastie Boys" name in the text of the Video Advertisement and then again in its Facebook posing was Monster's alone. (Tr. 11155:8-1156:3.)[4]  In fact, the Facebook posting goes even further and uses the Beastie Boys name twice: "Beastie Boys megamix by Z-trip.  Download "All-Access A Beastie Boys Megamix" here[.]" (Pl. Ex. 150, 270.)

---

[4] Monster's self-serving claim that its inclusion of the text "courtesy of Z-Trip" shows that Monster intended to identify Mr. Sciacca as the source of the music rather than the Beastie Boys has no basis in fact.  If it was truly Monster's intent to avoid an association with the Beastie Boys, it would have complied with Mr. Sciacca's request to simply include a link and not made specific reference to the band or the recently deceased Mr. Yauch.

Monster's multifaceted use of Plaintiffs' music, names, marks, identity and persona does not constitute nominative fair use. (Pl. Exs. 134, 150, 165, 200, 270, 276; Tr. 1156:4-1157:6, 1162:25-1166:22.)  A recent decision involving claims for copyright infringement and false endorsement against the operators of a website by the hip-hop artist Curtis Jackson (commonly known as 50 Cent), is instructive in this regard.  In *Jackson*, defendants had included Mr. Jackson's image on the website and included a link that featured one of Mr. Jackson's trademarks and directed a user to a webpage containing downloads of a series of "G-Unit Radio" mixtapes. 2014 WL 1202745, at *2.  Defendants' sought summary judgment on plaintiffs' claims based on the doctrine of nominative fair use, arguing that they only used Mr. Jackson's G-Unit mark to accurately identify the mixtapes. *Id.* at *13-14.  In denying summary judgment, Judge Keenan found that the context and placement of the "G-Unit Radio" button "on the masthead along with members of G-Unit could imply false affiliation or endorsement by Jackson, the owner of the 'G-Unit mark.'" *Id.* at *14.

In this case, the context, placement and use of the Beastie Boys music, names, marks, identity and persona for the Video Advertisement falsely implied that Plaintiffs were affiliated with or endorsed the Video Advertisement and Monster's products.  As the jury logically concluded after being presented with this evidence, Monster used the Beastie Boys' names and music, and this use was meant to suggest an association or endorsement by the band.

### B.   The Jury Properly Found That Monster's Use of the Beastie Boys' Names And Music Resulted In A Likelihood Of Confusion

Monster argues that Plaintiffs failed to prove likelihood of confusion.  In analyzing whether a likelihood of confusion exists under the Lanham Act, courts in this Circuit employ the familiar test set forth in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961).  In false endorsement cases, courts adjust these factors as appropriate. *Jackson*, 2014 WL 1202745,

at * 9. The Court thus properly instructed the jury to consider the following factors to analyze

the likelihood of confusion: the level of recognition the Beastie Boys have among purchasers of

Monster's products; the similarity between the Beastie Boys' music and names and the music

and names used by Monster; any evidence of actual confusion regarding whether the Beastie

Boys endorsed Monster's products; Monster's intention in selecting the Beastie Boys' music and

names; and the sophistication of Monster's potential customers. (Tr. 1615:14-1616:13.)  The jury

had ample evidence from which to find a likelihood of confusion on these factors, and Monster

cannot establish that this finding was clearly erroneous.[5]

    *Recognition of the Beastie Boys by Monster's Purchasers.*  The evidence at trial

established that Beastie Boys have a high level of recognition among purchasers of Monster's

products. Beastie Boys, including Mr. Yauch under his performing name MCA,[6] through their

music, performances, television appearances, awards and charitable work, have earned an iconic

status and an extremely high level of recognition. (*E.g.*, Tr. 102:11-105:20.)  They are a

multigenerational band that has sold over 40 million albums, released eight studio albums

between 1986 and 2011, and have been inducted into the Rock and Roll Hall of Fame.

(Tr. 526:14-527:21.)  Indeed, Monster's damages expert, John Albert, corroborated Beastie

Boys' high level of recognition and celebrity stature. (Tr. 1476:25-1477:12.)

