UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

BEASTIE BOYS, et al.,

                        Plaintiffs,

            v.

MONSTER ENERGY COMPANY,

                      Defendant.

------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/4/2014

12 Civ. 6065 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Between May 27 and June 5, 2014, the Court presided over a jury trial in which the hip-hop group the Beastie Boys and affiliated plaintiffs[1] (collectively, the "Beastie Boys") pursued claims against Monster Energy Company ("Monster"), the beverage company. The jury found in the Beastie Boys' favor on both of their claims: for copyright infringement in violation of the Copyright Act, 17 U.S.C. § 101 *et seq.*, and false endorsement in violation of the Lanham Act, 15 U.S.C. § 1051 *et seq.* These claims arose out of Monster's creation and dissemination of a promotional video that, without the Beastie Boys' knowledge or permission, used portions of five songs composed and recorded by the Beastie Boys as its soundtrack and included other references to the Beastie Boys. The jury awarded the Beastie Boys, on the copyright claim, alternative awards of $1 million in actual and $1.2 million in statutory damages; and on the Lanham Act claim, $500,000 in damages, the jury having found that Monster had intended to deceive consumers, a prerequisite to awarding money damages for a Lanham Act violation.

---

[1] The Beastie Boys are a New York partnership. The other plaintiffs are Michael Diamond, a Beastie Boys member; Adam Horovitz, a Beastie Boys member; Dechen Yauch, executrix of the Estate of Adam Yauch, a late Beastie Boys member; and Brooklyn Dust Music, a distinct entity through which the Beastie Boys did business.

This decision resolves Monster's post-trial motions.  Monster moves for a judgment as a matter of law under Federal Rule of Civil Procedure 50.  As to the Copyright Act claim, Monster argues that the evidence was insufficient to support the finding of willful infringement on which the award of enhanced statutory damages was based.  As to the Lanham Act claim, Monster argues that the evidence was insufficient to support either a finding of a false endorsement or that Monster acted with intentional deception.  Monster alternatively moves for a new trial under Rule 59 or for a reduction in damages.  For the following reasons, Monster's motions are denied.

## I.   Background

### A.   Factual Background

#### 1.   The Parties

The Beastie Boys are a famous hip-hop group that was inducted into the Rock and Roll Hall of Fame in 2012.  *See* Trial Transcript ("Tr.") 103–05, 526–28, 869.  During their recording career, which dates to the early 1980s, the Beastie Boys were composed of three members: Adam Horovitz, who goes by the stage name "Ad-Rock"; Michael Diamond, who goes by the stage name "Mike D"; and Adam Yauch, now deceased, who went by the stage name "MCA." Tr. 105–06, 864, 870.  As of trial, the Beastie Boys had sold more than 20 million albums in the United States and 40 million worldwide.  Tr. 527, 1477.  The Beastie Boys have licensed their music for movies, television shows, sporting events, charitable causes, and other creative projects, but rarely, if ever, for product advertisements.  Tr. 118–20, 275, 864–65.[2]  On May 4, 2012, Yauch died of cancer.  Tr. 106, 458–59.  The surviving members of the Beastie Boys have

_____

[2] At trial, Monster elicited evidence that in 2011, the Beastie Boys had licensed four songs for use in snowboarding videos produced by Nixon, a watch company.  Tr. 137–38, 873–74, 886–88.  The group also authorized Nixon to create a watch bearing Diamond's image.  Tr. 125, 275, 871.  Horovitz and Diamond testified that they had agreed to this use of their songs and Diamond's image because Nixon's co-founder was a friend of Diamond's, Tr. 136, 871, and that they donated the proceeds they earned from the watch sales to charity, Tr. 134, 872–73.

since stated that they will no longer continue their careers as a group, in deference to Yauch.  *See* Tr. 864.

Monster is a well-known energy drink company.  Tr. 997.  It is known for its imaginative and decidedly non-traditional approach to advertising.  Rather than promoting its drinks in television ads or on billboards, as do many other beverage companies, Monster engages in what it calls "lifestyle marketing."  This entails sponsoring action-sport athletes and musicians, promoting concert and "festival-styled" tours, and hosting events.  Tr. 1059, 1351–54; PX 221. Monster's advertising goal is to create an aggressive and fun "brand personality," which will lead consumers to associate its beverages with music, action sports, video games, and attractive girls.  Tr. 1001–02; PX 221 ("Monster is a lifestyle in a can.").

Among the key demographic groups that Monster seeks to reach are fans of extreme sports and hip-hop music.  At one point, Monster's director of music marketing considered approaching the Beastie Boys about a sponsorship agreement, believing that the Beastie Boys' core "audience was similar to a Monster consumer."  Tr. 1379.  However, he determined that Monster's budget did not permit it to hire such a prominent group.  *See* Tr. 1379.

## 2. The Infringing Video

As part of its marketing efforts, Monster organizes and sponsors an annual event called the "Ruckus in the Rockies," which consists of a snowboarding competition and an after-party. Tr. 1092–93.  On May 5, 2012, coincidentally the day after Yauch died, Monster held the second annual Ruckus in the Rockies at Lake Louise in Alberta, Canada.  Tr. 1101–03; PX 145, PX 200. Monster booked various disc jockeys ("DJs") to perform at the after-party.  Tr. 359, 454, 1096.

One such DJ was Zach Sciacca, who records and performs under the name "Z-Trip."  Tr. 356, 954, 964–65, 1096–99; PX 145, PX 200.  In early 2011, Z-Trip had entered into an

agreement with the Beastie Boys to create a remix of some of their songs to promote the group's then-upcoming album, "Hot Sauce Committee Part II."  Tr. 194–96, 278–279, 356–57, 954–58, 969.  Under the agreement, Z-Trip was authorized to offer the remix for free as a promotional item.  However, Z-Trip did not have the right to sell or license the remix, or to authorize third-parties to use it.  Nor did he obtain any rights to the underlying Beastie Boys songs.  *See* Tr. 278–279, 306, 358–59, 973, 975–76.  On April 30, 2011, Z-Trip posted the remix on his website, where fans could download or stream it for free.  Tr. 197–98, 359, 446–47, 451, 971–72; DX 88.  The remix was entitled "Beastie Boys All-Access Megamix" (the "Megamix").  *See* Tr. 429–30.

At the 2012 Ruckus in the Rockies after-party, Z-Trip performed for 90 minutes.  Tr. 457.  His set included Beastie Boys music, in part to honor Yauch; other DJs also played music by the Beastie Boys.  Tr. 457–58.  At some point, Z-Trip said to the crowd, "Rest in peace, MCA."  Tr. 459.

Soon after the 2012 Ruckus, Monster's regional marketing director, Nelson Phillips, worked with videographer Clayton Larsen to create a recap video with highlights from the event.  Tr. 1114–16.  Phillips intended to use the video to promote the Monster brand.  Tr. 1159, 1163.  For the video's soundtrack, Phillips directed Larsen to use excerpts from Z-Trip's Megamix of Beastie Boys songs.  Tr. 1114–15.  Monster never obtained, or attempted to obtain, permission from the Beastie Boys or their management to use the Beastie Boys' music in the video.  *See, e.g.*, Tr. 121–22, 256, 875–76, 1115–16, 1173, 1316–17.

At trial, Phillips testified that he believed that Z-Trip, by his words and conduct, had authorized Phillips to use the Megamix, including the underlying Beastie Boys' songs, in Monster's promotional video.  Tr. 1115–16; *see also* Tr. 1170 (Phillips) ("Q.  [Y]ou thought you'd obtained a license from Z-Trip, is that right?  A.  More or less, yes.").  Phillips testified

that Z-Trip had conveyed this authorization to him orally, during a conversation in the after-party's "green room"; Z-Trip denied having any such conversation, or giving any such authorization, or telling anyone at Monster that he had any rights in the Beastie Boys' music. *See* Tr. 369–70, 456–57, 496.  Phillips further claimed that Z-Trip's authorization to use the Beastie Boys' songs in the promotional video could be inferred from a short email exchange in which he sent the video to Z-Trip for "approv[al]," and Z-Trip responded, "Dope!"  Tr. 1119, 1121; PX 134.  This email exchange, and Phillips' and Z-Trip's respective accounts of their oral communications—both relevant to plaintiffs' claim of willful copyright infringement—are reviewed at length *infra*, pp. 20–23.

Monster's promotional video is just over four minutes long.  *See* PX 211 ("video").  It consists of footage from the 2012 Ruckus, including a road trip to Lake Louise, the snowboarding competition, and the after-party.  Monster's green logo is ubiquitous in the video: It appears, among other places, on apparel, snowboarding ramps, banners surrounding the snowboarding course, and cans of Monster energy drinks held by promotional models and DJs. The Beastie Boys' music is also ubiquitous:  The video's soundtrack consists of excerpts from five Beastie Boys songs: "Pass the Mic," "So Whatcha Want," "Sabotage," "Looking Down the Barrel of a Gun," and "Make Some Noise."  The video does not contain any voice-overs, narration, or interviews; the Beastie Boys' music, which fills all but 32 seconds of the video, is the main aural event.

Near the end of the video, the credits roll in neon green and grey text, Monster's official brand colors.  In pertinent part, the credits read:

MUSIC
ALL-ACCESS BEASTIE BOYS MEGA MIX
COURTESY OF Z-TRIP

DOWNLOAD THE LINK FOR FREE AT
ZTRIP.BANDCAMP.COM

Video at 3:51–3:53.  The next screen reads "RIP MCA."  *Id.* at 3:54–3:58.[3]

On May 9, 2012, Monster posted the video on its website, YouTube channel, and Facebook page.  *See* Tr. 307, 531, 1119–21, 1124–26, 1266; PX 135, PX 142, PX 150, PX 200, PX 270.  The description of the video read: "Beastie Boys Megamix by Z-Trip.  Download 'All-Access A Beastie Boys Megamix' here: http://ztrip.bandcamp.com."  PX 135, PX 150, PX 270; *see also* Tr. 708, 835.  Monster also sent press releases to various snowboarding magazines and websites; these included the same language.  Tr. 1126–29; PX 165, PX 276.  "Dozens" of websites posted Monster's release verbatim, including the reference to the Beastie Boys Megamix.  *See* PX 165; *see also, e.g.*, PX 164, PX 276.

A few weeks later, Monster received a letter from counsel for the Beastie Boys, which stated that Monster did not have permission to use the Beastie Boys' music in the video.  Tr. 1129, 1269.  Phillips immediately removed the video from Monster's YouTube channel.  Tr. 1130.  Phillips and Larsen later edited the video, to replace the music and remove the references to the Beastie Boys, and then reposted it.  Tr. 1130–31, 1277.  As of August 2012, the video had been viewed 13,341 times.  Tr. 1275–76.

**B.    Pre-Trial Procedural History**

**1.    The Beastie Boys' Complaint**

On August 8, 2012, the Beastie Boys filed suit against Monster in this District.  Dkt. 1 ("Compl.").  Factually, the Complaint alleged that Monster, without the Beastie Boys' consent, had used the Beastie Boys' songs in the video, that Monster had thereby sought to associate its

---

[3] The video is described in detail, *infra* pp. 31–33, in the course of the Court's analysis of whether the video conveyed an implied endorsement by the Beastie Boys of Monster and its products.

products with the Beastie Boys and to convey the Beastie Boys' endorsement of Monster, that the video text had included the names "Beastie Boys" and "MCA" for the same purpose, and that Monster had posted links to the video on various websites to advertise and promote Monster's products, events, and corporate goodwill.  Compl. ¶¶ 58–68.

Based on these allegations, the Beastie Boys asserted claims of copyright infringement in violation of the Copyright Act, and false endorsement in violation of the Lanham Act.  As to copyright, the Beastie Boys asserted two claims of infringement for each of the five songs[4] used in the video: one for infringement of the Beastie Boys' sound recording copyright, and another for infringement of Brooklyn Dust's musical composition copyright.  Compl. ¶¶ 70–100.  In each of these 10 claims, the Beastie Boys alleged an "unauthorized reproduction," "distribution to the public, "and public performance" that was "intentional and willful."  *Id*.  In their Lanham Act claim, the Beastie Boys alleged that Monster had made unauthorized use of the mark "Beastie Boys" and "the marks comprised of the legal and professional names" of individual members. *Id*. ¶¶ 109–17.  As a result, the Beastie Boys alleged, "the public was confused into believing that plaintiffs sponsored, endorsed, and are associated with defendant Monster in promoting Monster's products and promotional events."  *Id*. ¶ 114.

---

[4] The Complaint originally identified only four Beastie Boys songs used in the video: "So Whatcha Want," "Sabotage," "Looking Down the Barrel of a Gun," and "Make Some Noise." Compl. ¶¶ 70–100.  Later, however, a music analyst discovered that the video used an excerpt from a fifth Beastie Boys song, "Pass the Mic."  Dkt. 74, at 3.  On March 18, after obtaining leave from the Court, *see* Dkt. 90, at 6–10, the Beastie Boys filed an Amended Complaint that asserted copyright infringement claims for all five songs used in the video.  Dkt. 91, at ¶¶ 33–72. The Amended Complaint also dropped additional claims the original Complaint had asserted under the Copyright Act and New York Civil Rights Law.  *See* Compl. ¶¶ 101–08, 118–22.

On October 4, 2014, Monster filed an Answer.[5]  Dkt. 5 ("Answer").  Monster denied

almost every factual allegation in the Complaint or stated that it lacked knowledge sufficient to

enable it to form a belief as to its truth.  *Id.* ¶¶ 1–122.  Monster also raised 12 affirmative

defenses.  Significant here, several sought to deflect responsibility for any copyright

infringement onto Z-Trip.  In this vein, the Answer asserted that (1) any injury to the Beastie

Boys was due not to Monster but instead to a breach of contract or fraud by Z-Trip; (2) in using

the band's music in its video, Monster had reasonably relied on Z-Trip's apparent authority as an

agent for the Beastie Boys; and (3) Monster had received permission from Z-Trip to use the

Beastie Boys' music.  *Id.* at 13.  Monster also raised the defense of a failure to join a necessary

party, again presumably Z-Trip.  *Id.* at 12.

### 2.    Monster's Third-Party Complaint Against Z-Trip

The following day, October 5, 2012, Monster brought a third-party Complaint against Z-

Trip.  Dkt. 9.  Consistent with the affirmative defenses in its Answer, Monster alleged that Z-

Trip had caused any damage to the Beastie Boys for which Monster might be found liable by (1)

contracting with Monster to allow it to make unrestricted use of the Megamix, and

(2) fraudulently leading Monster to believe that Z-Trip had authority to license the Beastie Boys'

recordings contained in the Megamix.  *Id.* ¶¶ 12–23, 28–33.  Monster based these claims on the

brief interactions between its employee, Phillips, and Z-Trip.  *Id.* ¶¶ 11–12, 15–17.  Specifically,

Monster alleged that Z-Trip had authorized Phillips to use the Megamix in the video in a brief

oral conversation during the Ruckus after-party on May 5, 2012, and in a short email exchange

on May 8, 2012.  *Id.*  As relief, Monster sought, from Z-Trip, indemnification, compensatory and

punitive damages, costs, and fees.  *Id.* ¶¶ 23, 26, 33, 36.

---

[5] On April 1, 2014, Monster filed an Answer to the Amended Complaint, Dkt. 98, which was
substantively identical to the original Answer.

### 3.    Z-Trip's Summary Judgment Motion

On August 1, 2013, following discovery, Z-Trip moved for summary judgment on Monster's claims against him.  Dkt. 36, 37 ("Z-Trip Br."), 38.  As to Monster's contract claim, Z-Trip argued that, as a matter of law, he could not have entered into a contract authorizing Monster to make unrestricted use of the Beastie Boys recordings in the Megamix because (1) he lacked apparent authority to issue a license for the Beastie Boys' music, and (2) his perfunctory exchanges with Phillips could not be read to reflect agreement on material terms of any such license.  Z-Trip Br. 7–14.  As to Monster's fraud claim, Z-Trip argued that no reasonable person could have believed that he had authority to license the Beastie Boys' music for use by Monster in a promotional video.  *Id.* at 15–18.  The Beastie Boys filed a memorandum supporting Z-Trip's motion.  Dkt. 39.

