USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/15/2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                    :

BEASTIE BOYS, et al.,                  :

                     Plaintiffs,     :

                v.             :

MONSTER ENERGY COMPANY,    :

                    Defendant.   :

                                   :
------------------------------------------------------------------X

12 Civ. 6065 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

       This decision resolves a post-trial application for attorneys' fees and costs.  Between May

27 and June 5, 2014, the Court presided over a jury trial in which the hip-hop group the Beastie

Boys and affiliated plaintiffs[1] (collectively, the "Beastie Boys") pursued claims against Monster

Energy Company ("Monster"), the beverage company.  The jury found for the Beastie Boys on

all claims—for copyright infringement in violation of the Copyright Act, 17 U.S.C. § 101 et seq.,

and false endorsement in violation of the Lanham Act, 15 U.S.C. § 1051 et seq.—and awarded a

total of $1.7 million in damages.  On December 4, 2014, the Court denied Monster's post-trial

motion for judgment as a matter of law.

       Now pending is the Beastie Boys' motion for an award of fees and costs under § 505 of

the Copyright Act and § 1117 of the Lanham Act.  For the reasons that follow, the Court finds

that the Beastie Boys are entitled to recover fees in connection with Monster's willful copyright

---

[1] The Beastie Boys are a New York partnership. The other plaintiffs are Michael Diamond
("Mike-D"), a Beastie Boys member; Adam Horovitz ("Ad-Rock"), a Beastie Boys member;
Dechen Yauch, executrix of the Estate of Adam Yauch ("MCA"), a late Beastie Boys member;
and Brooklyn Dust Music, a distinct entity through which the Beastie Boys did business.

infringement, although not in connection with Monster's violation of the Lanham Act. Considering all relevant circumstances, the Court finds that an award of $667,849.14 in fees—substantially less than the award of $2,385,175.50 sought by the Beastie Boys—is warranted. The Court also holds that the Beastie Boys are entitled to costs, but under Local Rule 54.1 leaves to the Clerk of Court the tabulation, in the first instance, of such costs.

This decision proceeds in four parts. First, the Court recaps the pertinent background of this case. Second, the Court addresses the Beastie Boys' claims of entitlement to fees under the Copyright Act and the Lanham Act. Third, the Court explains the amount of its fee award. Fourth, the Court addresses the Beastie Boys' application for costs.

## I.      Background

The Court assumes familiarity with this case's history, including the Court's December 4, 2014 Opinion denying Monster's post-trial motions. *See* Dkt. 182, *reported at Beastie Boys v. Monster Energy Co.*, No. 12 Civ. 6065 (PAE), 2014 WL 6845860 (S.D.N.Y. Dec. 4, 2014) [hereinafter *Beastie Boys*]. The history most relevant to the pending fee application follows.

### A.      Factual Background

On May 5, 2012, Monster hosted a promotional event called the "Ruckus in the Rockies," which consisted of a snowboarding competition and an after-party. *See* Trial Transcript ("Tr.") 1092–93. The performers at the after-party included Zach Sciacca, a disc jockey ("DJ") who records and performs under the name "Z-Trip." Tr. 356, 954, 964–65, 1096–99. In 2011, Z-Trip had entered into an agreement with the Beastie Boys to create a remix of some of their songs to promote the group's then-upcoming album, "Hot Sauce Committee Part II." Tr. 194–96, 278–79, 356–57, 954–58, 969. The remix was entitled "Beastie Boys All-Access Megamix" (the

"Megamix"). *See* Tr. 429–30.  Under the agreement, Z-Trip did not obtain any rights to the underlying Beastie Boys songs.  *See* Tr. 278–79, 306, 358–59, 973, 975–76.

Soon after the 2012 Ruckus in the Rockies, Monster's regional marketing director, Nelson Phillips, oversaw the creation of a recap video with highlights from the event.  Tr. 1114–16.  The video promotes Monster's brand and its energy drinks.  For the video's soundtrack, Phillips used excerpts of the Megamix that include portions of five Beastie Boys songs; these songs are the background music to approximately 80% of the four-minute video.  Tr. 1114–15.  The video also contains text referring to the band and one of its three members, Adam Yauch, a/k/a "MCA," who had died days before the Ruckus event.  *See* PX 211.  Monster did not obtain, and never attempted to obtain, permission from the Beastie Boys or their management to use the Beastie Boys' music or names in the promotional video.  *See, e.g.*, Tr. 121–22, 256, 875–76, 1115–16, 1173, 1316–17.  Phillips later testified that he believed that Z-Trip had provided legally sufficient authorization for him to use the Megamix, including the underlying Beastie Boys' songs, in the video.  Tr. 1115–16, 1170.  Phillips testified that Z-Trip had conveyed this authorization to him orally during the after-party, *see* Tr. 369–70, 456–57, 496, and again through a short email exchange in which Phillips sent the video to Z-Trip for "approv[al]," and Z-Trip responded, "Dope!," *see* Tr. 1119, 1121.  Z-Trip firmly denied giving any such authorization, or telling anyone at Monster that he had any rights to the Beastie Boys' music.  *See* Tr. 369–70, 456–57, 496.

On May 9, 2012, Monster posted the promotional video on its website, YouTube channel, and Facebook page.  *See* Tr. 307, 531, 1119–21, 1124–26, 1266.  Monster also sent press releases to various snowboarding magazines and websites to promote the video.  Tr. 1126–29.  The following month, Monster received a letter from counsel for the Beastie Boys, which stated

that Monster did not have permission to use the Beastie Boys' music in the video.  Tr. 1129,

1269.  Phillips then removed the video from Monster's YouTube channel.  Tr. 1130.  He later

edited the video, to replace the music and remove the references to the Beastie Boys, and then

reposted it.  Tr. 1130–31, 1277.  As of August 2012, the video had been viewed 13,341 times.

Tr. 1275–76.

###    B.    Procedural History

On August 8, 2012, the Beastie Boys filed suit against Monster in this District.  Dkt. 1.

The Complaint brought claims of copyright infringement in violation of the Copyright Act and

false endorsement in violation of the Lanham Act.

On October 4, 2012, Monster filed an Answer.  Dkt. 5.  Monster denied almost every

factual allegation in the Complaint or stated that it lacked knowledge sufficient to enable it to

form a belief as to its truth.  Monster also raised 12 affirmative defenses.  Several sought to

deflect responsibility for any infringement onto Z-Trip.  In this vein, the Answer asserted that

(1) Monster had received permission from Z-Trip to use the Beastie Boys' music; (2) in using the

band's music in its video, Monster had reasonably relied on Z-Trip's apparent authority as an

agent for the Beastie Boys; and (3) any injury to the Beastie Boys was due not to Monster but

instead to a breach of contract or fraud by Z-Trip.  *Id.* at 13.

The following day, October 5, 2012, Monster brought a third-party Complaint against Z-

Trip.  Dkt. 9.  Monster alleged that Z-Trip had caused any damage to the Beastie Boys for which

Monster might be found liable by (1) contracting with Monster to allow it to make unrestricted

use of the Megamix, and (2) fraudulently leading Monster to believe that Z-Trip had authority to

license the Beastie Boys' recordings contained in the Megamix.  *Id.* ¶¶ 12–23, 28–33.

On August 1, 2013, after discovery, Z-Trip moved for summary judgment on Monster's claims against him. Dkt. 36–38.  The Beastie Boys filed a memorandum supporting Z-Trip's motion. Dkt. 39.

On November 4, 2013, the Court granted summary judgment in favor of Z-Trip on both of Monster's third-party claims.  *See* Dkt. 51, *reported at Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 338 (S.D.N.Y. 2013) [hereinafter *Z-Trip*].  As to the breach of contract claim, the Court held that, based on the informal, "sparse," and "fleeting" communications between Phillips and Z-Trip, "a reasonable juror could not find an offer, sufficiently clear acceptance, or consideration . . . let alone all three," and thus no contract between Monster and Z-Trip could be found. *Id.* at 348, 350.  And even assuming that Phillips and Z-Trip had entered into some form of contract, it would have taken "an heroic effort of explication" and "flout[ed] common sense" to interpret the contract to include a license to use the Beastie Boys' music in the video. *Id.* at 351.  As to Monster's fraud claim, the Court found the record devoid of evidence that Z-Trip had acted with fraudulent intent or that Monster had reasonably relied on Z-Trip's representations. *Id.* at 351–53.  The Court stated that it had been reckless for Monster "to delegate to Phillips alone the responsibility by which Monster was to acquire, for commercial exploitation, various intellectual [property] rights presumptively belonging to an iconic band." *Id.* at 352.  "Monster's reliance on Phillips to protect its interest in these matters was perforce unreasonable." *Id.* at 353.

Trial on the Beastie Boys' claims against Monster commenced on May 27, 2014.  At the final pretrial conference on May 22, 2014, Monster, for the first time, conceded liability as to the copyright infringement claims.  *See* Dkt. 141, at 48.  Accordingly, the issues litigated at trial were liability for the Lanham Act claim, and damages as to both the Copyright and Lanham Act

claims.  During the eight-day trial, the parties called a dozen witnesses, including four experts. *See* Dkt. 149–63.

On June 5, 2014, the jury returned its verdict.  *See* Dkt. 147.  On the Copyright Act claims, the jury found that each of Monster's 10 acts of infringement had been willful and awarded a total of $1.2 million in statutory damages and, alternatively, a total of $1 million in actual damages.  *Id.* at 2.  On the Lanham Act claim, the jury found Monster liable, found that it had engaged in intentional deception, and awarded the Beastie Boys $500,000 in damages.  *Id.* at 4.  The jury also found that Monster had acted in bad faith in causing the false endorsement.  *Id.*

On December 4, 2014, the Court issued a lengthy decision, denying Monster's post-trial challenges to the verdict.  *See* Dkt. 182

### C.     The Beastie Boys' Motion for Fees and Costs

On January 16, 2015, the Beastie Boys moved for an award of attorneys' fees and costs. Dkt. 188, 189 ("Anderson Decl."), 190 ("Beastie Br.").  On March 6, 2015, Monster filed its opposition.  Dkt. 205 ("Kahn Decl."), 206 ("Schiano-Strain Decl."), 207 ("Monster Br.").  On March 20, 2015, the Beastie Boys submitted a reply.  Dkt. 210 ("Beastie Reply Br."), 211 ("Garrity Decl.").  On March 30, 2015, the Court heard argument.

## II.     The Legal Basis for Beastie Boys' Asserted Entitlement to Fees

The Beastie Boys move for attorneys' fees under both the Copyright Act, 17 U.S.C. § 505, and the Lanham Act, 15 U.S.C. § 1117(a).  Because these Acts set different standards for fee awards, the Court addresses the Beastie Boys' claim of entitlement to fees under each fee-shifting provision in turn.