    The jury was presented with a evidence that Beasties Boys and Mr. Yauch's level of

recognition by Monster's target demographic is particularly strong, and that the audience for

---

[5] The *Brown v. Twentieth Century Fox Film Corp.*, 799 F. Supp. 166 (D.D.C. 1992), and *Seale v. Gramercy Pictures*, 968 F. Supp. 918 (E.D. Pa. 1997) cases relied upon by Monster are readily distinguished: neither involved the use of the plaintiffs' names, marks, or music, and rather involved limited use of the plaintiffs' image or likeness.

[6] Mr. Yauch was widely and publicly known as MCA.  When the band was inducted into the Rock and Roll Hall of Fame in 2012, Mr. Yauch was inducted under that name, and the New York City Parks Department refers to Mr. Yauch as MCA in its description of the memorial park named for Mr. Yauch in Brooklyn. (Tr. 254:10-255:2.) MCA's musical achievement and philanthropy were substantial and well known.  As Mr. Sciacca testified, "he was like a John Lennon to the people of my generation." (Tr. 458:9-10.)

Plaintiffs' music overlaps with the market for Monster's products.  The Beastie Boys have a close association with snowboarding, the subject of the Video Advertisement. (Tr. 877:5-15.) Monster sponsors bands in connection with its marketing strategy, and affirmatively seeks to be affiliated with musical acts. (Pl. Exs. 221, 238.)  In fact, one of the four pillars of Monster's brand strategy—along with action sports, gaming and girls—is music. (Tr. 1048:2-1050:6, 1403:1-21.)  Indeed, Monster's own Director of Music Marketing testified that the audience for Beastie Boys' music is "similar to the Monster consumer." (Tr. 1379:7-8.)

*Similarity Between the Music and Names.*  This factor strongly favors a finding of likelihood of confusion because the evidence at trial showed, and Monster conceded, that Monster used the Beastie Boys' actual music and actual names. (Pl. Exs. 150, 165, 200, 270, 276; Tr. 1162:25-11-1166:22.)  The jury properly heard testimony that Monster's incorporation of the slogan "RIP MCA" into the Video Advertisement, printed in Monster's signature green trade dress, further communicated a false affiliation or endorsement by Plaintiffs using Beastie Boys' actual marks.[7]

*Actual Confusion.*  As the Court instructed the jury, the Beastie Boys do not need to show that any specific person was actually confused for the jury to find a likelihood of confusion. While Monster stretches in the Motion to suggest otherwise, "it is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." *Lois*

---

[7] As discussed further below, it was Defendant's counsel, not Plaintiffs, that elicited from Lisa Thomas her opinion on various factors showing an endorsement.  As a result, Monster's criticism of Ms. Thomas's testimony that the appearance of the text "RIP MCA" in the Video Advertisement printed in Monster green "suggests an intimacy with Mr. Yauch" (Monster Br. at 15) is waived by their inviting the testimony; in any event, it is logically unpersuasive. The jury could properly conclude based on its own common sense that the use of a recently deceased celebrity's name in an advertisement incorporating (a) the artist's name in the advertiser's signature color and trade dress, (b) a soundtrack comprised entirely of five of the artist's songs, and (c) the offer of a download of the artist's music, suggests an intimacy with that celebrity (here MCA) and suggests an endorsement.

*Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986); *see also Geisel v. Poynter Products, Inc.*, 283 F. Supp. 261 (S.D.N.Y. 1968) (no requirement in a false endorsement case to prove that customers were actually deceived).

    *Monster's Intention in Selecting the Beastie Boys Music and Names.* Monster's reliance on a sophisticated marketing program featuring online videos enabled it to avoid the significant costs associated with traditional advertising. (Tr. 1048:2-1050:6, 1050:7-1053:6, 1403:1-21; Pl. Ex. 221, 238.) Instead, Monster focused its $120 million advertising budget on supporting its four marketing pillars (music, sports, video games and girls). (*Id.*) Monster clearly lacked, however, any policy for clearing third-party intellectual property rights in connection with its online campaign. (Tr. 1055:20-1057:7, 1278:17-1279:4, 1134:17-1141:9.) Although Beastie Boys aligned perfectly with Monster's marketing plan because they matched well with Monster's demographic, Monster decided not to approach Beastie Boys because Monster could not afford them. (Tr. 1378:23-1379:12; Dep. Tr. 85:25-86:11.) In the context of this marketing strategy, Monster's desire to use Plaintiffs' music, Monster's acknowledged inability to afford such a use, and Monster's lack of any policy to avoid infringement, is further evidence of both a likelihood of confusion and Monster's bad faith. *See Jackson*, 2014 WL 1202745, at * 12 (finding defendant's knowledge of plaintiff's persona and intent to capitalize on plaintiff's fame and goodwill "provided sufficient evidence for a jury to conclude that this factor weights in [plaintiff's] favor"); *see also Allen*, 610 F. Supp. at 628 (failure to include disclaimer with unauthorized use "supports finding of, at best, dubious motives.").