On November 4, 2013, the Court granted summary judgment in favor of Z-Trip on both of Monster's third-party claims.  *See* Dkt. 51, *reported as Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 338 (S.D.N.Y. 2013).  As to the breach of contract claim, the Court held that, based on the "fleeting oral communications" and "ensuing email exchange" between Phillips and Z-Trip, "a reasonable juror could not find an offer, sufficiently clear acceptance, or consideration . . . let alone all three," and thus no contract between Monster and Z-Trip could be found.  *Id.* at 348.  The Court noted that these informal communications, even read in the light most favorable to Monster, did not include any actual or proposed "bilateral exchange"; nor did either party "specif[y] the legal duties [it] was offering to undertake."  *Id.* at 349.  Furthermore, these communications were "too enigmatic and elliptical to constitute the 'clear [and] unambiguous' acceptance necessary for contract formation."  *Id.* at 350 (alteration in original).  The "sparse communications" also did not establish any non-incidental consideration.  *Id.*  Finally, the Court

noted, even assuming that Phillips and Z-Trip had entered into some form of contract, it would have taken "an heroic effort of explication" and "flout[ed] common sense" to interpret the contract to include a license to use the Beastie Boys' music in the video. *Id.* at 351.

As to Monster's claim of fraud, the Court found the record devoid of evidence either that Z-Trip acted with fraudulent intent *or* that Monster had reasonably relied on Z-Trip's representations. *Id.* at 351–53. On the contrary, the summary judgment record reflected that Z-Trip was developing business relationships with Monster and the Beastie Boys, and had had "every incentive" to keep both parties happy. *Id.* at 352. Z-Trip also had sent an email "ruing his failure to prevent Monster's misuse of the Beastie Boys' original recordings," which the Court found difficult to square with the allegations of fraud. *Id.* At the most, the Court held, Phillips could claim to have misunderstood Z-Trip. *Id.* The Court further observed that it had been reckless for Monster "to delegate to Phillips alone the responsibility by which Monster was to acquire, for commercial exploitation, various intellectual [property] rights presumptively belonging to an iconic band" and that "[o]n the record before the Court, Monster had no business entrusting such matters to Phillips." *Id.* A sophisticated corporation like Monster could not have reasonably relied on the "short, casual, and vague" communications between Phillips and Z-Trip as the basis on which rights to five Beastie Boys' songs had been conveyed for Monster to use, for free, in its marketing. *Id.* at 353. Rather, the record appeared to reflect ignorance on Phillips' part as to the need to obtain licenses to use others' music. And "Monster's reliance on Phillips to protect its interest in these matters was perforce unreasonable." *Id.* The Court accordingly dismissed Monster's third-party complaint with prejudice. *Id.*

### C.      Trial

Trial began May 27, 2014.  As witnesses, the Beastie Boys called Horovitz and Diamond, the two surviving band members; John Silva, the band's manager; Z-Trip, the DJ; Lisa Thomas, a damages expert; and Anthony Ricigliano, a musicologist who analyzed the video's use of Beastie Boys' songs.  The Beastie Boys also offered deposition testimony from Lorrie Boula, Z-Trip's manager, and from Monster employees.  Monster, for its part, called four of its employees: Phillips, director of marketing for Monster's Canadian business unit; Leroy Nichols, director of interactive marketing; Brent Hamilton, director of music marketing; and Sam Pontrelli, global head of marketing.  Monster also called two damages experts: Jon Albert and Erich Joachimsthaler.

### 1.      Overview of Disputed Issues

***Copyright claims***:  Shortly before trial, Monster conceded liability as to the claims of copyright infringement, and did so again in its opening statement.  *See* Dkt. 141 ("Pre-Trial Conf. Tr."), at 48; Tr. 91–92.  Accordingly, trial focused on damages.  Under the Copyright Act, a prevailing plaintiff may choose, at any time before entry of final judgment, between actual and statutory damages.  *See* 17 U.S.C. § 504(c).  The parties vigorously litigated both types.

The parties agreed that actual damages were measured by the price that a willing buyer and a willing seller would have agreed upon for a license to use the Beastie Boys' musical compositions and sound recordings in Monster's video.  *See* Pre-Trial Conf. Tr. 84, 87; Tr. 525–26 (Thomas), 1478–79 (Albert).  But, for two reasons, there was no obvious benchmark for determining the cost of such a license.  First, although the Beastie Boys have widely licensed their music for other purposes, it had never done so for a traditional product advertisement.  *See* Tr. 121 (Horovitz), 864–65 (Diamond).  *But see* note 2, *supra*.  Second, Monster's four-minute

web video, disseminated via YouTube, Facebook, and other websites, was a modern, relatively novel form of product advertisement.

As a result, the parties' expert witnesses advocated starkly different methodologies for valuing these licenses.  The Beastie Boys' expert, Thomas, who represents recording artists and songwriters through her company Lisa Thomas Music Services, drew upon the prices historically paid to license the Beastie Boys' musical compositions and sound recordings.  These were set out in two lengthy exhibits chronicling the group's licensing history; these reflected licensing fees for Beastie Boys' songs that reached as high as several hundred thousand dollars for use of a 30-second snippet of a single song in a movie trailer.  *See* PX 219, PX 220.  Although recognizing differences between the genres, Thomas opined that Monster's infringing video was most comparable to a movie trailer "advertising and marketing [a] film."  Tr. 544.  Thomas estimated the market value of a license to use the Beastie Boys' songs in Monster's video as $100,000 for each musical composition and another $100,000 for each sound recording, for a total of $1 million.  Tr. 550.

Monster's expert, Albert, who helps advertisers obtain music rights through his business The Albert Company, opined that the video was more comparable to an entertainment video that also had commercial value.  Tr. 1516-17, 1528–29.  For other non-commercial snowboarding and skateboarding videos, the Beastie Boys have received licensing fees of up to $25,000 per song, or $12,500 for each copyright "side" (musical composition and sound recording).  *See* Tr. 1688–89.  Albert opined that a licensing fee for use of the songs in Monster's video should be valued by first determining the value of a license to use a single Beastie Boys song in all media for one year, *see* Tr. 1474–80, and then discounting that figure to reflect the limited context in which the song appeared (*i.e.,* online only) and its limited duration (five weeks).  Tr. 1483–85.

Albert calculated the total value of a license to use all five songs as between $93,750 and $125,000.  Tr. 1485–87.

As to statutory damages, the parties disputed whether Monster's infringements of the Beastie Boys' 10 copyrights had been willful, innocent, or neither (which the Court and counsel referred to as "regular").  The Copyright Act authorizes statutory damages between $750 and $150,000 for willful infringement; between $200 and $30,000 for innocent infringement; and between $750 and $30,000 for "regular" infringement.  *See* 17 U.S.C. §§ 504(c)(1)–(2); *see also Agence France Presse v. Morel*, No. 10 Civ. 2730 (AJN), 2014 WL 3963124, at *11 (S.D.N.Y. Aug. 13, 2014).  The evidence as to this point is reviewed in detail below, in connection with Monster's Rule 50 challenge to the jury's finding of willfulness.  *See infra* pp. 20–30.  In brief, in arguing for willfulness, the Beastie Boys emphasized Monster's sophistication, its failure to take any steps to inquire into whether it could lawfully use the Beastie Boys' songs in the video, its economic motive to exploit the band's music to promote its beverages to the Beastie Boys' fan base, and the absence of any policies or controls within Monster to assure that its promotional videos respected artists' copyrights.  The Beastie Boys also disputed as false Phillips' claim that Z-Trip had authorized Monster to use the Beastie Boys' music to promote its beverages.  For its part, Monster denied adopting a corporate strategy that facilitated misuse of copyrighted music.  Monster instead depicted Phillips as a lone actor who had inadvertently infringed on the Beastie Boys' copyrights.  Monster argued that Phillips had honestly but mistakenly believed, based on his interactions with Z-Trip, that he had sufficient permission to include the band's music in the video.

***Lanham Act claim***:  On the Lanham Act claim, the parties disputed whether the video would reasonably be viewed as an endorsement of Monster products by the Beastie Boys, and if

so, whether Monster's endorsement was intentionally deceptive, thus authorizing monetary (as opposed to solely injunctive) relief.  The evidence relevant to these issues is reviewed in detail below, in connection with Monster's Rule 50 challenge to the jury's findings of liability and damages on this claim.  *See infra* pp. 30–60.  In brief, the Beastie Boys argued that the video did suggest an endorsement of Monster by the Beastie Boys and that Monster intentionally conveyed this false message; it noted that the video was filled with their songs and also contained textual references to the Beastie Boys and to MCA.  For its part, Monster defended these references as benign:  The reference to "the Beastie Boys," it argued, was added to accommodate Z-Trip, and the reference to "MCA" was a mere homage to Yauch.

As to monetary damages on the Lanham Act claim, the parties agreed that the proper measure was the fair market value a willing buyer would pay a willing seller for such an implied endorsement of Monster by the Beastie Boys.  *See* Tr. 574, 1514.  Thomas, plaintiffs' damages expert, drew on her experience negotiating product endorsement deals for celebrity clients, *see* Tr. 575–77, and estimated the value of such an endorsement fee as $1 million.  *See* Tr. 553, 574. By contrast, Monster's expert, Joachimsthaler—the CEO of a brand consulting company, Vivaldi Partners—opined that the purported endorsement had no value.  Tr. 1422.  He testified that there is "no way" that a viewer would have perceived any association between the Beastie Boys and Monster because the video was not memorable, lacked an image of any band member, and was unlikely to be watched repeatedly by a viewer.  Tr. 1411–14.  Occupying something of a middle ground, Albert, another damages expert who testified for Monster, estimated the value of the use of the Beastie Boys' music and marks in the video and Facebook link at $50,000.  Tr. 1515.

### 2.      Monster's Rule 50(a) Motion

On June 2, 2014, after the Beastie Boys rested, Monster orally moved for a directed

verdict on the Lanham Act claim under Rule 50(a).  Tr. 1192–94.  The Court denied the motion.

Tr. 1223, 1234–35.  The Court, however, invited Monster, in the event of an adverse verdict, to

renew its challenge, this time supported by legal briefing.  Tr. 1220–22.  The Court noted that

even if the Lanham Act claim later proved deficient, Monster was not prejudiced by submitting it

to the jury alongside the Copyright Act claims.  The Court also invited Monster to propose jury

instructions that would minimize the risk that the jury might confuse the standards governing the

two causes of action.  *See* Tr. 1234–35.[6]

### 3.      The Charge Conference

On June 3, 2014, the Court held a conference at which it reviewed its draft jury charge

with counsel.  *See* Tr. 1241–63, 1383–85, 1390–92, 1500–07.  For the most part, counsel were in

accord with the Court's proposed charge.

Monster made two substantive objections.  First, it asked the Court not to elicit, on the

verdict form, a separate finding as to whether Monster, if liable on the Lanham Act claim, had

acted in bad faith.  The Court rejected this claim because this finding would be relevant in the

event the Beastie Boys sought attorneys' fees.  *See* Tr. 1255–59, 1384–85; *see also Twin Peaks*

---

[6] The Beastie Boys had intended to offer, on their case, excerpts of the deposition testimony of
several Monster employees including Phillips.  Because Monster planned to call those employees
as live witnesses on their case, the Court, to promote efficiency, asked the Beastie Boys' counsel
to offer those excerpts later, at the time they cross-examined those witnesses during the defense
case.  Counsel agreed to this approach.  However, to assure that the Beastie Boys were not
prejudiced by this procedure in connection with the resolution of Monster's Rule 50(a) motion,
made at the close of plaintiffs' case, the Court permitted the Beastie Boys to designate, for
purposes of that motion, the deposition excerpts that they had planned to offer, and the Beastie
Boys did so.  *See* Tr. 909–12.  The testimony elicited during examination of Monster's
employees substantially tracked the designated deposition testimony.  Because Monster's Rule
50 motion is a renewed motion, the Court, where relevant, cites alongside the trial testimony
those witnesses' parallel deposition testimony as designated by the Beastie Boys.

*Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1383 (2d Cir. 1993). Second, Monster asked

for a nominative fair use instruction with respect to the use of the Beastie Boys' name in

describing Z-Trip's Megamix. The Court declined to give that instruction because there had

been no need for Monster to use the Beastie Boys' name when identifying the Megamix. Tr.

1500–07; *see also infra*, pp. 21–22, 50–51.

Otherwise, as to the Court's instructions—including as to willful copyright infringement,

actual and statutory copyright damages, the elements of false endorsement and intentional

deception under the Lanham Act, and the standards for awarding monetary damages under that

Act—the parties substantially agreed with the Court's proposed charge. On June 4, 2014, after

Monster rested, the Court charged the jury. *See* Tr. 1590–1620.

### 4.        The Verdict

On June 5, 2014, the jury returned its verdict. *See* Dkt. 147 ("Verdict Form"). On the

Copyright Act claims, the jury found each of Monster's 10 acts of infringement willful. *Id.* at 2.

In actual damages, it awarded $100,000 to Brooklyn Dust for each infringement of a musical

composition copyright and $100,000 to the Beastie Boys for each infringement of a sound

recording copyright, for a total of $1 million. *Id.* As to statutory damages, the jury awarded

$120,000 for each of the 10 acts of infringement, for a total of $1.2 million. *Id.* at 2.[7]

---

[7] When a single entity owns the copyright to a musical composition and the copyright to a sound recording, the Copyright Act treats those two copyrights as one and permits only one award of statutory damages for that work. *See Teevee Toons, Inc. v. MP3.com*, 134 F. Supp. 2d 546, 548 (S.D.N.Y. 2001). But when distinct entities hold the composition and sound recording copyrights to a single song, even if those entities are related, each entity is entitled to an award of statutory damages. *See id.* Because the Beastie Boys and Brooklyn Dust were distinct entities, Tr. 1240, the jury was permitted to award two sets of statutory damages. The Court, however, invited the jury, in tabulating such damages, to take into account the fact that statutory damages were being awarded to related entities based on two distinct copyright infringements involving the same song. Tr. 1613–14. Counsel all consented to the Court's instruction authorizing the jury to consider this factor, among others, in calculating statutory damages. *See* Tr. 1241–63.

On the Lanham Act claim, the jury found that Monster had "used the Beastie Boys' persona without permission, thereby suggesting a false endorsement of Monster's products." *Id.* at 4.  It also found that Monster had "intended to deceive consumers concerning the Beastie Boys endorsement of its products," and had not proven "that consumers were not, in fact, confused or deceived as to whether the Beastie Boys endorsed Monster's products." *Id.*  On this claim, the jury awarded the Beastie Boys $500,000 in damages. *Id.*  Combined with the higher damages award (*i.e.*, statutory damages) on the Copyright Act claims, the damages awards totaled $1.7 million.[8]

**5.     Post-Trial Motions**

After the jury returned the verdict, Monster orally renewed its motion for judgment as a matter of law.  Tr. 1750.  On July 22, 2014, Monster moved under Rule 50(b) for such a judgment, along with a supporting memorandum of law and a declaration.  Dkt. 168, 169, 170 ("Monster Br.").  On August 27, 2014, the Beastie Boys filed a memorandum of law and a declaration in opposition.  Dkt. 173, 174 ("Beastie Br.").  On September 9, 2014, Monster submitted its reply.  Dkt. 175, 176 ("Reply Br.").  On October 17, 2014, the Court held argument.  Dkt. 177.

## II.     Discussion

Monster moves for judgment as a matter of law under Rule 50(b) on three issues: whether (1) its copyright infringement was willful, as required to recover enhanced statutory damages under the Copyright Act; (2) it is liable for false endorsement in violation of the Lanham Act; and (3) it intentionally deceived consumers, as required to recover monetary

---

[8] The jury also found that Monster had acted in bad faith in causing the false endorsement.  That finding would be relevant to an award of attorney's fees.  *See Twin Peaks Prods.*, 996 F.2d at 1383.  Pending resolution of Monster's post-trial motions, no such award has yet been sought.

damages under the Lanham Act.  Monster concedes that the jury was properly instructed but contends that its verdict was not supported by legally sufficient evidence.  Alternatively, Monster seeks a new trial on all claims pursuant to Rule 59, or a reduction of the jury's damages awards.