6

A.      **Attorneys' Fees Under the Copyright Act**

1.      **Applicable Legal Standards**

The Copyright Act provides that "the court in its discretion may allow the recovery of

full costs by or against any party other than the United States" and "may also award a reasonable

attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. Fee awards,

however, are not "automatic" or given "as a matter of course." *Fogerty v. Fantasy, Inc.*, 510

U.S. 517, 533 (1994).

Rather, courts award attorneys' fees only where doing so is "faithful to the purposes of

the Copyright Act." *Matthew Bender & Co. v. W. Pub. Co.*, 240 F.3d 116, 122 (2d Cir. 2001)

(quoting *Fogerty*, 510 U.S. at 534 n.19). The "principal purpose" of the Copyright Act is "to

encourage the origination of creative works by attaching enforceable property rights to them."

*Davis v. Blige*, 505 F.3d 90, 105 (2d Cir. 2007) (quoting *Diamond v. Am-Law Publ'g Corp.*, 745

F.2d 142, 147 (2d Cir. 1984)); *see also Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151,

156 (1975) ("The immediate effect of our copyright law is to secure a fair return for an author's

creative labor. But the ultimate aim is, by this incentive, to stimulate artistic creativity for the

general public good.").

Under the Copyright Act, "'[t]here is no precise rule or formula' that district courts must

apply in determining whether to award attorney's fees." *Zalewski v. Cicero Builder Dev., Inc.*,

754 F.3d 95, 108 (2d Cir. 2014) (quoting *Fogerty*, 510 U.S. at 534) (alteration in original).

However, "the Supreme Court has suggested a list of non-exclusive factors that courts may

consider," which are commonly referred to as the "*Fogerty* factors"; these include

"frivolousness, motivation, objective unreasonableness (both in the factual and in the legal

components of the case) and the need in particular circumstances to advance considerations of

compensation and deterrence." *Id.* (quoting *Fogerty*, 510 U.S. at 534). "Of these factors, 'objective reasonableness . . . should be given substantial weight in determining whether an award of attorneys' fees is warranted.'" *Id.* (quoting *Matthew Bender*, 240 F.3d at 122).

"In an appropriate case," however, "the presence of other factors might justify an award of fees despite a finding that the non-prevailing party's position was objectively reasonable." *Matthew Bender*, 240 F.3d at 122. Each factor is relevant only insofar as it guides the Court in resolving, in its discretion, the ultimate inquiry: whether awarding attorneys' fees is consistent with the purposes of the Copyright Act. *See id.* (citing *Fogerty*, 510 U.S. at 534 n.19).

### 2. Discussion

Considering the Beastie Boys' fee application in light of the principles governing fee awards under the Copyright Act, the Court's judgment is that, on balance, an award of fees is consistent with, and would further, the purposes of the Act. But the analysis is textured, not unitary: Although there are arguments favoring a fee award that ultimately carry the day, there are also countervailing considerations. These have contributed to the Court's decision to impose a fee award below that sought by the Beastie Boys. *See* Section III, *infra*. The Court's assessment of the most relevant factors follows.

***Objective reasonableness***: Monster's conduct and legal positions during and after trial— and, with one significant exception discussed below, before trial—were objectively reasonable. As the Court explained in its post-trial opinion, the issues tried with respect to the Copyright Act claims were difficult and close.

One issue at trial, which affected whether the maximum available statutory damages for each act of infringement was $30,000 or $150,000, was whether Monster's conduct had been willful. *See* 17 U.S.C. §§ 504(c)(1)–(2). As the Court concluded, "the issue of willfulness was

8

vigorously disputed at trial and certainly could have been resolved for either side." *Beastie Boys*, 2014 WL 6845860, at *13.  To be sure, "there was sufficient circumstantial evidence of reckless disregard to support the jury's finding" of willfulness, *id.*, but a jury could also have reached the opposite conclusion.  Monster was not unreasonable in contesting willfulness during, and after, trial.  Nor was Monster unreasonable in its arguments to the jury as to specific factors bearing on the amount of the statutory damages award, which included "the deterrent effect of such an award on Monster and third parties," "the revenue lost by the plaintiffs, if any, as a result of the infringement," and "the conduct and attitude of the parties."  Tr. 1613 (jury charge); *see also* Tr. 1690–91 (Monster's summation).

      Monster's litigation as to actual copyright damages was also objectively reasonable.  The calculation of actual damages turned on the jury's subjective assessment of the infringing video. In litigating the cost of an assumed license authorizing Monster to use the Beastie Boys' songs as the soundtrack for Monster's promotional video, counsel for each side vigorously advocated as to the most apt comparator for that unusual video.  This inquiry was complicated by the fact that the Beastie Boys had never licensed their music for traditional product advertisements, Tr. 118–20, 275, 864–65, and that the Ruckus video was, by its nature, far from a standard product promotion.  "[T]he quirky, indeed new-age, nature of the advertising medium in this case, and the Beastie Boys' extensive licensing history . . . provided fodder for a wide range of potential valuations." *Beastie Boys*, 2014 WL 6845860, at *35.  The Beastie Boys compared the video to a movie trailer, for which the group had received up to $800,000 for a license to use a single song, *see* PX 219, at 9, whereas Monster compared the video, *inter alia*, to Internet "webisodes" produced by a watch company, for which the Beastie Boys had received just a few hundred dollars per copyright, *see* PX 220, at 2.  The jury's verdict indicates that it ultimately accepted a

valuation more in line with those urged by the Beastie Boys.  But Monster's decision to vigorously litigate actual damages, including presenting expert testimony on this point, was reasonable.  Presiding over trial, this Court could not reliably have forecasted, with any level of confidence, the jury's actual damages award.

Finally, and relatedly, the Court is not persuaded that the settlement positions Monster took were unreasonable.  Following trial, the Court received briefing as to the settlement process, with each party contending that the settlement history supported its position on the Beastie Boys' fee application.  To be sure, there is some factual dispute as to Monster's final offer:  The Beastie Boys' counsel represented that the highest offer had been $250,000, *see* Anderson Decl. ¶ 28, whereas Monster's counsel attested that Monster's final offer had been $650,000, *see* Kahn Decl. ¶ 17.  Regardless, viewed in real time and not in hindsight, either figure was defensible.  Under Monster's theory of the case, the Beastie Boys' maximum possible recovery on the Copyright Act claims was $300,000:  Without a finding of willfulness, the statutory damages would have been capped at $30,000 per infringement.  *See* 17 U.S.C. §§ 504(c)(1)–(2).  And actual damages would have been significantly lower than that had the jury accepted Monster's view, and that of its expert, as to the most appropriate analogue for the Ruckus video.[2]

To be sure, the Beastie Boys' final demand of $1.65 million appears prescient in light of the jury's $1.7 million verdict.  But, particularly given the idiosyncrasies of this controversy,

---

[2] In calculating damages for purposes of settlement, Monster could have reasonably believed that a Lanham Act violation, even if found, would not result in an award of money damages because only violations that involve actual consumer confusion or intentional deception permit such an award.  *See George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir. 1992).  The jury found intentional deception, but, as the Court has noted, this finding, like the jury's finding of willfulness on the Copyright Act claims, was not a foregone conclusion.  The evidence was circumstantial and could be read to support either side's chosen inference.  *See Beastie Boys*, 2014 WL 6845860, at *31–32.

Monster was not unreasonable in offering either $250,000 or $650,000, or, at an August 2013 settlement conference, in refusing to negotiate until the Beastie Boys demanded "less than $1 million." *See* Anderson Decl. ¶ 27.

However, one significant aspect of Monster's approach to litigating the copyright claims was objectively unreasonable: It refused, until the brink of trial, to concede that it had infringed the Beastie Boys' copyrights, and it attempted to shift legal responsibility for any infringement to Z-Trip. Putting aside the question of whether Monster had acted willfully in trenching on the Beastie Boys' copyrights, Monster's liability for infringing the 10 copyrights at issue was open and shut. Monster had taken a host of the Beastie Boys' copyrighted musical compositions and sound recordings and exploited them, at length, in an extended web advertisement for its products, without any license to do so. There was no claim that Monster ever had the Beastie Boys' permission to use these songs, and Monster's anemic pretrial claim (echoing its employee, Phillips) to have received a legally valid license from Z-Trip to use the group's compositions and songs in the promotional video was blatantly meritless. The infringement here thus was flagrant. Yet Monster, strikingly, did not concede liability on the Copyright Act claims until the final pretrial conference, days before trial. *See* Dkt. 141, at 48; Anderson Decl., Ex. E; Garrity Decl. Exs. A–B.

This refusal positioned the parties needlessly far apart on a foundational issue and, it can be assumed, made pretrial settlement less likely. Further, as a result of Monster's adamancy that it was not liable for infringement, the Beastie Boys were obliged to prepare for trial on this point, so as to prove "ownership of a valid copyright and copying of the protectable elements of the copyrighted work." *Scholz Design, Inc. v. Sard Custom Homes, LLC*, 691 F.3d 182, 186 (2d Cir. 2012) (listing elements of copyright infringement). This entailed, *inter alia*, procuring

11

certificates of copyright registration to prove that the Beastie Boys owned the rights to the songs in question, and hiring a musicologist to establish that the video did, in fact, contain the Beastie Boys' music. These basic facts were never subject to reasonable dispute.

Relatedly, Monster needlessly prolonged this litigation and increased the Beastie Boys' attorneys' fees through its pretrial attempt, via a third-party complaint, to shift blame to Z-Trip. After denying any responsibility for the copyright infringement in its Answer, Dkt. 5, Monster brought claims of breach of contract and fraud against Z-Trip, Dkt. 9. Both Z-Trip and the Beastie Boys, whose interests were affected by Monster's claims against the DJ, spent time and money litigating these meritless claims.

As the Court held in granting summary judgment for Z-Trip, Monster's arguments were patently unreasonable: On Monster's contract claim, no communications between Phillips and Z-Trip "could be plausibly read to involve an offer," *Z-Trip*, 983 F. Supp. 2d at 348, and there was "no evidence on which a reasonable juror could find acceptance of contractual terms," *id.* at 350. And, it would "flout common sense" to conclude that Z-Trip "granted Monster the rights necessary here." *Id.* at 350–51. As to Monster's fraud claim, "Monster ha[d] not adduced *any* evidence tending to show that Z-Trip acted with fraudulent intent" or had any motive to defraud Monster. *Id.* at 351 (emphasis in original). Nor had Monster offered "any credible argument why it was reasonable to rely on Z-Trip's colloquialisms as a basis to conclude it had obtained from him the necessary licenses." *Id.* at 353. The Court therefore described Monster's fraud claim against Z-Trip as "risible." *Id.* at 351.