    *Sophistication of Consumers.* Monster's own expert on marketing and branding testified that energy drinks are an impulse purchase. (Tr. 1434:6-14.) Impulse buyers are generally regarded as "unsophisticated casual purchasers," *Home Shopping Club, Inc. v. Charles of the*

*Ritz Grp., Inc.*, 820 F. Supp. 763, 773 (S.D.N.Y. 1993), who would be particularly susceptible to Monster's misleading Video Advertisement.

In total, the likelihood of confusion evidence presented to the jury at trial is hardly "paltry" as Monster suggests. (Monster Br. at 15.) The *Polaroid* factors relevant to a false endorsement claim under the Lanham Act strongly supported a finding that Monster's use of the Beastie Boys music and names in the Video Advertisement and associated press and social media releases was likely to cause consumer confusion as to whether Plaintiffs' sponsored or approved the Video Advertisement and Monster's products.

**C.    Evidence Of Monster's Intentional Deception Supports The Monetary Damages Awarded By The Jury**

To receive an award of actual damages for false endorsement under the Lanham Act, "the plaintiff must prove either actual consumer confusion or deception resulting from the violation, or that the defendant's actions were intentionally deceptive." *GMA Accessories, Inc. v. POP, LLC*, 765 F. Supp. 2d 457, 469 (S.D.N.Y. 2011) (quoting *Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.*, 145 F.3d 481, 493 (2d Cir. 1998)). After considering all of the evidence presented at trial, the jury determined that Plaintiffs had shown that Monster intentionally deceived consumers regarding whether Plaintiffs had endorsed Monster's products.

When viewed collectively, the facts and circumstances surrounding Monster's unlawful use of the Plaintiffs' trademarks, names and music rises to the level of intent. *Cf. In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 497 (S.D.N.Y. 2005) (citing *U.S. v. Bank of New England, N.A.*, 821 F.2d 844 (1st Cir. 1987)) (proof of corporate intent in securities fraud case may be show by aggregating knowledge and intent of all employees). Monster's marketing strategy is based on non-traditional methods, including publishing video content online. Notwithstanding its heavy reliance on the posting of such advertising videos, the evidence

-18-

showed clearly that Monster did not have any policy or procedure for clearing third-party intellectual property rights in that published content. (Tr. 1055:20-1057:7, 1278:17-1279:4, 1134:17-1141:9.)  Furthermore, the Director of Music Marketing warned the company about its lax approach to music licensing. (Pl. Exs. 189, 195.)  Ultimately, Monster ignored these potential dangers and warnings, because their marketing strategy was successful and the company was making money and saving money by avoiding more traditional advertising purchases.

Stated another way, Defendant chose to engage in a marketing strategy based on the posting of videos to the web in part to save money on advertising.  Despite that strategy, and despite warnings about the risk, Monster chose to operate without any effective policy concerning third party intellectual property and chose to rely on employees with no training or experience in rights clearance whatsoever.  Defendant's employees then chose to produce and approve the posting of the Video Advertisement utilizing the Beastie Boys music and names despite knowing that it could not afford to pay for such use.  When viewed together, this affirmative conduct rises to the level of intentionally deceptive conduct and bad faith that allows for recovery of damages under the Lanham Act. *See Borghese Trademarks Inc. v. Borghese*, 2013 WL 143807 (S.D.N.Y. Jan. 14, 2013) (defendants intention to take advantage of a valuable name suggested bad faith).[8]   The jury explicitly found that Monster acted in "bad faith" in suggesting a false endorsement of its products by Plaintiffs.