### A.     Monster's Rule 50(b) Motion

#### 1.      Applicable Legal Standards

"[J]ury verdicts should be disturbed with great infrequency."  *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012).  To grant a motion for judgment as a matter of law, the Court must find that "'a reasonable jury would not have a legally sufficient evidentiary basis to find for [the non-moving] party on that issue.'"  *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 197 (2d Cir. 2014) (quoting Fed. R. Civ. P. 50(a)).  This determination is appropriate "only where there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him."  *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 127–28 (2d Cir. 2012) (citations omitted).

In resolving a Rule 50 motion, the Court reviews all the record evidence.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  However, the Court must disregard evidence favorable to the moving party that the jury was not required to credit (*i.e.*, because it was impeached or disputed).  *Id.* at 150–51.  And the Court must view the evidence "in the light most favorable to the [non-moving] party" and "give deference to all credibility determinations and reasonable inferences of the jury."  *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998).

In sum, the Court "may grant a motion for judgment as a matter of law 'only if it can conclude that, with credibility assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been *compelled* to accept the view of the moving party.'" *Zellner v. Summerlin*, 494 F.3d 344, 370–71 (2d Cir. 2007) (quoting *Piesco v. Koch*, 12 F.3d 332, 343 (2d Cir. 1993)). This presents the moving party with a "heavy burden." *Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011).

### 2.    Copyright Act—Willfulness[9]

Monster does not dispute that—without seeking or obtaining a license or other form of authorization from the Beastie Boys or their manager—it used excerpts of five Beastie Boys songs as the soundtrack for its recap video. *See, e.g.*, Tr. 106–07, 121–22, 256, 875–76, 1115–16, 1173, 1316–17. At trial, Monster therefore conceded liability on the Copyright Act claims, disputing only damages. As to the statutory damages inquiry, a key issue was whether Monster's infringements were willful. The jury held that they were, and this finding elevated the maximum damages per infringement to $150,000; had the jury found either an innocent or a "regular" (neither innocent nor willful) violation, the maximum damages per infringement would have been $30,000. *See* 17 U.S.C. §§ 504(c)(1)–(2); *Agence France Presse*, 2014 WL 3963124, at *11. Accordingly, if the evidence did not support a finding of willfulness, the Court must reduce

---

[9] On October 5, 2014, the Court requested briefing on whether Monster, in its Rule 50(a) motion, preserved its challenge to the jury's verdict on the Copyright Act claims. Dkt. 178. Monster and the Beastie Boys submitted letters on October 8 and October 10, respectively. Dkt. 179, 180. Although Monster made only a brief reference to these claims at the end of its Rule 50(a) colloquy with the Court, *see* Tr. 1223, the Court holds that the claims were preserved. Considered in the context of the parties' preceding colloquies, Monster's brief reference to these claims was sufficient to put plaintiffs on notice of the nature of Monster's claims of evidentiary insufficiency. *See Negron v. Wesolowski*, 536 F. App'x 151, 153 (2d Cir. 2013) (summary order) (noting that the purpose of Rule 50(a) is "'to alert the opposing party to the supposed deficiencies in her proof'" (quoting *Galdieri-Ambrosini*, 136 F.3d at 287)). Indeed, that the Beastie Boys did not contend in their initial briefing that this issue was waived suggests that Monster's arguments as to Copyright Act willfulness were not a surprise.

the statutory damages award from the present $120,000 per violation to, at most, $30,000 per violation. This reduction would not, however, affect the jury's award of $100,000 per violation in actual damages.

*a.*    *Relevant Facts*

Phillips, director of marketing for Monster's Canadian business unit, planned the 2012 Ruckus and produced the recap video. Tr. 1088, 1092, 1114–16. Before joining Monster, he had completed one semester of college, spent several years in the forestry and ski industries, and worked in sales and marketing for an apparel company. Tr. 1089–90. He had no training in music licensing. Tr. 1135–38. Phillips testified that, at the time he created the video, he believed that Z-Trip had authorized him to use the Beastie Boys music in the video and that he did not need to obtain permission from anyone else. Tr. 1115–16, 1170. Z-Trip, by contrast, denied that he had ever granted such permission. Tr. 369–70, 456–57, 496.

According to Phillips, he and Z-Trip first discussed Z-Trip's Beastie Boys Megamix in person on May 5, 2012. Shortly before Z-Trip's performance at the after-party, Z-Trip and Phillips had a brief conversation in the green room. Tr. 456, 1111–12. Z-Trip and Phillips had very different recollections of this conversation. Phillips testified as follows:

Q. Can you describe the conversation?

A. We had just -- we had just entered the green room and we -- from the green room we could overlook the crowd, and I quite simply said, "Do you have any music that we can use for a recap video?"

. . .

Q. Okay. What did Z-Trip say after you asked him if he had any music you could use for the recap video?

A. He said yes, he had this All Access Beastie Boys Megamix available on his website, and he suggested that it would be the perfect music for us to use for a recap video for this weekend, or for this event.

20

> Q.  Had you ever heard of the All Access Beastie Boys – had you ever heard of
> the All Access Beastie Boys Megamix before Z-Trip mentioned it to you?
>
> A.  No.
>
> Q.  What did you say in response to Z-Trip's suggestion?
>
> A.  Well, I can't tell you the exact words, but I was fairly excited and I thought
> that was a great idea, I told him so, and we carried on.

Tr. 1111–12.  In contrast, Z-Trip testified that he and Phillips had "a brief conversation . . . about the drinks that were on my hospitality rider not being correct."  Tr. 456.  Z-Trip also recalled saying "something along the lines of, like, I'm really excited to play or something or I'm ready to go."  Tr. 456.  Z-Trip testified that he did not remember any other conversation with Phillips in the green room.  Tr. 456–57.

Soon after the 2012 Ruckus, Phillips worked with Larsen, a videographer, to create a recap video.  Tr. 1114–17.  Although Larsen handled the mechanics of video editing and decided which audio and video clips to include, Phillips dictated the general structure of the video and directed Larsen to use the Megamix as the soundtrack.  *Id.*

On May 8, 2012 at 2:14 p.m., Larsen sent a "preview" of the video to Phillips and two other Monster employees, Dano Pendygrasse and Jay Vaillancourt.  PX 133.  Both Phillips and Pendygrasse responded with several requested changes.  PX 132, PX133.  For instance, the preview video did not include a music credit, so Phillips suggested adding "Re-mix provided by ZTrip," PX 133, and Pendygrasse proposed "Courtesy of Z-Trip," PX 132.

Later on May 8, 2012, at 11:47 p.m., Phillips sent Z-Trip the following email, including a link to the video as it then stood:

Hey Zach,
Please have a look at the video from this past weekend and let me know if you
approve.  (I think we'll remove the logo[]s at the end since they're redundant and
the rest will get cleaned up just a little bit more.)
Thanks again for an amazing weekend!!
Once you approve, we'll post on youtube and notify our 16M fans on fb
[Facebook].
the password is: ruckus
http://vimeo.com/41825355

PX 134.  On May 9, 2012, at 3:50 a.m., Z-Trip replied:

Dope!
Maybe at the end when you put up the info about my Beasties mix, you could post
below it "Download the mix for free at http://ztrip.bandcamp.com"
That way people can pause it and go get it if they want… Also maybe a proper
link on the description they can click thru once it's posted proper?
Dope though… Love the can at the end.
No 45 footage?
And, btw [by the way]… Thanks again for everything… still high off the
weekend!
Z

PX 134 (ellipses in original).

At trial, Phillips and Z-Trip offered significantly different understandings of Phillips'

email and Z-Trip's response.  Phillips testified that when he wrote "let me know if you approve,"

he "meant to approve everything that there is, all aspects of this video."  Tr. 1119.  Z-Trip, by

contrast, testified that he interpreted Phillips' request to pertain only to "[his] likeness and [his]

involvement in the video."  Tr. 369–70.  He did not understand Phillips to request his approval to

use the Beastie Boys music as the video's soundtrack, because the music did not belong to him.

Tr. 370, 496.  Rather, as he testified, he assumed that Monster had separately reached out to the

Beastie Boys to secure permission to use their music.  Tr. 481; *see also* DX 7 (June 5, 2012

email from Z-Trip to his manager Boula, stating of Monster, "I figured they'd also reach out to

the Beasties to clear their tunes too…Didn't know they hadn't.").

On May 9, 2012, Pendygrasse sent the video to Leroy Nichols and Ryan Hartsfield, copying Phillips and Vaillancourt.  Tr. 1162, PX 135.  Nichols and Hartsfield, both Monster employees, were responsible for reviewing all video content before it was posted to Monster's social media pages.  Tr. 1187–88, 1281 (Nichols Dep. 19–20, 31–32, 38–39).  Nichols reviewed the video to make sure "it fit with the Monster Energy brand," Tr. 1266, 1278 (Nichols Dep. 19–20, 38–39), but he did not consider whether the necessary music rights had been secured, Tr. 1280 (Nichols Dep. 42–43).  Instead, he testified, his practice was to trust that the content producers had secured the rights for any music used in promotional videos.  Tr. 1280–81 (Nichols Dep. 15–18, 22–23, 43, 101).  Nichols was familiar with some of Monster's third-party content providers and believed that licensing music was part of their job.  Tr. 1280–81, 1300 (Nichols Dep. 15–18).  With regard to the Ruckus video, however, Nichols was aware that Monster's primary third-party content providers had not been involved; he did not know who had created the recap video.  Tr. 1316–17 (Nichols Dep. 38).  He also knew that Monster, at that time, did not provide any training or guidance related to the use in its videos of copyrighted or trademarked content.  *See* Tr. 1296 (Nichols Dep. 21).  Yet Nichols reviewed the video only for "fit" with Monster's brand and then posted it to Monster's YouTube channel.  Tr. 1266 (Nichols Dep. 19–20, 38–39).

As a result of this lawsuit, Monster has changed its policy.  PX 191.  Monster now requires that "ALL videos will have to be approved by [Monster headquarters] before they get posted.  Any time music is used, we will need authorization on the music." *Id.*

> ### b.    *Applicable Legal Standards*

In the context of copyright infringement, the Second Circuit has defined "willfulness" to mean "(1) that the defendant was actually aware of the infringing activity, or (2) that the

defendant's actions were the result of 'reckless disregard' for, or 'willful blindness' to, the copyright holder's rights."  *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 263 (2d Cir. 2005).  Accordingly, courts have found willfulness where a defendant engaged in "a pattern of conduct so unreasonable as to constitute reckless disregard," *id.* at 264, had "constructive knowledge" of the infringement, *Fitzgerald Pub. Co. v. Baylor Pub. Co.*, 807 F.2d 1110, 1115 (2d Cir. 1986), "should have known" that his actions constituted infringement, *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1543 (S.D.N.Y. 1991), or "fail[ed] to investigate because [he] was afraid of what the inquiry would yield," *Fendi Adele S.R.L. v. Filene's Basement, Inc.*, 696 F. Supp. 2d 368, 393 (S.D.N.Y. 2010).[10]  By contrast, infringement is not willful where a party "reasonably and in good faith believes that its conduct is innocent." *N.A.S. Imp., Corp. v. Chenson Enters., Inc.*, 968 F.2d 250, 252 (2d Cir. 1992) (citation and internal quotation marks omitted).

Where the defendant is a corporation, it can be held liable for acts of willful infringement committed by its employees within the scope of their employment or for its benefit.  *See Sygma Photo News, Inc. v. High Soc. Magazine, Inc.*, 778 F.2d 89, 92 (2d Cir. 1985) (citing *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 308–09 (2d Cir. 1963)) ("All persons and corporations who participate in, exercise control over, or benefit from the infringement are jointly and severally liable as copyright infringers."); *Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 437 (S.D.N.Y. 2011) (same).  "[A]n employer is responsible for copyright infringement committed by an employee in the course of employment, under the normal agency rule of *respondeat superior*."  *U.S. Media Corp. v. Edde Enter., Inc.*, No. 94 Civ. 4849 (MBM)

---

[10] The Court instructed the jury, without objection, that reckless disregard means that a defendant "harbored actual doubts about its right to distribute a video containing the copyrighted music and yet willfully proceeded to do so without investigating further."  Tr. 1611 (citing *Agence France Presse*, 2014 WL 3963124, at *4).

(MHD), 1996 WL 520901, at *6 (S.D.N.Y. Sept. 12, 1996) (citing *Sygma*, 778 F.2d at 92).

          *c.*     *Analysis*

At trial, the Beastie Boys pursued a theory of reckless disregard.  They argued that Monster had recklessly disregarded the possibility that the video infringed on the Beastie Boys' copyrights and that its infringement therefore was willful.  It argues now that the evidence supported the jury's finding of willfulness.  Although the issue of willfulness was vigorously disputed at trial and certainly could have been resolved for either side, the Court agrees with plaintiffs that there was sufficient circumstantial evidence of reckless disregard to support the jury's finding.

The central figure as to this issue is Phillips.  Notwithstanding his background (in the forestry and skiing industries) and his lack of training in music licensing, there was ample evidence from which a jury could conclude that Phillips well appreciated the concept of copyright and the consequent need to obtain permission to use an artist's music in the promotional videos he created for Monster.  Phillips testified that, before the 2012 Ruckus, he had produced about a dozen recap videos on Monster's behalf.  Tr. 1103–04 (Phillips Dep. 78–79, 83).  To create a soundtrack for each video, Phillips testified, he either contacted the artist to seek permission to use that artist's music or used music that an artist had explicitly asked him to use.  *See* Tr. 1105–06, 1108–09.  Phillips also was familiar with a written sponsorship agreement between Monster and a DJ who performs as "Mat the Alien" that allowed Monster to use that DJ's music.  Tr. 1105–06 (Phillips Dep. 40).  And Phillips' claim to have asked Z-Trip for permission to use the Megamix in the recap video arguably reinforced the inference that he understood the need to obtain some sort of authorization.

Notwithstanding this awareness, Phillips did not seek permission from the Beastie Boys or their manager to use their music.  Nor did he believe that anyone else at Monster had done so. *See, e.g.*, Tr. 1173 (Phillips Dep. 124, 181).  The jury could thereby have determined that Phillips acted in reckless disregard of the Beastie Boys' rights when he directed Larsen to use their music in Monster's recap video without seeking the Beastie Boys' authorization.  To be sure, Phillips later claimed that he believed that Z-Trip had granted him the necessary permission during an after-party conversation in the green room.  But there was no corroboration of that claim (*e.g.*, in the form of a contemporaneous email), and Z-Trip forcefully disputed it.  He testified that he had never granted permission for Monster to use the Beastie Boys' music in the video. *See* Tr. 369–70, 456–57, 496.  The jury was entitled to credit that denial and to reject Phillips' claim of authorization.

Furthermore, not only was Phillips' testimony on that point directly contradicted by Z-Trip—during cross-examination, Phillips' trial testimony was impeached on a number of other points where it was at odds with his deposition testimony. *See, e.g.,* Tr. 1142–43, 1147–48, 1179–80.  Phillips also bizarrely refused to acknowledge that Monster's signature shade of green appeared in the video he had helped create. *See* Tr. 1142, 1149, 1157.  The self-serving nature of the claim of copyright authorization by Phillips, who remained a Monster employee, gave the jury an additional reason to reject it. *See, e.g.*, PX 170 (July 2012 e-mail from Phillips stating "I've found myself in a bit of trouble using unlicensed music lately…HA!").  Making all credibility assessments in favor of the Beastie Boys, as the Court must on Monster's Rule 50 motion, *see Zellner*, 494 F.3d at 370–71, the jury must be taken as having rejected Phillips' claim

to have sought and received from Z-Trip the authorization, which he claims to have known was needed, to use the Beastie Boys' music in the video.[11]

Unlike Phillips' disputed claim to have received oral authorization from Z-Trip to use the Beastie Boys' copyrighted music, the May 8, 2012 email exchange between Phillips and Z-Trip is a durable, indisputable fact. At trial, Monster, standing by Phillips's testimony, argued that the post-Ruckus email exchange was a good-faith attempt by Phillips to secure the needed authorization to include the Beastie Boys' music in the recap video. Had the jury accepted Monster's reading of the email exchange, it presumably would not have found willful copyright infringement. But the jury evidently did not credit Monster on that point. And the Court, on its Rule 50(b) review, rejects Monster's claim that the Phillips/Z-Trip email exchange disproves that it acted with reckless disregard of the Beastie Boys' copyright interests.