Because, as to this aspect of the litigation, Monster's conduct was unreasonable and was "directly responsible" for certain fees "plaintiff[s] had to expend," the factor of objective

unreasonableness supports some fee-shifting.  *Harrell v. Van der Plas*, No. 08 Civ. 8252 (GEL),

2009 WL 3756327, at *4 (S.D.N.Y. Nov. 9, 2009).

     ***Willfulness of underlying conduct*:**  The jury found that Monster's infringement was

willful, and the Court upheld that finding as fairly grounded in the record evidence.  *See Beastie*

*Boys*, 2014 WL 6845860, at *13–16.  Despite being a large, sophisticated corporation with a

$120 million annual marketing budget and with safeguards in place to protect its own intellectual

property rights, Tr. 1050, "Monster had no comprehensive music licensing policy; it tasked

unqualified and untrained employees with the job of creating and disseminating promotional

recap videos that presented a goodly risk of trenching on others' rights; and it protected its own

intellectual property interests with far more vigor and solicitude than it did others'," *Beastie*

*Boys*, 2014 WL 6845860, at *33.  As a result of these "striking failure[s]," the Court held, "it

was likely only a matter of time before infringement occurred."  *Id.* at *16 & n.13.  Based on

these factors, among others, the Court found that, although the issue of copyright willfulness

"could have been resolved for either side," there was sufficient evidence of reckless disregard to

support the jury's finding of willfulness.  *See id.* at *14.

     As courts in this Circuit have repeatedly held, a defendant's willful infringement supports

an award of attorneys' fees to a prevailing plaintiff.  *See, e.g., Kepner-Tregoe, Inc. v. Vroom*, 186

F.3d 283, 289 (2d Cir. 1999); *Hounddog Prods., L.L.C. v. Empire Film Grp., Inc.*, 826 F. Supp.

2d 619, 634 (S.D.N.Y. 2011); *Nature's Enters., Inc. v. Pearson*, No. 08 Civ. 8549 (JGK), 2010

WL 447377, at *9 (S.D.N.Y. Feb. 9, 2010); *Manno v. Tenn. Prod. Ctr., Inc.*, 657 F. Supp. 2d

425, 435 (S.D.N.Y. 2009).  Courts have awarded fees based on willfulness even where the

infringement was reckless rather than knowing.  In *Design Resources, Inc. v. John Wolf*

*Decorative Fabrics*, for example, the defendant obtained samples of plaintiff's fabrics and

commissioned a studio to create similar patterns.  No. 83 Civ. 7606 (CBM), 1985 WL 2445, at

*2 (S.D.N.Y. Sept. 5, 1985).  "Although the record [did] not establish whether defendant knew

of plaintiff's copyrights," a fee award was appropriate because "there [was] sufficient evidence

to find that defendant acted in reckless disregard for plaintiff's rights in the copyrighted

patterns."  *Id.* at *11.

Similarly, in *Adidas Sportschuhfabriken Adi Dassler Stiftung & Co., K.G. v. New

*Generation*, the defendants had sold merchandise decorated with logos, insignias, and cartoon

characters owned by the plaintiffs.  No. 88 Civ. 5519 (PKL), 1990 WL 180679, at *1 (S.D.N.Y.

May 29, 1990).  The record contained no direct evidence of the defendants' intent, and they

"profess[ed] little knowledge of the significance of the pirated logos and symbols."  *Id.* at *2.

The court nevertheless awarded attorneys' fees because defendants were "under a duty to inquire

into whether their business sources for the designs were fully authorized to sell such products,"

and if they had "made significant inquiry into the legality of their activities," "they would have

discovered that their activities were unauthorized and illegal."  *Id.*  Here, too, the lack of any

serious internal controls, and Monster's failure to verify whether it had the right to use the

Beastie Boys' sound recordings and musical compositions in its promotional video, justify an

award of fees.

Finally, in *Basic Books, Inc. v. Kinko's Graphics Corp.*, several publishing companies

sued a copy shop for making unauthorized reproductions of book excerpts and selling them to

students as "course packets."  758 F. Supp. 1522, 1526 (S.D.N.Y. 1991).  While acknowledging

that the fair use issues in the case bore "some degree of novelty," the court awarded attorneys'

fees to the prevailing plaintiffs because the defendant had not engaged in a "critical analysis" or

"wrestled with the [fair use] determinations" before engaging in the infringing activities.  *Id.* at

1547. Because the difficult legal issues emerged only during the ensuing litigation, the court held, awarding attorneys' fees was reasonable and appropriate. *See id.* The Beastie Boys have a far stronger case for an award of attorneys' fees than the plaintiffs in *Basic Books* because the contested issues here as to the Copyright Act involve the appropriate measure of damages; the fact of infringement was indisputable. Had Monster engaged in a "critical analysis"—or even a cursory inquiry—before posting the Ruckus video online, it could have prevented the infringement and obviated the need for this litigation.

**Compensation and deterrence**: A final relevant pair of factors, both of which strongly support some fee award so as to vindicate the purposes of the Copyright Act, are compensation and deterrence. *See Zalewski*, 754 F.3d at 108; *Walt Disney Co. v. Best*, No. 88 Civ. 1595 (SWK), 1990 WL 144209, at *4 (S.D.N.Y. Sept. 26, 1990) (awarding fees "serves the purposes of the Copyright Act to compensate the plaintiff and deter future infringements").

As to compensation, a fee award helps ensure that an injured copyright holder is, at the end of the day, compensated for his injury. Otherwise, there is some risk that the cost of litigation will erode, if not eliminate altogether, the plaintiff's recovery. In this case, the Beastie Boys paid their counsel more in fees (approximately $2.4 million) than was awarded by the jury in total ($1.7 million) or on the Copyright Act claims alone ($1.2 million).[3] To be sure, in

---

[3] The plaintiffs in this case will receive some, but not all, of the damages awarded because the copyrights to the five musical compositions and sound recordings used in the video are co-owned by other entities. *See* Dkt. 202, *reported at Beastie Boys v. Monster Energy Co.*, No. 12 Civ. 6065 (PAE), 2015 WL 736078 (S.D.N.Y. Feb. 20, 2015). In practice, however, the co-owners, who have brought a follow-on lawsuit against Monster, will be able to leverage the verdict in this case into judgments in their favor via offensive collateral estoppel. *See Capitol Records, LLC v. Monster Energy Co.*, 14 Civ. 7718. And the Beastie Boys' counsel represented to the Court that they have communicated and coordinated with—and indeed, shortly before trial, belatedly sought leave to litigate the claims of—the other rights holders. *See* Dkt. 72–74. For the purpose of resolving this motion, in particular for assessing the compensation objective of the Copyright

assessing whether the Copyright Act's compensation goal is implicated here, the Court must determine the minimum amount reasonably necessary to effectively litigate these claims, not the amount actually spent in this case; the Court undertakes that analysis in Section III, *infra*. But it suffices for now to say that shifting some of the Beastie Boys' substantial fees to Monster helps ensure the Beastie Boys a net positive recovery as to the copyright claims.

Further, as to the goal of deterrence, a fee award to plaintiffs here may encourage copyright holders whose rights are infringed to vindicate meritorious claims. Contested copyright cases can be expensive to litigate, as this case illustrates. Without the prospect of a fee award, plaintiffs facing mounting legal fees "'might be forced into a nuisance settlement or deterred altogether from enforcing [their] rights.'" *Crown Awards, Inc. v. Disc. Trophy & Co.*, 564 F. Supp. 2d 290, 296 (S.D.N.Y. 2008), *aff'd*, 326 F. App'x 575 (2d Cir. 2009) (summary order) (quoting *Assessment Techs. of WI, LLC v. WIREdata, Inc.*, 361 F.3d 434, 437 (7th Cir. 2004)). Awarding such fees incents rather than deters potential plaintiffs: It serves to "satisfy the Copyright Act's purposes" because it will "encourage plaintiffs to litigate meritorious claims of copyright infringement" and, in turn, "encourage the origination of creative works by attaching enforceable rights to them." *Id.* at 295 (citations omitted).

For these reasons, the Court finds that awarding attorneys' fees to the Beastie Boys will, on balance, advance the purposes of the Copyright Act. In particular, a fee award is supported by the interests of compensation and deterrence; by the interest in placing some of the burden of paying legal fees on the willful infringer; and, to the extent that Monster unjustifiably contested its liability and wrongly attempted to shift legal responsibility onto Z-Trip, by the interest in

---

Act, it is therefore fair to treat the Beastie Boys as if they stood to receive the entire award on the copyright claims.

making a party bear the expenses generated by its unreasonable litigation tactics.  However, the proper amount of such an award presents a complex question.  Various factors—including the manner in which the Beastie Boys' case was staffed, the fact that some portion of the Beastie Boys' legal fees were occasioned by work on the Lanham Act claim, and the fact that the issues litigated at trial included difficult and close questions and that Monster's trial defenses were not objectively unreasonable—counsel for an award of only a subset of the fees that the Beastie Boys incurred.  The Court addresses these factors and the proper amount of the fee award in Section III below.

### B.    Attorneys' Fees Under the Lanham Act

#### 1.    Applicable Legal Standards

Under the Lanham Act, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."  15 U.S.C. § 1117(a).  "The decision whether or not to award such fees [] rests within the broad discretion of the district judge."  *Microban Prods. Co. v. API Indus., Inc.*, No. 14 Civ. 41 (KPF), 2014 WL 1856471, at *23 (S.D.N.Y. May 8, 2014) (quoting *George Basch Co.*, 968 F.2d at 1543) (alteration in original).

The Second Circuit has defined "exceptional cases" as ones involving fraud, bad faith, or willfulness.  *See Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 221 (2d Cir. 2003) (citing *Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 854 (2d Cir. 1995); *Twin Peaks Prods. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1383 (2d Cir. 1993)); *see also, e.g.*, *Keystone Global LLC v. Auto Essentials, Inc.*, No. 12 Civ. 9077 (DLC), 2015 WL 224359, at *7 (S.D.N.Y. Jan. 16, 2015); *Leviton Mfg. Co. v. Fastmac Performance Upgrades, Inc.*, No. 13 Civ. 1629 (LGS) (SN), 2014 WL 2653116, at *8 (S.D.N.Y. Feb. 28, 2014) (collecting cases).  However, a finding of willfulness or bad faith does not automatically entitle the prevailing party to attorneys' fees.