---

[8] On a Lanham Act claim, a plaintiff may also recover an accounting of an infringer's profits where that infringer acted in bad faith. *See Int'l Star Class Yacht Racing Assoc. v. Tommy Hilfiger, U.S.A., Inc.*, 80 F.3d 749 (2d Cir. 1996).  In that context, bad faith can be shown where the infringer's acts were done "wantonly and maliciously and in reckless disregard of [plaintiff's] rights." *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1541 (2d Cir. 1992).  As this Court noted during argument on Monster's motion for a directed verdict, no case expressly precludes a plaintiff from recovering damages where those damages were caused by the infringer's reckless conduct (Tr. 1216:15-1217:17), and Defendants do not cite one here.  Although Beastie Boys submit that they presented sufficient evidence at trial that allowed the jury to find that Defendant's conduct was intentionally deceptive, at the very least, the evidence at trial showed that Monster evinced a reckless disregard for Beastie Boys intellectual property rights.

**D.    Monster's Use Of Multiple Copyrighted Works Was Properly Introduced At Trial And The Jury's Consideration Of That On The False Endorsement Claim Was Proper**

Defendant attempts to upset the false endorsement verdict by arguing that the Beastie Boys' false endorsement claim cannot be based on the use of copyrighted music in the Video Advertisement.  This argument overlooks the fact that this claim extends well beyond the soundtrack of Video Advertisement, to include the social media, marketing, and public relations around the advertising, each of which contains elements (beyond the Copyrights) that the jury ruled likely misled or confused consumers as to whether the Beastie Boys endorsed Monster's products.  Indeed, the Beastie Boys' claim is clearly based on a number of factors that, when viewed as a whole, shows a false endorsement.

The false endorsement claim is supported by far more than the mere use of a copyrighted work:  five different works were featured in the Video Advertisement; these musical works incorporated famous hooks, lyrics and refrains from iconic Beastie Boys songs, including the Beastie Boys' very identifiable voices, references to the titles of the recordings and to the Beastie Boys' stage names; the music was used as essentially the entire soundtrack of a four-plus minute advertisement; Defendant also made explicit use of the Beastie Boys name in the Advertising Video, its YouTube channel, and Facebook page, and explicitly referenced the death of Mr. Yauch.  (Pl. Exs. 145, 146, 150, 200, 211.)  Viewing all of these factors together, as the Court properly instructed that the jury should, the jury decided that the Video Advertisement created a false endorsement.  That finding was supported by the evidence, by logic, and by the law.

In the face of such evidence, Defendant argues that "an artistic work *itself* cannot form the basis of a false endorsement claim."  (Defendant's Br. at 7) (emphasis supplied).  The predicate for this argument, the ruling in *Oliveira v. Frito-Lay, Inc.*, 251 F.3d 56 (2d Cir. 2001), is entirely inapposite.  In *Oliveira*, unlike here, the defendants had secured all rights necessary to

use the a recording of the plaintiff's performance, made no reference to plaintiff whatsoever, and made no use of her persona.  251 F.3d at 62.  Likewise, Defendant's argument that the Beastie Boys cannot rely *solely* on the Copyrights as a basis for their false endorsement claims, relying on *EMI Catalogue v. Hill, Holiday, et al.*, 228 F.3d 56 (2d Cir. 2000) and *Henley v. DeVore*, 733 F. Supp. 2d 1144 (C.D. Cal 2010), is unavailing, as the totality of Defendant's conduct consists of far more than the mere use of the Beastie Boys' copyrighted musical works.  *See, e.g., DeVore*, 733 F. Supp. 2d at 1168 ("Plaintiffs cannot maintain a Lanham Act claim *based purely* on the use of Henley's songs") (emphasis added).  Accordingly, Defendant's use of the Copyrights as the soundtrack of the Video Advertisement can, in the context of all of the evidence, be part of the basis for the Beastie Boys' false endorsement claim.  It is the totality of this evidence, and all of the surrounding circumstances, from which the jury may  (indeed, must) determine whether an actionable false advertising has occurred.