In his email, Phillips asked Z-Trip to review the video "and let me know if you approve." Z-Trip replied, "Dope!" and asked Phillips to add a plug for his Megamix. PX 134. On its face, this exchange does not ask for, and says nothing about, approval of the video *on behalf of the Beastie Boys*. The Beastie Boys are not referenced at all in Phillips' email; and they are referenced in Z-Trip's response only as part of a descriptor ("my Beasties mix") of the Megamix that Z-Trip, *sua sponte*, asked Phillips to plug. The email thus is more reasonably read—and a reasonable jury would be well within its rights to read it—as seeking Z-Trip's approval for the use of Z-Trip's *own* likeness, name, words, and logo in the video. Z-Trip himself appears in the video performing at the after-party, *see* PX 211 ("video"), at 2:50; and Monster's contract with

---

[11] In any event, even if Phillips' account were credited, nothing was said in his conversation with Z-Trip about the *Beastie Boys'* copyrights or to the effect that Z-Trip had legal authority to permit Monster to use the band's songs. According to Phillips, he asked Z-Trip only, "Do you have any music that we can use for a recap video?" and Z-Trip and alerted Phillips to the existence of the Megamix. Tr. 1111–12.

Z-Trip required Monster to secure his approval before recording any portion of his performance. PX 130. Monster had not theretofore done so. Indeed, Z-Trip testified that he had understood Phillips' email as a request for permission to use the video recording Monster had made of him. Tr. 362–64.[12]

In sum, a reasonable jury could find that Phillips was well aware, including based on his experience securing approval of other artists' music for similar recap videos at Monster, of the legal duty to secure the Beastie Boys' approval for the use of their music in the company's video, but that Phillips recklessly disregarded that duty. *See, e.g.*, *Basic Books*, 758 F. Supp. at 1543–44 (finding reckless disregard where defendant "should have known" that its conduct infringed plaintiff's copyrights).

Although Phillips' knowledge and conduct by itself supported a finding of willful infringement based on a theory of reckless disregard, the trial evidence as to Nichols, Monster's director of interactive marketing, reinforces that finding. Nichols was not involved in the creation of the recap video. But he posted it online—also without ever ascertaining that Monster had obtained authorization from the Beastie Boys to use their music. Tr. 1316–17. Nichols was familiar with music licensing procedures, *see* Tr. 1280–81 (Nichols Dep. 40–43); his job responsibilities required sensitivity to others' intellectual property rights, including procuring sponsorship agreements with athletes and video game companies, *see* Tr. 1184–86 (Nichols Dep. 30, 81–82). Nichols also was responsible for producing and updating Monster's social media guide, which instructed employees on how to use YouTube, Facebook, and other websites in promoting the Monster brand. *See* Tr. 1297–99. Revealingly, Nichols had been vigilant in

---

[12] Further undermining Phillips' claim, his colloquial email with Z-Trip was a far cry in form and solemnity from the written sponsorship agreement between Monster and a DJ which was the one prior instance that Phillips was aware of in which a DJ had authorized Monster to use the DJ's music. *See* Tr. 1105–06.

protecting *Monster*'s intellectual property rights:  He had, for example, initiated the take-down of websites and advertisements that had used Monster's trademarked logo without authorization. *See* Tr. 1284–85 (Nichols Dep. 12, 23).

Despite his facility with intellectual property and licensing, and despite his solicitude for *Monster*'s intellectual property rights, Nichols never inquired into whether Monster had a license to use the Beastie Boys' music in its promotional video.  Tr. 1280, 1316–17 (Nichols Dep. 42–43).  Nichols also was aware that, unlike some earlier recap videos, this video was not produced by a third-party content provider who was responsible for securing the rights to the music.  Tr. 1316–17 (Nichols Dep. 30–31, 38.)  Yet, before posting the video to Monster's website, YouTube channel, and Facebook page, Nichols ensured only that the video "fit with the Monster Energy brand."  Tr. 1266, 1278 (Nichols Dep. 19–20, 38–39).  The jury could reasonably conclude that this failure to investigate constituted reckless disregard.  *See, e.g.*, *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 113 (2d Cir. 2001) (finding willful infringement based on defendant's "failure to investigate the possibility of intellectual property violations"); *Granada Sales Corp. v. Aumer*, No. 02 Civ. 6682 (HB) (RLE), 2003 WL 21383821, at *2 (S.D.N.Y. June 2, 2003) (finding reckless disregard where defendant "purchas[ed] the infringing garments in Pakistan 'off the shelf' without inquiring into the identity of the owner of the fabric design").

Finally, to the extent that Monster depicted its infringement as a sloppy but non-willful act by Phillips, Nichols, and perhaps others, the evidence gave the Beastie Boys a solid rejoinder sounding in recklessness.  As the Beastie Boys' counsel noted in closing argument, *see* Tr. 1622, Monster, at the time, did not perform any training of employees related to the use of copyrighted or trademarked content; it therefore left Phillips to his own devices in producing the video.  *See,*

*e.g.*, Tr. 1109–10, 1134–38 (Phillips Dep. 221–22), 1295 (Nichols Dep. 21).  In determining

whether there was reckless disregard, the jury could fairly take into account both Monster's

(1) decision to task an employee who was manifestly unqualified to make sophisticated

judgments about intellectual property and licensing with the responsibility for creating and

disseminating the recap video, and (2) striking failure to put in place a comprehensive music

licensing policy.[13]

### 3.    Lanham Act—Monster's Liability for False Endorsement

Monster's next challenge under Rule 50(b) is to the jury's finding of liability on the

Lanham Act claim.  Specifically, the jury found that "Monster used the Beastie Boys' persona

without permission, thereby suggesting a false endorsement of Monster's products."  Verdict

Form at 4.

---

[13] The evidence established that, despite its frequent use of others' copyrighted works, Monster
did not have in place a comprehensive music licensing policy.  For example, both Hamilton,
Monster's director of music marketing, and Pontrelli, its global head of marketing, knew that
Monster frequently posted event recap videos on its YouTube channel.  *See* Tr. 1007, 1050–51
(Pontrelli), 1360, 1365 (Hamilton).  When the content of these videos was created by outside
production companies, these companies were responsible, under Monster's contracts with them,
for securing the rights to music within the videos.  Tr. 1012–13 (Pontrelli).  But, as Hamilton and
Pontrelli each admitted, promotional videos were sometimes produced internally, by Monster
employees, *see* Tr. 1013 (Pontrelli), 1359–61 (Hamilton), and as to such videos, Monster had no
policy in place to ensure that music licenses were obtained.  *See, e.g.*, Tr. 1134–37 (Phillips),
1371 (Hamilton).  Hamilton testified, in fact, that he had concerns about the absence of music
clearance procedures for some such videos, Tr. 1371–73, and had warned a sports marketing
employee about the need to obtain clearances for sports marketing recap videos that use music.
Tr. 1359–61, 1364–65, 1367.  The jury could reasonably conclude that it was as a result of
Monster's blasé approach to licensing that each Monster employee who viewed the recap video
before it was posted online assumed (or claimed later to have assumed) that someone else had
had responsibility for securing music rights.  Phillips testified that he relied on his superiors to
handle it, Tr. 1140–41; Nichols testified that he had trusted others at Monster, presumably
Phillips, Tr. 1280–81.  Where, as here, the evidence supports that it was likely only a matter of
time before infringement occurred, a finding of reckless disregard is merited.  *See Island
Software*, 413 F.3d at 263–64 ("A jury could, without doubt," find reckless disregard where
defendant had a "'casual' response to claims of counterfeiting" and "did not take extensive
measures to prevent the receipt and sale of high-quality counterfeit merchandise.").

a.      *Relevant Facts*

A detailed account of the video is necessary to assess the Lanham Act claim.  The video is four minutes and six seconds long.  *See* PX 211 ("video").  It opens with a full-screen image of the Monster logo crashing down amidst grey smoke and broken-glass sound effects.  Video at 0:01.  Immediately thereafter, an excerpt of the Beastie Boys' song "Pass the Mic" begins, and Horovitz's distinctive vocals announce, "I'm the A-D-R-O-C-K," spelling out his well-known stage name.  *Id.* at 0:01–0:04.  The first section of the video shows the snowboarders who competed at the 2012 Ruckus bowling, goofing around, and driving out to Lake Louise.  *Id.* at 0:01–0:37.  Aside from several seconds in which engines are heard revving in the background of a single shot, *id.* at 0:29–0:37, "Pass the Mic" is the only sound in this portion of the video.

With "Pass the Mic" continuing to play, the video turns to the main events of the 2012 Ruckus.  The first on-site shot is of two "Monster girls," promotional models in midriff-baring outfits emblazoned with the Monster logo on their low-slung belts and bra tops.  *Id.* at 0:38–0:41. After the Monster girls wave and blow kisses, the video cuts to about 90 seconds of footage of the snowboarding competition.  *Id.* at 0:41–2:12.  At 53 seconds, the video shows a snowboard with a Monster logo sticker, and the soundtrack changes from "Pass the Mic" to "So Whatcha Want," a second Beastie Boys song.  Monster logos also appear on the competitors' helmets and hats, the sides of man-made snowboarding ramps, and large banners surrounding the snowboarding course.  Monster's official brand colors are similarly ubiquitous:  The textual headers that appear throughout the video are green and grey; even the snow is accented in Monster's signature shade of bright green.  At 1:05, the video shifts from "So Whatcha Want" to "Sabotage," a third, iconic Beastie Boys song.  While snowboarders perform tricks in the heavily branded arena, the Beastie Boys collectively chant, "listen all of y'all it's a sabotage"

31

increasingly loudly, culminating in a distinctive scream by Horovitz.  At 1:18, as a snowboarder

flies over a Monster-branded ramp, an excerpt from the fourth Beastie Boys song in the video,

"Looking Down the Barrel of a Gun," begins.  Between 0:38 and 2:08 of the video, these four

Beastie Boys songs provide the only sound in the video.

　　　　After a brief shot of the snowboarding competition winners posing with Monster girls

and cans of Monster Energy beverages, set to the noise of the cheering crowd, *id.* at 2:08–2:13,

the video transitions to after-party footage.  At that point, "Make Some Noise"—the fifth Beastie

Boys song in the video—begins.  *Id.* at 2:13.  The video clips and stills from the after-party

prominently display Monster logos on apparel and large video screens mounted on a wall at the

venue; DJs and many partygoers hold cans of Monster Energy drink.  For a full minute, the video

mutes the live music and the crowd, and "Make Some Noise" is the sole soundtrack, with one

exception:  At 2:49, the Beastie Boys sing "make some noise if you're with me," and, with the

song still playing in the foreground, the video cuts to a shot of the crowd audibly cheering.  *Id.* at

2:49–2:56.  Several seconds later, the music stops while a DJ gives a shout-out to Monster

Energy and scratches records on a turntable, *id.* at 3:10–3:33; "Make Some Noise" resumes after

that, *id.* at 3:33.

　　　　The Beastie Boys' song "Make Some Noise" continues to play while the credits roll in

green-and-grey text.  The credits read, in pertinent part:

MUSIC
ALL-ACCESS BEASTIE BOYS MEGA MIX
COURTESY OF Z-TRIP

DOWNLOAD THE LINK FOR FREE AT
ZTRIP.BANDCAMP.COM

*Id.* at 3:51–3:53.  The next screen reads "RIP MCA."  *Id.* at 3:54–3:58.  After that screen slowly

fades to black, the video concludes with a Monster Energy can bouncing into a recycling bin *sua*

*sponte* due to the vibrations of the after-party soundsystem.  *Id.* at 3:58–4:03.  The last image is the same as the first—a full-screen Monster logo enhanced by smoke and sound effects.

On May 9, 2012, Monster posted the video on its website, YouTube channel, and Facebook page.  The squib posted on YouTube and cross-posted to Facebook read "Beastie Boys Megamix by Z-Trip.  Download 'All-Access A Beastie Boys Megamix' here: http://ztrip.bandcamp.com."  *See* Tr. 307, 531, 708, 835, 1119–21, 1124–26, Tr. 1266; PX 135, PX 142, PX 150, PX 200, PX 270.  By clicking on that link, viewers could go to Z-Trip's website and download the Beastie Boys Megamix for free; downloading the Megamix allowed viewers to keep the audio recording of Beastie Boys music on their computers permanently.  Tr. 197–98, 306, 715.  The video, however, was not downloadable.  Tr. 701–02, 716.

Monster also sent press releases to a number of snowboarding magazines and websites.  Tr. 1126–29; PX 165, PX 276.  The press release included the same language as the YouTube and Facebook posts: "Beastie Boys Megamix by Z-Trip.  Download 'All-Access A Beastie Boys Megamix' here."  PX 276.  "Dozens" of websites posted the press release verbatim, including the reference and link to the Beastie Boys Megamix.  *See, e.g.*, PX 165, PX 164, PX 276.

### b.  *Statutory Background as to False Endorsement Claims*

As originally enacted in 1946, § 43(a) of the Lanham Act read:

> Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce . . . shall be liable to a civil action . . . by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. § 1125(a) (1946).  This provision had two purposes: "to prevent consumer confusion" and "to protect 'the synonymous right of a trademark owner to control his product's reputation.'"

*Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 (2d Cir. 1979)

(quoting *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 274 (7th Cir. 1976));

*see also Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 198 (1985) (Lanham Act

"provides national protection of trademarks in order to secure to the owner of the mark the

goodwill of his business and to protect the ability of consumers to distinguish among competing

producers.").

The Lanham Act's legislative history was "convoluted" and "inconclusive," especially

with regard to § 43(a). *Colligan v. Activities Club of N.Y., Ltd.*, 442 F.2d 686, 689–90 (2d Cir.

1971). Courts initially interpreted the § 43(a) remedy as a "limited one," consistent with the

Lanham Act's predecessor, the Trademark Act of 1920. *Id.* at 690–94. Thus, at first, § 43(a)

was used primarily in connection with claims that a business competitor had passed off a

trademark as his own or had used a mark so similar that consumers could be confused as to the

origin or source of the product or service. *See* Ethan Horwitz & Benjamin Levi, *Fifty Years of

the Lanham Act: A Retrospective of Section 43(a)*, 60 Fordham Intell. Prop. Media & Ent. L.J.

59, 64 (1996); *see also Advanced Res. Int'l, Inc. v. Tri-Star Petroleum Co.*, 4 F.3d 327, 334 (4th

Cir. 1993) (collecting cases). Paradigmatic § 43(a) cases arose, for example, from a lawsuit

between rival airport parking lots named "Park N' Fly" and "Dollar Park and Fly," *see Park N'

Fly*, 469 U.S. at 191–92, and between competing clothing lines called "Bee Wear" and "B

Wear," *see Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 487–88 (2d Cir. 1988).

In the 1970s and 1980s, courts substantially expanded the range of claims actionable

under § 43(a). *See* J. Thomas McCarthy, *Lanham Act § 43(a): The Sleeping Giant is Now Wide

Awake*, 59 L. & Contemp. Probs. 45, 52 (1996). Courts began applying § 43(a) to infringement

of common-law marks (not merely registered trademarks), to trade dress infringement, and to

false statements about a competitor's goods or services.  Horwitz & Levi, *supra*, at 66.  Relevant here, courts also began "permitting Lanham Act claims by plaintiffs who [were] not in commercial competition with the defendants" and "giving a broad interpretation to the concept of a 'mark.'"  *Advanced Res. Int'l*, 4 F.3d at 334.

By the 1980s, courts routinely recognized claims of both express and implied false endorsement.  Courts found express false endorsement when, for example, "one company had falsely portrayed another as a satisfied customer" through a fabricated testimonial.  *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 109 (2d Cir. 2010) (citing *Courtenay Commc'ns Corp. v. Hall*, 334 F.3d 210, 212 (2d Cir. 2003)).  False implied endorsement, by contrast, was found when a company or individual had used another's trademark to suggest an association without explicitly stating that a sponsorship or affiliation exists.