Such a finding may be regarded as "a *prerequisite* to finding a case sufficiently exceptional to warrant an award of fees under section 1117(a)," but it does not "*automatically* require[] an award of fees under that section." *Mister Softee of Brooklyn, Inc. v. Boula Vending Inc.*, 484 F. App'x 623, 624 (2d Cir. 2012) (summary order) (citations omitted). Rather, the court should "weigh considerations such as the closeness of the case, the tactics of counsel, the conduct of the parties, and any other factors that may contribute to a fair allocation of the burdens of litigation as between winner and loser." *Fresh Del Monte Produce Inc. v. Del Monte Foods Co.*, 933 F. Supp. 2d 655, 665 (S.D.N.Y. 2013) (quoting *S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*, 781 F.2d 198, 201 (Fed. Cir. 1986)).

In the context of the Patent Act, which, like the Lanham Act, provides that courts "may" award attorneys' fees in "exceptional cases," the Supreme Court recently provided guidance as to the meaning of the term "exceptional." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014) (discussing 35 U.S.C. § 285). The Court held that:

> [A]n "exceptional" case is simply one that stands out from others with respect to the substantive strength of a party's litigating position . . . or the unreasonable manner in which the case was litigated. District courts may determine whether a case is "exceptional" in the case-by-case exercise of their discretion, considering the totality of the circumstances.

*Id.* The Court further instructed that courts resolving motions for fees in patent cases should consider the *Fogerty* factors used in Copyright Act cases, including frivolousness, motivation, objective unreasonableness, compensation, and deterrence. *Id.* at 1756 & n.6. Accordingly, courts should consider whether a given case "stands out from others" based on those factors, or based on a finding of willfulness or bad faith.

18

2.    **Discussion**

The jury here found that Monster's conduct was willful, intentionally deceptive, and in bad faith. *See* Dkt. 147, at 2–4. Those findings, however, do not "require[] an award of fees." *Mister Softee*, 484 F. App'x at 624; *see also Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 82 F. Supp. 2d 136, 147 (S.D.N.Y. 2000) ("[T]his Court has discretion to deny an award of attorney's fees, even with the jury's finding of bad faith."). After reviewing cases from this Circuit that have resolved motions for attorneys' fees under § 1117(a) and measuring the circumstances here in light of that authority, the Court's considered judgment is that the Lanham Act claims in this case are not sufficiently "exceptional" to merit an award of fees.

Courts in this District typically award Lanham Act fees based on extreme misconduct *during litigation.* "[C]ourts frequently look to whether the claims raised by either side were interposed for an 'improper purpose,'" *Microban*, 2014 WL 1856471, at *23 (quoting *Multivideo Labs, Inc. v. Intel Corp.*, No. 99 Civ. 3908 (DLC), 2000 WL 502866, at *2 (S.D.N.Y. Apr. 27, 2000)), or whether the losing party engaged in "deceptive litigation tactics," *C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 251 (S.D.N.Y. 2013); *see also Sprint Commc'ns Co. L.P. v. Chong*, No. 13 Civ. 3846 (RA), 2014 WL 6611484, at *5 (S.D.N.Y. Nov. 21, 2014) ("[Defendant] not only frustrated the litigation process by failing to participate, he obstructed the plaintiffs and caused unnecessary delay by using an alias that was only uncovered through [plaintiffs'] investigations late in this litigation.").

Courts have also granted Lanham Act fees to prevailing plaintiffs where the defendant defaulted. *See, e.g., Lane Crawford LLC v. Kelex Trading (CA) Inc.*, No. 12 Civ. 9190 (GBD) (AJP), 2014 WL 1338065, at *2 (S.D.N.Y. Apr. 3, 2014); *Sub-Zero, Inc. v. Sub Zero NY*

*Refrigeration & Appliances Servs., Inc.*, No. 13 Civ. 2548 (KMW) (JLC), 2014 WL 1303434, at *7 (S.D.N.Y. Apr. 1, 2014).

On occasion, courts have also awarded Lanham Act fees based on egregious underlying facts, for instance, where a defendant continued its infringing conduct "in the face of a preliminary injunction." *Playboy Enters., Inc. v. Chuckleberry Pub., Inc.*, 687 F.2d 563, 571 (2d Cir. 1982).

None of those circumstances are present here. Unlike the Copyright Act claims, as to which Monster's pretrial denial of liability was unreasonable, the Court does not perceive any unreasonableness to Monster's arguments or litigation positions as to the Lanham Act claim of false endorsement. Monster made responsible arguments opposing that claim, and the jury's verdict for the Beastie Boys, in the Court's view, was no foregone conclusion. This case is thus a far cry from one in which the losing party's litigation positions as to a Lanham Act claim were so "devoid of legal merit that one could only conclude that they were advanced with an improper motive," *Microban*, 2014 WL 1856471, at *23, or constituted "outrageous[]" conduct evincing a "complete lack of respect for the judicial process," *C=Holdings*, 992 F. Supp. 2d at 251. The case was certainly "exceptional" in the sense that the facts were idiosyncratic, but not in the sense relevant here, in that the egregiousness required to justify a fee award under the statute was lacking.

This case thus resembles, more than the cases in which attorneys' fees were awarded, two Lanham Act cases in which courts in this District declined to award fees. In *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, the jury found bad faith, but the court nevertheless declined to award fees because the defendant's litigation decisions were "justifiable," and the plaintiffs had not prevailed on every issue. 82 F. Supp. 2d 136, 140, 148–49 (S.D.N.Y. 2000). Similarly, in *Simon*

20

*& Schuster, Inc. v. Dove Audio, Inc.*, the court denied Lanham Act fees to a prevailing plaintiff

because, although the defendant's infringement was ultimately found willful, the "litigation

presented a number of close and contested issues; the outcome was by no means a foregone

conclusion." 970 F. Supp. 279, 302 (S.D.N.Y. 1997).  The Court similarly concludes that,

notwithstanding the jury's findings of intentional deception and bad faith, a fee award under the

Lanham Act is not merited here.

**III.     Determination of the Reasonable Amount of the Fee Award**

The Beastie Boys were represented throughout this case by Sheppard Mullin Richter &

Hampton LLP ("Sheppard Mullin") and paid Sheppard Mullin all of the fees the firm billed

them.  The Beastie Boys seek an award of $2,385,175.50.  This figure reflects two reductions,

totaling $101,504.50, from the fees the Beastie Boys paid.  First, the Beastie Boys do not seek to

recover fees for attorneys and staff who spent less than 10 hours on the case; this eliminated 70.4

hours of work, corresponding to $20,977 in fees.  Second, to avoid a fee award for duplicative

efforts, the  Beastie Boys do not seek to recover fees for work performed after July 2013 by

Theodore Max, Esq., Sheppard Mullin's initial lead partner on the case, because from that point

forward, Kevin Puvalowski, Esq., was lead partner.  This eliminated 119.3 hours of work,

corresponding to $80,527.50 in fees.  *See* Anderson Decl., Ex. U.

**A.     Legal Standards Governing Reasonableness of Fees**

In determining the amount of a fee award, district courts are to calculate the

"presumptively reasonable fee." *Simmons v. N.Y. City Transit Auth.*, 575 F.3d 170, 172 (2d Cir.

2009).  The starting point for determining the presumptive reasonable fee is the "lodestar"

amount, which is "the product of a reasonable hourly rate and the reasonable number of hours

required by the case." *Gaia House Mezz LLC v. State Street Bank & Trust Co.*, No. 11 Civ. 3186

(TPG), 2014 WL 3955178, at *1 (S.D.N.Y. Aug. 13, 2014) (quoting *Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011)).  "The presumptively reasonable fee boils down to 'what a reasonable, paying client would be willing to pay,' given that such a party wishes 'to spend the minimum necessary to litigate the case effectively.'"  *Simmons*, 575 F.3d at 174 (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 493 F.3d 110, 112, 118 (2d Cir. 2007), *amended on other grounds by* 522 F.3d 182 (2d Cir. 2008)).  In resolving what a reasonable client would pay, the Court must consider the "*Johnson* factors," namely:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Arbor Hill*, 493 F.3d at 186 n.3 (citing *Johnson v. Ga. Highway Exp., Inc.*, 488 F.2d 714, 716 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989)).  "As the fee applicant, plaintiffs 'bear[] the burden of documenting the hours reasonably spent by counsel, and the reasonableness of the hourly rates claimed.'"  *Allende v. Unitech Design, Inc.*, 783 F. Supp. 2d 509, 512 (S.D.N.Y. 2011) (quoting *General Elec. Co. v. Compagnie Euralair, S.A.*, 96 Civ. 0884 (SAS), 1997 WL 397627 at *4 (S.D.N.Y. July 3, 1997)).

Additionally, "[a]ttorney's fees must be reasonable in terms of the circumstances of the particular case." *John Wiley & Sons, Inc. v. Kirtsaeng*, No. 14-344, 2015 WL 3396832, at *1 (2d Cir. May 27, 2015) (quoting *Alderman v. Pan Am World Airways*, 169 F.3d 99, 102 (2d Cir. 1999)).  "'[T]here is no precise rule or formula' for determining a proper attorney's fees award"; rather, the district court should exercise its "equitable discretion" in light of all relevant factors. *GMA Accessories, Inc. v. Olivia Miller, Inc.*, 139 F. App'x 301, 304 (2d Cir. 2005) (summary

order) (quoting *Fogerty*, 510 U.S. at 534); *see also Clark v. Hudson Bay Music, Inc.*, 104 F.3d

351, 351 (2d Cir. 1996) (unpublished opinion); *N.A.S. Imp., Corp. v. Chenson Enters., Inc.*, 968

F.2d 250, 253–54 (2d Cir. 1992).

**B.     The Proper Amount of the Fee Award**

The Court's analysis as to the reasonable fee award on the Copyright Act claims proceeds

in three steps.

First, the Court considers challenges Monster raises to discrete aspects of the fees billed

by Sheppard Mullin—to areas of legal work Monster claims were unnecessary to vindicate the

Beastie Boys' claims and to certain billing practices.  Finding merit to some of these arguments,

the Court reduces the fees eligible for shifting.  Second, the Court considers the extent to which a

further reduction is merited to reflect the fact that some of plaintiffs' counsel's work was

directed at the Lanham Act claim, as to which the Court has declined to award fees.  Third, the

Court considers what portion of the resulting fees must be shifted to Monster to vindicate the

interests served by the Copyright Act.