In any event, the jury's consideration of the five Beastie Boys songs on the false endorsement claim need not even be reached here, because it was Defendant that first introduced the evidence that it is now complaining about, and, further, failed to preserve the issue for the instant Motion.  The record is clear that Beastie Boys were extremely careful in soliciting the testimony of their damages expert, Lisa Thomas, to make clear that she was did opine as to whether the use of Plaintiff's music actually created an association but rather to discuss what factors went into her damages calculation assuming that such an association exists: "[w]ithout talking about -- without discussing your own view as to whether an association was made, can you describe the context of the use that was made here that would affect the valuation of the endorsement fee that you're talking about." (Tr. 551:23-552:7.)  Indeed, when Ms. Thomas made

-21-

a passing reference to the association, the Court stopped her, struck the testimony and provided a clear limiting instruction on this point. (Tr. 552:8-553:1.)

However, it was Defendant — on its own cross-examination of Ms. Thomas — that specifically solicited Ms. Thomas's testimony as to whether an implied endorsement occurred: "Just so I'm clear – I don't want to be confusing – I'm not talking about how you valued the endorsement. I'm talking about the factors you took into consideration in determining that an endorsement existed." (Tr. 722:15-25.) In fact, Defendant repeatedly and explicitly sought testimony from Ms. Thomas regarding whether an implied endorsement occurred and whether the use of the Beastie Boys' music was a factor in her determination that such an endorsement occurred. (Tr. 728:14-729:24, 803:10-16, 811:21-812:1, 813:21-814:4.) Having itself elicited this testimony, Defendant cannot now claim that the jury verdict in Plaintiffs' favor must be overturned based on an argument that such testimony was improper.

Finally, Monster is precluded from raising this issue now, because it failed to do so in connection with its motion for a directed verdict. *See AIG Global Secs. Lending Corp. v. Banc of Am. Secs, LLC*, 386 Fed. Appx. 5, 6 (2d Cir. 2010) (post-verdict motion for judgment as a matter of law is limited to those grounds that were specifically raised in the pre-verdict motion). During the course of Monster's directed verdict motion, it did not claim that the use of Plaintiffs' music could not support their false endorsement claim. (Tr. 1192:22-1224:3.) The use of Beastie Boys' music as a basis for Plaintiff's false endorsement claim was clearly in play, as much of Defendant's directed verdict motion was spent discussing examples where the use of a person's music, and only their music (such as the use of Bob Seger's song "Like a Rock" in the Chevrolet commercials) could constitute an implied endorsement. (Tr. 1196:17-1197:21.) In fact, with respect to the issue of whether the use of Plaintiffs' music could contribute to a basis for a

-22-

reasonable juror to find that false endorsement, the Court specifically asked "why aren't we over the line here with five songs spread over four minutes and in case there was any ambiguity, the actual name is reproduced?" (Tr. 1199:14-16.)  Monster did not argue, as it does now, that those "five songs spread over four minutes" could not legally be a basis for Plaintiff's false endorsement claim, either at that point or at any other point during its directed verdict motion. Because Monster failed to make this argument on its motion for a directed verdict, Monster must be precluded from making it for the first time on this motion.

## IV.   THE DAMAGES AWARDED ARE REASONABLE

The jury's verdict was not excessive, and this Court should not exercise its discretion to reduce the damages awarded as Monster requests.  In support of their actual copyright damages, Beastie Boys introduced over a decade's worth of their copyright licensing history to provide a complete picture of comparable copyright licensing fees for the jury to base its damages determination. (Pl. Exs. 211, 219, 220, 265.)[9]  To establish the value of Plaintiffs' implied endorsement, the jury was presented with testimony from Ms. Thomas that identified three similar endorsements by iconic musicians and celebrities reflecting a range—some higher and some lower—for comparable uses. (Tr. 746:7-749:8.)  These comparable licensing and endorsement fees clearly established that Plaintiffs' music catalogue and endorsement are extremely valuable.  The jury's decision to award $1 million in actual copyright damages and $500,000 for Plaintiff's implied endorsement was supported by the comparable amounts presented to the jury and very fairly reflects that high value of Plaintiffs' intellectual property.[10]

---

[9] Because the jury's award of statutory copyright damages exceeds its award of actual copyright damages, Plaintiffs intend to elect the higher statutory award.  However, Defendants seek to reduce both of the jury's copyright damage awards.  As discussed herein, both copyright damages awards by the jury are fully supported by the record.