A famous example of a false implied endorsement appears in *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, in which the Dallas Cowboys Cheerleaders, Inc., sued to prevent the distribution and exhibition of the pornographic film "Debbie Does Dallas." 604 F.2d at 202.  Although defendants (and the film) never expressly stated that the Cowboys Cheerleaders had participated in or approved of the film, the Second Circuit found that the "striking similarity" between the Cowboys Cheerleaders' uniforms and the cheerleading uniforms in the film created a risk of consumer confusion.  *Id.* at 204.  Affirming the district court's grant of a preliminary injunction, the Second Circuit stated that "the uniform depicted in 'Debbie Does Dallas' unquestionably brings to mind the Dallas Cowboys Cheerleaders.  Indeed, it is hard to believe that anyone who had seen defendants' sexually depraved film could ever thereafter disassociate it from plaintiff's cheerleaders."  *Id.*  And, as the Court explained, such an implied association is actionable under § 43(a) because it causes consumer confusion and "has 'a

35

tendency to impugn [plaintiff's services] and injure plaintiff's business reputation.'"  *Id.* at 205

(quoting *Coca-Cola Co. v. Gemini Rising, Inc.*, 346 F. Supp. 1183, 1189 (E.D.N.Y. 1972))

(alteration in original).

 The line of implied false endorsement cases also came to include cases brought by

celebrities whose persona was used to imply a product or corporate endorsement.  As the Fourth

Circuit has explained, "courts recognized a § 43(a) injury where the plaintiff's voices, uniforms,

likenesses, published words, or names were used in such a way as to deceive the public into

believing that they endorsed, sponsored, or approved of defendant's product."  *Advanced Res.*

*Int'l*, 4 F.3d at 334 (collecting cases).

 A good example is *Allen v. National Video, Inc.*, which involved a magazine

advertisement that depicted a Woody Allen look-alike holding a National Video membership

card.  610 F. Supp. 612, 617–18 (S.D.N.Y. 1985).  Then-Chief Judge Motley, describing Allen

as a "major international celebrity," *id.* at 617, observed that a celebrity has a "commercial

investment in the 'drawing power' of his or her name and face in endorsing products and in

marketing a career.  The celebrity's investment depends upon the good will of the public, and

infringement of the celebrity's rights also implicates the public's interest in being free from

deception when it relies on a public figure's endorsement in an advertisement."  *Id.* at 625–26.

Protecting these was among the "underlying purposes of the Lanham Act."  *Id.* at 626.  Judge

Motley granted summary judgment for Allen.  *Id.* at 629–30.

 In 1988, Congress enacted the first set of comprehensive amendments to the Lanham Act.

*See* Horwitz & Levi, *supra*, at 66.  As amended, § 43(a) prohibits:

> use[] in commerce [of] any word, term, name, symbol, or device, or any
> combination thereof, or any false designation of origin, false or misleading
> description of fact, or false or misleading representation of fact, which is likely to
> cause confusion, or to cause mistake, or to deceive as to the affiliation,

connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person[.]

15 U.S.C. § 1125(a).  But the twin aims of the law—to protect both consumers and producers— remained the same.  As the Senate Report on the amendment to § 43(a) stated, the amendment served "to codify the interpretation it has been given by the courts."  S. Rep. 100-515, at 5603 (1988); *see also id.* at 5603, 5580 (stating that Senate "expects the courts to continue to interpret the section," *id.* at 5603, and inviting further judicial expansion as new technologies and "new avenues for markets" emerge, *id.* at 5580).  Courts therefore held that their "precedents predating the new [statutory] language remain in force."  *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1038 n.1 (2d Cir. 1992); *see also, e.g.*, *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1107 (9th Cir. 1992) ("[W]e read the amended language to codify case law interpreting section 43(a) to encompass false endorsement claims.").

Since the 1988 amendments, courts have continued to recognize claims for implied false endorsement as cognizable under the Lanham Act.  *See, e.g.*, *Parks v. LaFace Records*, 329 F.3d 437, 445–46 (6th Cir. 2003) (collecting cases); *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 63 (2d Cir. 2000) (collecting cases).  Courts have also "expand[ed] the universe of symbols and devices eligible for trademark protection" to include a particular sound or color, the title of an artistic work such as a film or song, an entertainer's distinctive voice or features, and a celebrity's persona.  *EMI Catalogue P'ship*, 228 F.3d at 62– 63 (citing, *inter alia*, *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 162 (1995)).  Thus, for example, § 43(a) claims have been found viable when Oldsmobile cited a basketball star's former name and accolades in a television commercial, *see Abdul-Jabbar v. Gen. Motors Corp.*,

85 F.3d 407, 409, 413 (9th Cir. 1996), and when Doritos used an imitation of a renowned

musician's voice to tout its corn chips, *see Waits*, 978 F.2d at 1110–11.

Section 43(a)'s reach has been limited, however, by two considerations.  First, courts

must construe the Lanham Act narrowly where necessary to avoid conflict with the First

Amendment right to artistic expression.  *See, e.g.*, *Rogers v. Grimaldi*, 875 F.2d 994, 998 (2d

Cir. 1989) ("Because overextension of Lanham Act restrictions in the area of titles might intrude

on First Amendment values, we must construe the Act narrowly to avoid such a conflict.").  The

First Amendment has been held, for example, to protect the parodical use of a trademarked name

in the 1997 pop song "Barbie Girl."  *See Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 902

(9th Cir. 2002).

Second, courts have hesitated to extend the Lanham Act to areas where its use would

merely duplicate coverage provided by copyright law.  *See Oliveira v. Frito-Lay, Inc.*, 251 F.3d

56, 63 (2d Cir. 2001); *see also Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23,

34 (2003) ("[I]n construing the Lanham Act, we have been 'careful to caution against misuse or

over-extension' of trademark and related protections into areas traditionally occupied by patent

or copyright.") (citation omitted).  On this ground, courts have rejected false endorsement claims

based, exclusively, on an infringing use of a copyrighted song.[14]  *See Oliveira*, 251 F.3d at 62–

63; *Henley v. DeVore*, 733 F. Supp. 2d 1144, 1168 (C.D. Cal. 2010).

---

[14] This issue has arisen recently in the context of the campaign use by political candidates of
songs as to which they have received licenses from performing-rights organizations, but as to
which they have not received permission for such use from the artist.  Scholars have argued for
an amendment to, or a construction of, the Lanham Act, to allow the artist to sue the candidate
for false endorsement in these circumstances.  *See* Michelle Lin, *Keep on Rockin' in the Free
World: Trademark Remedies for Musicians*, 93 J. Pat. & Trademark Off. Soc'y 98 (2011);
Kimberlianne Podlas, *I Do Not Endorse This Message! Does a Political Campaign's
Unauthorized Use of a Song Infringe on the Rights of the Musical Performer?*, 24 Fordham
Intell. Prop. Media & Ent. L.J. 1 (2013); John Tehranian, *Guantanamo's Greatest Hits: The*

c.      *Legal Standards as to False Endorsement Claims*

As noted, the current iteration of § 43(a) prohibits the use of a protected mark in a way that is likely to confuse or deceive consumers "as to the affiliation, connection, or association" of plaintiff and defendant or "as to the origin, sponsorship, or approval of [defendant's] goods."  15 U.S.C. § 1125(a).  In recent years, courts in this District have found viable false endorsement claims where, for example, t-shirts bore a celebrity's name and likeness, *Bruce Lee Enter., LLC v. A.V.E.L.A., Inc.*, No. 10 Civ. 2333 (KMW), 2013 WL 822173, at \*19–22 (S.D.N.Y. Mar. 6, 2013), a website's masthead included an image of a celebrity, *Jackson v. Odenat*, 9 F. Supp. 3d 342, 361 (2014), and an advertisement featured an M&M character dressed in a celebrity's signature costume, *Burck v. Mars, Inc.*, 571 F. Supp. 2d 446, 455–56 (S.D.N.Y. 2008).

Courts "have not established a uniform test for false endorsement under the Lanham Act."  Barbara A. Solomon, *Can the Lanham Act Protect Tiger Woods? An Analysis of Whether the Lanham Act Is A Proper Substitute for A Federal Right of Publicity*, 94 Trademark Rep. 1202, 1214 (2004) (comparing test used by the Third Circuit with that used by the Second, Sixth, and Ninth Circuits).  To prevail on a false endorsement claim in the Second Circuit, a plaintiff must prove that "the defendant, (1) made a false or misleading representation of fact; (2) in commerce; (3) in connection with goods or services; (4) that is likely to cause consumer confusion as to the origin, sponsorship, or approval of the goods or services."  *Burck*, 571 F. Supp. 2d at 455; *see also, e.g.*, *CourtAlert.com, Inc. v. e-Law, LLC*, No. 12 Civ. 2473 (DAB), 2013 WL 4754819, at \*2 (S.D.N.Y. Aug. 26, 2013); *Naked Cowboy v. CBS*, 844 F. Supp. 2d 510, 516 (S.D.N.Y. 2012), *appeal dismissed* (July 5, 2012).  The Court here so instructed the jury, without objection from either party, explaining that "false endorsement occurs when a

*Semiotics of Sound and the Protection of Performer Rights Under the Lanham Act*, 16 Vand. J. Ent. & Tech. L. 11 (2013).

defendant uses a celebrity's persona without permission to suggest a false endorsement or association."  Tr. 1614 (citing *Bruce Lee Enter.*, 2013 WL 822173, at *19; *see also, e.g.*, *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 925–26 (6th Cir. 2003) ("False endorsement occurs when a celebrity's identity is connected with a product or service in such a way that consumers are likely to be misled about the celebrity's sponsorship or approval of the product or service.").

The second and third elements were (and are) not disputed.  *See* Tr. 1615; Monster Br. 7–15.  Accordingly, to find liability, the jury had to make two determinations: first, that the video contained a false or misleading representation of fact—*i.e.*, that it misleadingly implied that the Beastie Boys had endorsed Monster, when in fact it had not; and second, that consumers were likely to be confused by this false or misleading representation.

### d. Was There a False or Misleading Representation of Fact?

The Beastie Boys undisputedly never endorsed Monster.  The first Lanham Act element therefore turned on whether the video implied that the Beastie Boys had done so, because any such implication was necessarily false.  On Monster's Rule 50 challenge as to the sufficiency of the evidence supporting the jury's finding of a false endorsement, it is useful to analyze the issue in two steps:  Did the video contain an endorsement of Monster?  And if so, is that endorsement fairly attributed to the Beastie Boys?

As to the first question, the answer is plainly yes.  Phillips testified that he created the video to promote the Monster brand.  Tr. 1159, 1163 (Phillips Dep. 175).  And the video relentlessly does just that.  It is a four-minute advertisement for Monster.  Viewers are inundated with visual references to Monster's product, name, and brand.  Monster's logo and signature green and grey colors are omnipresent—on the snow, ramps, and rails that comprise the snowboarding course; on banners surrounding the course; on video screens at the after-party; on

apparel worn by snowboarders, DJs, and promotional models; and on cans of Monster Energy beverages.  In total, the Monster logo appears more than 100 times in the video.

As to the second question, there was ample basis on which a viewer could conclude that the Beastie Boys joined in the video's endorsement of Monster.  The Beastie Boys are featured as prominently in the video as Monster—where Monster is dominantly featured pictorially, the Beastie Boys are dominantly featured aurally.  The Beastie Boys' music fills almost all of the video.  It contains a total of 53 seconds of "Pass the Mic," 12 seconds of "So Whatcha Want," 13 seconds of "Sabotage," 51 seconds of "Looking Down the Barrel of a Gun," and 86 seconds of "Make Some Noise."  Tr. 332 (Ricigliano).  These are among the Beastie Boys' most famous songs.  Tr. 117 (Horovitz).[15]  As an expert witness testified, the music is "loud" and "not in the background."  Tr. 529 (Thomas).  In total, the Beastie Boys' music provides the only sound for nearly 80% of the video.

Further, the video repeatedly juxtaposes the Beastie Boys' music with Monster logos, in a way that naturally suggests association.  The first thing viewers see is a full-screen Monster logo; the next thing viewers hear is Horovitz singing "I'm the A-D-R-O-C-K," referring to his stage name.  Video at 0:01–0:04.  The Beastie Boys song, "Pass the Mic," plays as the video displays Monster's promotional models showing off the strategically placed Monster logos on their revealing outfits.  *Id.* at 0:38–0:41.  While snowboarders with Monster stickers on their helmets and boards zoom over ramps emblazoned with Monster logos on a course populated by Monster banners, the Beastie Boys chant, "listen all of y'all it's a sabotage"—a recognizable line from one of the band's most popular songs.  *Id.* at 1:05–1:18.  And, as the video depicts, when the

---

[15] An analogy is illustrative:  Had Phillips chosen as the video's soundtrack songs by The Beatles that were comparably prominent within that band's body of work, he might have chosen "Love Me Do," "Yesterday," "Let It Be," "Here, There and Everywhere," and "Hey Jude."

Beastie Boys sing "make some noise if you're with me," the after-party crowd readily complies. *Id.* at 2:49–2:56.

In addition, the video contains two textual references to the Beastie Boys, both in Monster's green and grey colors. As noted, the credits read, in relevant part:

MUSIC
ALL-ACCESS BEASTIE BOYS MEGA MIX
COURTESY OF Z-TRIP

DOWNLOAD THE LINK FOR FREE AT
ZTRIP.BANDCAMP.COM

*Id.* at 3:51–3:53. The next screen reads "RIP MCA" and slowly fades to black. *Id.* at 3:54–3:58.

Finally, in disseminating the video, Monster continued to draw attention to the Beastie Boys. The company's description of the video as posted on its website, YouTube channel, and Facebook page, began with a reference to "Beastie Boys Megamix by Z-Trip. Download 'All-Access A Beastie Boys Megamix' here: http://ztrip.bandcamp.com." PX 135, PX 150, PX 200, PX 270. The press release Monster sent to snowboarding magazines and websites contained the same language. PX 165; *see also, e.g.*, PX 164, PX 276. Finally, a visitor to YouTube, Facebook, or Monster's website who clicked on the link to the Megamix would find himself or herself on Z-Trip's website, able to download the Beastie Boys Megamix for free, Tr. 197–98, 306, 715, apparently compliments of Monster. Indeed, a Monster employee acknowledged that this circumstance connoted sponsorship of Monster by the Beastie Boys. *See* PX 175 (email from Hartsfield to Nichols acknowledging that "the fact we used the song and provided a link to download for free makes it look more like we are sponsoring them").

In light of this evidence, a jury could easily conclude that Monster used the Beastie Boys persona to suggest, misleadingly, that the band was endorsing Monster Energy. The ubiquity of the band's music "unquestionably br[ought] to mind" the Beastie Boys, and the use of the names

42

"Beastie Boys" and "MCA" in the credits drove the point home. *Dallas Cowboys Cheerleaders*, 604 F.2d at 205. It is, in sum, "hard to believe that anyone who had seen defendant['s video] could ever thereafter disassociate it from plaintiff[s' music]." *Id.*

There was, therefore, sufficient evidence to establish this element of the Beastie Boys' false endorsement claim. And Monster, tellingly, does not argue that, were the video viewed as a whole, a consumer would not be left with the impression that the Beastie Boys had endorsed Monster and its products. Instead, Monster primarily argues that, as a matter of law, in determining whether the video constituted an endorsement, the jury was not permitted to consider the use of the Beastie Boys' copyrighted music in the video; the jury was instead limited to considering only the video's textual use of the names "Beastie Boys" and "MCA." Monster bases this argument on *Oliveira v. Frito-Lay, Inc.*, which held that Frito Lay's use of Astrud Gilberto's song, *The Girl from Ipanema*, in a television commercial for potato chips did not give rise to a valid false endorsement claim. 251 F.3d at 62–63. And, Monster argues, the textual snippets in Monster's video alone were insufficient to support a finding of false endorsement. Monster Br. 7–10.

Monster's argument is unpersuasive, for several reasons.