Before examining potential reductions, however, it is important to keep in mind the big

picture.  This case was justifiably expensive to litigate.  It implicated complex questions of law,

challenging questions of fact, and difficult and hotly contested damages determinations.  Further,

the high profile of the parties and the attention given to this lawsuit no doubt impelled counsel to

leave no stone unturned.  Indeed, this case was litigated aggressively by estimable lawyers on

both sides.  The Court's analysis as to the proper fee award, and the reductions that follow, do

not bespeak any criticism of counsel for either side, whose impressive lawyering the Court has

previously recognized.

1.      **Monster's Arguments as to Specific Projects and Billing Practices**

a.      **Legal Work on Unnecessary Projects**

Monster argues that several areas of legal work were unnecessary to vindicate the Beastie Boys' claims.

First, Monster notes, the Beastie Boys "conducted extensive discovery" into two sets of videos that were never received in evidence. The first, the "Monster Army" videos, were posted by athletes whom Monster had sponsored to a website that Monster created for the purpose of promoting these athletes and Monster itself. Six such videos allegedly incorporate, without authorization, Beastie Boys music. The other video was created in connection with a sporting event in Switzerland called "Wheels Fest," which Monster sponsored and promoted. The video allegedly used a Beastie Boys song, "Sabotage," as its soundtrack, without authorization. The Court, however, granted Monster's motion *in limine* to exclude evidence as to these subjects pursuant to Federal Rule of Evidence 403, on the grounds that Monster had not created the videos, and the confusion, delay, and unfair prejudice from litigating at trial the circumstances under which these videos had been created would outweigh any limited probative value. *See* Dkt. 90. Although it was surely proper for the Beastie Boys to seek discovery into the Monster Army and Wheels Fest videos, the Court agrees with Monster that the legal fees the Beastie Boys incurred doing so are not properly shifted to it, given the tenuous relevance of, and the exclusion of, this evidence from trial.[4]

---

[4] A table provided by the Beastie Boys shows that 22 billing entries, which total 70.7 hours of legal work, explicitly reference discovery efforts with respect to the Wheels Fest video. Garrity Decl., Ex. D. These entries also describe other work performed by counsel, such that not all of the 70.7 hours can be assumed to have related to Wheels Fest. At the same time, the Beastie Boys' legal work opposing Monster's motion *in limine* to exclude the Monster Army and Wheels Fest videos, Dkt. 66, is not reflected in this table. Nor is the time expended investigating the Monster Army videos, which are rarely mentioned by name in the billing records.

Second, Monster argues that it should not be compelled to pay the Beastie Boys' fees incurred with respect to two aspects of legal work relating to expert witnesses. First, Monster brought a *Daubert* challenge to the report of Beastie Boys' damages expert Lisa Thomas, and although the Court held the bulk of Thomas's expert report to be reliable, it granted Monster's motion insofar as Thomas, in valuing an assumed license to use the Beastie Boys' copyrights, wrongly assumed a lifetime, as opposed to five-week-long, license. *See* Dkt. 63–65, 84, 87, 89, 101–03, 107–08, 109–14, 116, 119. Monster urges that the Beastie Boys' legal work, to the extent it involved defending this problematic aspect of Thomas's report or helping revise the report to correct this deficiency, should not be borne by Monster.[5] The Court agrees. Second, the Beastie Boys brought an unsuccessful *Daubert* challenge to one of Monster's expert witnesses, Dr. Eric Joachimsthaler. *See* Dkt. 76–78, 80, 90, 104–06. The Court agrees that in light of the denial of this motion, these costs, too, are not properly borne by Monster.[6]

Third, Monster notes that the Beastie Boys abandoned two claims shortly before trial: a copyright infringement claim based on the link to Z-Trip's Megamix included in the Ruckus video, and a claim asserted under the New York Civil Rights Law. *See* Dkt. 90, at 6. In similar circumstances, courts in this District have declined to reimburse plaintiffs for fees related to voluntarily dismissed claims. *See Scanlon v. Kessler*, 23 F. Supp. 2d 413, 417 (S.D.N.Y. 1998) ("The court finds and concludes that plaintiff should only recover expenses for work done on the

---

[5] Between March 6 and March 21, 2014, for example, Sheppard Mullin attorneys billed approximately 80 hours for tasks related to revising Thomas's report. *See* Anderson Decl., Ex. U, Dkt. 189-23, at 15–18.

[6] For instance, Sheppard Mullin appears to have billed at least 20 hours for preparing the *Daubert* motion between February 6 and 14, 2014. *See, e.g.*, Anderson Decl., Ex. U, Dkt. 189-22, at 88–95.

meritorious copyright infringement claims.") (citing *Knitwaves v. Lollytogs*, 71 F.3d 996, 1012

(2nd Cir. 1995)).  The Court finds this authority persuasive, and holds that fees incurred pursuing

these claims are not properly borne by Monster.  *See Hensley v. Eckerhart*, 461 U.S. 424, 433–34

(1983) (Courts must "exclude from a fee request hours that are excessive, redundant, or

otherwise unnecessary."); *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1997) (Courts

should exclude "hours dedicated to severable unsuccessful claims.").[7]

### b.      Partner-Heavy Staffing

Monster next argues that the Court should exclude all of Kenneth Anderson's hours.

Anderson, a Sheppard Mullin partner, billed 902.8 hours on the case for a total of $609,390.

Kahn Decl., Ex. 2 (compiling Anderson's time entries).  Monster claims that Anderson "is not a

litigator" and that his work was "duplicative and unnecessary."  Monster Br. 17.

The Court rejects Monster's attempt to excise as categorically unnecessary all of

Anderson's legal work on this matter.  Anderson undeniably added value to the Beastie Boys'

efforts to vindicate their rights.  Logically in light of his role as the firm's relationship partner

with the Beastie Boys—he has represented them for 30 years—Anderson led the firm's

representation of the group during the early part of this case.  *See* Anderson Decl. ¶ 39.  His work

included issuing cease-and-desist and demand letters to Monster, working to obtain copyright

assignments from entities that held fractional rights in the copyrights at issue so as to streamline

litigation, and developing the case management plan.  *See id.*; Kahn Decl., Ex. 2, at 1–2.  And,

although Sheppard Mullin litigating partners took the lead during discovery and handled the case

at trial, the billing records reflect Anderson's contributions.  These include serving as the

---

[7] As these claims do not appear to be explicitly referenced in the billing records, the Court cannot reliably estimate the fees incurred in their pursuit.

primary liaison to the Beastie Boys; preparing the two surviving members of the group for their depositions; managing important aspects of the firm's work with respect to experts, including selecting those witnesses and reviewing draft expert reports; participating in settlement conferences and mediations, at least once as the only partner; and, after trial, helping to resolve the proper allocation of copyright damages as among the various owners. *See* Kahn Decl., Ex. 2; Anderson Decl., Ex. U.  Given Anderson's relationship with the Beastie Boys and his expertise with intellectual property law, it was reasonable for him to remain involved in the case, and the Court accepts that his contributions were meaningful.

However, although Monster's focus on Anderson personally misses the mark, its critique points to a broader consideration highly relevant to the fee award: the extraordinarily partner-heavy nature of Sheppard Mullin's work on this case.  The firm billed nearly 2.5 times as many partner hours as associate hours.  Specifically, the firm billed 2,621.2 partner hours and 1,069.4 associate hours.  *See* Anderson Decl., Ex. V.  The partners were: Anderson, who, as noted, billed 902.8 hours totaling $609,390; Puvalowski, who billed 692.5 hours totaling $467,437.50; Paul W. Garrity, who billed 594.8 hours totaling $401,490; and Max, who (in addition to the 119.3 hours with respect to which the Beastie Boys are not seeking a fee award) billed 431.1 hours totaling $291,652.50.  And the associates were: Thomas M. Monahan, who billed 815.9 hours totaling $376,177; Valentina Shenderovich, who billed 156.8 hours totaling $73,240; Kathryn J. Hines, who billed 41.5 hours totaling $20,957.50; and Manuel Gomez, who billed 55.2 hours totaling $17,940.  Anderson Decl., Ex. V.

In the Court's experience, such lopsidedly partner-heavy bills are quite unusual in the context of litigation work.  It is common, particularly with respect to discovery and other pretrial tasks, that associates shoulder much of the work, under the active supervision of partners, and

that partners take lead roles as to projects for which their expertise adds value.  The ratio of

associate to partner hours on pretrial work typically reflects more associate than partner hours—

often significantly more.  *See, e.g.*, *Yurman Designs, Inc. v. PAJ, Inc.*, 125 F. Supp. 2d 54, 55

(S.D.N.Y. 2000), *aff'd*, 29 F. App'x 46 (2d Cir. 2002) (summary order) (copyright case in which

the ratio of associate hours to partner hours was 13 to one).  Clients commonly demand that legal

work be "pushed down" to the timekeeper with the lowest billing rate who is able to capably

perform that work, so as to keep legal fees manageable.  In contrast, trial work tends to be more

partner-intensive, befitting partners' greater trial expertise.

The Court has no doubt that many aspects of this case required active engagement by

Sheppard Mullin partners.  These included preparing for and defending depositions of the two

surviving Beastie Boys; preparing for, taking, and defending expert depositions; and handling the

trial itself.  And Monster's vigorous defense of the case at all stages demanded a muscular and

sophisticated response.  This case therefore no doubt justified more partner-intensive staffing

than much federal-court litigation.

It may also be that Sheppard Mullin's clients here—including the two surviving Beastie

Boys and the estate executrix (and wife) of deceased band member Yauch—affirmatively wanted

the firm's partners to personally perform virtually all aspects of their legal work.  Presiding over

trial and hearing the surviving Beastie Boys' testimony, it was apparent to the Court that this

case had great personal significance to them.  Monster's commercial exploitation of the band's

music and songs, and what the Beastie Boys perceived as Monster's crass misappropriation of

the name of the recently deceased Yauch in its video promoting its energy drinks, appeared to

have deeply offended plaintiffs.[8]  *See, e.g.*, Tr. 60–61.  It was apparent that this case, and cause, was of significant importance to plaintiffs.  The Court is mindful that, unlike commercial cases in which the merits of litigation expenditures are typically subject to cost-benefit analysis, this case may well have been one in which Sheppard Mullin's charge from its clients was simply to win, irrespective of cost.  If assuring the highest quality representation and maximizing the prospects of a favorable verdict were paramount to Sheppard Mullin's clients, then it was entirely rational for the firm to spare no expense on their behalf.  The Court therefore does not, at all, suggest that Sheppard Mullin's litigation expenditures were excessive or improper.  That judgment was the Beastie Boys' to make—and, as noted, plaintiffs paid 100% of the firm's fees and by all appearances were well-satisfied clients.