[10] Monster's reliance on *Zervitz v. Hollywood Pictures*, 995 F. Supp. 596 (D. Md. 1996), is misplaced.  There, while upholding an award of close to $600,000 for profits,  the court determined that an award of $222,000 in actual (footnote continued)

In fact, Monster's own conduct and the testimony of its own experts supports that high valuation. The testimony at trial showed that Monster emphasizes music in its marketing as one of its four brand "pillars," and the evidence showed that Monster has spent significant sums of money to become affiliated with famous (albeit less statured) artists.  In fact, Monster paid the guitarist Slash $750,000 for an endorsement deal that primarily included the use of his name and a one-hour performance. (Tr. 1060:9-1062:17.)  Monster's own expert admitted on cross examination that he had provided expert opinions suggesting substantial damage awards for Internet only, short term uses such as the use in this case. (Tr. 1567:22-1577:12.)

Monster also argues that the jury's verdict should be reduced because it did not receive enough of a benefit for unlawfully using Plaintiffs' trademarks and copyrights.  However, as Ms. Thomas testified, copyright license and endorsement fees are not dependent on the success of a marketing campaign. (Tr. 836:14-837:10.)[11]

Finally, Monster's argument that the jury's statutory damages award should be reduced must be rejected.  As discussed above, *supra* at III., Monster's infringement was willful.  The Court, without objection, properly charged the jury on the factors it could consider in determining statutory damages; indeed, the Court gave an instruction specifically informing the jury that it should consider the fact that Plaintiffs were, collectively, recovering for both the musical composition and sound recording copyrights and thus the jury should consider whether

---

damages for infringement of a six-page move synopsis written by a writer whose only other experience was writing a short feature for which he was paid $800 was excessive  and reduced that award to $75,000. *Id.* at 600.  Here, Plaintiffs have received license fees in excess of the $100,000 per copyright award on multiple occasions including $800,000 for both sides of just one musical composition and sound recording (Pl. Exs. 219, 220, 265), and the jury reasonably calculated the value of Monster's use of the Copyrights and marks.

[11] Monster continues to take issue with Ms. Thomas's valuation methods (Monster Br. at 23-25), however, as this Court determined each of the three times Monster sought to preclude Ms. Thomas's testimony at trial (Dkt. Nos. 89, 96, 119), Ms. Thomas articulated a reasonable basis for her opinions.  Accordingly, Monster's argument that Ms. Thomas's had no basis, relying on *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 214 (S.D.N.Y. 2009), must be rejected.

damages would constitute double recovery. (Tr. 1613:4-1614:7.)  In considering the factors for determining an award of statutory damages, the jury reasonably found that Plaintiffs were entitled to an award of $120,000 per Copyright (a fully twenty percent less than the maximum amount the jury could have awarded).[12]  That reasoned view, based on proper instructions by the Court, should not be disturbed.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Monster's motion for judgment as a matter of law, or, in the alternative, for a new trial, together with such other and further relief as the Court may deem just and proper.

Dated:  New York, New York
        August 26, 2014

                    Respectfully submitted,

                    SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

            By:     _____/s/ Kevin R. Puvalowski_____
                    Kevin R. Puvalowski, Esq. (KP-0091)
                    Paul W. Garrity, Esq. (PG-3492)
                    Kenneth B. Anderson, Esq. (KA-9923)
                    Thomas M. Monahan, Esq. (TM-1984)

                    30 Rockefeller Plaza
                    New York, New York 10112
                    Tel:    (212) 653-8700
                    Fax:    (212) 653-8701

                    *Attorneys for Plaintiffs*

---

[12] Determining the amount of a statutory damages award is an inherently subjective and fact intensive exercise as the finder of fact may consider multiple factors including:  "the expenses saved and the profits earned by the defendant, the revenues lost by the plaintiff, the deterrent effect on the defendant and third parties, the defendant's cooperation in providing evidence concerning the value of the infringing material, and the conduct and attitude of the parties." *Nat'l Football League v. PrimeTime 24 Joint Venture*, 131 F. Supp. 2d 458, 473-74 (S.D.N.Y. 2001) (quoting 2 WILLIAM F. PATRY, COPYRIGHT LAW & PRACTICE at 1172-73).