First, this argument should have been made at the time the Court, with counsel's input, formulated instructions as to the facts that the jury could properly consider in deciding the Lanham Act claim. At the charge conference, the Court invited counsel "to comment on each page [of the draft jury instructions] on which you have an issue." Tr. 1241. Although Monster raised other issues, *see, e.g.*, Tr. 1250–52, it did not object to the proposed instructions or seek an instruction excluding the five Beastie Boys songs used in the video from the evidence the jury could consider in determining if there had been a false endorsement. *See* Tr. 1241–63, 1383–85,

1390–92, 1500–07.  To the contrary, in discussing Monster's request for an instruction on

nominative fair use, the Court had the following exchange with Monster's counsel:

> THE COURT: [A]s I understand the false endorsement claim, it is really based on three things. ***First and foremost, it's based on the fact of the music being used***; second, it's based on the MCA reference; and third—and this is the only part that your instruction goes to—it would be the fact that the Beastie Boys are referenced in the title of the Megamix. And so to the extent that you're seeking this instruction, it goes only to defend as against that third part, correct?

> MR. KAHN: That's correct.

Tr. 1502 (emphasis added).  To the extent Monster's present argument implicitly challenges the

jury instructions given at trial, it is waived.[16]

Second, to the extent Monster seeks judgment as a matter of law on this theory, the

argument also was waived.  A party may move for judgment as a matter of law "at any time

before the case is submitted to the jury."  Fed. R. Civ. P. 50(a).  After an unfavorable verdict, the

party may "renew[]" its motion.  Fed. R. Civ. P. 50(b).  The renewed motion, however, is

"limited only to the grounds specifically raised in the prior motion for judgment as a matter of

law; new grounds may not be added post-trial."  *AIG Global Sec. Lending Corp. v. Banc of Am.*

*Sec., LLC*, 386 F. App'x 5, 6 (2d Cir. 2010) (summary order) (citing *Tolbert v. Queens Coll.*, 242

F.3d 58, 70 (2d Cir. 2001)).  Rule 50 is structured in this way to give the non-moving party "an

opportunity to cure any deficiency in that party's proof."  *Lore v. City of Syracuse*, 670 F.3d 127,

152 (2d Cir. 2012).  Accordingly, "[t]he motion must specify the judgment sought and the law

---

[16] Under Rule 51, a party must "articulate and lodge their objections to jury charges before they are delivered so that 'the trial court [will have] an opportunity to cure any defects in the instructions before sending the jury to deliberate.'"  *ING Global v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir. 2014) (quoting *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 200 (2d Cir. 2004)) (alteration in original).  Any objection must be made "on the record, stating distinctly the matter objected to and the grounds for the objection."  Fed. R. Civ. P. 51(c)(1).  By failing to do so, Monster waived any argument challenging this portion of the jury instructions, at least absent "plain error."  *Rasanen v. Doe*, 723 F.3d 325, 332–33 & n.2 (2d Cir. 2013).  As discussed below, the instructions were not error, let alone "plain error."

and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a). This "'specificity requirement is obligatory.'" *Lore*, 670 F.3d at 152 (quoting *Holmes v. United States*, 85 F.3d 956, 962 (2d Cir. 1996)).

In arguing that it satisfactorily raised this issue, Monster relies on a three-sentence part of its colloquy with the Court regarding its Rule 50(a) motion. *See* Reply Br. 7. Monster there stated: "[H]ere the music . . . is subsumed by the copyright law. The music is being licensed, it's Beastie Boys' music. They're singing it, they're licensing it and that is protected by the copyright." Tr. 1196 (Kahn). Although hinting at the point, Monster hardly made it with the required specificity. Its counsel's statement might be taken to mean that the Beastie Boys cannot pursue claims for both copyright infringement and trademark infringement. But Monster's counsel did not argue that the Beastie Boys music used in Monster's video could not properly be considered in determining whether the video constituted a false endorsement. Nor did counsel cite *Oliveira v. Frito-Lay, Inc.* or, for that matter, any case authority—let alone "the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(1). Monster appears instead to have developed its theory of evidentiary insufficiency based on *Oliveira* only after trial.[17]

Third, and most important, Monster's argument fails on the merits. Relying primarily on *Oliveira*, Monster argues that "a claim based on use of the work is within the exclusive province of copyright law, not trademark law," Monster Br. 8, and that "Second Circuit precedent holds that an artistic work itself cannot form the basis of a false endorsement claim," *id.* at 7. But this argument misconstrues—it substantially overreads—*Oliveira*. *Oliveira* and its progeny do not bar a finding of false endorsement based on the facts here: Monster's use, in a single promotional

---

[17] To be sure, the Court "may reach the waived issue if to ignore it would result in manifest injustice," or if it reflects a "purely legal error." *Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 119 (2d Cir. 2004). But Monster has not argued that either of these exceptions applies here, and, for the reasons discussed *infra*, they do not.

video, of lengthy excerpts from five Beastie Boys songs, a textual reference to the Beastie Boys, and a separate reference to a member of that group (MCA).

Contrary to Monster's characterization, the Second Circuit in *Oliveira* did not treat copyright infringement and false endorsement as inherently incompatible causes of action, such that a successful action pursuing one could never succeed as to the other.  Rather, the Court first acknowledged:

> The fact that musical compositions are protected by the copyright laws is not incompatible with their also qualifying for protection as trademarks.  Graphic designs, of course, may be protected by copyright; that does not make them ineligible for protection as trademarks.  The Act defines a "trademark" as including "any word, name, symbol, or device, or any combination thereof used by a person . . . to identify and distinguish his or her goods . . . from those manufactured or sold by others and to indicate the source of the goods."  15 U.S.C. § 1127.  We can see no reason why a musical composition should be ineligible to serve as a symbol or device to identify a person's goods or services.

251 F.3d at 61 (ellipses in original).  For example, the Court noted, the song "Sweet Georgia Brown" is a registered trademark for the Harlem Globetrotters, and the "double your pleasure, double your fun" ditty likely serves as a common-law trademark for Doublemint Gum.  *Id.* at 61 n.1.  But, the Court explained, there are limits.  Although a musical composition can serve as a trademark for goods or services, it cannot serve as a trademark "*for itself.*"  *Id.* at 62 (citing *EMI Catalogue P'ship*, 228 F.3d at 64).  And an artist's "signature performance" cannot establish a trademark signifying that artist.  *Id.*  Thus, to use a well-known example, the singer Bob Seger's performance of the song "Like a Rock," the long-running musical backdrop for Chevrolet truck commercials, can function as a trademark for Chevy.  But Seger's performance cannot be a trademark for the song "Like a Rock" or for the artist, Seger.

Accordingly, under *Oliveira*, a single signature song, considered alone, cannot form the basis of a false endorsement claim.  *See also, e.g.*, *Henley*, 733 F. Supp. 2d at 1168 ("Plaintiffs

cannot maintain a Lanham Act claim based *purely* on the use of Henley's songs.") (emphasis added).  As the Second Circuit explained in *Oliveira*, this rule is necessary to vindicate the copyright laws.  Were suits by the artist for false endorsement permitted based solely on use of the artist's song, a person who lawfully acquired a license to use this copyrighted work could be chilled from doing so by fear of a suit brought under the Lanham Act.  The facts of *Oliveira* aptly illustrated the point.  Frito-Lay had spent more than $200,000 to acquire, under the copyright laws, a license and synchronization rights from the record owners of *The Girl from Ipanema*.  251 F.3d at 58.  Gilberto, who had provided lead vocals but had no established proprietary interest in the song, then sued Frito Lay under the Lanham Act for trademark infringement based on a theory of false endorsement.  *Id*. at 58–59.  In ruling for Frito-Lay, the Second Circuit explained that allowing Gilberto's Lanham Act claim "would be profoundly disruptive to commerce" because "[n]umerous artists who could assert claims similar to Gilberto's would bring suit against entities that had paid bona fide license fees to all known holders of rights."  *Id.* at 63.

For two reasons, *Oliveira* does not assist Monster in this lawsuit.  First, the Beastie Boys did not base their claim of false endorsement on Monster's use of a single Beastie Boys song in an advertisement.  Instead, Monster's promotional video incorporated a variety of elements referencing the Beastie Boys—extensive excerpts from not one but five songs, a textual reference to the Beastie Boys, and another reference ("RIP MCA") to the well-known stage name of one of the band's three members.

At trial, the Beastie Boys contended that the use of these elements, synergistically and in combination, associated the band with Monster and its products in the minds of viewers of the video, constituting an endorsement.  *See* Tr. 1641, 1656–57.  Although *Oliveira* precludes an

artist from claiming false endorsement based solely on the use of a single song, that decision does not speak to the circumstance in which such use is claimed to be one part of a broader effort to falsely convey an endorsement by the artist of a product or company.  And a rule of law that prevented a factfinder from examining the allegedly endorsing advertisement holistically, and artificially required it to excise and ignore the portions of the ad comprised of copyrightable works, would invite abuse.  Here, the Beastie Boys argued, the video's numerous references to the band (five excerpts of songs and two textual references, plus other references in website links and press releases) were additive.  The video's textual references to the Beastie Boys and to MCA took on greater significance in that they followed four minutes of video footage in which Beastie Boys songs formed the loud and virtually unrelenting aural backdrop to the ad's running endorsement of Monster.  On Monster's theory, however, the jury would be obliged to consider the Beastie Boys' endorsement claim based, at most, on the video's two textual references to the band in isolation, cut loose from the musical backdrop against which those references appear. The Court is unaware of any authority requiring this unlikely result.  Certainly *Oliveira* does not address this scenario.[18]

        Second, the policy concern that drove *Oliveira* does not support Monster here.  There, the Second Circuit understandably was concerned about the deterrent effect upon bona fide holders of copyright licenses to perform musical works if performance of such a work were held sufficient to support a Lanham Act claim of a falsely implied endorsement.  But that concern is not present where, as here, the Lanham Act defendant did not hold (or claim to hold) a copyright

---

[18] *Dastar Corp. v. Twentieth Century Fox Film Corp.* is similarly inapt.  There, the Supreme Court held that the unauthorized use of a copyrightable television series, considered alone, cannot support a reverse "passing-off" claim under § 43(a).  539 U.S. at 37–38.  *Dastar* does not address whether a defendant's unauthorized use of copyrighted works, when occurring in conjunction with the defendant's unauthorized use of protected marks, can support a § 43(a) claim of an implied endorsement.

license and in fact conceded copyright infringement.  Holding such a defendant liable for false

endorsement based on an advertisement that exploited (among other things) an artist's

copyrighted works does not threaten, at all, to "upset[] reasonable commercial expectations."

*Oliveira* , 251 F.3d at 63.[19]

In a final challenge to the jury's finding of a falsely implied endorsement, Monster argues

that the video's use of the term "Beastie Boys" in describing the video was protected under the

"nominative fair use" doctrine, and therefore the jury could not consider it in deciding whether

the video implied an endorsement by the band.  Specifically, Monster argues that "there was no

other way for Monster to refer to Sciacca's Megamix than by its proper title."  Monster Br. 11.

The Court rejected this argument during trial when Monster requested a jury instruction on

nominative fair use.  *See* Tr. 1500–07.  Monster's parallel claim, now made as part of its Rule 50

motion, is also unpersuasive.

The doctrine of nominative fair use originated in the Ninth Circuit.  *See generally New

Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d 302 (9th Cir. 1992).  The premise of the

doctrine is that, in some instances, "there is no descriptive substitute" for a trademarked name or

---

[19] Even if the video's use of the Beastie Boys' performance of their five copyrighted songs was
barred from its consideration, a jury conceivably could have reached the same verdict based on
the video's use of the band's and MCA's names. *See, e.g.*, *Abdul-Jabbar*, 85 F.3d at 413 (jury
could reasonably find false endorsement based on a car company's reference to basketball star's
former name and accolades in a commercial); *Chambers v. Time Warner*, No. 00 Civ. 2839
(JSR), 2003 WL 749422, at *3 (S.D.N.Y. Mar. 5, 2003) (finding a false endorsement claim
plausible based on the use of trademarked names on a website).  The Court, of course, can do no
more than speculate as to the bases of the jury's verdict.  It is, however, notable that plaintiffs'
damages expert, Thomas, opined that damages on the Lanham Act claim were $1 million, of
which Thomas attributed $500,000–$600,000 to the use of the Beastie Boys' music, and the
balance to the use of the Beastie Boys' names. *See* Tr. 802–03.  The jury—which had been
instructed that in determining Lanham Act damages it could take into account any overlap with
copyright damages, Tr. 1618—awarded plaintiffs $500,000 on the Lanham Act claim.
Conceivably, the jury could have arrived at this $500,000 award by attributing that sum to the
video's use of the band's and MCA's trademarked names.

term, and so "use of the trademark does not imply sponsorship or endorsement of the product because the mark is used only to describe the thing." *Id.* at 306.  Applying this doctrine, the Ninth Circuit found no trademark infringement where a newspaper used the name of a band in a survey that asked readers to identify their favorite band member. *Id.* at 308–09.  Similarly, the First Circuit found no infringement where a news channel used the trademarked term "Boston Marathon" in reporting on that event. *WCVB–TV v. Boston Athletic Ass'n*, 926 F.2d 42, 44–46 (1st Cir. 1991).  Courts have also applied this principle in commercial contexts.  For example, the Ninth Circuit held that an automobile repair shop could not advertise its expertise in repairing Volkswagens without using that trademarked name. *See Volkswagenwerk Aktiengesellschaft v. Church*, 411 F.2d 350, 352 (9th Cir. 1969).

The Second Circuit has not adopted the Ninth Circuit's formulation of this doctrine. *See Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 102 (2d Cir. 2010).  But it has recognized that "a defendant may lawfully use a plaintiff's trademark where doing so [1] is necessary to describe the plaintiff's product and [2] does not imply a false affiliation or endorsement by the plaintiff of the defendant." *Id.* at 102–03 (numerals added); *see also EMI Catalogue P'ship*, 228 F.3d 56 at 65 ("Where a mark incorporates a term that is the only reasonably available means of describing a characteristic of another's goods, the other's use of that term in a descriptive sense is usually protected by the fair use doctrine.").

Neither of these two requirements is satisfied here.  First, it was not necessary for Monster to use the Beastie Boys name to describe Z-Trip's Megamix.  The Megamix, which provided the soundtrack for the entire video, was readily identifiable without using the name "Beastie Boys."  As Monster employees suggested in the course of editing the video, the credits could have read music "courtesy of Z-Trip," PX 132, or "re-mix provided by ZTrip," PX 133.

And although Monster argues that Phillips added the Beastie Boys' name to the video's credits to satisfy Z-Trip, *see* Monster Br. 18, the email in which Z-Trip asked Phillips to mention his Megamix in the recap video said nothing of the sort.  Z-Trip instead suggested adding "[d]ownload the mix for free at http://ztrip.bandcamp.com."  PX 134.  In any event, even if Monster had needed to use the Beastie Boys name to identify the video's soundtrack in the credits, there was no need for it to include the additional reference to MCA,[20] to mention the Beastie Boys by name on Monster's YouTube channel and Facebook page, or to refer to the Beastie Boys in the press release promoting the video.  *Cf. Jackson*, 9 F. Supp. 3d at 361 ("While the use of the 'G-Unit Radio' button seems necessary to identify the mixtape series of the same name, its placement on the masthead along with members of G–Unit could imply false affiliation or endorsement by Jackson, the owner of the 'G–Unit' mark.").

Second, for the reasons reviewed above, the use of the Beastie Boys' name in conjunction may have implied a false affiliation or endorsement, given that the name was accompanied by lengthy excerpts of five of their songs and by a separate reference to MCA.  *Cf. Chambers*, 2003 WL 749422, at *3 (finding false endorsement claim plausible where a website used trademarked names to accurately identify unauthorized MP3s available for consumers to download).  This case thus differs from ones in which the use of a trademarked name was done in the course of journalistic reporting.  Indeed, Monster's own employees testified that Monster had added Beastie Boys music to the montage of the Ruckus event to make the Monster brand "lifestyle" seem "cool."  *See* Tr. 1159, 1163 (Phillips Dep. 175), 1278 (Nichols Dep. 19–20, 38–39).

---

[20] Monster argued to the jury that its reference to MCA was intended and would be understood as an homage to the recently deceased Yauch and that the jury therefore should not consider it in determining whether the video constituted an endorsement.  *See* Monster Br. 11–12, 18–20.  The jury was free to accept or reject that argument.