On a fee-shifting application, however, the governing test of reasonableness is objective; it is not dictated by a particular client's subjective desires or tolerance for spending.  The test is whether the plaintiff "spen[t] the minimum necessary to litigate the case effectively."  *Simmons*, 575 F.3d at 174 (citation omitted); *see also Bergerson v. N.Y. State Office of Mental Health, Cent. N.Y. Psychiatric Ctr.*, 652 F.3d 277, 289 (2d Cir. 2011) (same); *McDaniel v. County of Schenectady*, 595 F.3d 411, 415 (2d Cir. 2010) (same); *cf. In re Weatherford Int'l Sec. Litig.*, No. 11 Civ. 1646 (LAK), 2015 WL 127847, at *1 (S.D.N.Y. Jan. 5, 2015) (reducing fee award based on doubts that a paying client would approve bills for 34 attorneys and 10 staff members who

---

[8] The surviving Beastie Boys also testified that, as a matter of principle, they have not licensed their music for product advertisements, Tr. 118–21, 864–65, or for creative endeavors with which they do not identify, Tr. 866–68, a philosophy that led them, not long before trial, to decline a $500,000 fee to license a song for an Arnold Schwarzenegger movie because they are not "fan[s] of [his] recent actions or work," Tr. 867.  For this reason, too, the Beastie Boys may have approached this case with special zeal.  Indeed, the surviving band members testified that had Monster sought permission to use the Beastie Boys' music and names in the video, the group would have refused.  Tr. 121, 876.

collectively worked over 30,000 hours); *Campbell v. Mark Hotel Sponsor, LLC*, No. 09 Civ.
9644 (WHP), 2012 WL 4360011, at *2 (S.D.N.Y. Sept. 13, 2012) (reducing fee award because
the number of hours billed was "unreasonable," and no client "would pay over $3.3 million in
fees and expenses for the mere possibility of securing a $4.68 million down payment");
*Simmonds v. N.Y.C. Dep't of Corr.*, No. 06 Civ. 5298 (NRB), 2008 WL 4303474, at *4
(S.D.N.Y. Sept. 16, 2008) (reducing fee award where "a reasonably thrifty client made aware of
the adequacy of [plaintiff's] core claims would have opted for less costly representation").

 Here, the Court's review of Sheppard Mullin's bills suggests that the Beastie Boys opted
to pay for, and received, the Cadillac Escalade, not the Honda Civic.  Apart from the high ratio
of partner to associate hours, two aspects of these bills are notable.  First, some tasks carried out
by partners surely could have been delegated to associates.  To cite just a few examples,
Sheppard Mullin's capable associates presumably could have (1) drafted a letter to the Court
regarding the parties' stipulation of confidentiality, *see* Anderson Decl., Ex. U, at 71–71;
(2) coordinated deposition scheduling, *id.* at 91, 107; (3) reviewed depositions to identify
designations for the joint pretrial order, *id.* at 87–89; and (4) researched authority from Monster's
pretrial memorandum, *id.* at 96.  Second, there are various instances at which multiple partners
(often including relationship partner Anderson) appear to have participated in the same tasks,
where use of a single partner, or a single partner and an associate, would have been reasonable.
*See* p. 34, *infra*.

 It was the Beastie Boys' prerogative to commission or approve such staffing.  But the
issue for this Court is whether it is reasonable to shift the resulting fees to Monster, their
adversary.  And there is ample authority in this District, applying the standard of objective
reasonableness, for reducing a fee award where the legal hours recorded by plaintiffs' counsel

fell unusually heavily on partners with high hourly rates. *See, e.g., New Earthshell Corp. v. Jobookit Holdings Ltd.*, No. 14 Civ. 3602 (JMF), 2015 WL 2152681, at *2 (S.D.N.Y. May 7, 2015); *Trinidad v. Pret a Manger (USA) Ltd.*, No. 12 Civ. 6094 (PAE), 2014 WL 4670870, at *9 (S.D.N.Y. Sept. 19, 2014); *Lucky Brand Dungarees, Inc. v. Ally Apparel Res., LLC*, No. 05 Civ. 6757 (LTS) (MHD), 2009 WL 466136, at *4 (S.D.N.Y. Feb. 25, 2009); *Patrolmen's Benevolent Assoc. of City of N.Y., Inc. v. City of New York*, No. 97 Civ. 7895 (SAS), 2003 WL 21782675, at *4 (S.D.N.Y. July 31, 2003); *Shannon v. Fireman's Fund Ins. Co.*, 156 F. Supp. 2d 279, 301–02 (S.D.N.Y. 2001). Here, plaintiffs' case could similarly have been pursued with leaner, less-partner-heavy staffing. Accordingly, a material reduction in the requested fee award is merited to reflect the unusually partner-intensive nature of Sheppard Mullin's work.

### c.   Duplicative or Vague Billing Records

Monster next presents three distinct challenges to Sheppard Mullin's billing records.

First, Monster claims that 89% of Sheppard Mullin's entries are block billed such that Monster cannot assess whether the hours that Sheppard Mullin expended were duplicative or unnecessary. *Id.* To support this claim, Monster provided a compilation of all time entries they identify as improperly block billed. *See* Schiano-Strain Decl., Ex. 3. Most of Sheppard Mullin's time entries do list multiple tasks in the "description of services" section, without isolating the particular hours assigned to each task.

As a general rule, block billing is disfavored. It impedes the client's ability to understand the precise time allocable to the tasks for which it is being billed on an hourly basis. And, in the event of a later fee application, it impedes a court's ability to assess whether the time expended on any given task was reasonable. *See Green v. City of New York*, 403 F. App'x 626, 630 (2d Cir. 2010) (summary order); *Ramirez v. Benares Indian Rest. LLC*, No. 14 Civ. 7423 (JMF),

2015 WL 926008, at *2 (S.D.N.Y. Mar. 4, 2015) (collecting cases); *SEC v. Yorkville Advisors, LLC*, No. 12 Civ. 7728 (GBD) (HBP), 2015 WL 855796, at *14 (S.D.N.Y. Feb. 27, 2015) (collecting cases).

At the same time, block billing is most problematic where large amounts of time (*e.g.*, five hours or more) are block billed; in such circumstances, the limited transparency afforded by block billing meaningfully clouds a reviewer's ability to determine the projects on which significant legal hours were spent. *See Abdell v. City of New York*, No. 05 Civ. 8453 (RJS), 2015 WL 898974, at *4 (S.D.N.Y. Mar. 2, 2015) (finding block billing unproblematic where it was "for temporally short entries combining related tasks"); *Trinidad*, 2014 WL 4670870, at *9 (reducing fee award based on block billed entries covering as many as 16 hours); *Charles v. City of New York*, No. 13 Civ. 3547 (PAE), 2014 WL 4384155, at *6 (S.D.N.Y. Sept. 4, 2014) (reducing fee award based on block billed entries spanning more than six hours each); *Thai-Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republic*, No. 10 Civ. 05256 (KMW) (DF), 2012 WL 5816878, at *8 n.9, *10 (S.D.N.Y. Nov. 14, 2012) (reducing fee award where partner billed 11-hour days in single entries). Here, in contrast, two-thirds of Sheppard Mullin's block billed entries—159 of the 239 entries Monster flagged—were for less than three hours, a shorter amount of time. And, for the most part, the block billed entries, particularly the longer ones, contained enough detail and specificity so as to afford reasonable confidence that the time billed was productively spent, even if it is impossible to reconstruct the precise amounts of time allocable to each specific task listed in the block entry. For example, on December 14, 2012, associate Shenderovich billed 7.4 hours for:

> Reviewed and revised Plaintiff's initial disclosures. Reviewed and revised First Set of Requests for Interrogatories to Monster. Reviewed and revised Request for Production of Documents to Monster. Drafted Request for Interrogatories to Z-Trip. Drafted Request for Production of Documents to Z-Trip. Reviewed and

revised all.  Drafted cover letters.  Compiled all documents and coordinated delivery.

Similarly, on January 29, 2013, partner Max billed 4.6 hours for:

> Prepare for mediation before Magistrate Judge Pitman; travel to U.S. District Court S.D.N.Y. for mediation; give presentation and discussion at mediation; discuss status and evaluation with J. Silva and K. Anderson; return to office; read email for R. Kahn; discuss with V. Shenderovich regarding discussing follow-up.

These entries, although block billed, clearly enumerate the work completed in the designated amounts of time. *See Aurora Commercial Corp. v. Approved Funding Corp.*, No. 13 Civ. 230 (RPP), 2014 WL 3866090, at *6 (S.D.N.Y. Aug. 6, 2014) (declining to reduce fees based on block billing where attorneys' "entries [we]re sufficiently detailed to convey to the reader the tasks for which they billed").

The Court's judgment is therefore that, with limited exceptions, the "commingling of activities within one time entry" in this case does not "impede[] the [C]ourt's efforts to evaluate the reasonableness of any of the listed activities"; the block billing thus does not provide a basis for reducing, more than marginally, the fee award. *Berry v. Deutsche Bank Trust Co. Americas*, 632 F. Supp. 2d 300, 306 (S.D.N.Y. 2009); *see also U.S., ex rel. Fox Rx, Inc. v. Omnicare, Inc.*, No. 12 Civ. 275 (DLC), 2015 WL 1726474, at *3 (S.D.N.Y. Apr. 15, 2015) ("The use of 'block billing' here is perfectly reasonable; the specific tasks in each 'block' are described with sufficient detail and clarity to confirm 'the reasonableness of the work performed.'" (citation omitted)); *G.B. ex rel. N.B. v. Tuxedo Union Free Sch. Dist.*, 894 F. Supp. 2d 415, 441 (S.D.N.Y. 2012) ("Defendant has identified no entries where the hours billed are unreasonable, or where block billing has combined activities compensable at different rates.  Therefore, the Court does not find any reduction warranted."); *Adorno v. Port Auth. of N.Y. & N.J.*, 685 F. Supp. 2d 507, 515 (S.D.N.Y. 2010) ("While block billing is disfavored and may lack the specificity for an

award of attorneys' fees, it is not prohibited as long as the court can determine the reasonableness of the work performed." (citation omitted)).

Second, Monster argues that 17% of Sheppard Mullin's entries, which total 634 attorney hours, are duplicative. To support this claim, Monster provided a compilation of all such entries. *See* Schiano-Strain Decl., Ex. 4. Many of these entries are not problematic, as there is no rule requiring that only one attorney participate in each litigation event; whether it is reasonable for a second attorney to participate depends on the context. Here, for example, it was reasonable for (1) Anderson and Max to attend the initial pretrial conference, a potentially very important event, on November 16, 2012, (2) for Anderson and an associate to attend a settlement conference on July 25, 2013, and (3) for members of the firm's litigation team to strategize with one another, as occurred on numerous days (*e.g.*, November 4, 7, 14, and 19, 2013).