Monster's use of the Beastie Boys' trademark therefore did not qualify as nominative fair use, and the jury was entitled to consider it in resolving the endorsement element.

e.      *Was the Video Likely to Cause Consumer Confusion?*

Monster also disputes the sufficiency of the evidence as to the other disputed Lanham Act element: whether there was a likelihood of consumer confusion as to the Beastie Boys' sponsorship or endorsement of Monster and its products.  *See EMI Catalogue P'ship*, 228 F.3d at 62 ("If consumers believe that the trademark owner sponsors or endorses the use of the challenged mark, the confusion requirement is satisfied.").  To evaluate whether plaintiffs have shown a likelihood of confusion, courts in this Circuit consider the eight factors set out in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961).  *See, e.g.*, *Kelly-Brown v. Winfrey*, 717 F.3d 295, 307 (2d Cir. 2013) (discussing the *Polaroid* factors).  As the Court instructed the jury, without objection, the *Polaroid* factors relevant in this case included: "(1) the level of recognition that the Beastie Boys have among purchasers of Monster's products; (2) the similarity between the Beastie Boys' music and names and the music and names used by Monster; (3) any evidence of actual consumer confusion regarding whether the Beastie boys endorsed Monster's products; (4) Monster's intention in selecting the Beastie Boys' music and names; and (5) the sophistication of Monster's potential customers."  Tr. 1615–16 (citing *Polaroid*, 287 F.2d at 495).

The Beastie Boys did not offer evidence of actual consumer confusion.  *See* Beastie Br. 16–17.  But such evidence was not required:  "[A]ctual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a *likelihood* of confusion as to source."  *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799

F.2d 867, 875 (2d Cir. 1986) (emphasis added).  And the other factors, for the most part, supported a finding of likely confusion.

The first factor, familiarity with the Beastie Boys among Monster consumers, strongly supported the verdict.  The jury received evidence of Beastie Boys' long and successful career, *see, e.g.*, Tr. 103–05, 526–28, 869, in which they have won Grammy and MTV awards and performed thousands of concerts at famous venues (*e.g.*, Madison Square Garden) around the world.  Tr. 103–105.  The evidence showed that the Beastie Boys are particularly popular among young men, Monster's target demographic.  *See* Tr. 727–29, 1133 (Phillips Dep. 57–58).  For that reason, multiple DJs played Beastie Boys music at the Ruckus in the Rockies after-party, Tr. 457–58, and Hamilton, Monster's director of music marketing, had weighed approaching the Beastie Boys about a corporate sponsorship agreement because he viewed a Beastie Boys "audience [as] similar to a Monster consumer," Tr. 1378–79 (Hamilton Dep. 63–64).

The second factor, the similarity between the Beastie Boys' music and names and the music and names used by Monster, also strongly supports the verdict.  The recap video used the Beastie Boys' actual music and, verbatim, the group's name and Yauch's "MCA" stage name. *See, e.g.*, Tr. 332–33 (Ricigliano); PX 211.

There also was evidence from which the jury could find that the fourth factor, Monster's intention in selecting the Beastie Boys' music and names, favored the Beastie Boys.  Phillips testified that he produced the video, in the form he did, to promote Monster's brand.  Tr. 1159, 1163 (Phillips Dep. 175).  And the construct of the video itself bespoke an intention to liberally draw upon the Beastie Boys music.  On those bases, the jury could have reasonably concluded that Monster included the Beastie Boys' music and names to advance the goal of promoting Monster—"to appropriate the cachet of one product," the Beastie Boys, "for another," Monster.

*Abdul-Jabbar*, 85 F.3d at 413 (citation omitted); *see also, e.g.*, *Jackson*, 9 F. Supp. 3d at 359

(finding "sufficient evidence for a jury to conclude that this factor weighs in [plaintiff's] favor"

based on defendant's "knowledge of [plaintiff's] persona" and use of his trademark without

permission).

　　The fifth factor, the sophistication of Monster's consumers, also supported the verdict.

Monster's expert testified that energy drinks are "an impulse purchase." Tr. 1434

(Joachimsthaler). As the jury could also appreciate, such beverages are inexpensive, and are

unlikely to require extended pre-purchase cerebration. On these bases, the jury could fairly

conclude that Monster's consumers are relatively unsophisticated and vulnerable to confusion.

*See Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, No. 01 Civ. 5981 (LTS), 2004 WL

2158120, at *7 (S.D.N.Y. Sept. 28, 2004) (citation omitted) ("The expense of the products, the

manner and market conditions in which the products are purchased, and whether purchasers may

be subject to impulse are relevant in determining the sophistication of the buyers."); *see also*

*Natural White, Inc. v. Dentorium Prods. Co.*, 210 F.3d 355, 356 (2d Cir. 2000) (summary order)

("[C]onsumers are less careful when making small purchases."). Indeed, the case law recognizes

that purchasers of inexpensive snacks are less likely than purchasers of expensive or luxury items

to carefully consider alternatives or closely probe marketing gambits. *Compare Merit Diamond*

*Corp. v. Suberi Bros.*, No. 94 Civ. 4572 (SHS), 1996 WL 11192, at *9 (S.D.N.Y. Jan. 11, 1996)

(purchasers of diamonds likely sophisticated), *and Deere & Co. v. MTD Prods., Inc.*, 860 F.

Supp. 113, 124 n.4 (S.D.N.Y. 1994) *aff'd*, 41 F.3d 39 (2d Cir. 1994) (purchasers of lawn tractors

likely sophisticated), *with Malaco Leaf, AB v. Promotion In Motion, Inc.*, 287 F. Supp. 2d 355,

377 (S.D.N.Y. 2003) (purchasers of fish-shaped gummy candies likely not sophisticated), *and*

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1004 (2d Cir. 1997) ("[P]otential

buyers of toilet-shaped coin banks, generally speaking, lack the sophistication to distinguish" between competing products.).

Considering these factors, and considering the evidence in the light most favorable to the verdict, the jury could have reasonably concluded that the *Polaroid* factors supported a finding of a likelihood of consumer confusion. Deference to the verdict is particularly appropriate on this issue because "[t]he question of whether consumer confusion exists is factual by nature," and so "a jury should be allowed to weigh the facts and determine ultimate relief." *Schieffelin & Co. v. Jack Co. of Boca*, 725 F. Supp. 1314, 1323–24 (S.D.N.Y. 1989) (citing, *inter alia*, *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 116 (2d Cir. 1984)); *see also Jackson*, 9 F. Supp. 3d at 361 ("[T]he likelihood of confusion . . . is a matter best left for the jury."). The jury was certainly not "compelled to accept" Monster's view, as would be necessary to grant judgment for Monster as a matter of law. *Zellner*, 494 F.3d at 370–71.

### 4. Lanham Act—Intentional Deception

Monster, finally, challenges in its Rule 50 motion the jury's finding of intentionally deceptive conduct by Monster, a finding which authorized the imposition of money damages on the Lanham Act claim.

#### a. *Applicable Legal Standard*

Upon a finding of liability for false endorsement under the Lanham Act, a plaintiff may petition for injunctive relief. *PPX Enters., Inc. v. Audiofidelity Enters., Inc.*, 818 F.2d 266, 271 (2d Cir. 1987).[21] But to recover money damages, plaintiffs "have a greater burden." *Id.* They must prove "either actual consumer confusion or deception resulting from the violation or that

---

[21] At argument, Monster has acknowledged that, if the Lanham Act verdict stands, injunctive relief is appropriate. *See* Oral Arg. Tr. 28–29.

the defendant's actions were intentionally deceptive thus giving rise to a rebuttable presumption of consumer confusion."  *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir. 1992) (citations and internal quotation marks omitted).[22]

 The Beastie Boys did not offer evidence of actual consumer confusion.  *See* Tr. 1207–08, Beastie Br. 16–17.  Accordingly, the Court instructed the jury that, to obtain money damages on the Lanham Act claim, the Beastie Boys were required to prove that Monster "intended to deceive the public."  Tr. 1616.

As to this issue, unlike with respect to proving willful copyright infringement under the Copyright Act, reckless disregard does not suffice.  *See, e.g.*, *Reed Constr. Data Inc. v. McGraw-Hill Co.*, No. 09 Civ. 8578 (JPO), 2014 WL 4746130, at *22 (S.D.N.Y. Sept. 24, 2014).  Instead, "a plaintiff must show that the 'defendant adopted [the plaintiff's] mark with the intention of capitalizing on [the] plaintiff's reputation and goodwill and any confusion between his and the [defendant's] product.'"  *Borghese Trademarks Inc. v. Borghese*, No. 10 Civ. 5552 (JPO) (AJP), 2013 WL 143807, at *11 (S.D.N.Y. Jan. 14, 2013) (quoting *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 482–83 (2d Cir. 1996)) (first and second alterations in original).[23]

---

[22] As the Court noted in a pretrial decision, judges in this District have reached different conclusions as to whether Congress' 1999 amendments to the Lanham Act abrogated the Second Circuit's rule governing Lanham Act damages.  Dkt. 90, *reported as Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 354, 366 (S.D.N.Y. 2014) (collecting cases).  For the reasons given there, the Court held that this Circuit's rule survived the 1999 Amendments.  *Id.* at 366–67; *see also, e.g.*, *GMA Accessories, Inc. v. BOP, LLC*, 765 F. Supp. 2d 457, 469–71 (S.D.N.Y. 2011) *aff'd sub nom. GMA Accessories, Inc. v. Elec. Wonderland, Inc.*, 558 F. App'x 116 (2d Cir. 2014) (summary order).

[23] Monster now argues that, to find intentionally deceptive conduct, the jury was obliged to separately find that this conduct was "egregious."  Monster Br. 16; Reply Br. 1.  That is wrong.  The Second Circuit has indeed stated that "[g]iven the 'egregious nature' of deliberate conduct, 'we see no need to require [plaintiff] to provide consumer surveys or reaction tests in order to prove entitlement to damages.'"  *Res. Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134, 140 (2d Cir. 1991) (citation omitted).  But in using the word "egregious" to

This showing can be made through direct or circumstantial evidence.  *See, e.g.*, *WE Media, Inc. v. Gen. Elec. Co.*, 218 F. Supp. 2d 463, 475 (S.D.N.Y. 2002) *aff'd sub nom. WE Media, Inc. v. Cablevision Sys. Corp.*, 94 F. App'x 29 (2d Cir. 2004) (summary order).  Indeed, the Second Circuit "'has unequivocally rejected the view that circumstantial evidence is probatively inferior to direct evidence.'"  *La Torres v. Walker*, 216 F. Supp. 2d 157, 168 (S.D.N.Y. 2000) (quoting *United States v. Brown,* 236 F.2d 403, 405 (2d Cir. 1956)).

"Once it is shown that a defendant deliberately engaged in a deceptive commercial practice, . . . a powerful inference may be drawn that the defendant has succeeded in confusing the public."  *Res. Developers, Inc.*, 926 F.2d at 140.  The burden then "shifts to the defendant to demonstrate the absence of consumer confusion."  *Id.*

> b.      *Analysis*

In seeking judgment as a matter of law on this point, Monster notes, accurately, that there was no direct evidence at trial of intentional deception by Phillips (or other Monster employees involved with the video).  Phillips did not, for example, admit in his testimony that he had acted with intent to deceive consumers as to whether the Beastie Boys had endorsed or were otherwise affiliated with Monster.  Nor was there contemporaneous evidence (*e.g.*, emails) containing any such admission.

But, as noted, intentional deception can be proven by circumstantial evidence.  Here, two firmly established facts supplied a basis on which a jury could infer intentional deception, to wit,

---

characterize intentionally deceptive conduct—and thereby to explain why a finding of intentionally deceptive conduct obviates the need to prove actual consumer confusion—the Second Circuit did not suggest that it was adding an element to the showing necessary to support a finding of damages.  Rather, courts in this Circuit consider whether conduct was particularly egregious in considering the proper amount of a damages award.  *See, e.g., Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 72–73 (2d Cir. 1998); *EMI April Music Inc. v. 4MM Games, LLC*, 12 Civ. 2080 (DLC) (JLC), 2014 WL 325933, at *5 (S.D.N.Y. Jan. 13, 2014) (collecting cases).

that Monster intended to capitalize on the Beastie Boys' goodwill and reputation and to convey the impression of an endorsement while knowing that the group had not endorsed Monster. First, Phillips, the Monster employee who produced the video, knew—and at trial admitted knowing—that the Beastie Boys had not endorsed Monster. *See* Tr. 1173 (Phillips Dep. 124). Second, despite knowing this, Phillips constructed a video promoting Monster that for four minutes was suffused with Beastie Boys' songs (and contained references to the band). *See* Tr. 1147–48, 1155–56 (Phillips Dep. 106, 111).

Under these circumstances, a jury could reasonably conclude that Phillips intended the natural consequences of his actions. The video he created drew so heavily upon the Beastie Boys' music (and names) that an objective observer—at least one who knew enough to recognize the five songs as performances by the Beastie Boys of their music—would likely have regarded the Beastie Boys as a co-equal subject of the video, along with Monster. Two of Phillips' colleagues at Monster in fact recognized just this—that the video suggested an affiliation between Monster and the Beastie Boys. *See* PX 175 (emails between Hartsfield and Nichols stating that "the use of their name in the description and in the video creating association" was "bad," and "the fact we used the song and provided a link to download for free makes it look more like we are sponsoring them"). An objective observer could easily have concluded that the Beastie Boys, by lending their music and names to the video, were endorsing Monster products.

Where the natural implication of the promotional video (*i.e.*, to falsely imply that the Beastie Boys were backing Monster) was apparent, the lack of direct proof of Phillips' deceptive intent was not fatal. *See Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 84 n.27 (1989) ("Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For normally

the actor is presumed to have intended the natural consequences of his deeds.") (citation

omitted); *see also Rice & Hutchins v. Vera Shoe Co.*, 290 F. 124, 126 (2d Cir. 1923)

("[A]dopting the word 'Vera' in its corporate name, which is an arbitrary selection, the appellee

must be held to have intended the natural consequences of its act.  It is very likely that appellee's

shoes would soon become known as 'Vera' shoes, with the resulting confusion.").

Moreover, aspects of Phillips' testimony reinforced the inference that he appreciated the

false impression of association with the Beastie Boys that the Monster recap video would create.

He testified, for example, that he had created the video to promote Monster's "brand lifestyle"

and "personality."  Tr. 1159, 1163 (Phillips Dep. 175).  He further testified that he was a fan of

the Beastie Boys, grew up listening to their music, and knew that the band was important to his

peer group.  Tr. 1101, 1145 (Phillips Dep. 111–12).  He also admitted that he had been "fairly

excited" to use the group's music in the video, Tr. 1112, and that he had suggested adding the

"RIP MCA" insignia at the end of the video because the Beastie Boys were "heroes" to and had a

"heavy influence" on Monster's target demographic, Tr. 1147–48 (Phillips Dep. 57–58, 111–12).

Further, to the extent that Phillips denied exploiting the Beastie Boys' name in the service of his

employer, his testimony contained enough contradictory or jarring elements to justify the jury in

disregarding such a claim.  *See supra* p. 26.[24]

---

[24] Relitigating a claim it pressed before the jury, Monster argues that Phillips included the textual
reference to the "Beastie Boys" in the video because Z-Trip asked him to do so, not out of intent
to deceive consumers.  Monster Br. 18.  For two reasons, this argument fails.  First, as noted, Z-
Trip did not ask Phillips to add the words "Beastie Boys" to the video; rather, Z-Trip suggested
that Phillips add the phrase "[d]ownload the mix for free at http://ztrip.bandcamp.com," PX 134,
and Phillips went beyond that request, adding the words "Beastie Boys."  *See supra* pp. 21–22,
50–51.  Second, the two purposes (placating Z-Trip and promoting the video by heightening the
association between Monster and the Beastie Boys) are not mutually exclusive.  Even if Phillips
was prompted to act by a desire to please Z-Trip, he nevertheless could also have appreciated
that referring to the Beastie Boys would enhance the association between Monster and the band.