That said, as noted, there are some instances in which multiple partners worked on a task where such staffing was not, at least evidently, objectively necessary. On November 30, 2012, for example, multiple partners worked on a letter to opposing counsel; and on June 4 and 5, 2013, four partners billed for attending trial, even though the trial was in the hands of only two (Puvalowski and Garrity). There are also occasions in which more hours may have been applied to a task than was needed, consistent with the firm's staffing approach in this case described above. On July 10, 2012, for example, Anderson billed six hours to "complete[] complaint," but the next day billed another 4.8 hours to "finalize[] complaint." Anderson Decl., Ex. U, at 13. All considered, the Court concludes that some basis exists for reducing the fee award from that requested due to such staffing practices.

Third, Monster asserts that many billing entries are vague or ambiguous. As might be expected in a large case with many fee entries, the billing records, in several instances, contain

unhelpful descriptions, such as "worked on Monster." Anderson Decl., Ex. U, at 16. Such

entries do not "enable the court to determine whether a reasonable amount of time was spent on

each activity" or "whether the particular activity is compensable." *Miroglio S.P.A. v. Conway*

*Stores, Inc.*, 629 F. Supp. 2d 307, 313 (S.D.N.Y. 2009). However, these deficiencies are few and

far between; the vast majority of entries are thorough and clear. Accordingly, the few vague

entries do not support a significant reduction in the fees awarded.

### d.    Hourly Rates

The Court, finally, considers the reasonableness of the billing rates charged by plaintiffs'

counsel. The Beastie Boys seek to recover fees for the work of four Sheppard Mullin partners,

four associates, and four members of the firm's support staff. In assessing whether the hourly

rates they charged were reasonable, the Court looks to the hourly rates typically charged in this

District. *See Arbor Hill*, 493 F.3d at 119.

Monster does not challenge the hourly rates charged by the four Sheppard Mullin

partners who worked on the case, and the Court agrees that those rates were reasonable.

Puvalowski, Garrity, and Anderson each charged an average of $675 per hour, and Max charged

an average of $676.53 per hour. *See* Anderson Decl., Ex. V. Courts in this District routinely

approve similar rates for experienced partners in copyright cases. *See, e.g., Broad. Music, Inc. v.*

*Pamdh Enters., Inc.*, No. 13 Civ. 2255 (KMW), 2014 WL 2781846, at *7 (S.D.N.Y. June 19,

2014) (collecting cases awarding $400 to $735 per hour for partners); *OZ Mgmt. LP v. Ozdeal*

*Inv. Consultants, Inc.*, No. 09 Civ. 8665 (JGK) (FM), 2010 WL 5538552, at *3 (S.D.N.Y. Dec.

6, 2010), *report and recommendation adopted*, 2011 WL 43459 (S.D.N.Y. Jan. 5, 2011)

(describing $657 per hour rate as "well within the range of rates for law firm partners in the New

York City area with significant intellectual property law experience").

As to associates, Monster argues that the hourly rates charged by three of the four were excessive. Sheppard Mullin charged an average of $461.06 per hour for Monahan, then a fourth-year associate; an average of $467.09 per hour for Shenderovich, then a second-year associate; and an average of $505 per hour for Kathryn Hines, then a third-year associate. Anderson Decl., Ex. V. Manuel Gomez, then a first-year associate, billed at $325 per hour. *Id.* Monster does not object to that rate. *See* Monster Br. 18–21.

Rates between $461 and $505 per hour are higher than those typically approved for associates in this District. *See, e.g., Genger v. Genger*, No. 14 Civ. 5683 (KBF), 2015 WL 1011718, at *2 (S.D.N.Y. Mar. 9, 2015) ("New York district courts have . . . recently approved rates for law firm associates in the range of $200 to $450 per hour."); *Dweck v. Amadi*, 10 Civ. 2577 (RMB) (HBP), 2012 WL 3020029, at *4 & n. 5 (S.D.N.Y. July 6, 2012) (collecting cases approving rates between $180 and $440 per hour for associates); *OZ Mgmt.*, 2010 WL 5538552, at *4 (approving rates between $355 and $400 per hour for associates); *Malletier v. Artex Creative Int'l Corp.*, 687 F. Supp. 2d 347, 361 (S.D.N.Y. 2010) ("The hourly rates of $390.00 to $470.00 charged by the associates and junior partner representing Vuitton fall at the very top of the spectrum of reasonable hourly rates for associates."). Accordingly, the Beastie Boys bear the burden of justifying the upward deviation. *See Allende*, 783 F. Supp. 2d at 512. They have, however, carried that burden. In defense of the associates' hourly rates, plaintiffs provided the most recent National Law Journal billing survey. Garrity Decl., Ex. C. It shows that, in 2014, average associate rates at large New York City law firms ranged from $340 to $678 per hour with an overall average of $518 per hour. *See id.* And the lowest rates charged by these firms—presumably, the hourly rates for first-year associates—ranged from $120 to $595 with an average of $318. *See id.* In light of this data, the Court finds that hourly rates averaging $461 to $505 for

second, third, and fourth-year associates were reasonable. That is particularly so where, as here, the associates' work was, for the most part, relatively demanding and complex rather than quotidian (*e.g.*, document review).

Monster also contends that the hourly rates Sheppard Mullin charged for litigation support staff were excessive. Four individuals—Lisa Rodriguez, Stephanie Limbaugh, Giles Mitchell, and Brian Simpson—billed a total of 536.7 hours at rates averaging $204.22 to $254.42 per hour. To justify these rates, Sheppard Mullin explained that Rodriguez, who billed an average of $254.42 per hour, has 25 years of experience. Garrity Decl. ¶ 7. Limbaugh, who billed at an average of $235 per hour, has 14 years of experience and managed the Beastie Boys' courtroom technology in addition to fulfilling paralegal responsibilities. *Id.* ¶ 8. Mitchell, who billed at an average of $215.48 per hour, has more than eight years of experience and assisted with processing and producing electronic discovery. *Id.* ¶ 9. Finally, Simpson, who billed at an average of $204.22 per hour, spent a modest number of hours filing documents and ensuring compliance with local rules. *Id.* ¶ 10.

These rates are indeed higher than those typically approved for paralegals and other litigation support staff. *See, e.g.*, *M. Lady, LLC v. AJI, Inc.*, No. 06 Civ. 0194 (HBP), 2009 WL 1150279, at *7 (S.D.N.Y. Apr. 29, 2009) (collecting cases awarding between $50 and $180 per hour for paralegals); *J.S. Nicol, Inc. v. Peking Handicraft, Inc.*, No. 03 Civ. 1548 (GHD) (AJP), 2008 WL 4613752, at *16 (S.D.N.Y. Oct. 17, 2008) (collecting cases awarding between $100 and $150 for paralegals and other litigation support staff). However, courts in this District have approved rates of $200 per hour for paralegals, *see Broad. Music, Inc.*, 2014 WL 2781846, at *7 (collecting cases), and the Court is prepared to find that rate reasonable here. Indeed, Trial Graphix, the service Monster itself used to manage its courtroom technology, charges between

$195 and $265 per hour. *See* Garrity Decl. ¶ 6; *id.* Ex. E. And the work of Sheppard Mullin's paralegals and support staff was professional and of high quality, as the Court observed. The Court therefore finds that a fee reduction to a $200 per hour rate for such personnel, but no greater reduction, is merited.

###### e.    Aggregate Fee Reduction Based on These Considerations

Considering all of the above factors, the Court's judgment is that a 30% reduction of the fees paid by the Beastie Boys is merited, to ensure that the fee award reflects fees that were the "the minimum necessary to litigate the case effectively." *Simmons*, 575 F.3d at 174. As noted, the Court is not to compensate counsel for unnecessary hours, *Berry*, 632 F. Supp. 2d at 306 (quoting *Hensley*, 461 U.S. at 433–34), and in sizing the appropriate reduction, "the court has discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application," *Black v. Nunwood, Inc.*, No. 13 Civ. 7207 (GHW), 2015 WL 1958917, at *6 (S.D.N.Y. Apr. 30, 2015) (quoting *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998)); *see also In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 226, 237 (2d Cir. 1987) (same). "It is common practice in this Circuit to reduce a fee award by an across-the-board percentage where a precise hour-for-hour reduction would be unwieldy or potentially inaccurate." *Ass'n of Holocaust Victims for Restitution of Artwork & Masterpieces v. Bank Austria Creditanstalt AG*, No. 04 Civ. 3600 (SWK), 2005 WL 3099592, at *7 (S.D.N.Y. Nov. 17, 2005); *see also Kahlil v. Original Old Homestead Rest.*, 657 F. Supp. 2d 470, 476 (S.D.N.Y. 2009) ("It is well established that across-the-board reductions are appropriate when billing records are voluminous and numerous billing entries are in dispute." (citation omitted)).

Fee reductions around 30% are, further, common in this District to reflect considerations of whether work performed was necessary, leanly staffed, or properly billed. *See, e.g., Hines v.*

*City of Albany*, No. 14-2299, 2015 WL 3479820, at \*2–3 (2d Cir. June 3, 2015) (summary order) (affirming 30% reduction in fees based on block billing and other concerns); *Melodrama Publ'g, LLC v. Santiago*, No. 12 Civ. 7830 (JSR) (FM), 2015 WL 2380521, at \*6 (S.D.N.Y. May 19, 2015) (reducing fees by 25% where the hours billed were excessive and partner-heavy); *Genger*, 2015 WL 1011718, at \*2 ("Across-the-board reductions in the range of 15% to 30% are appropriate when block billing is employed."); *De La Paz v. Rubin & Rothman, LLC*, No. 11 Civ. 9625 (ER), 2013 WL 6184425, at \*6 (S.D.N.Y. Nov. 25, 2013) (reducing fees by 30% to account for vague and excessive entries); *Wise v. Kelly*, 620 F. Supp. 2d 435, 452–53 (S.D.N.Y. 2008) (reducing fees 25% because certain entries were too vague for the court to assess their reasonableness).  In this case, the factor most influential to the Court was the partner-intensive nature of the case staffing, but the Court also took account of the other factors addressed above, including instances in which more than one lawyer was assigned to a task without evident justification.  The 30% reduction here, which equates to $715,552.65, leaves fees of $1,669,622.85.

### 2.    Fee Reduction to Reflect Work on the Lanham Act Claim

The Court next turns to a separate issue: the proper reduction to reflect that this litigation—and Sheppard Mullin's corresponding fees—encompassed work on the Lanham Act claim, for which the Court has held fee-shifting unwarranted.  *See Yurman Design, Inc.*, 29 F. App'x at 48 (affirming 80% reduction in fees where plaintiff was entitled to fees under Copyright Act but not Lanham Act).  The issue is the appropriate amount of this reduction.