Based on this testimony, the jury could have inferred that Phillips, acting on behalf of Monster, used the Beastie Boys' music and marks "with the intention of capitalizing on [its] reputation and goodwill and [on] any confusion" that resulted. *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 124 (2d Cir. 2001) (quoting *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir. 1991)). To be sure, Monster's counsel forcefully argued the opposite to the jury, *see, e.g.*, Tr. 1680–81, and, on the trial evidence, the jury could well have accepted Monster's argument that no endorsement was intended. A verdict for either side on this point had an anchor in the evidence. But on a motion for judgment as a matter of law, the Court must defer to the verdict where supported by reasonable inferences drawn from the evidence, *Galdieri-Ambrosini*, 136 F.3d at 289, particularly where these inferences relate to a matter as subjective as the intentions of an employee whom the jury had the opportunity to size up at trial, *cf. Am. Int'l Grp., Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 353 (2d Cir. 1981) ("Subjective issues such as good faith are singularly inappropriate for determination on summary judgment.").

Once the jury found that Monster's employee, Phillips, intended to deceive the public, a presumption arose that Monster's conduct led to actual consumer confusion. *See Res. Developers*, 926 F.2d at 140. The burden then shifted to Monster to establish a lack of actual confusion. *Id.* Monster did not attempt to rebut this presumption. Accordingly, because the evidence permitted the jury to infer intentional deceptiveness on the part of Phillips and thereby Monster, the jury was entitled to find for the Beastie Boys on this issue.

### B.    Monster's Rule 59 Motion

The burden for granting a new trial under Rule 59 is lighter than that for granting judgment as a matter of law under Rule 50. *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998). In resolving a Rule 59 motion, a court "may weigh the evidence and the credibility of

witnesses and need not view the evidence in the light most favorable to the verdict winner."
*Raedle*, 670 F.3d at 418.  A court may grant a new trial "even if there is substantial evidence to
support the jury's verdict."  *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 54 (2d Cir. 2000) (citation
omitted).  In general, however, a court should not grant a new trial unless "the jury has reached a
seriously erroneous result or the verdict is a miscarriage of justice."  *Carrion v. Agfa Constr.,
Inc.*, 720 F.3d 382, 387 (2d Cir. 2013) (citation and internal quotation marks omitted).

### 1.      Copyright Act

The Court declines to grant a new trial on the Copyright Act claims for two reasons.
First, although the Court is not required to "view the evidence in the light most favorable to the
verdict winner" in resolving a motion for a new trial, *Raedle*, 670 F.3d at 418, the jury's
credibility determinations still merit a "high degree of deference," *ING Global*, 757 F.3d at 98.
Here, the critical disputed issue was whether Monster's infringement was willful—Monster had
conceded the fact of infringement—and Monster's defense on that point turned significantly on
Phillips' testimony.  The verdict suggests that the jury rejected Phillips' claim that Z-Trip had
granted permission for Monster to use the Beastie Boys' music in its promotional video, and that
it credited Z-Trip's testimony on that point.  That judgment was reasonable.  The Court declines
to disturb it.

More broadly, there is no injustice in holding Monster accountable for recklessly
disregarding the Beastie Boys' copyright interests.  For the reasons reviewed earlier, the record
contained an ample basis on which to find that Phillips and Nichols, Monster's employees and
agents, each acted with such disregard.  Beyond that, the record strongly supported the
conclusion that Monster's infringement of the Beastie Boys' copyrights derived from a gross
lack of attention at the corporate level to other entities' intellectual property rights.  Monster had

no comprehensive music licensing policy; it tasked unqualified and untrained employees with the job of creating and disseminating promotional recap videos that presented a goodly risk of trenching on others' rights; and it protected its own intellectual property interests with far more vigor and solicitude than it did others'.  In light of Monster's "casual" approach to others' intellectual property rights, *see Island Software*, 413 F.3d at 263, the jury's finding of willful infringement on a reckless disregard theory was therefore neither "seriously erroneous" nor a "miscarriage of justice," *Carrion*, 720 F.3d at 387.

### 2.    Lanham Act

The Court also declines to grant a new trial on the Lanham Act claim.  Monster's exploitation of the Beastie Boys' music and marks associated the Beastie Boys with Monster Energy "in such a way that consumers [were] likely to be misled about the celebrity's sponsorship or approval of the product."  *ETW Corp.*, 332 F.3d at 925–96.  Indeed, if an ordinary viewer familiar with the Beastie Boys' music were asked to watch the video once and were then asked what it was about, the viewer would almost certainly list two things—Monster and the Beastie Boys.  After viewing the video, it is difficult to disassociate the two.  *See Dallas Cowboys Cheerleaders*, 604 F.2d at 205.  In the Court's view, the jury's finding that the video gave rise to the false impression that the Beastie Boys endorsed Monster was clearly correct.

The jury's finding that Monster's deceptiveness was intentional, thereby entitling the Beastie Boys to money damages on this claim, presented a much closer question.  The jury could have fairly resolved it either way.  But in the Court's judgment, on the evidence presented, it is reasonable to infer that Phillips—and other Monster employees who viewed the video knowing that the Beastie Boys had not endorsed the company—appreciated that the video would give rise to just that false association in viewers' minds.  There is no injustice in the jury's verdict that

Monster, through its employees, published the video appreciating that it would mislead consumers into believing that the Beastie Boys endorsed Monster. As to its Lanham Act verdict, too, the jury's verdict was neither "seriously erroneous" nor a "miscarriage of justice," *Carrion*, 720 F.3d at 387, and the Court declines to disturb it.

Finally, as to all claims, Monster received a thoroughly fair trial. It, like the Beastie Boys, had the benefit of excellent legal representation. Counsel vigorously litigated the case, both pretrial and at trial, and assured that the jury was presented with all relevant evidence and all fair inferences from that evidence. The jury acted within fair bounds in returning the verdict that it did. A retrial would serve only to give Monster an undeserved second bite at the apple.

### C.     Reduction in Damages

Monster, finally, asks the Court to reduce the damages award on both claims. Once liability has been established, the "'calculation of damages is the province of the jury.'" *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 671 (2d Cir. 2012) (quoting *Ismail v. Cohen,* 899 F.2d 183, 186 (2d Cir. 1990)). The Court "may set aside a jury's award only if it is 'so high as to shock the judicial conscience and constitute a denial of justice.'" *Id.* (quoting *Manganiello v. City of New York,* 612 F.3d 149, 168 (2d Cir. 2010)). In reviewing a motion for remittitur, the Court "examine[s] awards in similar cases" to "determine whether the award is 'within [a] reasonable range,'" *Kuper v. Empire Blue Cross & Blue Shield*, No. 99 Civ. 1190, 2003 WL 359462, at *2 (S.D.N.Y. Feb. 18, 2003) (quoting *Ismail*, 899 F. 2d at 187), or "whether the jury's award is so excessive that the Court should intrude on its prerogative to set damages," *Agence France Presse*, 2014 WL 3963124, at *15.

### 1.    Copyright Act

As noted, the Copyright Act authorizes a prevailing plaintiff to elect to recover the higher of statutory and actual damages.  17 U.S.C. § 504(c)(1).  The Court declines to reduce the jury's award as to either category of damages, because the damages awarded here—$1 million in actual damages and $1.2 million in statutory damages—were both consistent with the trial evidence.

As to actual damages, the Court instructed the jury, without objection, that "actual damages means the amount of money adequate to compensate the copyright owner for the fair market value of a defendant's infringing use."  Tr. 1609 (citing *On Davis v. The Gap, Inc.*, 246 F.3d 152, 166 (2d Cir. 2001)).  The Beastie Boys' damages expert, Thomas, opined that the market value of the licenses was $100,000 per song, per side for each of the five songs, a total of $1 million.  Tr. 549–50.  In reaching this figure, Thomas considered the amounts actually paid to the Beastie Boys for other licenses; the ways in which the unusual forum presented by Monster's video compared and contrasted to other fora in which the Beastie Boys had licensed their works; and the five-week term of use that the Court directed the parties' respective experts to assume.  Tr. 549–50; *see also* Dkt. 89, *reported as Beastie Boys v. Monster Energy Co.*, No. 12 Civ. 6065 (PAE), 2014 WL 888235, at *3 (S.D.N.Y. Mar. 6, 2014) ("[D]amages stemming from the Video must be based on its actual period of availability on YouTube, which the parties have stated is approximately five weeks.").[25]

---

[25] Before trial, Monster moved to preclude Thomas's testimony as unreliable under *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993).  Dkt. 66–68.  Although the Court denied the motion, it agreed with Monster in one respect:  To be relevant and reliable in this case, Thomas's testimony had to base the fair market value of a license on a five-week term of use, not the perpetual term of use assumed in Thomas' initial expert report.  *See* Dkt. 89, *reported as Beastie Boys*, 2014 WL 888235, at *3.  The Court therefore directed Thomas to revise her expert report to take account of that assumption.

Monster here argues that "Thomas' testimony was so riddled with contradictions as to be unhelpful to the jury."  Monster Br. 25.  It is true that Thomas, who was testifying for the first time, was not a model witness.  As Monster notes, there were contradictions in her testimony, and she struggled in particular in responding to hypotheticals and assumed facts.  But her assessment of damages was within the realm of reason, particularly given the idiosyncratic nature of the license she was asked to assume (to use five iconic musical compositions and sound recordings, at length, in a four-minute promotional video published in various web fora), and it was anchored in prices actually paid for past licenses to play the Beastie Boys' music.  The jury was permitted to accept Thomas's testimony if, on balance, the jury found it credible, *see Reeves*, 530 U.S. at 151, and in the Court's estimation, the jury reasonably could have done so.

Further, the Beastie Boys' extensive licensing history was received in evidence, and it both corroborated Thomas's opinion and supplied data that would have permitted the jury, on its own, to reasonably calculate damages as it did.  *See* PX 219, PX 220.  For example, the Beastie Boys received $125,000 for use of a song in a 30-second trailer for the film *The Hangover Part II*.  PX 219, at 5.  Accepting $125,000 as the fair market value for a license to use 30 seconds of a single Beastie Boys song as part of a movie promotion,[26] the jury could have multiplied by eight to reach a $1 million figure for the right to use four minutes of five such songs as the central part of a beverage company promotion.  To be sure, whether the video is most closely akin to a movie trailer is quite debatable—the expert witnesses (and counsel) vigorously debated at trial what the most apt analogy was to the recap video.  But it was within the jury's province to

---

[26] $125,000 is a representative figure.  For other movie trailers, the Beastie Boys have received between $88,000 (for use of a song they co-wrote in a trailer for *I Love You, Man*), PX 220 at 9; and $800,000 (for 30 seconds of "visual vocals" in a trailer for *Hancock*), *id.* at 11; Tr. 261.  The Beastie Boys also *rejected* an offer of $500,000 to use 60 seconds of the song "Sabotage" in a trailer for an Arnold Schwarzenegger thriller of the same name.  PX 206; Tr. 866–67.

draw that conclusion.  And the jury received ample evidence about fees to license music for use in other media, such as talk shows and video games.  In the Court's judgment, the quirky, indeed new-age, nature of the advertising medium in this case, and the Beastie Boys' extensive licensing history that provided fodder for a wide range of potential valuations, favor deferring to the plausible valuation arrived at by the jury.  *See, e.g.*, *United States v. Applins*, 637 F.3d 59, 76 (2d Cir. 2011) (The Court "defer[s] . . . to the jury's choice of the competing inferences that can be drawn from the evidence.").

        As to statutory damages, the Court instructed the jury, again without objection, that it could award "between $750 and $150,000 for each of the 10 works infringed" if it found that Monster's conduct was willful.  Tr. 1612 (citing 17 U.S.C. §§ 504(c)(1)–(2)).  The Court further instructed the jury that, in evaluating willfulness, it could consider factors including "Monster's state of mind"; "the expenses saved, and profits earned, if any, by Monster in connection with the infringement"; "the deterrent effect of such an award on Monster and third parties"; "whether Monster cooperated in providing evidence concerning the value of the infringing material"; "the revenue lost by the plaintiffs, if any, as a result of the infringement"; and "the conduct and attitude of the parties."  Tr. 1613 (citing *Psihoyos v. Wiley*, 748 F.3d 120, 127 (2d Cir. 2014)).  Applying these factors is necessarily a subjective and fact-intensive exercise.  The Court declines to second-guess the jury's assessment, particularly because several factors—including Monster's state of mind, and the deterrent effect of such an award on Monster and third parties—can fairly be argued to justify a substantial damages award.  *See Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 355 (1998) ("[T]he Seventh Amendment provides a right to a jury trial on all issues pertinent to an award of statutory damages under § 504(c) of the Copyright Act, including the amount itself.").

Also relevant, a comparison with damage awards in other cases bearing some similarity to this one reveals that the award here falls within a reasonable range.  *See, e.g.*, *Agence France Presse*, 2014 WL 3963124, at *16 (upholding jury's award of $1.2 million in statutory damages for defendant's unauthorized use of eight photographs); *Tiger Candy Arts, Inc. v. Blairson Corp.*, No. 09 CIV. 6215 (GBD) (FM), 2012 WL 1948816, at *3 (S.D.N.Y. May 30, 2012) (awarding $1 million in statutory damages for sock-puppet kits that violated nine of plaintiff's copyrights).[27]  The Court's considered judgment is, therefore, that the award here is not so high as to "shock the conscience."  *Zeno*, 702 F.3d at 671.

### 2.  Lanham Act

As to Lanham Act damages, the Court instructed the jury, again without objection, that it should fix damages based on "the market value of the license fee that [the Beastie Boys] were entitled to charge for their endorsement."  Tr. 1617 (citing *Waits*, 978 F.2d at 1111).  On this point, Thomas opined that the fair market value of the endorsement was $1 million.  Tr. 574. Her calculation considered various factors including the "stature and prominence of the artist," "the value that they would bring" to the particular endorsement, the "territory," the "duration" of the use, and the "media" and "context" of the use.  Tr. 551.  Here, too, Monster's able cross-examination of Thomas gave the jury bases to discount or discredit her opinion, *see, e.g.,* Monster Br. 23–24, but not so much that the jury was precluded from giving her testimony weight, *see Reeves*, 530 U.S. at 151, and Thomas's opinion was not, on its face, unworthy of

---

[27] Monster cites only one case in which a Court reduced an award of statutory damages under the Copyright Act, *Home Box Office v. Champs of New Haven, Inc.*, 837 F. Supp. 480 (D. Conn. 1993).  There, defendant sought relief from a default judgment, *id.* at 481, so the court had no jury award to defer to and calculated damages independently.  Here, by contrast, "the question is not what this Court would award were it deciding the question itself; the question is whether the jury's award is so excessive that the Court should intrude on its prerogative to set damages." *Agence France Presse*, 2014 WL 3963124, at *15.

belief.  That the jury awarded $500,000 rather than the $1 million urged by Thomas suggests that the jury's damages determination was independent and discriminating.

Moreover, as with the Copyright Act claim, the jury could have reached the conclusion that it did on other grounds.  The Beastie Boys' history of music-licensing arrangements revealed ample fees for licenses granted for contexts in which the viewer might perceive an endorsement by the group, including in motion pictures and movie trailers.  *See* PX 219, PX 220.  Further, the jury heard testimony that Monster had paid substantial sums for endorsement deals.  For example, Monster paid Slash—the former guitarist for the rock band Guns N' Roses—$750,000 for a promotion that included a one-hour performance and the right to use Slash's name in connection with Monster beverages.  Tr. 1060–62 (Pontrelli).  The $500,000 award is also in line with the few comparable reported cases that have resulted in jury verdicts.  *See, e.g.*, *Waits*, 978 F.2d at 1102–06 (affirming jury award of $2,375,000 under state tort law parallel to the Lanham Act for a commercial that imitated singer Tom Waits' voice).  The Court therefore holds that the damage award does not "shock the conscience" and does not warrant remittitur.  *Zeno*, 702 F.3d at 671.

## CONCLUSION

For the foregoing reasons, Monster's motions pursuant to Rules 50 and 59 are denied. The Clerk of Court is respectfully directed to terminate the motion pending at docket number 168. An order as to next steps in the case—and in particular, soliciting information from the parties necessary to complete the final judgment that will close this case—will issue shortly.


SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: December 4, 2014
    New York, New York