Anticipating that the Court might find fee-shifting merited only for the Copyright Act claims, Monster proposed a 50% fee cut.  Monster Br. 16 n.6.[9]  But that proposal is simplistic.  It

---

[9] The Beastie Boys did not suggest an alternative percentage cut; rather, they argued that "even if Plaintiffs had not pursued their Lanham Act claims, the scope of fact discovery would have been

ignores the very substantial extent to which the work required to pursue the Lanham Act claim

overlapped with the work required to prevail on the Copyright Act claims. Most obviously, the

two claims arose out of the same operative facts—the creation and dissemination of the Ruckus

video. The fact discovery into these claims thus was almost entirely overlapping. And virtually

all fact witnesses at trial were relevant to both claims. With or without the Lanham Act claim,

trial likely would have been held in this case, with much of the attendant submissions and

preparatory work.

At the same time, certain legal work was particular to the Lanham Act claim. Portions of

some briefs addressed issues relevant only to the Lanham Act claim, *see, e.g.*, Dkt. 174 (brief in

opposition to Monster's post-trial motions), 197 (brief in support of the Beastie Boys' motion for

a permanent injunction); the parties' examinations of witnesses in depositions and at trial about

the Beastie Boys' endorsement practices were directed at that claim; the extended expert

testimony at trial as to the value of an implied endorsement—as opposed to the value of a license

to use copyrighted works—was necessitated by that claim; and the parties summed up

extensively at trial with close attention to the elements of the Lanham Act claim (the only claim

as to which liability was contested), the subsidiary issues of intentional deception and bad faith,

and the quantum of damages for false endorsement. It is fair to assume, too, that a material part

of the jury's deliberations were devoted to the Lanham Act claim.

The Court's unscientific but carefully considered assessment is that a further reduction of

20% of the fees paid by the Beastie Boys is appropriate to strip out the legal work that, but for

---

identical, and expert discovery, the trial, and post-trial proceedings would have been
substantially the same." Beastie Reply Br. 7.

the Lanham Act claim, would not have been done.[10]  This reduction of $333,924.57 leaves a fee

of $1,335,698.28.

### 3.    The Fee Award Consistent With Advancing Statutory Purposes

The Court, finally, considers the extent to which a fee award here would further the goals

of the Copyright Act.

For four reasons, the Court's judgment is that an award to the Beastie Boys of 50% of the

$1,335,698.28 in fees which the Court has found reasonable and necessary to incur on the

copyright claims—*i.e.*, $667,849.14—is appropriate.

First, as discussed earlier, although significant statutory interests are served by a fee

award, there are competing considerations.  A fee award to the Beastie Boys would advance the

goals of compensation and deterrence and reflect Monster's willful infringements, as found by

the jury; it would also reflect the objective unreasonableness of Monster's denial of infringement

until the brink of trial, and its attempt to shift responsibility for infringement to Z-Trip.  But, at

the same time, there are factors disfavoring an award, including that Monster's legal positions at

trial were objectively reasonable, and that the willfulness and other damages-related issues on

which the copyright claims turned at trial presented hard questions as to which reasonable minds

could differ.  These opposite considerations counsel shifting to Monster part, but not all, of the

objectively reasonable fees on the copyright claims.  *Cf. GMA Assocs., Inc.*, 2004 WL 1277997,

at *3 (reducing fee award by 86% where "plaintiff was the prevailing party," but "it was not so

by much").

---

[10] Although the jury's damages verdict is not a reliable proxy for the quantum of legal work, the
Court notes that a 20% reduction is not far afield from the percentage (29%) of the overall $1.7
million damage award which the Lanham Act verdict ($500,000) represented.

Second, the statutory interest of compensation is met by the award the Court issues. On the 10 copyright infringement claims, the Beastie Boys recovered $1.2 million in statutory damages, trumping the alternative finding of $1 million in actual damages. And by the Court's calculations, the Beastie Boys reasonably spent $1,335,698.28 litigating these claims. Without a fee award, the Beastie Boys would be in the red by some $135,698.28, if one compares the copyright damages award to the group's reasonable fee expenditures. An award of $667,849.14 ensures ample net compensation to the Beastie Boys for the infringement of their copyrights: By the Court's measure, plaintiffs would come out ahead by some $532,150.86. The Copyright Act's goal of compensating victims of infringement does not, in the Court's judgment, require a larger net recovery.

Third, the award the Court imposes is sufficient, but not greater than necessary, to deter future would-be infringers. On the copyright claims, Monster is already accountable for the $1.2 million damages award, plus its own legal fees, which assuredly are substantial. A fee award of $667,849.14 adds significantly to the price tag of Monster's infringements. It should lead future parties either contemplating infringement, or designing corporate protocols with respect to the handling of intellectual property, to think twice before disrespecting others' copyright interests.

Fourth and finally, the award chosen here is in harmony with other fee awards in copyright cases, including in this District. In a number of less complex cases involving shorter trials, awards have ranged from about one-quarter to one-half of that imposed here. *See, e.g.*, *Crown Awards*, 564 F. Supp. 2d at 297 (plaintiff awarded $150,024.51 after a one-day bench trial); *Richard Feiner & Co. v. Turner Entm't Co.*, No. 96 Civ. 1472 (RO), 2004 WL 2710054, at *2 (S.D.N.Y. Nov. 23, 2004) (plaintiff awarded $219,577.63 after a four-day jury trial); *In Design v. Lauren Knitwear Corp.*, 782 F. Supp. 824 (S.D.N.Y. 1991) (plaintiff awarded

42

$103,688 after a brief bench trial).  And in copyright cases of comparable duration and

complexity, courts have awarded legal fees consonant with those awarded here.  *See, e.g.,*

*Yankee Candle Co. v. Bridgewater Candle Co., LLC*, 140 F. Supp. 2d 111 (D. Mass.), *aff'd*, 259

F.3d 25 (1st Cir. 2001) (prevailing defendant awarded $890,282.40 following a partial grant of

summary judgment); *ABC, Inc. v. Primetime 24*, 67 F. Supp. 2d 558, 567 (M.D.N.C. 1999),

*aff'd*, 232 F.3d 886 (4th Cir. 2000) (plaintiff awarded $605,240.75 following grant of summary

judgment); *Synapsis Corp. v. Veenstra*, 116 F.3d 486, 486 (9th Cir. 1997) (unpublished

disposition) (prevailing defendant awarded $536,908.10 after grant of summary judgment);

*Fantasy Inc. v. Fogerty*, No. 85 Civ. 4929 (SC), 1995 WL 261504, at *1 (N.D. Cal. May 2,

1995), *aff'd*, 94 F.3d 553 (9th Cir. 1996) (prevailing defendant awarded $1,249,028.66 following

jury trial and appeal to Ninth Circuit and Supreme Court); *Cable/Home Commc'n Corp. v.

Network Prods., Inc.*, 902 F.2d 829, 853 (11th Cir. 1990) (plaintiff awarded $451,789.06 after

grant of summary judgment).  This case required plaintiffs to incur substantial fees, and in

awarding fees, the Court must consider "the complexity and difficulty of the case" and "the

resources required to prosecute the case effectively (taking account of the resources being

marshaled on the other side but not endorsing scorched earth tactics)."  *Arbor Hill*, 522 F.3d at

184.  Given these factors, an award of $667,849.14 is in harmony with these landmarks, whereas

an award of 100% of the fees which the Court has found reasonable and necessary would not be.

Accordingly, the Court approves a fee award to the Beastie Boys of $667,849.14.

**IV.   Costs**

Under the Federal Rules of Civil Procedure, "costs other than attorney's fees" generally

"should be allowed to the prevailing party," "unless a federal statute, these rules, or a court order

provides otherwise."  Fed. R. Civ. P. 54(d)(1).  As noted, the Copyright Act provides that "the

court in its discretion may allow the recovery of full costs by or against any party." 17 U.S.C.

§ 505. For the reasons explained at pages 7–17, *supra*, the Court finds that the Beastie Boys are

entitled to an award of costs under the Copyright Act. In addition, under the Lanham Act, "the

plaintiff shall be entitled" to recover "the costs of the action" where a violation of § 1125(a) of

that statute has been established. 15 U.S.C. § 1117(a). Here, the jury found that Monster's video

created an implied false endorsement in violation of § 1125(a), and the Court upheld the jury's

verdict. *See Beastie Boys*, 2014 WL 6845860, at *22–30. Accordingly, the Beastie Boys are

entitled to recover full costs under both the Copyright Act and the Lanham Act.

Monster challenges the Beastie Boys' costs on a line-item basis. *See* Monster Br. 24–26.

However, the Clerk of Court, not this Court, must resolve those disputes in the first instance. *See*

*Overseas Direct Imp. Co. v. Family Dollar Stores Inc.*, No. 10 Civ. 4919 (JGK), 2013 WL

5988937, at *3 (S.D.N.Y. Nov. 12, 2013). Pursuant to Local Rule 54.1:

> Within thirty (30) days after the entry of final judgment, or, in the case of an appeal
> by any party, within thirty (30) days after the final disposition of the appeal, unless
> this period is extended by the Court for good cause shown, any party seeking to
> recover costs shall file with the Clerk a notice of taxation of costs by Electronic
> Case Filing . . . . A party objecting to any cost item shall serve objections by
> Electronic Case Filing . . . . The Clerk will proceed to tax costs at the time
> scheduled and allow such items as are properly taxable.

Accordingly, the Beastie Boys are directed to present a bill of costs to the Clerk within 30 days

of the final disposition of Monster's appeal or, if no appeal is taken, within 30 days of the entry

of final judgment by this Court. After the Clerk awards costs, the parties will have seven days to

appeal that award to this Court. Fed. R. Civ. P. 54(1)(d); *see also Whitfield v. Scully*, 241 F.3d

264, 269 (2d Cir. 2001); *Balance Point Divorce Funding, LLC v. Scrantom*, No. 13 Civ. 1049

(PKC), 2015 WL 997718, at *2 (S.D.N.Y. Mar. 6, 2015). For the time being, the Court does not

reach the merits of Monster's objections to the tabulation of costs presented by the Beastie Boys.

## CONCLUSION

For the foregoing reasons, the Court hereby awards the Beastie Boys attorneys' fees in the amount of $667,849.14.  The Clerk of Court is directed to terminate the motion pending at docket number 188, and to close this case.

SO ORDERED.

_Paul A. Engelmayer_
Paul A. Engelmayer
United States District Judge

Dated: June 15, 2015
       New York, New York